ACCEPTED
03-14-00416-CV
4941122
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/17/2015 4:32:14 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/17/2015 4:32:14 PM
JEFFREY D. KYLE
Clerk

——————————————————————————

BRADLEY B. WARE,

*Appellant*,

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Appellee*.

——————————————————————————

Appeal from the 53rd Judicial District Court
Travis County, Texas
Cause No. D-1-GN-10-002342

——————————————————————————

BRIEF OF APPELLEE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

——————————————————————————

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

JON NIERMANN
Chief, Environmental Protection Div.

LINDA B. SECORD
Assistant Attorney General
State Bar No. 17973400
Linda.Secord@texasattorneygeneral.gov

April 17, 2015

**TABLE OF CONTENTS**

**Page**

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     REPLY POINT PERTAINING TO ALL OF WARE'S POINTS OF
ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Ware's case is tainted by false assumptions. His permit is limited to a
term of years, but he complains about priority dates as if it were a
perpetual right. He diverts water from a single point far upriver, but he
complains about return flows as if he should have water that is only fully
available where the Brazos meets the Gulf of Mexico. Resting on these
false premises, his entire argument is fatally flawed... . . . . . . . . . . . . . . . . . 8

A.     Term permits are not permanent water rights.. . . . . . . . . . . . . . . . . . 8

B.     A term permit is based on marginal water supplies not in use or
contemplated for near-term use by permanent water rights
holders.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C.     No one has a vested right to the issuance of a term permit or a
renewal of a term permit.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D.     The priority dates for term permits are different from those for
permanent water rights... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E.     Given his circumstances, the BRA return flows are just not
available to Ware.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

F.      Ware's interpretation of §§ 11.1381 and 11.134 is incorrect.. . . . . . 16

G.      Ware's false premises are fatal.. . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.    REPLY TO WARE'S POINT OF ERROR NO. 1. . . . . . . . . . . . . . . . . . . . . 17

A.      There is no merit to Ware's argument that he is entitled to return flows.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B.      There is more than ample support for TCEQ's analysis in this case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.      Agency experts did not provide contrary or improper evidence.. . . . 23

III.   REPLY TO WARE'S POINTS OF ERROR NOS. 2 AND 5. . . . . . . . . . . . 25

A.      In attacking TCEQ's findings, Ware misconstrues Tex. Water Code § 11.046(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.      The broader statutory scheme confirms that Ware's interpretation of Water Code § 11.046(c) is incorrect.. . . . . . . . . . . . . . . . . . . . . . 28

C.      Ware has misinterpreted the Water Code, but even if he were right, the proper interpretation of § 11.1046(c) is not dispositive here. Ware's renewal was denied based on his location; the order can and should be affirmed on that basis.. . . . . . . . . . . . . . . . . . . . 30

IV.   REPLY TO WARE'S POINT OF ERROR NO. 3. . . . . . . . . . . . . . . . . . . . 31

A.      BRA withdrew its protest of Ware's renewal application, but that did not make water available for Ware.. . . . . . . . . . . . . . . . . . . . . . 31

B.      Even if Ware were right that he should have been given a 1997 priority date, it would not matter.. . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.      Ware's cancellation theory is wrong.. . . . . . . . . . . . . . . . . . . . . . . 32

V.       REPLY TO WARE'S POINT OF ERROR NO. 4. . . . . . . . . . . . . . . . . . . . 34

VI.     REPLY TO WARE'S POINT OF ERROR NO. 6. . . . . . . . . . . . . . . . . . . 37

VII.   CONCLUSION: NOT ONLY ARE WARE'S LEGAL THEORIES
WRONG, THE EQUITIES DO NOT FAVOR HIM EITHER.. . . . . . . . . . 38

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# INDEX OF AUTHORITIES

**Cases**                                                 **Page**

*Central Power & Light Co. v. PUC,*
    36 S.W.3d 547 (Tex. App.–Austin 2000, pet. denied). . . . . . . . . . . . . . . . . . 5

*City of Corpus Christi v. Nueces Co. Water Control. & Imp. Dist. No. 3,*
    540 S.W.2d 357 (Tex. Civ. App.–Corpus Christi 1976,
    writ ref'd., n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Consumers Water, Inc. v. PUC,*
    774 S.W.2d 719 (Tex. App.–Austin 1989, no writ). . . . . . . . . . . . . . . . . . . . 5

*H.G. Sledge, Inc. v. Prospective Investment and Trading Co., Ltd.,*
    36 S.W.3d 597 (Tex. App.–Austin 2000, pet. denied). . . . . . . . . . . . . . . . . . 4

*Lower Colorado River Auth. v. Tex. Dep't of Water Res.,*
    638 S.W.2d 557 (Tex. App.–Austin 1982, rev'd. on other grounds,
    689 S.W. 873 (Tex. 1984)). . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 12, 27, *passim*

*Meier Infiniti Co. v. Motor Vehicle Board,*
    918 S.W.2d 95 (Tex. App.–Austin 1996, writ denied). . . . . . . . . . . . . . . . . . 5

*Smith Motor Sales, Inc. v. Texas Motor Vehicle Comm'n,*
    809 S.W.2d 268 (Tex. App.–Austin 1991, writ denied). . . . . . . . . . . . . . . . . 5

*Tex. Water Rights Comm'n v. Wright,*
    464 S.W.2d 642 (Tex. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

**Statutes**

Tex. Gov't. Code
    § 2001.060. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    § 2001.175(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    § 2001.175(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Statutes (cont'd)**                                         **Page**

Tex. Water Code

§ 11.022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

§ 11.025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 11.026 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 11.027 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 11.042 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

§ 11.042(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 11.042(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 11.046 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 29

§ 11.046(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

§ 11.046(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

§ 11.046(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 28, 30

§ 11.046(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

§ 11.046(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

§ 11.121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8,

§ 11.134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

§ 11.134(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

§ 11.134(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 17, 25, 31

§ 11.134(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

§ 11.1351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.1381 . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 16, 17, *passim*

§ 11.1381(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12, 16

§ 11.1381(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

§ 11.146 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 11.147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.1471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 11.171-.186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 11.172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

**Statutes (cont'd)**                                           **Page**

§ 16.012(g)-(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Rules**

30 Tex. Admin. Code

§ 297.19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 297.19(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

§ 297.42(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

**Other References**

Act of Mar. 19, 1917, 35th Leg., R.S., ch. 88, § 72,
        1917 Gen. Laws 211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Act of May 21, 1987, 70th Leg., R.S., ch. 405, § 1,
        1987 Tex. Gen. Laws 1932. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 2.06,
        1997 Tex. Gen. Laws 3610. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 2.07,
        1997 Tex. Gen. Laws 3610. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 26

Martin Hubert and Bob Bullock,
        *Senate Bill 1, the First Big and Bold Step Toward Meeting Texas's*
        *Future Water Needs,* 30 Texas Tech L. Rev. 53 (1999). . . . . . . . . . . . . . . . 29

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary.  This case lends itself to submission on briefs and a Memorandum Opinion.

Throughout the life of this case, from the SOAH hearing to the Commissioner's consideration of SOAH's PFD to the district court, Appellant Ware has made the same fundamentally unsound argument based on a misunderstanding of the type of permit that he holds.  No tribunal has agreed with Ware.  Having lost at every level, he now presents a third round of the same briefing.  Appellee Texas Commission on Environmental Quality submits that these written materials amply illustrate the flaws in Ware's case so that the Court may decide the issues without oral argument.

The Commission welcomes oral argument when the Court deems it useful and asks to be allowed to participate should the Court grant Ware's request.

No. 03-14-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

_____

BRADLEY B. WARE,
*Appellant*,
**v.**

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
*Appellee*.

_____

Appeal from the 53rd Judicial District Court
Travis County, Texas
Cause No. D-1-GN-10-002342

_____

BRIEF OF APPELLEE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

_____

TO THE HONORABLE COURT OF APPEALS:

Appellant Bradley B. Ware ("Ware") appeals the decision of Appellee the

Texas Commission on Environmental Quality ("Commission" or "TCEQ")[1] denying

_____

[1] References to the TCEQ in this brief also refer to its predecessor agencies as applicable for the timeframe being discussed. These would include the Texas Board of Water Engineers, the Texas Water Commission, the Texas Water Rights Commission, the Texas Department of Water Resources, and the Texas Natural Resource Conservation Commission.

1

renewal of his 1997 permit allowing him to divert state water for a term of ten years. The district court order affirmed TCEQ's decision; this Court should affirm as well.

## STATEMENT OF FACTS

In 1997, Ware was issued term Permit No. 5594, which authorized him to divert 130 acre–feet of water per year from the Lampasas River in Bell County, upstream of Stillhouse Hollow Reservoir.[2] This permit was for a "run of the river" right. That means that the permit did not authorize Ware to store water, e.g., in wetter times for use in drier times. Instead, Ware was authorized to divert water directly out of the Lampassas River and use it to irrigate.[3]

The 1997 Permit No. 5594 contains a special condition providing that it was to become null and void on November 7, 2007, unless Ware applied for an extension prior to that time and the extension was subsequently granted.[4] On March 20, 2006, he filed an application to renew or in the alternative to convert his permit to a

---

[2] A copy of the permit is attached to Ware's application, both of which were introduced into evidence in the administrative hearing as Applicant's Exhibit No. 2. *See* Administrative Record ("AR") Vol. 5, Item No. App 2. A copy of Permit No. 5594 is attached at Appendix Tab A.

[3] *Id.* No storage is authorized in the permit and TCEQ authorization to store water is required under Tex. Water Code § 11.121. A copy of the statutes cited in this brief are at Appendix Tab D.

[4] *See* Appendix Tab A (Permit No. 5594, Special Condition 3.b., p. 2).

2

permanent water right.[5]  The staff of the TCEQ Executive Director ("ED") reviewed Ware's application using the Water Availability Model for the Brazos River Basin for current conditions, i.e., for water availability (including all water use and return flows) as of 2006, and determined that there was not enough water available to grant the application for either a permanent or a term permit.[6]  The ED recommended denial and the matter was heard in an evidentiary hearing conducted by a SOAH Administrative Law Judge ("ALJ")[7] who issued a Proposal for Decision ("PFD") recommending denial.[8]  The TCEQ Commissioners denied Ware's application by order dated April 23, 2010.[9]  The district court affirmed the agency's decision in an order issued June 11, 2014.[10]

## STANDARD OF REVIEW

Ware's brief lacks a statement of the standard of review but his argument repeatedly focuses on a lack of substantial evidence to support the order or on

---

[5]  AR, Vol. 1, Item No. 1E (letter from Kathy Hopkins, TCEQ Project Manager, to Bradley Ware).

[6]  AR, Vol 5, Exhibit App. 47 (Water Availability Review Memorandum); Testimony.of Jeffrey Thomas, AR Vol. 7, (Transcript Vol.1), p. 82.

[7]  *See* Transcripts, AR Vol. 7 (October 28, 2009) and Vol. 8 (October 29, 2009).

[8]  *See* PFD, pp. 28–29, AR, Vol. 4, Item No. 58A. A copy of the PFD is at Appendix Tab B.

[9]  AR, Vol. 4, Item No. 64 (TCEQ's Final Order).  A copy is at Appendix Tab C.

[10]  CR at 446.

references to the contents of the record to support his claims. He also frequently asserts that the agency decision is arbitrary and capricious, an abuse of discretion, and tainted by unlawful procedure and an incorrect interpretation of the Water Code. All of this indicates Ware's recognition that because this is a suit for judicial review of a TCEQ order issued after a contested case hearing at the State Office of Administrative Hearings ("SOAH"), the substantial evidence standard of review applies.

Reflecting our constitutional commitment to keeping the powers of three co-equal branches of government separate, "substantial evidence review" is a standard of review that governs the relationship between the executive branch's state agencies and the judiciary. Under this standard of review, agency orders are deemed valid, findings of fact are reviewed for support by substantial evidence, legal conclusions are reviewed for errors of law, and the proper test is whether the evidence in its entirety is such that reasonable minds could have reached the conclusion that the agency must have reached to justify its decision or whether the agency acted arbitrarily and without regard to the facts.[11] As to what the facts are, the agency is the

_____

[11] *H.G. Sledge, Inc. v. Prospective Investment and Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

sole judge of the weight of the evidence and the credibility of the witnesses.[12]

Challenges to agency orders often contain "arbitrary and capricious" claims. This Court has explained that agency actions challenged as arbitrary and capricious are reviewed for abuse of discretion.[13] Thus, in performing substantial evidence review of an agency decision, reviewing courts often use the abuse of discretion standard to determine whether an agency committed error. Under the abuse of discretion standard, a court (or agency) abuses its discretion if it acts without reference to any guiding rules or principles.[14]

Courts conducting substantial evidence review do not second-guess an agency. This Court has long held that it is the agency that determines which factors to consider, how much weight to give each, and how to weigh conflicting evidence.[15]

In this case, Ware often tries to avoid the effect of the substantial evidence standard of review by describing the agency as misinterpreting the Water Code or using an unlawful procedure. Even if he were right, these complaints are just one

---

[12] *Central Power & Light Co. v. PUC*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied).

[13] *Consumers Water, Inc. v. PUC*, 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ).

[14] *Smith Motor Sales, Inc. v. Texas Motor Vehicle Comm'n*, 809 S.W.2d 268, 270 (Tex. App.—Austin 1991, writ denied).

[15] *Meier Infiniti Co. v. Motor Vehicle Board*, 918 S.W.2d 95, 100 (Tex. App.—Austin 1996, writ denied) ("[t]his Court will neither substitute its own judgment as to which factors the agency should consider to be the most important nor make a de novo determination of good cause.").

type of error that an agency can commit. Allegations of such error fit within the substantial evidence standard of review. Indeed, the APA specifically mentions errors of law and unlawful procedure in its list of reversible error.

This case does not require the Court to test the limits of this standard of review. The record amply supports the order. The agency's legal conclusions are correct and in accord with the judicial and legislative directives providing that term permits, such as Ware's, cannot infringe on permanent water rights. Further, no unlawful procedures were used, nor any constitutional or statutory provisions violated.

## SUMMARY OF THE ARGUMENT

Virtually all of Ware's arguments flow from two broad complaints: (1) that TCEQ analyzed the amount of water available for the renewal of his term water rights permit based on what he contends is an incorrect priority date; and (2) there is additional water in the Brazos River Basin that could have been allocated to his application. For both of these complaints, Ware compares his application with that of the Brazos River Authority ("BRA"), who holds a permanent water right and operates a system of reservoirs throughout the Brazos River basin.

Ware holds a specialized type of water use permit known as a "term" permit. His 1997 term permit had a renewal provision but could not be renewed because agency staff concluded—using a legislatively mandated computer model as well as

6

information and theories put forth by Ware—that there was not enough water available at his diversion point to grant him another term. In urging that there was enough water, Ware insists that BRA's application indicated that there was water in the form of "return flows" that could and should have been allocated to Ware under a "priority date" senior to BRA. These aspects of water rights—term permits, their priority dates, and return flows—are the core of this case.

Legally, his arguments are based on the flawed assumption that the law requires TCEQ to grant a permit or renewal under the conditions he describes in his brief. The law does no such thing. He also misapprehends the legal nature of a term permit as compared to the nature of a permanent water right, and so he misconstrues what his rights are and what the significance of a priority date is for a term permit. Finally, he incorrectly views the return flows associated with BRA's application (for want of a better term, "BRA's return flows") as available to him. Ware makes this mistake because he fails to appreciate that the circumstances of his water use are very different from BRA's.

# ARGUMENT

## I. REPLY POINT PERTAINING TO ALL OF WARE'S POINTS OF ERROR

**Ware's case is tainted by false assumptions. His permit is limited to a term of years, but he complains about priority dates as if it were a perpetual right. He diverts water from a single point far upriver, but he complains about return flows as if he should have water that is only fully available where the Brazos meets the Gulf of Mexico. Resting on these false premises, his entire argument is fatally flawed.**

### A. Term permits are not permanent water rights.

No one may take, store, or divert State Water (water in rivers, lakes, creeks, or in the Gulf of Mexico) without authorization from the TCEQ.[16] The Water Code authorizes a number of different types of water rights, including what are called "permanent water rights"[17] and water rights granted under what are called "term permits."[18]

A permanent water right is an incorporeal right to use water.[19] The right vests in the water rights holder to the extent that the holder makes (and continues to make)

---

[16] Tex. Water Code § 11.121. There are exceptions to the requirements of § 11.121, but they are not applicable to the case at bar.

[17] TCEQ derives its general authority to issue water rights permits under Tex. Water Code §§ 11.022, 11.121, 11.134, and other provisions in Chapter 11 of the Code.

[18] Term Permits are authorized under Tex. Water Code § 11.1381.

[19] *Lower Colorado River Auth. v. Tex. Dep't of Water Res.,* 638 S.W.2d 557, 562 (Tex. App.—Austin 1982), *rev'd. on other grounds*, 689 S.W.2d 873 (Tex. 1984), (citing *Tex. Water Rights Comm'n v. Wright,* 464 S.W.2d 642 (Tex. 1971)).

8

beneficial use of the water in accordance with the terms of the permit.[20] It is subject to forfeiture or cancellation for nonuse.[21] It is subject to loss by prescription.[22] Nevertheless, to the extent that a permit holder continues to make beneficial use of the water authorized for a permanent water right, the right continues in effect.[23]

A term permit, on the other hand, is just what its name implies. It is a right to use water for a term of years.[24] Unlike a permanent water right, a term permit does not continue in effect so long as the water authorized under the permit continues to be put to beneficial use. Both Tex. Water Code § 11.1381 and the TCEQ rule addressing term permits at 30 Tex. Admin. Code § 297.19[25] contemplate that term permits are for a term of years, not a perpetual right. As noted above, Ware's Permit No. 5594 stated that it became null and void on a certain date if an application to

---

[20] *See* Tex. Water Code §§ 11.022, .025, and .026. *See also*, *Wright,* 464 S.W.2d at 647–48.

[21] *See* Tex. Water Code § 11.146 (forfeiture for failure to commence construction of necessary dams and facilities to use the water) and §§ 11.171–.186 (cancellation for nonuse).

[22] *City of Corpus Christi v. Nueces Co. Water Control. & Improvement Dist. No. 3,* 540 S.W.2d 357, 375-76 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd., n.r.e.).

[23] *See Wright*, 464 S.W.2d at 649, where the Texas Supreme Court held permits were "grants to the permittees of usufructuary rights to the State's water upon the implied condition subsequent that the waters would be beneficially used."

[24] Tex. Water Code § 11.1381(a); 30 Tex. Admin. Code § 297.19(a). A copy of the rules referenced in this brief is at Appendix Tab H.

[25] 30 Tex. Admin. Code § 297.19. Water Code §§ 11.153–.155 referenced in § 297.19 relate to a specialized use of water under term permits (aquifer storage). These Water Code sections are not germane to the case at bar.

renew was not timely filed and if the renewal was not granted.[26]

## B. A term permit is based on marginal water supplies not in use or contemplated for near–term use by permanent water rights holders.

In order for TCEQ to grant an application for a permanent water right, TCEQ must find that there is unappropriated water available in the "source of supply," i.e., in the stream from which the would–be permittee wants to take water.[27] In 1984, the Texas Supreme Court construed that Water Code requirement in *Lower Colorado River Authority. v. Texas Department of Water Resources* (also called the "Stacy Dam case,").[28] In the Stacy Dam case, the Colorado River Municipal Water District ("CRMWD") applied for a permit to construct what is now O. H. Ivie Reservoir in Coleman, Concho, and Runnels Counties. There was insufficient water available in the Upper Colorado River to permit the reservoir unless TCEQ took into account water that was permitted to the Lower Colorado River Authority ("LRCA") but was not being used by LRCA. TCEQ granted CRMWD's permit application over LCRA's protest and LCRA appealed.

The Texas Supreme Court reversed the agency's decision and the judgments of both the district court and the court of civil Appeals. The Court held that TCEQ

---

[26] *See* Permit No. 5594, Special Condition 3.a , p. 2.

[27] *See now* Tex. Water Code § 11.134(b)(2).

[28] 689 S.W.2d 873 (Tex. 1984).

10

must take into account the entire amount of water already permitted in the stream when considering a new application for a water right. TCEQ could not base the new permanent water right on water that was permitted to others but was not being used. The Court held that in amending certain water laws, the Legislature had "explicitly shown its purpose to interdict 'double permitting' of water."[29]

After the Stacy Dam opinion was issued, the Legislature authorized the issuance of term permits under what is now codified as Water Code § 11.1381.[30] As noted above, § 11.1381 allows TCEQ—in its discretion—to authorize temporary use of water that is already permitted to others but is not being used.[31] TCEQ witness Kathy Alexander explained it in her testimony before SOAH in this case:

> [A]n appropriative [i.e., permanent] water right is a water right that gets water that's never been given to anyone else before. A term water right is . . . an authorization to use water that we've previously given to someone else which they're either not using in whole or in part.[32]

This reflects the language of the applicable TCEQ rule, which provides that TCEQ may issue a term permit for appropriated water when there is insufficient

---

[29] 689 S.W. 2d at 878.

[30] Act of May 21, 1987, 70th Leg., R.S., ch. 405, § 1, 1987 Tex. Gen. Laws 1932. A copy is at Appendix Tab F.

[31] Section 11.1381(a) says in part, "The commission *may* issue permits for a term of years for use of state water to which a senior water right has not been perfected." (Emphasis added.)

[32] Testimony of Dr. Kathy Alexander. AR. Vol. 8, (Transcript, Vol. 2), p. 345, ln. 6–11.

*un*–appropriated water available to satisfy an application, *i.e.,* for a permanent water right.[33] Clearly, the unused water must be there in order for TCEQ to authorize a term permit or permit renewal.[34] TCEQ does perform an analysis to determine if there is water available for a term permit. TCEQ staff performs a simulation on its water availability model, called a "current conditions" run.

## C. No one has a vested right to the issuance of a term permit or a renewal of a term permit.

It is important to note that absolutely nothing in the law mandates the issuance or renewal of a term permit. The Water Code says TCEQ "may" issue term permits,[35] as does the relevant TCEQ rule.[36] Term permits are a means for TCEQ to promote what TCEQ determines to be optimum use of the State's water resources while holders of permanent rights develop their rights to use the water. Term permits were not—and under the Stacy Dam case, they could not be—intended as perpetual grants of water rights.

---

[33] *See* 30 Tex. Admin. Code § 297.19(a).

[34] *Id.*

[35] Tex. Water Code § 11.1381(a).

[36] 30 Tex. Admin. Code § 297.19(a).

12

**D. The priority dates for term permits are different from those for permanent water rights.**

Ware relies heavily on the doctrine that in water rights, first in time is first in right. But Ware fails to appreciate that term permits are subordinate to permanent permits. Water Code § 11.1381(d) states that "[a] permit issued under this section is subordinate to any senior appropriative water rights." The term "any" and the use of the plural "senior appropriative water rights" was best characterized by TCEQ hydrologist Dr. Kathy Alexander, who testified that a term water right is a second class permit.[37]

As discussed more fully below, in determining which water user is "first in time," term permits and permanent water rights do not mix. A term permit will trump other, later, term permits. A permanent water right will trump other, later, permanent water rights. But a permanent water right will always trump a term permit. Each type of water right has its own timeline for determining who is first. The priority dates for term permits such as Ware's are not dots occurring on the same timeline as for permanent water rights such as BRA's.

Ware also fails to understand another aspect of priority dates. While Ware's 1997 term permit's priority date clause gives him a first in time right over other term

---

[37] Testimony of Dr. Kathy Alexander. AR Vol. 8, (Transcript, Vol. 2), p. 345, ln.12-15.

permits with later priority dates, that 1997 date is only important if a new term is authorized. Because term permits may only authorize water that is available on the margins, any renewal request must be judged based on the water available for the renewal term. In deciding whether to authorize a renewal, TCEQ must look at current conditions and use a priority date related to the renewal application. Had there been water available and the renewal issued, Ware would have then benefitted from his 1997 date vis a vis other term permit holders.

Thus, Ware's insistence on 1997 as his priority date as a date that should have led to his renewal being granted is wrong on two fronts. That 1997 date does not put Ware's term permit date ahead of BRA's permanent water right nor does it play any part in determining water availability for the renewal term requested.

E.     **Given his circumstances, the BRA return flows are just not available to Ware.**

The extra water that Ware claims was available for him was, from a hydrological and legal standpoint, not really there at his location on the river for direct diversion from the Lampasas River when and where he wants. Water rights can seem metaphysical: someone can see water flowing past his farm and be told that he cannot have it, even if there seems to be plenty. But that is because it may already have been appropriated to someone else who lives downstream. The Commission is

14

charged with protecting that someone else and with managing all of the water in the entire basin of a Texas river. It is a delicate balance between protecting permanent water rights and issuing term permits to avoid waste of water that those permanent rights holders are not currently using.

In this case, the Commission could not strike the balance in Ware's favor for several reasons.[38] First, Ware does not create any return flows from the water that he diverts. Second, he directly diverts from a single point far upstream from the mouth of the Brazos at the Gulf of Mexico. Third, as a term permit holder, he is subordinate to all holders of permanent water rights.

These factors all work against Ware's obtaining any BRA return flows. BRA manages many reservoirs but Ware has no storage to tap into to cover shortages. With his upriver diversion point, the BRA return flows (only fully available hydrologically at the Gulf) are not counted as available to him. And he is subordinate to BRA and all other permanent water rights holders. As the Commission explained, the BRA return flows were already reserved for downstream use when Ware sought renewal and were needed for the overall management of the basin.[39]

---

[38] Perhaps the clearest explanation of the issues in this case is the ED's Response to Ware's written closing arguments after the close of the SOAH evidentiary hearing. It is Item 57 in Volume 4 of the administrative record; a copy is at Appendix Tab I.

[39] AR, Vol. 4, Item No. 57, p. 6.

15

**F.      Ware's interpretation of §§ 11.1381 and 11.134 is incorrect.**

Both in Point of Error No. 2 and Point of Error No. 5, Ware proceeds from the false assumption that § 11.1381 relating to term permits and § 11.134 relating to TCEQ consideration of permit applications somehow *require* TCEQ to issue permits if certain conditions are met. A cursory look at the black letter law demonstrates that this is not the case.

The term permit statute says that TCEQ "may"grant term permits.[40]  There is no "shall" associated with the granting of term permits in that section or elsewhere in the statutes. And, while Ware discusses Water Code § 11.134(b) at length in his brief, he fails to quote—or even mention – § 11.134(a). Subsection (b), which Ware does discuss, merely provides that TCEQ may *not* grant a permit application unless certain conditions are met. Subsection (a), though, is key to determining what TCEQ's obligations are under § 11.134. Subsection (a) indicates that TCEQ has no obligation to grant Ware's permit renewal:

> (a)     After the hearing, the commission shall make a written decision granting or denying the application. *The application may be granted or denied in whole or in part.*[41]

Indeed, when one considers the entire statutory scheme relating to water rights, it is

---

[40]  Tex. Water Code § 11.1381(a).

[41]  Tex. Water Code § 11.134(a).  (Emphasis added.)

16

apparent that the focus is on insuring that the granting of new or amended rights does not adversely impact senior water rights holders and the environment. Water Code § 11.134(b) provides that TCEQ *may not* grant a permit unless a litany of conditions listed therein are fulfilled and a litany of other items are considered first. Water Code § 11.1381 also contains express prohibitions against granting a term permit if certain conditions are present. Water Code § 11.1351 expressly allows TCEQ to place restrictions on permits that are granted. Sections 11.147, 11.1471, 11.1491, 11.150, and 11.152 all relate to obligations that TCEQ has to protect the environment and water quality when considering permits. Section 11.151 requires TCEQ to consider the groundwater impacts of an application.

## G.     Ware's false premises are fatal.

Because Ware's argument is infused by and tainted with misunderstanding of term permits, priority dates, the availability of return flows, and the TCEQ's obligation to grant permits, it should be rejected by this Court as it was by the SOAH ALJ, the agency, and the district court.

## II.  REPLY TO WARE'S POINT OF ERROR NO. 1

## A.     There is no merit to Ware's argument that he is entitled to return flows.

On pages 13–15 of his brief, Ware argues that a 2008 TCEQ analysis for a Brazos River Authority ("BRA") permit application found approximately 74,000

acre–feet of return flow water available for appropriation in the Brazos Basin. He complains that none of these flows were allocated to him, *i.e.*, that TCEQ did not consider these flows as being available for him to take. TCEQ expert Kathy Alexander explained why these return flows were not allocated to Ware. Dr. Alexander testified:

> The only water that would be available for Mr. Ware's application would be those return flows that could exist or not in the watershed of the Lampasas River and our current conditions model does include those return flows as part of flow and even with those return flows in the model, we still could not find water available for Mr. Ware's application.[42]

Regarding the 74,000 acre–feet of return flows themselves, Dr. Alexander testified that they were:

> [T]he result of different return flow locations throughout the [Brazos River] basin and the availability analysis was done at the Brazos River Authority's requested diversion point at the Gulf of Mexico, which is the most downstream place in the river basin, and the Executive Director had also recommended that prior to reuse of any of these return flows that the Brazos River Authority submit an accounting plan and a water management plan and a whole host of other items that would limit or direct how these flows would be used.[43]

Dr. Alexander also testified that BRA might be able to divert water downstream of its 12 reservoirs as opposed to down at the Gulf of Mexico. She explained that was

---

[42] Testimony of Dr. Kathy Alexander. AR, Vol. 8, (Transcript, Vol. 2), p. 384, ln. 1–7.

[43] *Id.,* p. 360–61, ln. 3-13.

possible because BRA has a number of large permitted reservoirs and, "should a shortage occur . . . as a result of diversions of those return flows, the BRA has a number of sources and a system operation permit that would allow them to make up those shortages in downstream senior water rights."[44] When asked why Ware could not do that, Dr. Alexander testified:

> Mr. Ware's application is a direct diversion from the stream. If he were taking other people's water, there's no way for him to give it back without reservoir storage or some other option.[45]

Dr. Alexander's testimony on the lack of available water quoted above is consistent with the policy expressed in TCEQ's "75–75 Rule", which provides in relevant part as follows:

> For the approval of an application for a direct diversion from a stream without sufficient on or off channel water storage facilities for irrigation, approximately 75% of the water requested must be available approximately 75% of the time when distributed on a monthly basis and based upon the available historic stream flow record. . .[46]

TCEQ staff's water availability review showed that 75% of the water Ware was requesting would be available in only 5.2% of the years of the period of record.[47]

---

[44] *Id.,* p. 361, ln. 7–20.

[45] *Id.,* p. 361, ln. 21–25.

[46] 30 Tex. Admin. Code § 297.42(c).

[47] *See* Water Availability Review. AR, Vol. 5, Item No. App. 47, p. 1.

TCEQ may grant an exception to the "75–75 Rule" provided the applicant "can demonstrate that a long-term, reliable, alternative source or sources of water of sufficient quantity and quality are economically available to the applicant to make the proposed project viable and ensure the beneficial use of state water without waste."[48] In this case, TCEQ staff suggested to Ware that he secure an alternate source of water in a letter dated March 20, 2006.[49] However, Ware provided no evidence of alternate sources that would satisfy the requirements of this exception.

**B.      There is more than ample support for TCEQ's analysis in this case.**

The record is replete with support for TCEQ's analysis in this case. The applicable law supports it as well. In 1997, the Texas Legislature enacted an omnibus water bill known as "Senate Bill 1."[50] As part of Senate Bill 1, the Legislature required TCEQ to "obtain or develop an updated water availability model" for all river basins in Texas by December 2001 and, upon developing the models, to provide comprehensive new information to water rights holders and water planners about water availability and potential environmental impacts of drought.[51]

---

[48]  30 Tex. Admin. Code § 297.42(c).

[49]  AR, Vol. 6, Item No. ED 5, p. 1.

[50]  Act of June 1, 1997, 75th Leg., R.S., ch. 1010 § 2.07, 1997 Tex. Gen. Laws 3610. A copy is at Appendix Tab G.

[51]  *Id.* at 3679–80, § 7.01, codified as Tex. Water Code § 16.012(g)–(j).

20

The model software was developed and revised by Dr. Ralph Wurbs from Texas A&M University.[52] The model was the collaborative work of consultants, TCEQ, the Texas Water Development Board, environmental agencies, and others.[53] Hydrology witness Jeffrey Thomas, a registered professional engineer and registered professional geologist who had performed water availability analyses for TCEQ for over 10 years at the time,[54] testified that, to his knowledge, the Brazos water availability model was the most accurate method of determining water availability that was available at the time of the hearing.[55]

Both Mr. Thomas and Dr. Kathy Alexander (who at the time was a doctoral candidate, who had a Masters of Science in Applied Geography, Water Resource, and Environmental Management, who had worked on water availability model development teams and worked as a hydrologist for TCEQ for almost 10 years )[56] testified that extending the period of record for the model, as Ware's witness Sam Jones suggested, would only add data that was within the range of water variability

---

[52] Testimony of Jeffrey Thomas. AR, Vol. 7 (Transcript Vol. 1), p. 73, ln. 17–19.

[53] *Id.,* p. 176, ln. 7–10.

[54] Resume of Jeffrey C. Thomas, P.E., P.G. AR, Vol. 6, Item ED-1.

[55] Testimony of Jeffrey Thomas. AR, Vol. 7 (Transcript Vol. 1), p. 174, ln. 5–9.

[56] Resume of Kathy Alexander. AR, Vol. 6, Item ED-6.

already contemplated by the model.[57]

In contrast to the testimony of Mr. Thomas and Dr. Alexander, the testimony of Ware's technical witness, Mr. Sam Jones, lacked credibility. Mr. Jones conceded that he was not an expert on the TCEQ's water availability models.[58] While he worked in TCEQ's water rights adjudication program, he admitted that he did not work with models in that job.[59] He admitted that he had never worked with any type of model or any other analytical framework to determine whether there was water available in a stream in the manner used by TCEQ.[60]

Ware claims that the Commission ignored record evidence and that the only reliable evidence favors him. Not so. Neither the SOAH ALJ nor the TCEQ Commissioners was persuaded by Mr. Jones's testimony and by Ware's theory that he should have been given some of the water identified in BRA's application as return flows—water with a diversion point far from Ware's location and subject to a very different type of permit including a water management plan for ensuring that other water rights are protected.

---

[57] Testimony of Jeffrey Thomas. AR, Vol. 7 (Transcript Vol. 1), p. 114, ln. 6–p. 115, ln. 25; *Id.*, p. 176, ln 2–p. 177, ln. 1. Testimony of Kathy Alexander. AR, Vol. 8 (Transcript Vol. 2), p. 346, ln. 19–p. 348, ln. 3.

[58] Testimony of Samuel W. Jones. AR, Vol. 7 (Transcript, Vol. 1), p 219, ln. 15–18.

[59] Testimony of Samuel W. Jones. AR, Vol. 7 (Transcript, Vol. 1), p. 220, ln. 15–17.

[60] Testimony of Samuel W. Jones. AR, Vol. 8 (Transcript, Vol. 2), p. 294, ln. 3–12.

Ware's evidentiary arguments under Point of Error No. 1 are actually a statement of his disagreement with the conclusions TCEQ reached on the evidence, not on a lack of evidence to support TCEQ's decisions nor on the agency ignoring the record evidence. The record evidence amply supports the Commission's decision not to allocate to him the BRA return flows that are the subject of Ware's Point of Error No. 1. He cannot ask the Court to substitute the Court's—or his—findings on the evidence for those of the agency.

## C.   Agency experts did not provide contrary or improper evidence.

At pages 15-17 of his brief, Ware asserts that TCEQ's decision was based on an unlawful procedure occurring at the open meeting in which the TCEQ Commissioners considered the PFD from the SOAH ALJ. Ware claims that agency staff responded to questions from the Commissioners with statements that were contrary to their testimony at the SOAH hearing and that the Commissioners in turn treated these answers as evidence. Ware's claim is meritless.

First, Ware's claim cannot be substantiated because he did not request that the transcript of the Commissioner's meeting be included in the administrative record. The Administrative Procedure Act does not list transcripts of these open meetings as a necessary part of the record, and they are not usually included.[61] But Ware did not

---

[61] Tex. Gov't Code § 2001.060.

23

even try to have a transcription included by utilizing the statutory provision authorizing a court to permit additions to the record.[62]

Second, although Ware tags it an unlawful procedure, there is nothing improper about the Commissioners asking questions and receiving answers from staff at an open meeting. From Ware's unsubstantiated description of the exchange, the questions were about the record, which is the very point of such a public meeting.

Third, Ware's unsubstantiated description of staff answers do not demonstrate that they contradicted earlier testimony before SOAH. According to Ware, Dr. Alexander told the Commissioners that the BRA return flows were considered in determining water available for Ware. At the SOAH hearing, Ware's counsel asked if the ED had run any analysis using the information Ware put forward through its witness Mr. Jones or had asked TCEQ expert Mr. Thomas about. Dr. Alexander answered that they had.[63] Ware's case focused heavily on return flows. Dr. Alexander said that the ED had run an analysis using information from Ware's witnesses; that surely included return flows. Clearly, staff had considered Ware's attack on their 2006 Water Availability Memorandum (Applicant's Exhibit 47) and determined that his information did not change the unfortunate reality that there is not

---

[62] Tex. Gov't Code § 2001.175(b).

[63] Testimony of Dr. Kathy Alexander. AR, Vol. 8, (Transcript Vol. 2), p. 370, ln. 12-22.

enough water to grant his renewal request. Dr. Alexander did not contradict this testimony when she answered Commissioners questions.

## III. REPLY TO WARE'S POINTS OF ERROR NOS. 2 AND 5

In Points of Error Nos. 2 and 5, Ware cites to a number of statutes, but particularly to Texas Water Code §§ 11.1381 (relating to term permits), 11.046(e) (relating to return of surplus waters to streams), and 11.134(b) (relating to TCEQ's consideration of permit applications). He attempts to weave those statutory provisions into evidentiary arguments he makes about water availability, apparently in an attempt to suggest that he has some entitlement to receiving a permit renewal based on these statutes. Ware is wrong.

## A. In attacking TCEQ's findings, Ware misconstrues Tex. Water Code § 11.046(c).

In Point of Error No. 2, Ware attacks the Commission's Finding of Fact No. 44, which states:

> 44. The addition of "new water," if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder[s] and could not be treated as available for new allocation.[64]

Ware argues that this finding is inconsistent with language in Tex. Water Code

---

[64] TCEQ's Final Order. AR, Vol. 4, Item No. 64, p. 5.

25

§ 11.046(c),[65] but in so doing, Ware misconstrues the statute.

Section 11.046(a) provides that surplus waters be conducted back to streams by gravity flow, whenever practicable. That language has been in the Texas statutes—virtually unchanged—since at least 1917.[66] The Legislature added Subsections (b), (c), and (d) to the statute in 1997 as part of Senate Bill 1.[67]

Notably, § 11.046(b) authorizes TCEQ to place conditions on any permit that requires certain percentages of water to be returned to streams at certain places, "*to protect senior downstream permits, certified filings, or certificates of adjudication or to provide flows for instream uses or bays and estuaries.*"[68] Section 11.046(b) does not allow TCEQ to reserve water for *new* permit holders or *junior* permit holders; it speaks in terms of protecting *senior* water rights holders, of allowing surplus water to flow to *senior* water rights holders.

The first part of Water Code § 11.046(c) provides that a water rights holder may use and reuse the water allocated under the permit as provided in the permit, but

---

[65] Ware's Brief at 20-21. Ware also discusses § 11.046(e) in more detail in his Point of Error No. 5. *See* Ware's Brief at 32-38.

[66] Act of Mar. 19, 1917, 35th Leg., R.S., ch. 88, § 72, 1917 Tex. Gen. Laws 211, 229. A copy is at Appendix Tab E.

[67] Act of June 1, 1997, 75th Leg., R.S., ch. 1010 § 2.07, 1997 Tex. Gen. Laws 3610, 3620. A copy is at Appendix Tab G. A copy of Tex. Water Code § 11.046 in its current form (unchanged from 1997) is at Appendix Tab D.

[68] (Emphasis added.)

26

it is the second part of Water Code § 11.046(c) that Ware emphasizes—and misconstrues. It provides as follows:

> Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows *or to appropriation by others* unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.[69]

Ware contends both in Point of Error No. 2 and Point of Error No. 5 that return flows should be available to him under a term permit by virtue of this language.[70] But there are several flaws in his reasoning. First, Ware seeks a term permit (or renewal of a term permit). As discussed at the beginning of this brief, a term permit is given for water that is already subject to appropriation by another person but is simply not being used at present. There is no law that allows a person to appropriate another person's water under a term permit. As discussed above, the Stacy Dam decision would prohibit that.

Additionally, the term "appropriation by others" in § 11.046(c), when read in context with the rest of the statute, clearly does not mean surplus water released into a river is somehow preserved for use by junior water rights holders or term permit

---

[69] (Emphasis added.)

[70] Ware's Brief at 20-21; 32-38.

holders when there are substantial numbers of senior water rights holders who *do have* senior rights to appropriate water in the river.[71]  And that is the case in the Brazos Basin.  It is undisputed that there are rights on the Lampasas River and downstream on the Brazos River that are senior to Ware's claimed 1997 priority date.

**B.     The broader statutory scheme confirms that Ware's interpretation of Water Code § 11.046(c) is incorrect.**

As noted above, the additions to § 11.046, including Subsection (c), were part of Senate Bill 1.  Related changes were made to Tex. Water Code § 11.042, relating to the movement of groundwater and surface water down the bed and banks of Texas streams.[72] Section 11.042 as amended by Senate Bill 1 provided TCEQ with authority to impose restrictions on the use of river beds and banks for the conveyance of water, including water that originated in streams and water that originated in underground aquifers. TCEQ was authorized to impose restrictions to protect water rights in the streams and to address environmental issues as well.[73]  The purpose of amendments to §§ 11.042 and 11.046 were explained in a commentary by Martin Hubert, general counsel to former Lieutenant Governor Bob Bullock, and Governor Bullock

---

[71] As Ware emphasizes in his brief, the law provides that "As between appropriators, the first in time is first in right."  Tex. Water Code § 11.027.

[72] Act of June 1, 1997, 75th Leg., R.S., ch. 1010, § 2.06, 1997 Tex. Gen. Laws 3610, 3620. A copy is at Appendix Tab G.

[73] Tex. Water Code § 11.042(b) and (c).

28

himself.[74] The authors explained these changes in the context of water reuse. They wrote:

> While reuse has been proven to decrease the total amount of water needed by a user, it also decreases the amount of water available to downstream users because more water is reused and less water is discharged. As a result, there is less water available for the environmental needs of instream flows, bays, and estuaries. Additionally, less water is available to downstream users dependent on discharged water. These situations present an especially critical problem in already over-appropriated rivers and streams.[75]

Specifically citing both §§ 11.042 and 11.046 in a footnote, they continued:

> S.B. 1 addresses this situation by balancing the needs of upstream and downstream interests.

The changes to § 11.046 cited by Ware were not made to insure that junior water rights holders and term permit applicants were guaranteed an increment of water. They were made to balance the needs and interests of existing senior appropriators and the environment in the face of growing demand for water recycling.

Finally, Ware improperly attempts to bolster his argument by claiming that the ALJ who heard the BRA application accepted Ware's interpretation of § 11.046 and rejected the ED's interpretation.[76] But the ALJ said that he disagreed with both

---

[74] Martin Hubert and Bob Bullock, *Senate Bill 1, the First Big and Bold Step Toward Meeting Texas's Future Water Needs,* 30 Texas Tech L. Rev. 53 (1999).

[75] *Id.* at 62 (footnotes in text omitted).

[76] Ware's brief at 36, relying on Ware's Exhibit I.

parties' competing analyses, so Ware's reliance is misplaced.[77]  Moreover, Ware

himself has said that the BRA matter was remanded to SOAH, so it remains to be

seen how much of the first BRA PFD remains intact.

**C.     Ware misinterprets the Water Code, but even if he were right, the proper interpretation of § 11.046(c) is not dispositive here.  Ware's renewal was denied based on his location; the order can and should be affirmed on that basis.**

At Finding of Fact No. 45, the TCEQ order denying Ware's renewal finds that

BRA's requested return flows become available only at the furthest downstream point

in the Brazos River basin.  This is in accord with the testimony of Dr. Kathy

Alexander, who performed the water availability analysis for the BRA application and

testified that the analysis used a diversion point of the Gulf of Mexico, the furthest

downstream point.[78]  Ware's diversion point is well upstream from that.  The return

flows are simply not available to him.

This was more fully explained by the ED in his response to Ware's written

closing arguments at SOAH.

> The Executive Director did include the return flows in the modeling used in the review of Applicant's request for a term renewal but the model showed that none of those return flows was available at Applicant's diversion point.  What the model shows is that these return

---

[77]  *Id*. at 147, CR at 213.

[78]  Testimony of Dr. Kathy Alexander.  AR, Vol. 8 (Transcript Vol. 2), p. 360, ln. 5-8.

flows were already reserved for some purpose of use downstream from Applicant's diversion point by the time his application was received. The hydrologic function and management of the Brazos River Basin depends on the presence of those return flows.[79]

These return flows were not, as Ware claims, reserved for future applicants—they were already needed for other purposes.

## IV.  REPLY TO WARE'S POINT OF ERROR NO. 3

### A.  BRA withdrew its protest of Ware's renewal application, but that did not make water available for Ware.

Ware discusses the fact that BRA withdrew from the proceedings and argues that BRA's actions mean that his application should be granted.  He is wrong. Neither BRA's decision to withdraw nor any resultant lack of evidence on the limiting factors for granting a permit application under Water Code § 11.1381 or § 11.134(b) serve to make the granting of Ware's application mandatory.  Especially in a time of burgeoning population and record drought, such a construction of the statutes would not be reasonable.  Put simply, BRA is not Ware's problem.  A lack of water is Ware's problem.

### B.  Even if Ware were right that he should have been given a 1997 priority date, it would not matter.

Reurging the issue of priority dates, Ware insists that he is entitled to some of

---

[79]  AR, Vol. 4, Item No. 57, p. 6.

the return flows listed in BRA's application because he has a 1997 priority date while

BRA's priority date is 2004, yet the ED used the 2006 date of his renewal application.

TCEQ hydrologist Dr. Alexander testified that using 1997 would make no difference:

> It's just at a very junior date whether it's 1997 or 2006, because of the vast number and amount of water rights that have been appropriated, there's certainly—there just isn't enough water let to go around which is why we recommended denial of Mr. Ware's application.[80]

Any "error" in choosing a priority date was harmless error.

## C.    Ware's cancellation theory is wrong.

Ware also claims that he is entitled to the return flows in BRA's application

because he has been beneficially using water under his existing permit.  Ware claims

that the TCEQ is implementing a cancellation program for term permits, and that this

is improper because  water rights cannot be cancelled if they are being put to

beneficial use.  All of these claims rest on Ware's false premise that his term permit

functions similarly to a permanent water right.  In this, as in so many other respects,

the two types of permit are very different.

While permanent water rights can be cancelled if the permit holder does not use

the water for ten years,[81] term permits are not subject to a cancellation program—they

---

[80]  Testimony of Dr. Kathy Alexander.  AR, Vol. 8 (Transcript Vol. 2), p. 389.

[81]  Tex. Water Code § 11.172.

32

are self cancelling. Ware's statement that "TCEQ is essentially implementing a cancellation program for term permits" ignores reality. Term permits do not have to be cancelled—they expire on their own terms, in this case after ten years. Ware sought to renew his term permit but the agency determined that there is not enough water available to do so.

By describing TCEQ's denial of his renewal request as a "cancellation" of his term permit, Ware tries to use Water Code § 11.172 and *Lower Colorado River Authority v. Texas Department of Water Resources*, 689 S.W.2d 873 (Tex. 1984) (the Stacy Dam case) to his advantage. In Ware's view, because permit holders not using all of the water appropriated to them in their permit can be subject to at least partial cancellation, someone like Ware who *is* using water should be shielded from cancellation. Once again, Ware ignores reality. The water that he is using does not belong to him. He holds a term permit, which by its very nature is the ability to temporarily use water allocated to someone else—a permanent water right holder—who is not currently using it. That current nonuse is the very reason that term permits can be granted. But term permit holders cannot use the fact of their temporary use to bootstrap themselves into the same status as a permanent water rights holder, which is what Ware attempts here with his "I-am-using-it-so-it-cannot-be-taken-away-from-me" argument. It was not taken away—it was not there when

the time came to seek renewal. As the record, the briefs, and the argument all demonstrated, no matter how the water availability assessment was done, there was not enough water for Ware, so his term permit was not renewed. TCEQ's Order should be affirmed.

## V.  REPLY TO WARE'S POINT OF ERROR NO. 4

Ware's Point of Error No. 4 insists that his 2006 application for renewal should have been reviewed using a priority date reflecting his 1997 permit, that the staff's use of the renewal application's 2006 date is a policy change and collateral attack on the order issuing the 1997 permit, and that using the 1997 date would have made all the difference to him, because it would have put him ahead of, i.e., made him senior to, BRA, whose application was reviewed using a 2004 priority date.

Ware fails to understand that priority assessments for term permits are different from permanent water rights. The Executive Director explained term-permit priority dates in his written response to closing arguments.[82]  When a term permit is assigned a priority date—as Ware's 1997 permit (and its renewals) was—that is for purposes of determining its seniority against junior term permits.[83]  But when the time for renewal arrives, the central principle underlying a term permit must be honored: there

---

[82]  AR, Vol. 4, Item No. 57, pp. 2-5.

[83]  *Id*. at 2.

34

must be sufficient appropriated but unused water available for the term permit holder to be granted another term.[84]

In order to make this determination, the staff uses the current conditions program in the water availability model. To do otherwise—to evaluate a renewal based on conditions that are ten years old—would run the risk of error and over-appropriation of water because it would not take into account the permanent water rights holders who may have started using their water since the original term permit was granted.[85] If the current conditions program indicates that there is enough water for another term, then and only then would the original date (1997 for Ware) be used to, at best, establish priority of rights among term permit holders.[86] There was no ED staff change of policy, denial of due process, or collateral attack on the 1997 order. That order never came into play because the requested renewal could not be granted due to a lack of water.

Ware also asserts that the record is clear that staff did not use the 1997 date in modeling for water availability, as if that were reversible error.[87] The TCEQ staff

---

[84] *Id*. at 3.

[85] *Id*. at 3-4.

[86] AR, Vol. 4, Item No. 58A, pp. 25-26.

[87] Ware's brief at 29.

explained why not: using 1997 as the priority date would make no difference because of the brief period of time between the two dates.[88] Ware characterizes staff testimony as indicating a procedural irregularity within the Executive Director's staff that the Court may examine,[89] alluding to the provision of the Administrative Procedure Act allowing courts to take evidence of procedural irregularities "alleged to have occurred before the agency *that are not reflected in the record*."[90] In his brief, Ware cites to testimony and evidentiary rulings relating to the very complaint about priorities that he makes.[91] Actually, Ware's counsel cross–examined Jeffrey Thomas at length about the priority date issue.[92] The ALJ also questioned Mr. Thomas at length about the priority date issue, and he questioned Mr. Thomas as to why it did not make any difference in Ware's application.[93] Ware's theory that there are procedural irregularities to be examined should be rejected.

---

[88] Testimony of Jeffrey Thomas. AR, Vol. 7 (Transcript Vol. 1), pp. 173-74; Testimony of Dr. Kathy Alexander. AR, Vol. 8 (Transcript Vol. 2), p. 389.

[89] Ware's brief at 28-29.

[90] Tex. Govt. Code § 2001.175(e). (Emphasis added.)

[91] On page 29 of his brief, Ware cites to the testimony of Jeffrey Thomas in Vol. 1 of the Transcript.

[92] *See, e.g.*, AR, Vol. 7 (Transcript Vol. 1) pp. 116–124 (Testimony of Jeffrey Thomas.).

[93] *See* AR, Vol. 7 (Transcript Vol. 1), pp. 186, ln. 3 – 193, ln. 13 (Testimony of Jeffrey Thomas.).

Ware fails to recognize that term permits and permanent water rights run on parallel tracks in terms of establishing seniority based on priority date. The two types of permits are not mingled together in assessing who is senior to whom. But Ware incorrectly treats them as if they were. The ALJ, TCEQ Commissioners, and district court all saw the fatal flaw in Ware's reasoning and rejected his priority-date theory.

## VI. REPLY TO WARE'S POINT OF ERROR NO. 6

In Point of Error No. 6, Ware complains that Findings of Fact Nos. 45, 49, 50, and 51 refer to the Brazos River Authority's pending permit application. This complaint is meritless. It was Ware himself who inserted BRA into this matter by offering the water availability memo for the review of BRA's application as Applicant's (Ware's) Exhibit 50, insisting, over the ED's objection, that it was relevant.[94]

Most of these complained-of findings discuss priority dates. Again, it was Ware himself who has argued repeatedly at SOAH, TCEQ, district court, and now in this Court that the ED's staff erred in assigning priority dates that put BRA earlier in time than Ware. Ware now complains of findings that his own argument invited.

---

[94] AR, Vol. 7 (Transcript Vol. 1), pp. 134-35. And while Ware initially indicated that his offer was of pages 1 through 7 of the document, the entire document was ultimately admitted without any limitations to its admissibility or use. AR, Vol. 8 (Transcript Vol. 2) p. 255.

## VII. CONCLUSION: NOT ONLY ARE WARE'S LEGAL THEORIES WRONG, THE EQUITIES DO NOT FAVOR HIM EITHER.

Ware himself testified that the permanent water right once associated with his family farm was lost years ago through inaction, albeit through no fault of his own.[95] He emphasizes the undisputed and indisputable principle that Texas agriculture is important and paints a picture of a family farm facing ruin. But he does *not* emphasize or even state that he has already obtained most of the water that he sought in his renewal application. He testified that he bought 100 acre-feet of water rights, which he intends to use to expand.[96] Renewal of his 1997 permit for another 10 years at his original 130 acre-feet and requested additional 20 acre-feet would put him well ahead. In fact, it would total 250 acre-feet, almost double the original 1997 amount. The denial of his renewal request, while disappointing, has not significantly harmed, much less ruined, Ware.

## PRAYER

Appellee TCEQ respectfully prays that the agency order be affirmed.

---

[95] Testimony of Bradley Ware. AR, Vol. 7 (Transcript Vol. 1), p. 22.

[96] Testimony of Bradley Ware. AR, Vol. 7 (Transcript Vol. 1), p. 64-65.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Litigation

JON NIERMANN
Chief, Environmental Protection Division

/s/*Linda B. Secord*
LINDA B. SECORD
Assistant Attorney General
State Bar No. 17973400

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548 - MC 066
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911
Linda.secord@texasattorneygeneral.gov

ATTORNEYS FOR DEFENDANT, TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because it contains 9,033 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4.(i)(1).

2.   This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) and the type style requirements because it has been prepared in a proportionally spaced typeface using *WordPerfect for Windows, version 12 in Times New Roman 14-point type face for text and 12-point type face for footnotes*.

/s/*Linda B. Secord*
LINDA B. SECORD
Attorney for Appellee
Office of the Attorney General

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing *Brief of Appellee Texas Commission on Environmental Quality* has been served on the persons listed below electronically by an electronic service provider and by email on the same day, April 17, 2015:

Stephen P. Webb
Gwendolyn Hill Webb
Webb & Webb
712 Southwest Towers
211 East 7th Street
Austin, Texas 78701

/s/*Linda B. Secord*
Linda B. Secord

# Index to Appendix

| Item Number | Description |
|---|---|
| A | Permit No. 5594 (AR, Vol. 5, Item No. App 2) |
| B | Proposal for Decision (PDF) (AR, Vol. 4, Item No. 58A) |
| C | TCEQ's Final Order (AR, Vol. 4, Item No. 64) |
| | Statutes<br>Texas Government Code<br> § 2001.060<br> § 2001.175<br>Texas Water Code<br> § 11.022<br> § 11.025<br> § 11.026<br> § 11.027<br> §11.042<br> §11.046<br> § 11.121<br> § 11.134<br> § 11.1351<br> § 11.1381<br> § 11.146<br> § 11.147<br> § 11.1471 |

| | |
|---|---|
| D | Statutes (cont.) <br> § 11.1491 <br> § 11.150 <br> § 11.151 <br> § 11.152 <br> § 11.171-.186 <br> § 11.172 <br> § 16.012 |
| E | Act of Mar. 19, 1917, 35th Leg., R.S., ch. 88, § 72, <br> 1917 Tex. Gen. Laws 211 |
| F | Act of May 21, 1987, 70th Leg., R.S., ch. 405, § 1, <br> 1987 Tex. Gen. Laws 1932 |
| G | Act of June 1, 1997, 75th Leg., R.S., ch. 1010, <br> 1997 Tex. Gen. Laws 3610 |
| H | Rules <br> 30 Texas Administrative Code <br> § 297.19 <br> § 297.42 |
| I | Executive Director's Response to Closing Arguments (AR, Vol. 4, <br> Item No. 57) |

# Appendix

A

App. Exh. 2



THE STATE OF TEXAS
COUNTY OF TRAVIS
I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY
OF A TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
DOCUMENT, WHICH IS FILED IN THE PERMANENT RECORDS

JUL 21 2009

OF THE COMMISSION, CERTIFIED AS VALID BY AND THE
SEAL OF THIS AGENCY.

LaDONNA CASTAÑUELA, CHIEF CLERK
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. BOX 13088, MC-160
Austin, Texas 78711-3088
Telephone No. (512) 239-4691 FAX (512) 239-4770

## APPLICATION FOR AMENDMENT TO A WATER RIGHT

REQUIRING MAILED AND PUBLISHED NOTICE; or

NOT REQUIRING MAILED AND PUBLISHED NOTICE
Reference Texas Administrative Code Section 295.158(b) or ©

'stomer Reference Number (if issued): CN ___ 5594

c:   If you do not have a Customer Reference Number, complete Section II of the Core Data Form (TCEQ-10400) and submit it with this application.

1.   NAME: ___ BRADLEY E. WARE

ADDRESS: ___ 911 GANN BRANCH RD. KILLEEN, TEXAS 76549

EMAIL   EDIESSTUFF@AOL.COM   ADDRESS:

2.   SYMBOL   \F   "WINGDINGS" 168   PERMIT   SYMBOL   \F
"WINGDINGS" 168   "WINGDINGS" 168   CERTIFIED   FILING   OR   SYMBOL   \F
"WINGDINGS" 168 ADJUDICATION CERT. NO.

STREAM LAMPASAS RIVER
RESERVOIR (PRESENT CONDITION, IF ONE EXISTS): ___   WATERSHED

COUNTY: ___ BELL COUNTY

3.   PROPOSED CHANGES TO WATER RIGHT AUTHORIZATIONS:

RENEWAL OF 130 ACRE FEET, WOULD LIKE TO ADD 20 MORE ACRE FEET.

(ATTACH ADDITIONAL PAGE AS NECESSARY; ATTACH MAP/PLAT DEPICTING PROJECT LOCATION, DIVERSION POINT, PLACE OF USE AND OTHER PERTINENT DATA)

Form TCEQ-10201(revised 8/02)

" UNDERSTAND THAT THE AGENCY MAY REQUIRE ADDITIONAL INFORMATION IN REGARD TO THE REQUESTED AMENDMENT BEFORE CONSIDERING MY APPLICATION.

5.    I HAVE SUBMITTED THE REQUIRED FEES HEREWITH. (SECTIONS 295.131-295.139)

WITNESS ___My_____ HAND AT
TEXAS,
      (MY/OUR)

THIS __15__ DAY OF __11_____, 200 _5_.
         (EXAMPLE: TWENTY-EIGHT DAY OF NOVEMBER)

_By B. Ware_____

_Bradley B. Ware_____
NAME (PRINT)                              NAME (PRINT)

SUBSCRIBED AND SWORN TO AS BEING TRUE AND CORRECT BEFORE ME
THIS ____15th_____ DAY

OF __November_____, 200_5_.

                              _____
                              NOTARY PUBLIC, STATE OF TEXAS

JENNIFER L. WILEY
Notary Public, State of Texas
My Commission Expires 10-14-2006

Form TCEQ-10201(revised 8/02)

# TEXAS NATURAL RESOURCE CONSERVATION COMMISSION



## PERMIT TO APPROPRIATE
## AND USE STATE WATER

APPLICATION NO. 5594          PERMIT NO. 5594          TYPE: Section 11.121

Name:          Bradley B. Ware          Address:          Rte. 3, Box 211
                                                           Killeen, TX 76542

Filed:          July 1, 1997          Granted:          NOV 0 7 1997

Purposes:          Irrigation          County:          Bell

Watercourse:          Lampasas River, tributary          Watershed:          Brazos River Basin
                      of the Little River, tributary
                      of the Brazos River

WHEREAS, Bradley B. Ware has requested authorization to divert and use not to exceed 130 acre-feet of water per annum to irrigate 100 acres of land owned by the applicant in Bell County approximately 15 miles southwest of Killeen, Texas; and

WHEREAS, the Texas Natural Conservation Commission finds that jurisdiction over the application is established; and

WHEREAS, no person protested the granting of this application; and

WHEREAS, the Commission has complied with the requirements of the Texas Water Code and Rules of the Texas Natural Resource Conservation Commission in issuing this permit.

NOW, THEREFORE, this permit to appropriate and use State Water is issued to Bradley B. Ware, subject to the following terms and conditions:

1. USE

Permittee is authorized to divert and use not to exceed 130 acre-feet of water per annum from the Lampasas River to irrigate 100 acres of land out of 261 acres in the W. Brown Survey, Abstract No. 67, the D.G. Van Vicheton (Vecheton)

1

Survey, Abstract No. 851, and the C. Edwards Survey, Abstract No. 291 in Bell County, Texas approximately 15 miles southwest of Killeen, Texas. This land is conveyed to permittee in a deed recorded in Volume 1524, page 671 of the Bell County Deed Records.

2. DIVERSION

a.    Diversion Area: Permitte is authorized to divert water from any point on the left or east bank of the Lampasas River, between a point N60.6°W 2,050 feet from the southeast corner of the aforesaid Van Vicheton Survey and a point located S37°E 4,200 feet from the aforesaid survey corner in Bell County. This downstream point is located at Latitude 31.032°N, Longitude 97.992°W.

b.    Maximum Diversion Rate: 2.67 cfs (1200 gpm).

3. SPECIAL CONDITIONS

a.    In order to protect instream uses, biological habitats and water quality, permittee is authorized to divert water hereunder during the months of April through June only when the flow of the Lampasas River at U.S.G.S. Gaging Station No. 08103800 near Kempner, Texas equals or exceeds 38 cfs and during the other months only when it equals or exceeds 12 cfs.

b.    The authorization to divert and use 130 acre-feet of water per year shall expire and become null and void on _November 7, 2007_ unless prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity. The priority date of this permit and all extensions hereof shall be July 1, 1997.

4. WATER CONSERVATION

Permitee shall implement a water conservation plan that provides for the utilization of those practices, techniques, and technologies that reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, or increase the recycling and reuse of water so that a water supply is made available for future or alternative uses.

This permit is issued subject to all superior and senior water rights in the Brazos River Basin.

Permittee agrees to be bound by the terms, conditions and provisions contained herein and such agreement is a condition precedent to the granting of this permit.

All other matters requested in the application which are not specifically granted by this permit are denied.

This permit is issued subject to the Rules of the Texas Natural Resource Conservation Commission and to the right of continuing supervision of State water resources exercised by the Commission.

TEXAS NATURAL RESOURCE
CONSERVATION COMMISSION

For the Commission

DATE ISSUED: **NOV 0 7 1997**

ATTEST:

Eugenia K. Brumm, Ph.D.,Chief Clerk

3



**TCEQ**

# REQUIREMENTS FOR WATER CONSERVATION PLANS FOR INDIVIDUAL IRRIGATION SYSTEMS

These Requirements are a synopsis of the rules as approved by the Commissioners of the Texas Commission on Environmental Quality on April 7, 1993. The approved rules were published in the Texas Register on April 23, and are recorded in the Texas Administrative Code, Title 30, Chapter 288. Conservation plans required to be submitted to the Texas Commission on Environmental Quality must follow these guidelines.

A water conservation plan for an individual irrigator shall provide information, where applicable, in response to each of the following elements, including what the user intends to do, or not to do and why, with regard to that element:

(1) A description of the agricultural production process which shall include but is not limited to the type of crops and acreage of each crop to be irrigated, monthly irrigation diversions and any seasonal or annual crop rotation and soil types of the land to be irrigated;

(2) A description of the irrigation method or system and equipment including pumps, flow rates, plans, and/or sketches of the system layout;

(3) A description as to which practice and/or device will be utilized to measure and account for the amount of water diverted from the source of supply;

(4) Any previous assessments which may have been performed regarding the system efficiency of the irrigation system;

(5) Specification of conservation goals including quantitative goals for irrigation water use efficiency;

(6) Water conserving irrigation equipment and application system or method including but not limited to surge irrigation, low pressure sprinkler, drip irrigation, pollution prevention, and non-leaking pipe;

(7) Leak-detection, repair, and water-loss control;

(8) Scheduling the timing and/or measuring the amount of water applied, such as, soil moisture monitoring;

(9) Land improvements for retaining or reducing runoff, and increasing the infiltration of rain and irrigation water including but not limited to land leveling, furrow diking, terracing, and weed control;

(10) Tailwater recovery and reuse;

(11) Any other water conservation practice, method, or technique which the irrigator show to be appropriate for preventing waste and achieving conservation.

# IRRIGATION WATER CONSERVATION DATA AND PLAN
## FOR INDIVIDUALLY OPERATED SYSTEMS

Submit this form with an application for Permit to Appropriate State Water. You may want to contact the local County Agent, Natural Resources Conservation Service office, the Texas Water Development Board or a professional engineer in preparing this form. If you have any questions concerning the information requested, contact us at (512)239-4730.

Name of Applicant: **BRADLEY B. WARE**

Daytime Telephone No.: **254-634-6327**

Requested Diversion Amount: **150**

SEE ATTACHED PAGE FOR THIS CHART →

I.

| | Type of crop: | Growing season (months): | Acres irrigated/year: |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| | | Total number of acres: | 132 |

Include hybrid crop names: for example, which type of coastal Bermuda?

II  On average, how much water in acre-feet will be diverted monthly for irrigation?

| January | 6 | May | 21 | September | 20 | TOTAL for all months |
|---|---|---|---|---|---|---|
| February | 4 | June | 17 | October | 7 | |
| March | 3 | July | 25 | November | 5 | |
| April | 7 | August | 30 | December | 5 | |
| MONTHLY TOTALS | 20 | | 93 | | 37 | 150 |

III. Do you seasonally or annually rotate crops?  (YES)  NO  (circle one)

If yes, please describe: WHEAT, FORAGE, SORGHUM, OATS WITH A LEGUME SUCH AS AUSTRIAN WINTER PEAS.

Bradley Ware

Part I.

Some of my land I double crop.

| Type of crop: | Growing season (months) | Acres irri/year |
|---|---|---|
| 1. Tifton 85 Bermuda ⌐ | 8 months | 36 |
| Soft Wheat (Grazing) ⌐ (double crop) | 6 months | 36 |
| 2. Improved Native Grass | 9 months | 22 |
| 3. Brown midrib Sorghum ⌐ | 7 months | 54 |
| Bob oats or soft wheat ⌐ (double crop) | 5 months | 54 |
| 4. Costal Bermuda grass ⌐ (double crop) | 8 months | 20 |
| Bob oats or soft wheat ⌐ | 5 months | 20 |

IV. Describe your soil type (include permeability characteristics, if available): BOSQUE CLAY LOAM HIGH WATER HOLDING CAPACITY, DENTON SILTY CLAY-DEEP WELL DRAINED, SLOWLY PERMABLE PRESENTLY CONTOUR TERRACED AND SEEDED TO NATIVE GRASS SPECIES. CRAWFORD CLAY-WELL DRAINED PRESEN CONTOUR TERRACED, ALSO REFER TO TEXAS COOPERATIVE EXTENSION PUBLICATION B-1670 p.3.

V. Describe the existing/proposed irrigation system including plans, designs and/or sketches of the system layout, pump location, slope of the land to be irrigated, and specifics about the delivery method. (For example: Single pivot with big gun sprinkler)

SLOPE 0 to 3 PERCENT/DELIVERY UNDERGROUND PVC PUMP

CAPACITY 500 GPM./POWER UNIT 25 H.P. ELECTRIC CENTER PIVOT-

LEPA DESIGN (LOW ENERGY PRECISE APPLICATION) WITH A DESIGN

EFFECIENCY ABOVE 95% DRAWING EXHIBITS A, B, C, & D. TEXAS

COOPERATIVE EXTENSION PUBLICATION B-1611, L-2218, L-5066,
B-6096, B-6162

VI. Describe the methods and/or device which will be used to measure and account for the amount of water diverted for irrigation.

CENTER PIVOT NOZZLE CHART AND PUMP EFFICENCY CURVE.

EHIBIT B AND C, LOG OF OPERATION HOURS EXHBIT H.

VII. If there's is an existing irrigation system, have any system evaluations been performed regarding the efficiency of the system? (YES) NO (circle one)
If YES, please indicate:
When: SEE ATTACHED TEXAS A+M PUBLICATION B-1670 & B6019

Who performed the evaluation: DR. BILL LYLE TEXAS A+M EXTENSION SERVICE, LUBBOCK TX
DR. LEON NEW, TEXAS COOPERATIVE EXTENSION AMARILLO, TX

Results of the evaluation: LEPA DESIGN CENTER PIVOT SYSTEMS ARE PROVEN TO EXCEED 95% EFFENCIENCY AND 96% UNIFORMITY OF DISTRIBUTION, EXHIBITS F + G, CHOOSING A CENTER PIVOT BY GUY FIPPS

VIII. Describe any water conserving equipment used in the irrigation system. (i.e. closed pipes, leak detection, pressure loss cut-off valve, etc.)

HIGH EFFECIENCY, ELECTRIC CENTRIFICAL PUMP; SEALED AND
(FRICTION)
PRESSURE TESTED LOW FRICTION, PVC UNDERGROUND

VIII. cont. DELIVERY PIPE LOW ENERGY PRECISE APPLICATION (LEPA) CENTER PIVOT, USING LOW DRIFT NOZZLES AND DRAG HOSES, WATER RELEASE WILL BE AT NO MORE THAN 18" ABOVE SOIL SURFACE, TEXAS COOPERATIVE EXTENSION SERVICE PUBLICATIONS, B-6011, L-2219, B6162, B-6150, B-6096

IX. Describe any methods which will be used for water loss control and leak detection and repair.

REGULAR PRESSURE TEST, REPAIRS MADE USING APPROVED METHODS AND STANDARDS / SUPERVISION DURING OPERATION

X. Describe any water saving scheduling or measurement practices to be utilized in the application of water, for example: irrigation only early in the morning, late evening or night hours, when the wind is calm and temperatures lower, and also the utilization of soil moisture monitoring:

ALL THE ABOVE, GYPSUM MOISTER MONITERING BLOCKS DELMORST METER IRRIGATION WILL BE MONITORED

_____

_____

XIV. Indicate (in gallons-per-minute or cubic-feet-per-second) the rate that water is diverted from the source: _____ 500 GPM OR 1.2 cfs _____



B

# State Office of Administrative Hearings



Cathleen Parsley
Chief Administrative Law Judge

February 8, 2010

Les Trobman, General Counsel
Texas Commission on Environmental Quality
P.O. Box 13087
Austin Texas 78711-3087

> Re:  SOAH Docket No. 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; TCEQ Docket No. 2008-0181-WR; In Re:
> Application of Bradley B. Ware to Amend Water Use Permit No. 5594

Dear Mr. Trobman:

The above-referenced matter will be considered by the Texas Commission on Environmental Quality on a date and time to be determined by the Chief Clerk's Office in Room 201S of Building E, 12118 N. Interstate 35, Austin, Texas.

Enclosed are copies of the Proposal for Decision and Order that have been recommended to the Commission for approval. Any party may file exceptions or briefs by filing the documents with the Chief Clerk of the Texas Commission on Environmental Quality no later than March 1, 2010. Any replies to exceptions or briefs must be filed in the same manner no later than March 10, 2010.

This matter has been designated **TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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** All documents to be filed must clearly reference these assigned docket numbers. All exceptions, briefs and replies along with certification of service to the above parties shall be filed with the Chief Clerk of the TCEQ electronically at http://www10.tceq.state.tx.us/epic/efilings/ or by filing an original and seven copies with the Chief Clerk of the TCEQ. Failure to provide copies may be grounds for withholding consideration of the pleadings.

Sincerely,

Paul D. Keeper
Administrative Law Judge

PDK:cm
Enclosures
cc: Mailing List

SOAH DOCKET NO. 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
TCEQ DOCKET NO. 2008-0181-WR

| | | |
|---|---|---|
| APPLICATION OF BRADLEY B. WARE TO AMEND WATER USE PERMIT NO. 5594 | § § § § § | BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS |

PROPOSAL FOR DECISION

TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. PARTIES ...................................................................................................... 1

III. JURISDICTION ........................................................................................... 2

IV. PROCEDURAL HISTORY ......................................................................... 2

V. BACKGROUND FACTS .............................................................................. 3

    A. History of the Ware Farm and the Permit ....................................... 3

    B. ED's recommendation to deny the Application ............................... 4

    C. The issues ............................................................................................. 5

VI. DID THE ED HAVE STANDING TO OPPOSE THE APPLICATION? ..... 6

    A. Did the ED's party status depend on whether the ED was an affected person? ..... 7

    B. Did the scope of the ED's authority include the right to present an opposing case? .. 7

    C. Was the information that the ED presented within the limits of the law? ............. 8

VII. WAS THIS AN UNCONTESTED MATTER? ............................................ 9

VIII. DID THE ED IMPROPERLY RELY SOLELY ON THE MODEL? ........... 9

    A. The burden of proof and the evidentiary standard for scientific testimony ............... 9

    B. The regulatory scheme for the Commission's issuance of permits ...................... 11

    C. The determination of the availability of water for appropriation ...................... 13

    D. Discussion ............................................................................................ 15

    1. Legal issues ........................................................................................ 15

        a. Does the law require the use of the Model? ................................ 15

        b. If not, may other analytical tools be used? .............................. 16

c.  Is the use of the Model appropriate in evaluating a request for a small amount of water? .................................................................................................... 17

2.  Mr. Jones' analysis.......................................................................................... 18

IX. IS THE MODEL FATALLY FLAWED? ................................................................ 20

A.  Naturalized flows ............................................................................................. 20

B.  Impervious cover.............................................................................................. 21

C.  Wastewater treatment plant return flows ......................................................... 22

X. PRIORITY DATES ............................................................................................... 23

A.  The ED's arguments ......................................................................................... 23

1.  Does the Permit authorize Mr. Ware to appropriate water? ............................ 23

2.  Does the Permit authorize Mr. Ware to use state water? ................................ 24

B.  Mr. Ware's arguments ...................................................................................... 24

1.  Did the ED disregard Mr. Ware's priority rights under the Permit? ................ 24

2.  Did the ED manipulate the priority dates of Mr. Ware's application so that its priority would be inferior to that of the Brazos River Authority's permit application? ......................................................................................................... 26

XI. CONCLUSION ..................................................................................................... 27

| APPLICATION OF BRADLEY B. | § | BEFORE THE STATE OFFICE |
| WARE TO AMEND | § | |
| WATER USE PERMIT NO. 5594 | § | OF |
| | § | |
| | § | ADMINISTRATIVE HEARINGS |

## PROPOSAL FOR DECISION

## I. INTRODUCTION

Bradley B. Ware, Applicant, seeks to amend his Water Use Permit 5594 (Permit). The ten-year term Permit authorizes him to annually withdraw 130 acre-feet of water from the Lampasas River. The amendment would either extend his term Permit for another ten-year period or convert his Permit to a perpetual right.[1] In addition, Mr. Ware seeks authority to withdraw 20 more acre-feet of water annually and to irrigate 31 more acres of his farm. The Executive Director (ED) of the Texas Commission on Environmental Quality (Commission) and the Office of Public Interest Counsel (OPIC) oppose the application. The application should be denied.

## II. PARTIES

The attorneys who appeared in this proceeding were Gwendolyn Hill Webb and Stephen Webb for Mr. Ware. Shana Horton and James Aldredge for the ED, and Garrett Arthur for OPIC.

---

[1] Mr. Ware's evidence and arguments request two different terms of renewal. In his application, Mr. Ware proposed to renew his ten-year rights under the Permit. Ware Ex. 2. In a January 28, 2000, letter to the ED, Mr. Ware stated that he sought to remove the ten-year term period and establish a permanent right. Ware Ex. 8. In his initial post-hearing brief, Mr. Ware referred to his request to "renew the 10 year term . . . ." Applicant's Closing Argument at 2. In his final brief, Mr. Ware argued for the right to renew "for an additional term or in perpetuity." Applicant's Reply to Closing Arguments at 9. The proposal for decision will treat the application as seeking the two periods in the alternative.

## III.  JURISDICTION

The parties did not contest the jurisdiction of the Commission or of the State Office of Administrative Hearings (SOAH) to hear the case.  The attached Proposed Order contains the necessary findings and conclusions about jurisdiction.

## IV.  PROCEDURAL HISTORY

On November 7, 1997, the Commission issued the original ten-year term Permit to Mr. Ware.  By its written terms, the Permit was to expire on November 7, 2007, unless before that date, Mr. Ware received the Commission's approval to extend the term or to convert the Permit to a perpetual right.

On November 15, 2005, Mr. Ware timely filed his Application for Amendment to a Water Right (Application).  On January 5, 2006, the ED determined that the Application was administratively complete.  On June 7, 2006, the Brazos River Authority contested the application.  On November 6, 2006, the ED recommended denial of the Application.  On January 8, 2007, Mr. Ware requested a contested case hearing at SOAH.  On January 25, 2008, the ED requested and the Commission directly referred the case to SOAH for a hearing on the merits on the agreed issue:

> Whether sufficient water exists in the Brazos River Basin and all applicable statutory and regulatory requirements have been met to warrant issuing Bradley B. Ware's proposed Water Use Permit No. 5594A?[2]

On April 3, 2008, the SOAH administrative law judge (ALJ) convened a preliminary hearing and took jurisdiction.  On January 12, 2009, the Brazos River Authority was granted the

---

[2]  The original Permit was issued as Water Use Permit No. 5594.  The proposed permit, if issued, would be Water Use Permit No. 5594A.

right to withdraw as a protesting party.[3]  The hearing adjourned on October 29, 2009, and the administrative record closed on December 21, 2009.

## V.  BACKGROUND FACTS

### A.     History of the Ware Farm and the Permit

In the mid-1870's, Mr. Ware's family acquired 261 acres of property along the Lampasas River near present-day Killeen.  Mr. Ware's great-grandfather and grandfather farmed the land, drawing water along the property's two miles of river frontage.  During Mr. Ware's parents' ownership of the land, they failed to seek an adjudication of water appropriation rights.[4]  The farm was not in production from the mid-1960s until 1996, when Mr. Ware acquired the property from his parents.

In 1997, Mr. Ware obtained from the Commission the term Permit that authorized him for ten years to divert and use 130 acre-feet of water from the Lampasas River to irrigate 100 acres.  The Permit required him to limit his withdrawals, subject to the river's rate of flow during specific months.  The Permit also established July 1, 1997 as "the priority date of this permit and all extensions hereof . . . ."[5]

During the twelve years in which Mr. Ware has had appropriation and irrigation rights,[6] he has farmed hay, pumpkins, wheat, sorghum, oats, and winter peas.  He has tried to impound

---

[3]  When the Brazos River Authority withdrew its protest, it clarified that it had no objection to the issuance of a ten-year extension of Mr. Ware's original term Permit.  The Brazos River Authority did object to the Commission's conversion of Mr. Ware's Permit to a perpetual right.  Ware Ex. 42.

[4]  By rule, the Commission has defined "appropriations" as "[t]he process or series of operations by which an appropriative right is acquired.  A completed appropriation thus results in an appropriative right; the water to which a completed appropriation in good standing relates is appropriated water."  The Commission has also defined "appropriative right" as "[t]he right to impound, divert, store, take, or use a specific quantity of state water acquired by law."  30 TEX. ADMIN. CODE (TAC) § 297.1 (3) and (4).

[5]  Ware Ex. 2

[6]  Although the Permit was to expire on November 7, 2007, his right to appropriate water has remained in effect pending a final administrative ruling on the Application.

his water by installing six or seven earthen tanks, but the composition of the soil limits the amount of water that the tanks will retain. He has purchased 100 acre-feet of water rights and installed 8,000 to 10,000 feet of two-inch pipes, plus an eight-inch pipe to a central pivot system.[7]

In addition to farming, Mr. Ware has issued hunting leases to gain additional income to fund the farm's operations. He has also made his land available at no cost to educational, non-profit, and public events, including summer camp programs held at the Parrie Haynes Ranch, a Texas Parks and Wildlife Department facility adjacent to his farm.

## B.     ED's recommendation to deny the Application

After Mr. Ware filed his Application in 2005, the ED's hydrology team determined that "little to no water" was available at Mr. Ware's diversion point on the Lampasas River, without regard to whether the amended Permit would have a perpetual or limited term.[8] The ED's surface water availability and interstate compacts team confirmed the hydrology team's conclusion in a Water Availability Review memo.[9] The memo stated that the team had calculated that insufficient water was available at Mr. Ware's diversion point to support even the original 130 acre-feet of term-limited appropriation rights. The team's calculation relied on the Commission's Water Availability Model for the Brazos River Basin (Model). The calculation used a historical period of record of 1940 to 1997. The team used a priority date of January 5, 2006, the date on which the ED had determined the Application to be administratively complete.

---

[7] Tr. 1 at 33, 44, and 65
[8] ED Ex. 5.
[9] ED Ex. 47.

## C.    The issues

Mr. Ware made five separate challenges to the ED's recommended denial of his Application. First, Mr. Ware contended that the ED had no authority to oppose his Application. He asserted that the law restricts the ED's role to the presentation of information about the Application. That restriction, according to Mr. Ware, does not give the ED the authority to actively oppose his Application, particularly in the absence of any challenges brought by other holders of water appropriation rights in the Brazos River Basin.

Second, Mr. Ware contended that the ED had a procedural duty to treat the Application as an uncontested matter when the Brazos River Authority withdrew its opposition. Mr. Ware argued that the ED's failure to withdraw its request for a contested case hearing and failure to approve the Application as an uncontested case were breaches of due process.

Third, Mr. Ware contended that the ED improperly relied solely on the Model in making the recommendation to deny the Application. Nothing in Texas water law restricts the evaluation of the Application to the ED's Model, argued Mr. Ware. Further, Mr. Ware contended that his due process rights were violated when the ED failed to consider factors that the ED had used in 1997 when evaluating Mr. Ware's original Permit application.

Fourth, Mr. Ware contended that the Model failed to protect his existing water rights. He asserted that the Model disregarded the prior appropriation doctrine. Mr. Ware also complained that the Model relied on a data set that was non-current and inaccurate.

Fifth, Mr. Ware argued that in creating the Model, the ED impermissibly relied on a priority date other than that stated in and required by the 1997 Permit. In doing this, Mr. Ware asserted, the ED disregarded the Commission's order and violated Mr. Ware's procedural and property rights.

## VI. DID THE ED HAVE STANDING TO OPPOSE THE APPLICATION?

In his written opening statement,[10] during the hearing,[11] in his closing brief,[12] and in his reply brief,[13] Mr. Ware challenged the authority of the ED to assert the rights of a protestant. A challenge to a person's status as a party is a jurisdictional challenge.[14] The challenge is rejected.

Mr. Ware's argument was that the ED's role in a contested case is limited to the provision of information to complete the administrative record. Mr. Ware noted that for any person, including the ED, to claim the status of an "affected person," he must demonstrate the existence of "a *personal* justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing."[15] Mr. Ware argued that the ED's actions and interests were based solely on his status as the agent of the Commission. In that role, he contended, the ED's justiciable interest, if any, could never be a personal interest.

The ED argued that the intention of the law's limitation of his role was to ensure that the ED does not aid an applicant in meeting his burden of proof. But, argued the ED, the limitation was not intended to prevent the ED from demonstrating that an application should be denied if it fails to protect state water resources.

---

[10] "Additionally, Applicant must question the role of the Executive Director in this proceeding, where the Executive Director has assumed the position of a party protestant . . . ." Opening Statement by Applicant, Bradley B. Ware at 8.

[11] Tr. 1 at 14.

[12] "This case was unique in that the [ED] of the [Commission] appeared in this case as a self-styled 'protestant' . . . ." Applicant's Closing Argument at 1.

[13] "[T]he authority and power [that the ED] seeks to exercise has been legally precluded by action of the Texas Legislature in prescribing the role of . . . the [ED] specifically in the Texas Water Code." Applicant's Reply to Closing Arguments at 2.

[14] See *M.D. Anderson Cancer Center v. Novak*, 52 S.W.3d 704, 710-11 (Tex. 2001).

[15] TEX. WATER CODE ANN. § 5.115(a). [Emphasis added.]

A.     **Did the ED's party status depend on whether the ED was an affected person?**

It did not. By statute, "any person" may appear at a hearing at which the issuance of a permit is to be considered.[16] By Commission rule, the ED is required to participate as a party in contested hearings relating to applications about water rights.[17] Whether the ED meets the definition of an "affected person" is irrelevant to these proceedings by virtue of the ED's statutory standing as a party.

B.     **Did the scope of the ED's authority include the right to present an opposing case?**

It did. By statute, the ED is required to represent the Commission in hearings that raise matters that affect the public's interest in the state's environment and natural resources, including matters that have been determined to be policies of the state.[18] In contested case permit hearings, the ED's presentation is limited to "the sole purpose of providing information to complete the administrative record."[19] That information is further limited to "information developed by the Commission . . . ."[20] And, in presenting the Commission's information, the law clearly prohibits the ED from assisting an applicant in permitting matters.[21]

But, the law does not prohibit the ED from providing information that opposes an application, as long as the information is within the limits of the statute. The law permits "any person" to object to the issuance of a permit.[22] The law does not restrict the form in which the ED may present his information, either through documentary or testimonial evidence. Finally, the Commission has adopted procedural rules that guarantee all parties the right to present a

---

[16]   TEX. WATER CODE ANN. § 11.133.
[17]   30 TAC § 80.108(b)(1).
[18]   TEX. WATER CODE ANN. § 5.228(a).
[19]   TEX. WATER CODE ANN. § 5.228(c).
[20]   TEX. WATER CODE ANN. § 5.228(a).
[21]   30 TAC § 80.108(e)
[22]   TEX. WATER CODE ANN. § 11.133.

direct case and to cross-examine an opposing party's evidence.[23]  The rule does not create a special category that limits or expands the ED's rights as a contesting party.

## C.    Was the information that the ED presented within the limits of the law?

It was.  For this hearing, the ED called two Commission employees as expert witnesses in its direct case, Steve Ramos and Kathy Alexander.  Mr. Ramos testified about the Commission's water rights permitting process, and Ms. Alexander testified about the Model.  The ED also elicited expert testimony from a third Commission employee, Jeffrey Thomas, a hydrologist whom Mr. Ware had called as an adverse witness.  Like Mr. Ramos, Mr. Thomas also testified about the Commission's permitting practices.

The ED cross-examined Mr. Ware and his expert witness, Samuel Jones, a professional engineer who had worked for the Commission's predecessor agencies.  The scope of the cross-examination focused on three main issues:  (1) how the Model was developed, (2) whether the Model was an accurate predictor of water availability in the Brazos River Basin, and (3) what factors the Commission had historically considered in processing applications for extensions of term permits.  All of this testimony related to the Commission's information.

The ED offered five exhibits, each of which was admitted:  the resumes of the Commission's three testifying employees,[24] a letter from the ED to Mr. Ware,[25] and the deposition of Mr. Jones.[26]  All of the evidence presented by the ED was generated by the Commission or was offered to support the integrity of the Commission's underlying information.  All of the information presented was within the limits of the law.

---

[23]  30 TAC § 80.115(a).
[24]  ED Exs. 1, 4, and 6.
[25]  ED Ex. 5.
[26]  ED Ex. 3.

The ED had standing to appear as a party in this proceeding and was authorized to present the Commission's evidence and arguments in opposition to Mr. Ware's case.

## VII. WAS THIS AN UNCONTESTED MATTER?

No, this was a contested matter. An applicant may request that an application be remanded to the ED for action as an uncontested matter if: (1) all timely hearing requests have been withdrawn or denied or (2) all parties to a contested case reach a settlement so that no facts or issues remain controverted.[27] A hearing was required in this case because the ED remained a party to a contested case after the Brazos River Authority withdrew its opposition and because there was not a settlement between the remaining parties.

## VIII. DID THE ED IMPROPERLY RELY SOLELY ON THE MODEL?

A. **The burden of proof and the evidentiary standard for scientific testimony**

For each of the substantive issues raised in this hearing, Mr. Ware, as applicant, was required to show that the factual support for his contentions outweighed the factual support presented by the other party.[28]

Mr. Ware's burden was particularly difficult to sustain because he had to prove the availability of sufficient unperfected water rights in the Brazos River basin at his diversion point, after giving proper recognition to all superior water rights. That proof required Mr. Ware to present scientific testimony, an area reserved by law to expert witnesses, and expert testimony must be based on a reliable foundation.[29] The law permits the finder of fact to determine the reliability of the evidence, and "[u]nreliable expert testimony is not evidence."[30]

---

[27] 30 TAC § 80.101.
[28] 30 TAC § 80.17.
[29] TEX. R. EVID. 702.
[30] *Gross v. Burt*, 149 S.W.3d 213, 237 (Tex. App. — Fort Worth 2004, pet. denied).

To establish the reliability of an expert's testimony, an offering party must first establish the reliability of the analysis that the expert used in reaching his conclusions. The Supreme Court of Texas has articulated six nonexclusive factors to be used in determining whether scientific testimony is reliable:

> (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique.[31]

Although Mr. Jones' credentials established him as an expert, he did not establish that his method of analysis had been tested, subjected to peer review or publication, or generally accepted as valid by any scientific community. Mr. Jones admitted that he had not developed a systematic or analytical framework by which he could determine the core issue in this case: whether water was available at a given point in the Brazos River basin.[32]

Further, the interpretation of Mr. Jones' results was his alone, in part because Mr. Jones generated no written report that was available for review. Instead, he reached his conclusions based on "his review of the file and his review of the information on that [which] is available regarding water availab[ility] at this diversion point."[33] Finally, as to the non-judicial uses of Mr. Jones' method. Mr. Jones established that his analysis was much like a method that had been previously used by the Commission but later had been abandoned.[34] Mr. Ware did not establish that Mr. Jones' method of analysis was reliable.

---

[31] *Id.* at 237-38, citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998) and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).
[32] Tr. II at 294.
[33] Tr. I at 223-24.
[34] Ware Ex. 49.

In addition, much of Mr. Ware's evidence focused on the alleged inadequacies of the ED's method of analysis, the Model, rather than on Mr. Ware's methods. Mr. Ware also paid particular attention to alleged flaws in the data on which the Model relied. Mr. Ware presented this line of evidence (much of it through cross-examination) in trying to establish the preponderance of his expert evidence over that offered by the ED. Although Mr. Jones' testimony was admitted by the ALJ, counsel for the ED timely objected to its reliability. Rather than conduct a *Daubert*-style hearing-within-a-hearing[35] to determine reliability before considering the merits of the same evidence, the ALJ granted the ED a running objection, subject to the ED's right to reassert the objection. The ED objected to the reliability of Mr. Jones' testimony, and the objection is now sustained.

Nonetheless, the ALJ has reviewed all of Mr. Ware's evidence and has compared the relative weight of Mr. Ware's evidence to that of the ED's. Even if Mr. Ware's evidence were not rejected for lack of reliability, Mr. Ware would not prevail on the preponderance of evidence standard. The ALJ presents this additional analysis to avoid the need for a remand if the Commission were to conclude that Mr. Ware's expert evidence is reliable.

## B.     The regulatory scheme for the Commission's issuance of permits

The water of every flowing river in the State of Texas is the property of the state, and the Commission is the state's agent for the regulation of its water.[36] The Commission has the authority to allow persons to appropriate state water for specific uses.[37] Although the Commission may grant permits to applicants who seek to appropriate unappropriated state water,[38] the amount of water for which the Commission may grant permits may not be more than is available.[39]

---

[35] *See* TEX. R. EVID. 104(c).
[36] TEX. WATER CODE ANN. § 11.021(a).
[37] TEX. WATER CODE ANN. § 11.022.
[38] TEX. WATER CODE ANN. § 11.124.
[39] TEX. WATER CODE ANN. § 11.023(e).

That policy was established by law in 1967 when the Texas legislature abandoned the chaotic condition of the state's former system of recognizing both riparian and appropriative rights.[40] In its place, the legislature adopted a new system that the Texas supreme court characterized as "an orderly forum and procedure for the [Commission's] adjudication and administration of water rights."[41] The Texas legislature later required the Commission to "provide certainty in water management" by evaluating the state's major river basins.[42] Using that information, the Commission now has the authority to grant a variety of types of water use permits. For all permits, the holder has the right to appropriate water only to the extent and for the purposes stated in the permit[43] and subject to the protection of the holders of senior water rights.[44]

In addition, the holder's rights to appropriate water may be affected by the amounts that the holder actually uses or can beneficially use.[45] "[A]ll water not so used is considered not appropriated."[46] If the holder of a permit does not beneficially use his water, then the right of appropriation is considered to be not perfected.[47]

Unperfected appropriative water rights may be reallocated by the Commission to persons other than the permanent permit holder. An applicant may seek a term permit to use these unperfected water rights for a term of years rather than in perpetuity.[48] A term permit creates derivative rights, not original rights, so that the maximum use of water may be achieved.[49]

[10] *In re Adjudication of Water Rights of Brazos III Segment of Brazos River Basin*, 746 S.W.2d 207, 209 (Tex. 1988). [*Brazos III*, herein].
[11] *Id.*
[12] TEX. WATER CODE ANN. § 11.0235(d-2).
[43] TEX. WATER CODE ANN. § 11.135(a).
[44] TEX. WATER CODE ANN. § 11.1351.
[45] An "appropriative right" is the right to impound, divert, store, take, or use a specific quantity of state water acquired by law. 30 TAC § 297.1(4).
[46] TEX. WATER CODE ANN. § 11.025.
[17] TEX. WATER CODE ANN. § 11.026.
[18] TEX. WATER CODE ANN. §§ 11.1381(a) and 11.026.
[49] TEX. WATER CODE ANN. § 11.123.

The Commission may deny an application for a term permit if the permit will jeopardize financial commitments for water projects[50] or if the permit will prevent the holder of the senior appropriative right from beneficially using his rights during the period of the term permit.[51] If the Commission approves a permit, then the rights that it confers are subordinate to any senior appropriative rights.[52]

The Commission has adopted a rule governing its issuance of term permits. The rule adds three relevant provisions to the language of the statute.[53] First, the Commission may issue a term permit "when there is insufficient unappropriated water in the source of supply to satisfy the application."[54] Second, a holder of a senior appropriative right may challenge an application for a term permit by showing that the Commission's issuance of a term permit would adversely affect the holder's beneficial use of its senior rights. In proving this adverse effect, the holder may use as its proof: water use projections in the state or regional water plans, economic indicators, population growth projections, electrical generation needs, or "other reasonable projections based on accepted methods."[55] Third, the Commission clarified that it may deny an application if the issuance of a proposed permit would be detrimental to the public welfare.[56]

### C.    The determination of the availability of water for appropriation

In 1997, the Texas legislature mandated the Commission to adopt an updated water availability model for six river basins in Texas.[57] The Commission contracted with a hydrologist at Texas A&M University to develop a software package, the Water Rights Analysis Package, for the purpose of determining water availability.[58] The software is designed to be used in

---

[50]  TEX. WATER CODE ANN. § 11.1381(b).
[51]  TEX. WATER CODE ANN. § 11.1381(c).
[52]  TEX. WATER CODE ANN. § 11.1381(d).
[53]  30 TAC § 297.19
[54]  30 TAC § 297.19(a).
[55]  30 TAC § 297.19(b)(2).
[56]  30 TAC § 297.19(b)(4).
[57]  TEX. WATER CODE ANN. § 16.012(g).
[58]  Tr. 1 at 72-73.

conjunction with a data set for each of the Texas river basins. The output is a water availability model that projects the availability of water over time at a particular diversion point. The software has been updated a number of times since its original adoption. The software is now used by the ED to model twenty-three river basins in Texas.[59]

The Model begins with the ED's development of "naturalized flows," a term that refers to the ED's estimate of the flow in a river in the absence of the diversion of water by human intervention.[60] Based on this estimate, the ED may run two simulations.[61] A "full authorization simulation" is used to determine all water rights at their full authorized amount. That simulation includes no return flows and includes reservoirs at their as-built capacities.[62] The full authorization simulation is used in determining the availability of unappropriated water.

The ED also may run a "current conditions simulation" to simulate all the water rights in the basin at their maximum amounts reported in the last 10 years, rather than at their authorized amounts. The current conditions simulation includes reservoirs that have diminished capacities due to siltation and includes return flows. The current conditions simulation reflects the water rights at their highest reported use.[63] Based on the current conditions simulation, the ED is able to determine the availability of water to a particular applicant at a particular location. The ED uses the current conditions simulation to determine the availability of unperfected water rights for term permit applicants.

In determining water availability, the ED is guided by the provisions of a Commission rule.[64] The rule requires that for direct diversions from a stream without sufficient water storage

---

[59] Tr. 1 at 86.

[60] Tr. 1 at 79-80.

[61] Tr. 1 at 82-83.

[62] Tr. 1 at 82. The full authorization simulation does not include return flows unless mandated by the terms of the permit. The reason for not including return flows is that interruptible amounts are not counted toward the total available for permitting.

[63] Tr. 1 at 87.

[64] 30 TAC § 297.42.

facilities, approximately 75% of the water request must be available approximately 75% of the time based on the available historic stream flow record. Under that rule, Mr. Ware's original 1997 application was found to comply because his request exceeded the 75% criterion in 78% of the years.[65] But, Mr. Ware's current Application was found to fail because his request met a 100% criterion in none of the years, at least 75% in none of the years, and at least 50% in only 27 of the years.[66]

Although previous water availability models were developed and used by the Commission, the current Model has been in use since 2001. The Commission has relied on the Model in evaluating all applications for appropriative rights since then.[67]

## D.     Discussion

Mr. Ware's expert, Mr. Jones, contended that the Model was only one of many tools that should be considered in evaluating water availability.[68] That argument prompted a series of legal challenges about the authority of the ED to rely solely on the Model, including: (1) does the law require the use of the Model in evaluating the Application; (2) if not, may other analytical tools be used; and (3) is the use of the Model appropriate when the request is for a quantity of water as small as that requested by Mr. Ware?

### 1.     Legal issues

#### a.     Does the law require the use of the Model?

It does not. Although the law requires the ED to evaluate river basins in the state,[69] neither the statutes nor the Commission's rules require the ED to use the Model. The

---

[65] Tr. I at 100-101; Ware Ex. 49.

[66] Ware Ex. 49.

[67] Tr. I at 72-73, 99, and 168.

[68] Tr. I at 223. Mr. Jones testified about his conclusions but prepared no report of his findings.

[69] TEX. WATER CODE ANN. § 11.0235(d-2).

Commission is similarly not required to evaluate an application based on its compliance with the state water plan and regional water plan. The law provides for a waiver if conditions warrant.[70] The ED's expert witness, Kathy Alexander, testified that although that the ED is not required to rely on the Model, he relies on it as the best modeling tool available.[71]

In testimony and in briefs, the ED described how the Model has been used in all applications involving water availability since the Water Rights Analysis Package was approved for use and delivered to the Commission.[72] Although the record reflects that the Commission commissioned the development of the Water Rights Availability Package and has used it for nine years, the record in this proceeding included no reference to the adoption of any statutory or regulatory requirement that this package of software and databases be used. In short, the ED and Mr. Ware are not required to use the Model in determining whether water is available in any river basin in Texas.

### b.     If not, may other analytical tools be used?

The ED has the authority to use whatever analytical tools he finds most appropriate. By statute, the Commission has the authority to contract for "scientific and technical environmental services," including scientific data analysis, to be used in the ED's modeling.[73] The ED has the authority to enforce the terms and conditions of any permit.[74] Although not specifically stated, a logical assumption is that the ED also has the authority to use his scientific data analysis in enforcing the terms of a permit and in presenting information about an application for a permit. Neither the statutes nor the rules include any prohibitions against the ED's use of any specific type of information in evaluating an application.

---

[70] TEX. WATER CODE ANN. § 11.134(b)(3)(E).
[71] Tr. 1 at 200.
[72] Tr. 1 at 168.
[73] TEX. WATER CODE ANN. § 5.2291(a).
[74] TEX. WATER CODE ANN. § 5.230.

In this case, Mr. Ware argued that tools other than the Model are available.   The
Commission's own rules authorize a contesting permit holder to rely on "reasonable projections
based on accepted methods."[75] A reasonable conclusion is that an applicant and the ED may do
the same.

> c.     Is the use of the Model appropriate in evaluating a request for a small
>        amount of water?

It is.  Mr. Ware argued that the Model was inadequate to use in considering applications
for small requests for water.  He pointed out that his request to withdraw 150 acre-feet of water
annually translated into no more than 2.5% of the estimated annual evaporative losses to the
Brazos River Authority's downstream Stillhouse Hollow Lake.[76]  Mr. Ware challenged the
reliability of the Model to evaluate changes of such a tiny magnitude.

Ms. Alexander explained that the Model is designed to be the most accurate method
available to the ED without regard to the size of the request for water.  That design relies in part
on the Model's use of a period of record.  The period of record gives the Commission a set of
historical boundaries ranging from the most severe basin-wide drought to the most severe flood
periods ever recorded.  Ms. Alexander explained that the historical period was developed by the
Commission in conjunction with other state agencies.  The Commission has relied on the Model
for the Brazos River basin since the Model was put into use.

Ms. Alexander also explained that the Model relies on an applicant's particular location
within a river basin to determine availability.  She explained that if an applicant's diversion point
is located within a large drainage area, then the applicant would be able to rely on large
streamflows and potentially greater water availability.[77]  The Commission gathers information
about water within those streamflows by relying on gauge information.   Where gauge

---

[75]  30 TAC § 297.19(b)(2).
[76]  Tr. II at 273-74.
[77]  Tr. I at 194.

information is unavailable, then the Commission may extrapolate information based on the readings at nearby gauging stations, a process producing data known as "naturalized flows."[78] The data has value to the Commission because it reflects the monthly average of the flow in a stream within a reporting period.[79]

Finally, Ms. Alexander explained that the Model takes into account an application's priority date in evaluating a request. The role of the priority date is to determine the seniority status of a particular appropriative right previously given by the Commission.    In Ms. Alexander's words, the ED examines the priority date to determine

> who has full – who [h]as perpetual authorizations in your area and in fact in the whole Brazos River Basin because one of the things that the [water availability models] do is allow us to look at availability and effect on other water rights on a basinwide scale, which we believe is a requirement under the Water Code because we can't grant a permit that would harm someone else.[80]

Ms. Alexander explained that by examining an application in terms of these three factors, period of record, location, and priority date, the ED is able to evaluate an application of any size in terms of the current conditions presented. As an example, Ms. Alexander related her efforts to examine Mr. Ware's application in terms of his expanded request of 150 acre-feet, the original 130 acre-feet, and diminished amounts as small as 10 acre-feet. The Model is capable of producing a result that projected availability without regard to the size of the request.

## 2.    Mr. Jones' analysis

In addition to arguing that the design of the Model was flawed, Mr. Jones also advanced his own analysis. That analysis relied in part on a balance between the scope of Mr. Ware's request and the then-current withdrawal rates of the most proximal water rights users and the inflow rates.

---

[78] Tr. I at 77-81.
[79] Tr. II at 354.
[80] Tr. II at 372.

Mr. Jones examined the difference between the amount of water being reported as used by Mr. Ware's neighbors and the amount of water that they are permitted to withdraw (more than required for his Permit);[81] the number of complaints about lack of water availability filed by downstream permit holders (none);[82] the streamflow gauge readings near Mr. Ware's farm, particular at Kempner, closest to Mr. Ware's diversion point (adequate);[83] the amount of impervious cover developed since 1997 (substantial),[84] and the volume of return flows created by wastewater treatment plants (large).[85] Mr. Jones easily concluded that sufficient amounts of water were available at Mr. Ware's diversion point and that if the Commission approved the amounts that Mr. Ware had requested, downstream permit holders would experience no adverse effects.

Although the data on which Mr. Jones relied was clear, his method of analysis did not satisfy the elements of the law controlling the award of a term permit. In brief, Mr. Jones did not evaluate the claims that senior water rights holders have on the unused water identified by Mr. Jones. Although the law takes into account any objections by senior water holders, the law requires the objecting parties to present evidence in support of their objections. But, the law does not take into account the absence of complaints.[86]

Although the streamflow gauge readings near Mr. Ware's farm showed that water may have flowed near his property, the gauge readings do not take into account the rights of existing permit holders with superior rights.[87] Although the amount of impervious cover developed since 1997 may return more water to the basin than anticipated in the historical period of record, Mr. Ware did not show that Model's period of record failed to accurately reflect the historical

---

[81] Ware Exs. 9, 10, 13, 14, 18, 21, 22, 24, 25, 28, 29, 32, 33, 36, 37, and 40.
[82] Tr. 1 at 233.
[83] Tr. 1 at 234.
[84] Id.
[85] Id
[86] TEX. WATER CODE ANN. § 11.1381.
[87] 30 TAC § 297.45(a). The rule provides an application must "not create an adverse impact to an existing water right . . . ."

highs and lows as required by law. Although the return flows to be created by wastewater treatment plants may accurately be projected to add more water to the basin, the record does not reflect that their discharges have been approved or that Mr. Ware's right to withdraw that water (if granted) would be superior to that of other permit holders.[88]

At best, Mr. Jones' analysis was a determination of whether the approval of Mr. Ware's request could be sustained from the flow of the river in recent years without adversely impacting the rights of some of the surrounding permit holders. Although Mr. Ware's request may have met that test, that method of evaluation did not satisfy the requirements of law.

## IX.  IS THE MODEL FATALLY FLAWED?

Mr. Ware argued that the Model relies on flawed data

### A.     Naturalized flows

The first of these flawed data, according to Mr. Ware, arises from the ED's mistaken reliance on "naturalized flows." Mr. Ware objected to the ED's practice of using estimates, interpolations, or projections in determining these amounts. Mr. Ware characterized these naturalized flow figures as "hypothetical constructs"[89] and the products of a mere "computer simulation," the credibility of which was rooted in an equally questionable "article of faith."[90] In contrast, he defended Mr. Jones' opinion as more reliable than that of the Model because Mr. Jones' opinion was the product of analysis using empirical data.[91]

---

[88]  Ware Ex. 50.
[89]  Tr. I at 81.
[90]  Tr. I at 115-116. These terms were developed in Mr. Ware's cross-examination of the Commission's employees.
[91]

Mr. Ware argued that the Commission should rely on empirical information instead of estimates, where possible. He challenged the ED's use of the estimates because of the possibility that they understated the amount of rain returned by runoff created by new impermeable cover. That understatement, contended Mr. Ware, could be sufficient to account for the exceedingly small amount of additional water for which he was seeking approval.

The ED argued that the determination of future availability of water is a process that necessarily relies on imperfect but best-available historical data. Mr. Thomas explained that sometimes an estimate is needed where no data is available because there are some areas where there are not complete gauge flow histories for the entire historic period of record.[92] He explained that those estimates are developed by relying on a variety of sources, including nearby rainfall amounts and estimating techniques that are built into the Model.

Although Mr. Ware may find greater reliability in the precision of the gauge reports than in the naturalized flow estimates, nothing in the law reflects that same prejudice. To the contrary, the Commission's own rule authorizes the use of approximate numbers in estimating water availability in permit application proceedings.[93] The overall reliability of the ED's conclusions is not suspect or made less credible because they include estimates. The argument is rejected.

B.    Impervious cover

Mr. Jones argued that the Model failed to consider the increased inflow into the Brazos River basin from increased impervious cover. Mr. Jones used a watershed map of Bell County[94] and historical reports of gauged flows at the United States Geological Service gauging station at Kempner to support his contention that water was available at Mr. Ware's diversion point.

---

[92] Tr. 1 at 76-77.
[93] 30 TAC § 297.42(c).
[94] Ware Ex. 54.

The ED did not contest Mr. Jones' assertion that development in the Brazos River basin had increased in the last ten years. But, Ms. Alexander testified that inclusion of more recent gauge flow data would have no effect on the historical period of record used in the Model.[95] And, Mr. Thomas testified that the addition of "new water," if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder and could not be treated as available for new allocation.[96]

The provisions of the Texas Water Code support the ED's argument. Return flows are subject to reservation for other downstream uses.[97] This part of Mr. Ware's argument is rejected.

## C.     Wastewater treatment plant return flows

Mr. Jones argued that the Brazos River basin contains wastewater treatment plant return flows (most of which were identified in the Brazos River Authority's jurisdiction) that would be available for Mr. Ware's appropriation.[98] These returns, argued Mr. Jones, effectively put more water into the basin than the Model originally identified. Mr. Jones argued that Mr. Ware should be entitled to use these flows in calculating water availability at his diversion point.

The ED showed that the Brazos River Authority's return flows become available only at the furthest downstream point in the basin. The Brazos River Authority has the right to divert that water at upstream locations, but only if its application for a System Operation Permit is granted. That right is contingent on the Brazos River Authority's having water storage capacity, an element not included in Mr. Ware's application. In addition, the ED showed that Mr. Ware's right to withdraw water, if granted, would be inferior to the Brazos River Authority's senior appropriative rights status.[99] Mr. Ware's argument failed to take into account these requirements of law and is rejected.

---

[95] Tr. II at 341-49; ED Ex. 6.
[96] Tr. II at 295.
[97] TEX. WATER CODE ANN. § 11.046(c)
[98] Ware Exs. 41 and 50.
[99] 30 TAC § 297.45

## X. PRIORITY DATES

Mr. Ware argued that in denying Mr. Ware's application, the ED was improperly trying to preserve water for use by the Brazos River Authority.[100]  Mr. Ware claimed that the ED manipulated the priority dates of Mr. Ware's Application so that its priority would be inferior to that of the Brazos River Authority's permit application.

In making these allegations, Mr. Ware accurately noted that July 1, 1997, is the priority date stated in the Permit and is the priority date for all its extensions.[101]  But, the legal consequence of the Commission's inclusion of that provision became an issue in this proceeding. Mr. Ware contended that the ED's use of a date other than July 1, 1997, in evaluating his application was the ED's single most important error in his review of the Application.[102]  The effect of that error, according to Mr. Ware, was that the ED disregarded the statute that states. "As between appropriators, the first in time is the first in right."[103]  In contrast, the ED argued that the Commission had never granted Mr. Ware the right to appropriate water and that he never had the right to claim the use of state water pursuant to an appropriative right.[104]

### A.    The ED's arguments

#### 1.    Does the Permit authorize Mr. Ware to appropriate water?

It does.   On its first page, the Permit states, "NOW, THEREFORE, this permit to appropriate and use State Water is issued to Bradley B. Ware, . . . ."[105]  A clearer statement of the Commission's intention to give Mr. Ware the right to appropriate state water under the term Permit would be difficult to draft.

---

[100] Applicant' Reply to Closing Arguments at 17.
[101] Ware Ex. 2.
[102] Applicant's Closing Argument at 14.
[103] TEX. WATER CODE ANN. § 11.027.
[104] Executive Director's Response to Closing Arguments at 8.
[105] Ware Ex. 2.

## 2.     Does the Permit authorize Mr. Ware to use state water?

It does.  The Permit states that Mr. Ware has the authority to "divert and use not to exceed 130 acre-feet of water per annum from the Lampasas River to irrigate 100 acres of land . . . ."  The definition of "appropriative right" includes the right to divert or use a specific quantity of state water acquired by law—precisely the activity in which Mr. Ware has engaged on his farm for the last twelve years.[106]  Mr. Ware holds appropriative rights under his Permit until it expires or is not extended.

## B.     Mr. Ware's arguments

### 1.     Did the ED disregard Mr. Ware's priority rights under the Permit?

The ED did not.  The law provides that for every permit, a priority date is established for the "appropriation of water" and for "the claimant's right to use the water."[107]  The measuring date for these priority dates is the date of filing of an administratively complete application.[108]  And, the date on which a priority date comes into being is "[w]hen the Commission issues the permit . . . ."[109]

The Commission has the right to include in any permit a variety of limitations. For example, an applicant's right to take and use water is limited "to the extent and purposes stated in the permit."[110]  A permit may also include special conditions that limit the total amount of

---

[106] 30 TAC § 297.1 (4).
[107] TEX. WATER CODE ANN. § 11.141.
[108] *Id.* and 30 TAC § 297.44(c).
[109] *Id.*
[110] TEX. WATER CODE ANN. § 11.135(a).

water that may be diverted.[111] With respect to all types of permits, the Commission may include ". . . conditions and restrictions . . . to protect the priority of senior water rights."[112]

Each term permit is subject to the statutory limitation making term permits "subordinate to any senior appropriative rights."[113] The phrase is undefined, and the courts generally interpret undefined terms according to their ordinary meaning.[114] In affirmative sentences, the ordinary meaning of "any" is "every" or "all."[115] Relying on that ordinary meaning, the rule makes term permits subordinate to all senior water rights.

In the Permit issued by the Commission to Mr. Ware, the priority date applies to the Permit and to "all extensions hereof . . . ."[116] The Permit does not state that the priority date will apply if the Permit is converted to a regular permit with a perpetual right. Instead, it states that the Permit will become null and void on November 7, 2007, unless "prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity."[117] In other words, the condition allows Mr. Ware to divert water from the Lampasas River until November 7, 2007. That right may be extended if Mr. Ware obtains an extension of that term or if he obtains a perpetual right to divert water. The priority date applies to "extensions" of the Permit, but the priority date has no relation to applications for new permits or to any matter other than establishing when the permit holder began the "appropriation of water" and when the permit holder acquired the "right to use the water."[118]

---

[111] TEX. WATER CODE ANN. § 11.135(b)(5).
[112] TEX. WATER CODE ANN. § 11.1351. The law controlling the issuance of temporary permits, a different type of permit, includes a similar provision: *"As between temporary permits,* the one applied for first has priority." TEX. WATER CODE ANN. § 11.138(c). [Emphasis supplied.]
[113] TEX. WATER CODE § 11.1381(d).
[114] TEX. GOV'T CODE ANN. § 311.011(a); *Geters v. Eagle Ins. Co.,* 834 S.W.2d 49, 50 (Tex. 1992).
[115] BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 52 (3d ed. 2009).
[116] Ware Ex. 2 at 2.
[117] *Id.*
[118] TEX. WATER CODE ANN. § 11.141.

These limitations on Mr. Ware's authority under the Permit may be taken into account by the ED when considering applications. As Ms. Alexander testified, the ED uses priority rights as one of three basic factors in reviewing water availability for permit applications. But, the law does not require the ED to use a priority date to establish a term permittee's rights with regard to non-term permit holders' rights. At best, Mr. Ware may rely on his priority date to establish the priority of his water rights in disputes with other term permit holders. As described in greater detail in the section that follows, the ED did not disregard Mr. Ware's priority rights under the Permit.

2.     **Did the ED manipulate the priority dates of Mr. Ware's application so that its priority would be inferior to that of the Brazos River Authority's permit application?**

The ED did not. This allegation had the least legal or factual support of any made in this proceeding. Mr. Ware argued in effect that the ED is engaged in comparing Mr. Ware's application to that of the Brazos River Authority, a former protesting party in this proceeding. The Brazos River Authority is seeking a permit from the Commission to appropriate an additional 421,449 acre-feet per year of unappropriated water,[119] or several thousand times the amount that Mr. Ware is seeking authority to appropriate from the same river basin.

In evaluating the merits of this claim, the first question to be addressed was whether Mr. Ware's Permit, if granted as an *extension of the original term Permit*, would be subject to a prior and superior water right of the Brazos River Authority.[120] It would because, as discussed in the previous section, every term permit issued by the Commission is subordinate to all senior appropriative rights.[121] As an inferior priority date holder, Mr. Ware's renewed term Permit, if

---

[119] Ware Ex. 41 at 2. The amount requested in the application is to be increased to over 1,000,000 acre-feet per year in the form of 331,449 acre-feet per year of firm water and 670,000 acre-feet per year of interruptible supply. *Id.* at 3. The parties' arguments often focused on 74,387 acre-feet of this total. Mr. Ware's point was almost any comparison between his Application and that of the Brazos River Authority involved grossly disproportional amounts.

[120] 30 TAC § 297.44.

[121] TEX. WATER CODE ANN. § 11.1381(d); 30 TAC § 297.19(a).

granted, would give him no priority-based claim to challenge the application of the Brazos River Authority.

The next question was whether Mr. Ware's Permit, if granted as a *regular permit in perpetuity*, would be subject to a prior and superior water right of the Brazos River Authority. The evidence is that the priority date for the new permit that the Brazos River Authority seeks is October 15, 2004.[122] The Brazos River Authority's application's priority date is earlier than that of Mr. Ware's application, which is January 5, 2006, when his application was administratively complete. Thus, the doctrine of "first in time, first in right" would establish Mr. Ware's application as an inferior water right, if it were granted.[123] Moreover, Mr. Ware filed his Application on November 15, 2005, which was more than one year after the Brazos River Authority filed its application. As with his rights under a term Permit, Mr. Ware's rights under a regular permit, if granted, would give him no priority-based claim for challenge the Brazos River Authority's application. The ED engaged in no manipulation of the priority dates in recommending the denial of Mr. Ware's application.

## XI. CONCLUSION

In his briefing, Mr. Ware characterized this case as "simply Applicant's epic battle to force the [ED] to apply the fundamental principal of 'first in time, first in right,' to the water in the Brazos River Basin which he knows to be available for appropriation."[124] That fundamental principal prevails in this case, but not to Mr. Ware's advantage.

---

[122] Ware Ex. 41 at 13. This date was included in a draft permit that had not been adopted by the Commission. The parties did not dispute that the date on which the Brazos River Authority's application was administratively complete was before the date on which Mr. Ware's Application was administratively complete. The parties did dispute whether Mr. Ware's priority date should be measured by the administrative complete date or the date stated in the Permit.

[123] TEX. WATER CODE ANN. § 11.027.

[124] Applicant's Closing Argument at 4.

Further, Mr. Ware described the dispute in this case as whether his Application satisfies the provisions of TEX. WATER CODE ANN. §§ 11.134(b)(2) and 11.134(b)(3)(B).[125]  The two sections require the Commission to grant an application only if unappropriated water is available at the source of supply and if the proposed appropriation does not impair existing water rights or vested riparian rights.  The evidence in this case does not support a finding that unappropriated water is available or that Mr. Ware's proposed appropriation will not impair existing water rights.

Mr. Ware contended that 74,387 acre-feet of water is available for appropriation from new wastewater return flows, described by Mr. Ware as the "central point" in his analysis of the ED's water availability review.[126]  Although Mr. Ware accurately stated that additional water may become available for appropriation, he failed to take into account the status of other priority rights with regard to the water.

Finally, with regard to the issue to which the parties agreed in seeking a contested case referral, Mr. Ware did not sustain his burden of proving that sufficient water exists in the Brazos River basin or that all applicable statutory and regulatory requirements have been met to warrant issuing to him the proposed Water Use Permit No. 5594A.  The application should be denied.

SIGNED February 8, 2010.

PAUL D. KEEPER
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

[125]  *Id.* at 8.
[126]  Applicant's Reply to Closing Arguments at 8.

# STATE OFFICE OF ADMINISTRATIVE HEARINGS

**AUSTIN OFFICE**
300 West 15th Street Suite 502
Austin, Texas 78701
Phone: (512) 475-4993
Fax: (512) 475-4994

## SERVICE LIST

**AGENCY:**      **Environmental Quality, Texas Commission on (TCEQ)**

**STYLE/CASE:**      **BRADLEY B. WARE**

**SOAH DOCKET NUMBER:**      **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**

**REFERRING AGENCY CASE: 2008-0181-WR**

| STATE OFFICE OF ADMINISTRATIVE HEARINGS | ADMINISTRATIVE LAW JUDGE<br>ALJ PAUL D. KEEPER |
|---|---|
| **REPRESENTATIVE / ADDRESS** | **PARTIES** |
| DOCKET CLERK<br>TEXAS COMMISSION ON ENVIRONMENTAL QUALITY<br>OFFICE OF THE CHIEF CLERK<br>PO BOX 13087<br>AUSTIN, TX 78711<br>(512) 239-3300 (PH)<br>(512) 239-3311 (FAX) | |
| | TEXAS COMMISSION ON ENVIRONMENTAL QUALITY |
| GARRETT ARTHUR<br>STAFF ATTORNEY<br>TEXAS COMMISSION ON ENVIRONMENTAL QUALITY<br>OFFICE OF PUBLIC INTEREST COUNSEL<br>MC-175 P.O. BOX 13087<br>AUSTIN, TX 78711-3087<br>(512) 239-5757 (PH)<br>(512) 239-6377 (FAX)<br>garthur@tceq.state.tx.us | |
| | OFFICE OF PUBLIC INTEREST COUNSEL |
| SHANA HORTON<br>ATTORNEY<br>TEXAS COMMISSION ON ENVIRONMENTAL QUALITY<br>P.O. BOX 13087, MC-175<br>AUSTIN, TX 78711-3087<br>(512) 239-1088 (PH)<br>(512) 239-3434 (FAX) | |
| | EXECUTIVE DIRECTOR |

GWENDOLYN HILL WEBB
ATTORNEY AT LAW
P. O. BOX 1329
AUSTIN, TX 78767
(512) 472-9990 (PH)
(512) 472-3183 (FAX)
gwen.hill.webb@sbcglobal.net

BRADLEY B. WARE

STEPHEN P WEBB
WEBB & WEBB ATTORNEYS AT LAW
515 CONGRESS AVENUE, SUITE 1270
AUSTIN, TX 78701
(512) 472-9990 (PH)
(512) 472-3183 (FAX)

BRADLEY B. WARE

JAMES ALDREDGE
ATTORNEY
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. BOX 13087
AUSTIN, TX 78711-3087
(512) 239-2496 (PH)
(512) 239-0606 (FAX)
jaldredge@tceq.state.tx.us

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

xc: Docket Clerk, State Office of Administrative Hearings



## APPLICATION OF BRADLEY B. WARE TO AMEND
## WATER USE PERMIT NO. 5594
## SOAH DOCKET NO. 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
## TCEQ DOCKET NO. 2008-0181-WR

On _____, the Texas Commission on Environmental Quality (TCEQ of Commission) considered the application (Application) of Bradley B. Ware to Amend Water Use Permit No. 5594 (Permit). A Proposal for Decision (PFD) was presented by Paul D. Keeper, an Administrative Law Judge (ALJ) with the State Office of Administrative Hearings (SOAH), who conducted a hearing in this case from October 28 through October 29, 2009, in Austin, Texas.

After considering the ALJ's PFD, the Commission adopts the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

### General Findings

1. The applicant is Bradley B. Ware. Mr. Ware owns a 261-acre farm on the Lampasas River, about 15 miles southwest of Killeen, Texas.

2. Mr. Ware's street and mailing address is 911 Gann Branch, Killeen, Texas 76549.

3. Mr. Ware's farm is located in Bell County, Texas, and is within the Brazos River basin.

### History of the Permit

4. On November 7, 1997, the Commission issued Mr. Ware the Permit for a ten-year term.

5. The Permit authorized Mr. Ware to divert and use 130 acre-feet of water annually from the Lampasas River to irrigate 100 acres.

6. The Permit also established July 1, 1997 as "the priority date of this permit and all extensions hereof . . . ."

7. The Permit was to expire on November 7, 2007, unless before that date, Mr. Ware received the Commission's approval to extend the term or to convert the Permit to a perpetual right.

8. Mr. Ware's rights under the Permit remained in effect pending a final administrative ruling on the Application.

9. During the twelve years in which Mr. Ware has had irrigation rights, he has farmed hay, pumpkins, wheat, sorghum, oats, and winter peas.

10. Mr. Ware has tried to impound his water by installing six or seven earthen tanks, but the composition of the soil limits the amount of water that the tanks will retain.

11. Mr. Ware has purchased 100 acre-feet of water rights and installed 8,000 to 10,000 feet of two-inch pipes, plus an eight-inch pipe to a central pivot system.

12. On November 15, 2005, Mr. Ware timely filed his Application to: (1) either extend his Permit for another ten-year period or convert his Permit to a perpetual right, (2) withdraw 20 more acre-feet of water annually, and (3) irrigate 31 more acres of his farm.

13. On January 5, 2006, the ED determined that the Application was administratively complete.

14. On June 7, 2006, the Brazos River Authority contested the application.

15. On November 4, 2006, the ED's surface water availability and interstate compacts team completed a water availability review and determined that there was not sufficient water available at the Applicant's location to support the requested demand.

16. On November 6, 2006, the ED recommended denial of the Application.

17. On January 8, 2007, Mr. Ware requested a contested case hearing at SOAH.

18. On January 25, 2008, the Commission directly referred the case to SOAH for a hearing on the merits.

19. On April 3, 2008, the SOAH administrative law judge (ALJ) convened a preliminary hearing and took jurisdiction.

20. On January 12, 2009, the Brazos River Authority was granted the right to withdraw as a protesting party.

21. On October 1, 2008, the ALJ issued an order following a telephonic prehearing conference and notified the parties that the hearing on the merits would be held March 18 through 19, 2009.

22. At the request of Mr. Ware, the hearing on the merits was rescheduled to convene October 29 through 30, 2009.

23. The hearing convened on October 28, 2009, and adjourned on October 29, 2009. The administrative record closed on December 21, 2009, after closing arguments and replies were filed.

### ED's recommendation to deny the Application

24. After Mr. Ware filed his Application in 2005, the ED's hydrology team determined that "little to no water" was available at Mr. Ware's diversion point on the Lampasas River, without regard to whether the amended Permit would have a perpetual or limited term.

25. The ED's surface water availability and interstate compacts team confirmed the hydrology team's conclusion in a water availability review memo that calculated that insufficient water was available at Mr. Ware's diversion point to support even the original 130 acre-feet of term-limited appropriation rights.

26. In recommending denial of the Appplication, the ED relied on the Commission's Water Availability Model for the Brazos River basin (Model). The calculation used a historical period of record of 1940 to 1997.

27. Although previous water availability models were developed and used by the Commission, the current Model has been in use since 2001. The Commission has relied on the Model in evaluating all applications for appropriative rights since then.

28. In evaluating the Application with the Model, the ED used a priority date of January 5, 2006, the date on which the Application was administratively complete.

29. The Model predicts that Mr. Ware's current request could be satisfied at a 100% level in none of the years, at least 75% in none of the years, and at least 50% in only 27 of the years.

*Standing*

30. The evidence presented by the ED at the hearing on the merits was generated by the Commission or was offered to support the integrity of the Commission's underlying information.

*The reliability of the Model*

31. The Model is designed to be the most accurate method available to the ED without regard to the size of the request for water.

32. The design relies in part on the Model's use of a period of record.

33. The period of record gives the Commission a set of historical boundaries ranging from the most severe basin-wide drought to the most severe flood periods ever recorded.

34. The historical period was developed by the Commission in conjunction with other state agencies.

35. The Model relies on an applicant's particular location within a river basin to determine availability.

4

36. If an applicant's diversion point is located within a large drainage area, then the applicant would be able to rely on large streamflows and potentially greater water availability.

37. The Commission gathers information about water within streamflows by relying on gauge information.

38. Where gauge information is unavailable, then the Commission may extrapolate information based on the readings at nearby gauging stations, a process producing data known as "naturalized flows."

39. Naturalized flow data has value to the Commission because it reflects the monthly average of the flow in a stream within a reporting period.

40. The Model takes into account an application's priority date in evaluating a request.

41. The role of the priority date is to determine the seniority status of a particular appropriative right previously given by the Commission.

42. By examining an application in terms of period of record, location, and priority date, the ED is able to evaluate an application of any size in terms of the current conditions presented.

43. The inclusion of more recent gauge flow data would have no effect on the historical period of record used in the Model.

44. The addition of "new water," if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder and could not be treated as available for new allocation.

45. The Brazos River Authority's return flows become available only at the furthest downstream point in the basin.

*Priority dates*

46. The priority date of Mr. Ware's current Permit is July 1, 1997, and applies to "all extensions . . . ."

47. The priority date in the Permit has no relation to applications for new permits or to any matter other than establishing when the permit holder began the appropriation of water or when the permit holder acquired the right to use the water.

48. The priority date of Mr. Ware's application was established on the date on which it became administratively complete, January 5, 2006.

49. The Brazos River Authority is seeking a permit from the Commission to appropriate an additional 421,449 acre-feet per year of unappropriated water, or several thousand times the amount that Mr. Ware is seeking authority to appropriate from the same river basin.

50. The priority date of the application of the Brazos River Authority is October 15, 2004.

51. The priority date of the Brazos River Authority's application is earlier than that of Mr. Ware's application.

52. The ED engaged in no manipulation of the priority dates in recommending the denial of Mr. Ware's application.

## II. CONCLUSIONS OF LAW

1. The Commission has jurisdiction over the determination of water rights in Texas rivers and streams. TEX. WATER CODE ANN. ch. 11.

2. Notice was provided in accordance with TEX. WATER CODE ANN. § 11.132, 30 TEX. ADMIN. CODE (TAC) ch. 295, subch. C; and TEX. GOV. CODE ANN. §§ 2003.051 and 2003.052.

3. SOAH has jurisdiction to conduct a hearing and to prepare a Proposal for Decision in contested cases referred by TCEQ. TEX. GOV. CODE ANN. § 2003.47.

4. The Application became administratively complete on January 5, 2006. TEX. WATER CODE ANN. § 11.141 and 30 TAC § 297.44(c)

6

5. The Application was processed and the proceedings described in this Order were conducted in accordance with applicable statutes and the rules of the Commission and SOAH. TEX. WATER CODE ANN. ch. 11; 30 TAC ch. 80, 1 TAC ch. 155.

6. Mr. Ware held the burden of proof. 30 TAC § 80.17(a). Mr. Ware did not meet his burden.

7. Any person may appear at a hearing at which the issuance of a permit is to be considered. TEX. WATER CODE ANN. § 11.133.

8. The ED is required to participate as a party in contested hearings relating to applications about water rights. 30 TAC § 80.108(b)(1).

9. The ED is required to represent the Commission in hearings that raise matters that affect the public's interest in the state's environment and natural resources, including matters that have been determined to be policies of the state. TEX. WATER CODE ANN. § 5.228(a).

10. In contested case permit hearings, the ED's presentation is limited to "the sole purpose of providing information to complete the administrative record." TEX. WATER CODE ANN. § 5.228(c).

11. In a contested hearing, the ED's presentation is limited to "information developed by the Commission . . . ." TEX. WATER CODE ANN. § 5.228(a).

12. In a contested hearing, the ED may provide information that opposes an application, as long as the information is within the limits of the law. TEX. WATER CODE ANN. § 11.133.

13. All parties to a contested case have the right to present a direct case and to cross-examine the opposing party's evidence. 30 TAC § 80.115(a).

14. The ED has standing to appear as a party in this proceeding and was authorized to present the Commission's evidence and arguments in opposition to Mr. Ware's case.

15. An applicant may request that an application be remanded to the ED for action as an uncontested matter if: (1) all timely hearing requests have been withdrawn or denied or (2) all parties to a contested case reach a settlement so that no facts or issues remain controverted. 30 TAC § 80.101.

16. A hearing was required in this case because the ED remained a party to a contested case after the Brazos River Authority withdrew its opposition and because there was not a settlement between the remaining parties.

17. Scientific testimony presented by a party must be offered through the testimony of an expert, and that testimony must be based on a reliable foundation. TEX. R. EVID. 702.

18. A finder of fact is to determine the reliability of the evidence, and "[u]nreliable expert testimony is not evidence." *Gross v. Burt*, 149 S.W.3d 213, 237 (Tex. App.—Fort Worth 2004, pet. denied)

19. To establish the reliability of an expert's testimony, an offering party must first establish the reliability of the analysis that the expert used in reaching his conclusions. Six nonexclusive factors are used in determining whether scientific testimony is reliable:

> (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique.

*Gross v. Burt*, 149 S.W.3d at 237, citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998) and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

20. Mr. Ware did not establish that the method used by Mr. Jones, Mr. Ware's expert witness, was reliable.

21. The water of every flowing river in the State of Texas is the property of the state, and the Commission is the state's agent for the regulation of its water. TEX. WATER CODE ANN. § 11.021(a).

22. The Commission has the authority to allow persons to appropriate state water for specific uses. TEX. WATER CODE ANN. § 11.022.

23. The Commission may grant permits to applicants who seek to appropriate unappropriated state water. TEX. WATER CODE ANN. § 11.124.

24. The amount of water for which the Commission may grant permits may not be more than is available. TEX. WATER CODE ANN. § 11.023(e).

25. In 1967, the Texas legislature abandoned the state's former system of recognizing both riparian and appropriative rights. *In re Adjudication of Water Rights of Brazos III Segment of Brazos River Basin*, 746 S.W.2d 207, 209 (Tex. 1988).

26. In place of the former system, the legislature adopted "an orderly forum and procedure for the [Commission's] adjudication and administration of water rights." *Brazos III*, 746 S.W.2d at 209.

27. The Commission is required to "provide certainty in water management" by evaluating the state's major river basins. TEX. WATER CODE ANN. § 11.0235(d-2).

28. For all permits, the holder has the right to appropriate water only to the extent and for the purposes stated in the permit and subject to the protection of the holders of senior water rights. TEX. WATER CODE ANN. §§ 11.135(a) and 1351.

29. An "appropriative right" is the right to impound, divert, store, take, or use a specific quantity of state water acquired by law. 30 TAC § 297.1(4).

30. The holder's rights to appropriate water may be affected by the amounts that the holder actually uses or can beneficially use, and "all water not so used is considered not appropriated." TEX. WATER CODE ANN. § 11.025.

31. If the holder of a permit does not beneficially use his water, then the right of appropriation is considered to be not perfected. TEX. WATER CODE ANN. § 11.026.

32. The Commission has discretionary authority to temporarily reallocate unperfected appropriative water rights to persons other than the regular permit holder. An applicant may seek a term permit, a permit that is issued for a term of years rather than in perpetuity. TEX. WATER CODE ANN. §§ 11.1381(a) and 11.026.

33. A term permit allows an applicant to use water rights that have not been perfected by the holders. A term permit creates derivative rights, not original rights, so that the maximum use of water may be achieved. TEX. WATER CODE ANN. § 11.123.

34. The Commission may deny an application for a term permit if the permit will jeopardize financial commitments for water projects or if the permit will prevent the holder of the senior appropriative right from beneficially using his rights during the period of the term permit. TEX. WATER CODE ANN. § 11.1381(b) and (c).

35. If the Commission approves a permit, then the rights that it confers are subordinate to any senior appropriative rights. TEX. WATER CODE ANN. § 11.1381(d).

36. The Commission may issue a term permit "when there is insufficient unappropriated water in the source of supply to satisfy the application." 30 TAC § 297.19(a).

37. A holder of a senior appropriative right may challenge an application for a term permit by showing that the Commission's issuance of a term permit would adversely affect the holder's beneficial use of its senior rights. In proving this adverse effect, the holder may use as its proof: water use projections in the state or regional water plans, economic indicators, population growth projections, electrical generation needs, or "other reasonable projections based on accepted methods." 30 TAC § 297.19(b)(2).

38. The Commission may deny an application if the proposed permit would be detrimental to the public welfare. 30 TAC § 297.19(b)(4).

10

39.	In 1997, the Texas legislature mandated the Commission to adopt an updated water availability model (Model) for six river basins in Texas. TEX. WATER CODE ANN. § 16.012(g).

40.	For direct diversions from a stream without sufficient water storage facilities, an applicant must prove that approximately 75% of the water request is available approximately 75% of the time based on the available historic stream flow record. 30 TAC § 297.42.

41.	Neither the ED nor an applicant is required to use the Model in determining whether water is available in each river basin in Texas.

42.	The Commission has the authority to contract for "scientific and technical environmental services," including scientific data analysis, to be used in the modeling to be conducted by the ED. TEX. WATER CODE ANN. § 5.2291(a).

43.	The ED has the authority to rely on scientific data analysis in enforcing the terms of a permit and in presenting information about an application for a permit. TEX. WATER CODE ANN. § 5.230.

44.	A contesting permit holder may rely on "reasonable projections based on accepted methods," and an applicant and the ED may do the same. 30 TAC § 297.19(b)(2).

45.	The Commission may use approximate numbers in estimating water availability in permit application proceedings. 30 TAC § 297.42(c).

46.	For every permit, a priority date is established for the appropriation of water and for the claimant's right to use the water. TEX. WATER CODE ANN. § 11.141.

47.	The measuring date for these priority dates is the date of filing of an administratively complete application. 30 TAC § 297.44(c).

48.	The date on which a priority date comes into being is "[w]hen the Commission issues the permit . . . ." 30 TAC § 297.44(c).

11

49. An applicant's right to take and use water is limited "to the extent and purposes stated in the permit." TEX. WATER CODE ANN. § 11.135(a).

50. A permit may include special conditions that limit the total amount of water that may be diverted. TEX. WATER CODE ANN. § 11.135(b)(5).

51. With respect to all types of permits, the Commission may include " . . . conditions and restrictions . . . to protect the priority of senior water rights." TEX. WATER CODE ANN. § 11.1351

52. Each term permit is subject to the unique statutory limitation making term permits "subordinate to any senior appropriative rights." TEX. WATER CODE § 11.1381(d).

53. Courts generally interpret undefined terms according to their ordinary meaning. TEX. GOV'T CODE ANN. § 311.011(a); *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992).

54. In affirmative sentences, the ordinary meaning of "any" is "every" or "all." BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 52 (3d ed. 2009).

55. Term permits are subordinate to all senior water rights. TEX. WATER CODE ANN. § 11.1381(d); 30 TAC § 297.19(a).

56. Mr. Ware failed to carry his burden of proving that sufficient water exists in the Brazos River basin or that all applicable statutory and regulatory requirements have been met to warrant issuing to him the proposed Water Use Permit No. 5594A

57. Pursuant to the authority of, and in accordance with, applicable laws and regulations, the requested Permit should not be granted.

58. Pursuant to 30 TEX. ADMIN. CODE ANN. §§ 80.23(d)(2), the Executive Director and Office of Public Interest Counsel may not be assessed any portion of the transcript and reporting costs.

12

NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, IN ACCORDANCE WITH THESE FINDINGS OF FACT AND CONCLUSIONS OF LAW THAT:

1. The application of Bradley B. Ware to amend Water Use Permit No. 5594 is denied.

2. The Applicant shall pay the court reporting and transcript costs for this case.

3. The Chief Clerk of the Commission shall forward a copy of this Order to all parties, and no amendment to Water Use Permit No. 5594 shall be issued.

4. All other motions, requests for specific Findings of Fact or Conclusions of Law, and other requests for general and specific relief, if not expressly granted, are denied for want of merit.

5. If any provision, sentence, clause, or phrase of this Order is for any reason held to be invalid, the invalidity of any portion shall not affect the validity of the remaining portions of this Order.

6. The effective date of this Order is the date the Order is final, as provided by 30 TAC § 80.273 and TEX. GOV. CODE ANN. § 2001.144.

ISSUED:

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

_____

**Buddy Garcia, Chairman**
**For the Commission**

13

C



Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 23, 2010

TO:     Persons on the attached mailing list.

RE:     Bradley B. Ware
        TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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
        Water Use Permit No. 5594

**Decision of the Commission on Application.**

The Texas Commission on Environmental Quality ("TCEQ" or "Commission") has made a decision to deny the above-referenced application. Enclosed with this letter is a copy of the Commission's order. Unless a Motion for Rehearing ("MFR" or "motion") is timely filed with the chief clerk, as described below, this action of the Commission will become final. A MFR is a request for the Commission to review its decision on the matter. Any motion must explain why the Commission should review the decision.

**Deadline for Filing Motion for Rehearing.**

A MFR must be received by the chief clerk's office no later than 20 days after the date a person is notified of the Commission's order on this application. A person is presumed to have been notified on the third day after the date that this order is mailed.

Motions may be filed with the chief clerk electronically at http://www10.tceq.state.tx.us/epic/efilings/ or by filing an original and 7 copies with the Chief Clerk at the following address:

> LaDonna Castañuela, Chief Clerk
> TCEQ, MC-105
> P.O. Box 13087
> Austin, Texas 78711-3087
> Fax: 512/239-3311

In addition, a copy of the motion must be sent on the same day to each of the individuals on the attached mailing list as indicated by an asterisk (*). A certificate of service stating that copies of the motion were sent to those on the mailing list must also be sent to the chief clerk. The procedures for filing and serving motions for rehearing and responses are located in 30 Texas Administrative Code (TAC) §80.272 and 30 TAC §1.10-1.11. The hardcopy filing requirement is waived by the General Counsel pursuant to 30 TAC §1.10(h).

The written motion must contain (1) the name and representative capacity of the person filing the motion; (2) the style and official docket number assigned by SOAH or official docket number assigned by the Commission; (3) the date of the order; and (4) a concise statement of each allegation of error.

Unless the time for the Commission to act on the motion is extended, the MFR is overruled by operation of law 45 days after a person is notified of the Commission's order on this application.

If you have any questions or need additional information about the procedures described in this letter, please call the Office of Public Assistance toll free at 1-800-687-4040.

Sincerely,

LaDonna Castañuela
Chief Clerk

LDC/ms

Enclosures

Bradley B. Ware
TCEQ Docket No. 2008-0181-WR
SOAH Docket No. 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

FOR THE APPLICANT:

Stephen P. Webb ✱
Gwendolyn Webb
Webb & Webb
712 Southwest Tower
211 East 7th Street
Austin, Texas 78701

Bradley B. Ware
911 Gann Branch Road
Killeen, Texas 76549

INTERESTED PERSONS:

Andrew Miller
Kemp Smith LLP
816 Congress Avenue, Suite 1150
Austin, Texas 78701

Gene W. Ray, DVM
Town & Country Veterinary Medical Center
505 East Elms Road
Killeen, Texas 76542

Bruce Wasinger
Bickerstaff Heath Delgado Acosta LLP
3711 South MoPac Expressway
Building 1, Suite 300
Austin, Texas 78746

FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Shana Horton, Staff Attorney ✱
James Aldredge, Staff Attorney
Texas Commission on Environmental Quality
Environmental Law Division MC-173
P.O. Box 13087
Austin, Texas 78711-3087

Steve Ramos, Technical Staff
Texas Commission on Environmental Quality
Water Supply Division MC-160
P.O. Box 13087
Austin, Texas 78711-3087

FOR OFFICE OF PUBLIC ASSISTANCE
via electronic mail:

Bridget Bohac, Director
Texas Commission on Environmental Quality
Office of Public Assistance MC-108
P.O. Box 13087
Austin, Texas 78711-3087

FOR PUBLIC INTEREST COUNSEL
via electronic mail:

Garrett Arthur, Attorney ✱
Texas Commission on Environmental Quality
Public Interest Counsel MC-103
P.O. Box 13087
Austin, Texas 78711-3087

FOR THE CHIEF CLERK
via electronic mail:

LaDonna Castañuela
Texas Commission on Environmental Quality
Office of Chief Clerk MC-105
P.O. Box 13087
Austin, Texas 78711-3087

* The Honorable Paul Keeper
Administrative Law Judge
State Office of Administrative Hearings
P. O. Box 13025
Austin, Texas 78711-3025

* Courtesy Copy via inter-agency mail

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



**AN ORDER Concerning the Application of Bradley B. Ware to amend water use Permit No. 5594; TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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**

On April 14, 2010, the Texas Commission on Environmental Quality (TCEQ of Commission) considered the application (Application) of Bradley B. Ware to Amend Water Use Permit No. 5594 (Permit). A Proposal for Decision (PFD) was presented by Paul D. Keeper, an Administrative Law Judge (ALJ) with the State Office of Administrative Hearings (SOAH), who conducted a hearing in this case from October 28 through October 29, 2009, in Austin, Texas.

After considering the ALJ's PFD, the Commission adopts the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

### *General Findings*

1. The applicant is Bradley B. Ware. Mr. Ware owns a 261-acre farm on the Lampasas River, about 15 miles southwest of Killeen, Texas.

2. Mr. Ware's street and mailing address is 911 Gann Branch, Killeen, Texas 76549.

3. Mr. Ware's farm is located in Bell County, Texas, and is within the Brazos River basin.

### *History of the Permit*

4. On November 7, 1997, the Commission issued Mr. Ware the Permit for a ten-year term.

5. The Permit authorized Mr. Ware to divert and use 130 acre-feet of water annually from the Lampasas River to irrigate 100 acres.

6. The Permit also established July 1, 1997 as "the priority date of this permit and all extensions hereof . . . ."

7. The Permit was to expire on November 7, 2007, unless before that date, Mr. Ware received the Commission's approval to extend the term or to convert the Permit to a perpetual right.

8. Mr. Ware's rights under the Permit remained in effect pending a final administrative ruling on the Application.

9. During the twelve years in which Mr. Ware has had irrigation rights, he has farmed hay, pumpkins, wheat, sorghum, oats, and winter peas.

10. Mr. Ware has tried to impound his water by installing six or seven earthen tanks, but the composition of the soil limits the amount of water that the tanks will retain.

11. Mr. Ware has purchased 100 acre-feet of water rights and installed 8,000 to 10,000 feet of two-inch pipes, plus an eight-inch pipe to a central pivot system.

12. On November 15, 2005, Mr. Ware timely filed his Application to: (1) either extend his Permit for another ten-year period or convert his Permit to a perpetual right, (2) withdraw 20 more acre-feet of water annually, and (3) irrigate 31 more acres of his farm.

13. On January 5, 2006, the ED determined that the Application was administratively complete.

14. On June 7, 2006, the Brazos River Authority contested the application.

15. On November 4, 2006, the ED's surface water availability and interstate compacts team completed a water availability review and determined that there was not sufficient water available at the Applicant's location to support the requested demand.

16. On November 6, 2006, the ED recommended denial of the Application.

17. On January 8, 2007, Mr. Ware requested a contested case hearing at SOAH.

18. On January 25, 2008, the Commission directly referred the case to SOAH for a hearing on the merits.

19. On April 3, 2008, the SOAH administrative law judge (ALJ) convened a preliminary hearing and took jurisdiction.

20. On January 12, 2009, the Brazos River Authority was granted the right to withdraw as a protesting party.

21. On October 1, 2008, the ALJ issued an order following a telephonic prehearing conference and notified the parties that the hearing on the merits would be held March 18 through 19, 2009.

22. At the request of Mr. Ware, the hearing on the merits was rescheduled to convene October 29 through 30, 2009.

23. The hearing convened on October 28, 2009, and adjourned on October 29, 2009. The administrative record closed on December 21, 2009, after closing arguments and replies were filed.

### ED's recommendation to deny the Application

24. After Mr. Ware filed his Application in 2005, the ED's Surface Water and Interstate Compacts Team determined that "little to no water" was available at Mr. Ware's diversion point on the Lampasas River, without regard to whether the amended Permit would have a perpetual or limited term.

25. The ED's Surface Water Availability and Interstate Compacts Team confirmed the hydrologist's conclusion in a water availability review memo that calculated that insufficient water was available at Mr. Ware's diversion point to support even the original 130 acre-feet of term-limited appropriation rights.

26. In recommending denial of the Application, the ED relied on the Commission's Water Availability Model for the Brazos River basin (Model). The calculation used a historical period of record of 1940 to 1997.

27. Although previous water availability models were developed and used by the Commission, the current Model has been in use since 2001. The Commission has relied on the Model in evaluating all applications for appropriative rights since then.

28. In evaluating the Application with the Model, the ED used a priority date of January 5, 2006, the date on which the Application was administratively complete.

29. The Model predicts that Mr. Ware's current request could be satisfied at a 100% level in none of the years and at least 75% in 5.2% of the years.

### Standing

30. The evidence presented by the ED at the hearing on the merits was generated by the Commission or was offered to support the integrity of the Commission's underlying information.

### The reliability of the Model

31. The Model is designed to be the most accurate method available to the ED without regard to the size of the request for water.

32. The design relies in part on the Model's use of a period of record.

33. The period of record gives the Commission a set of historical boundaries ranging from the most severe basin-wide drought to the most severe flood periods ever recorded.

34. The historical period was developed by the Commission in conjunction with other state agencies and outside consultants.

35. The Model relies on an applicant's particular location within a river basin to determine availability.

4

36.     If an applicant's diversion point is located within a large drainage area, then the applicant would be able to rely on large streamflows and potentially greater water availability.

37.     The Commission gathers information about streamflows by relying on gauge information and data from other sources.

38.     Where gauge information is unavailable, then the Commission may extrapolate information based on the readings at nearby gauging stations. This type of adjustment occurs during the creation of the naturalized flow data set.

39.     Naturalized flow data has value to the Commission because it reflects the flows that would have occurred without the impacts created by human diversions and storage of water.

40.     The Model takes into account an application's priority date in evaluating a request.

41.     The role of the priority date is to determine the seniority status of a particular appropriative right previously given by the Commission.

42.     By examining an application in terms of period of record, location, and priority date, the ED is able to evaluate an application of any size in terms of the current conditions presented.

43.     At this time, the inclusion of more recent gauge flow data would have no effect on the range of data reflected in the historical period of record used in the Model.

44.     The addition of "new water," if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder and could not be treated as available for new allocation.

45.     The full amount of the Brazos River Authority's requested return flows become available only at the furthest downstream point in the basin; diversions at other points are possible due to specific facts and circumstances of that application.

*Priority dates*

46. The priority date of Mr. Ware's current Permit is July 1, 1997, and applies to "all extensions . . . ."

47. The priority date in the Permit has no relation to applications for new permits or to any matter other than establishing when the permit holder began the appropriation of water or when the permit holder acquired the right to use the water.

48. The priority date of Mr. Ware's application was established on the date on which it became administratively complete, January 5, 2006.

49. The Brazos River Authority is seeking a permit from the Commission to appropriate an additional 421,449 acre-feet per year of unappropriated water, or several thousand times the amount that Mr. Ware is seeking authority to appropriate from the same river basin.

50. The priority date of the application of the Brazos River Authority is October 15, 2004.

51. The priority date of the Brazos River Authority's application is earlier than that of Mr. Ware's application.

52. The ED engaged in no manipulation of the priority dates in recommending the denial of Mr. Ware's application.

## II. CONCLUSIONS OF LAW

1. The Commission has jurisdiction over the determination of water rights in Texas rivers and streams. TEX. WATER CODE ANN. ch. 11.

2. Notice was provided in accordance with TEX. WATER CODE ANN. § 11.132, 30 TEX. ADMIN. CODE (TAC) ch. 295, subch. C; and TEX. GOV. CODE ANN. §§ 2003.051 and 2003.052.

3. SOAH has jurisdiction to conduct a hearing and to prepare a Proposal for Decision in contested cases referred by TCEQ. TEX. GOV. CODE ANN. § 2003.47.

4.  The Application became administratively complete on January 5, 2006. TEX. WATER CODE ANN. § 11.141 and 30 TAC § 297.44(c)

5.  The Application was processed and the proceedings described in this Order were conducted in accordance with applicable statutes and the rules of the Commission and SOAH. TEX. WATER CODE ANN. ch. 11; 30 TAC ch. 80, 1 TAC ch. 155.

6.  Mr. Ware held the burden of proof. 30 TAC § 80.17(a). Mr. Ware did not meet his burden.

7.  Any person may appear at a hearing at which the issuance of a permit is to be considered. TEX. WATER CODE ANN. § 11.133.

8.  The ED is required to participate as a party in contested hearings relating to applications about water rights. 30 TAC § 80.108(b)(1).

9.  The ED is required to represent the Commission in hearings that raise matters that affect the public's interest in the state's environment and natural resources, including matters that have been determined to be policies of the state. TEX. WATER CODE ANN. § 5.228(a).

10. In contested case permit hearings, the ED's presentation is limited to "the sole purpose of providing information to complete the administrative record." TEX. WATER CODE ANN. § 5.228(c).

11. In a contested hearing, the ED's presentation is limited to "information developed by the Commission . . . ." TEX. WATER CODE ANN. § 5.228(a).

12. In a contested hearing, the ED may provide information that opposes an application, as long as the information is within the limits of the law. TEX. WATER CODE ANN. § 11.133.

13. All parties to a contested case have the right to present a direct case and to cross-examine the opposing party's evidence. 30 TAC § 80.115(a).

14. The ED has standing to appear as a party in this proceeding and was authorized to present the Commission's evidence and arguments in opposition to Mr. Ware's case.

15. An applicant may request that an application be remanded to the ED for action as an uncontested matter if: (1) all timely hearing requests have been withdrawn or denied or (2) all parties to a contested case reach a settlement so that no facts or issues remain controverted. 30 TAC § 80.101.

16. A hearing was required in this case because the ED remained a party to a contested case after the Brazos River Authority withdrew its opposition and because there was not a settlement between the remaining parties.

17. Scientific testimony presented by a party must be offered through the testimony of an expert, and that testimony must be based on a reliable foundation. TEX. R. EVID. 702.

18. A finder of fact is to determine the reliability of the evidence, and "[u]nreliable expert testimony is not evidence." *Gross v. Burt*, 149 S.W.3d 213, 237 (Tex. App.—Fort Worth 2004, pet. denied).

19. To establish the reliability of an expert's testimony, an offering party must first establish the reliability of the analysis that the expert used in reaching his conclusions. Six nonexclusive factors are used in determining whether scientific testimony is reliable:

> (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique.

*Gross v. Burt*, 149 S.W.3d at 237, citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998) and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

20. Mr. Ware did not establish that the method used by Mr. Jones, Mr. Ware's expert witness, was reliable.

21. The water of every flowing river in the State of Texas is the property of the state, and the Commission is the state's agent for the regulation of its water. TEX. WATER CODE ANN. § 11.021(a).

22. The Commission has the authority to allow persons to appropriate state water for specific uses. TEX. WATER CODE ANN. § 11.022.

23. The Commission may grant permits to applicants who seek to appropriate unappropriated state water. TEX. WATER CODE ANN. § 11.124.

24. The amount of water for which the Commission may grant permits may not be more than is available. TEX. WATER CODE ANN. § 11.023(e).

25. In 1967, the Texas legislature abandoned the state's former system of recognizing both riparian and appropriative rights. *In re Adjudication of Water Rights of Brazos III Segment of Brazos River Basin*, 746 S.W.2d 207, 209 (Tex. 1988).

26. In place of the former system, the legislature adopted "an orderly forum and procedure for the [Commission's] adjudication and administration of water rights." *Brazos III*, 746 S.W.2d at 209.

27. The Commission is required to "provide certainty in water management" by evaluating the state's major river basins. TEX. WATER CODE ANN. § 11.0235(d-2).

28. For all permits, the holder has the right to appropriate water only to the extent and for the purposes stated in the permit and subject to the protection of the holders of senior water rights. TEX. WATER CODE ANN. §§ 11.135(a) and 1351.

29. An "appropriative right" is the right to impound, divert, store, take, or use a specific quantity of state water acquired by law. 30 TAC § 297.1(4).

30. The holder's rights to appropriate water may be affected by the amounts that the holder actually uses or can beneficially use, and "all water not so used is considered not appropriated." TEX. WATER CODE ANN. § 11.025.

31. If the holder of a permit does not beneficially use his water, then the right of appropriation is considered to be not perfected. TEX. WATER CODE ANN. § 11.026.

32. The Commission has discretionary authority to temporarily reallocate unperfected appropriative water rights to persons other than the regular permit holder. An applicant may seek a term permit, a permit that is issued for a term of years rather than in perpetuity. TEX. WATER CODE ANN. §§ 11.1381(a) and 11.026.

33. A term permit allows an applicant to use water rights that have not been perfected by the holders. A term permit creates derivative rights, not original rights, so that the maximum use of water may be achieved. TEX. WATER CODE ANN. § 11.123.

34. The Commission may deny an application for a term permit if the permit will jeopardize financial commitments for water projects or if the permit will prevent the holder of the senior appropriative right from beneficially using his rights during the period of the term permit. TEX. WATER CODE ANN. § 11.1381(b) and (c).

35. If the Commission approves a permit, then the rights that it confers are subordinate to any senior appropriative rights. TEX. WATER CODE ANN. § 11.1381(d).

36. The Commission may issue a term permit "when there is insufficient unappropriated water in the source of supply to satisfy the application." 30 TAC § 297.19(a).

37. A holder of a senior appropriative right may challenge an application for a term permit by showing that the Commission's issuance of a term permit would adversely affect the holder's beneficial use of its senior rights. In proving this adverse effect, the holder may use as its proof: water use projections in the state or regional water plans, economic

indicators, population growth projections, electrical generation needs, or "other reasonable projections based on accepted methods." 30 TAC § 297.19(b)(2).

38. The Commission may deny an application if the proposed permit would be detrimental to the public welfare. 30 TAC § 297.19(b)(4).

39. In 1997, the Texas legislature mandated the Commission to adopt an updated water availability model (Model) for six river basins in Texas. TEX. WATER CODE ANN. § 16.012(g).

40. For direct diversions from a stream without sufficient water storage facilities, an applicant must prove that approximately 75% of the water requested is available approximately 75% of the time when distributed on a monthly basis and based on the available historic stream flow record. 30 TAC § 297.42.

41. Neither the ED nor an applicant is required to use the Model in determining whether water is available in each river basin in Texas.

42. The Commission has the authority to contract for "scientific and technical environmental services," including scientific data analysis, to be used in the modeling to be conducted by the ED. TEX. WATER CODE ANN. § 5.2291(a).

43. The ED has the authority to rely on scientific data analysis in enforcing the terms of a permit and in presenting information about an application for a permit. TEX. WATER CODE ANN. § 5.230.

44. A contesting permit holder may rely on "reasonable projections based on accepted methods," and an applicant and the ED may do the same. 30 TAC § 297.19(b)(2).

45. The Commission may use approximate numbers in estimating water availability in permit application proceedings. 30 TAC § 297.42(c).

46. For every permit, a priority date is established for the appropriation of water and for the claimant's right to use the water. TEX. WATER CODE ANN. § 11.141.

11

47. The measuring date for these priority dates is the date of filing of an administratively complete application. 30 TAC § 297.44(c).

48. The date on which a priority date comes into being is "[w]hen the Commission issues the permit . . . ." 30 TAC § 297.44(c).

49. An applicant's right to take and use water is limited "to the extent and purposes stated in the permit." TEX. WATER CODE ANN. § 11.135(a).

50. A permit may include special conditions that limit the total amount of water that may be diverted. TEX. WATER CODE ANN. § 11.135(b)(5).

51. With respect to all types of permits, the Commission may include " . . . conditions and restrictions . . . to protect the priority of senior water rights." TEX. WATER CODE ANN. § 11.1351

52. Each term permit is subject to the unique statutory limitation making term permits "subordinate to any senior appropriative rights." TEX. WATER CODE § 11.1381(d).

53. Courts generally interpret undefined terms according to their ordinary meaning. TEX. GOV'T CODE ANN. § 311.011(a); Geters v. Eagle Ins. Co., 834 S.W.2d 49, 50 (Tex. 1992).

54. In affirmative sentences, the ordinary meaning of "any" is "every" or "all." BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 52 (3d ed. 2009).

55. Term permits are subordinate to all senior water rights. TEX. WATER CODE ANN. § 11.1381(d); 30 TAC § 297.19(a).

56. Mr. Ware failed to carry his burden of proving that sufficient water exists in the Brazos River basin or that all applicable statutory and regulatory requirements have been met to warrant issuing to him the proposed Water Use Permit No. 5594A.

57. Pursuant to the authority of, and in accordance with, applicable laws and regulations, the requested Permit should not be granted.

12

58. Pursuant to 30 Tex. Admin. Code Ann. §§ 80.23(d)(2), the Executive Director and Office of Public Interest Counsel may not be assessed any portion of the transcript and reporting costs.

## III. EXPLANATION OF CHANGES

1. The Commission sustained the ED's Exceptions regarding Findings of Fact Nos. 24, 25, 34, 37, 38, 39, 43, 45 and Conclusion of Law No. 40, as recommended by the ALJ in his March 17, 2010 reply to the parties' post-PFD submissions.

2. The Commission modified Finding of Fact No. 29 to provide consistency with the TCEQ's water availability review, included in the record as Applicant's Exhibit No. 47. The change was consistent with the ED's Exceptions.

**NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, IN ACCORDANCE WITH THESE FINDINGS OF FACT AND CONCLUSIONS OF LAW THAT:**

1. The application of Bradley B. Ware to amend Water Use Permit No. 5594 is denied.

2. The Applicant shall pay the court reporting and transcript costs for this case.

3. The Chief Clerk of the Commission shall forward a copy of this Order to all parties, and no amendment to Water Use Permit No. 5594 shall be issued.

4. All other motions, requests for specific Findings of Fact or Conclusions of Law, and other requests for general and specific relief, if not expressly granted, are denied for want of merit.

5.   If any provision, sentence, clause, or phrase of this Order is for any reason held to be invalid, the invalidity of any portion shall not affect the validity of the remaining portions of this Order.

6.   The effective date of this Order is the date the Order is final, as provided by 30 TAC § 80.273 and TEX. GOV. CODE ANN. § 2001.144.

ISSUED: **APR 2 0 2010**

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

Bryan W. Shaw, Ph.D., Chairman

14

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF TRAVIS** | § |

I, LaDonna Castañuela, Chief Clerk of the Texas Commission on Environmental Quality (TCEQ), do hereby certify that the attached mailing list provides the persons to whom the Order regarding Bradley B. Ware, TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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 was mailed on April 23, 2010. The persons on the attached mailing list were all mailed by first-class mail except TCEQ and State Office of Administrative (SOAH) staff. The order was provided to TCEQ via electronic mail and SOAH staff via inter-agency mail. Given under my hand and the seal of the Texas Commission on Environmental Quality, this the 23rd day of April, 2010.

LaDonna Castañuela, Chief Clerk
Texas Commission on Environmental Quality

SEAL

D

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
   Government Code (Refs & Annos)
     Title 10. General Government (Refs & Annos)
       Subtitle A. Administrative Procedure and Practice
         Chapter 2001. Administrative Procedure (Refs & Annos)
           Subchapter C. Contested Cases: General Rights and Procedures
             ➜➜ **§ 2001.060. Record**

The record in a contested case includes:

  (1) each pleading, motion, and intermediate ruling;

  (2) evidence received or considered;

  (3) a statement of matters officially noticed;

  (4) questions and offers of proof, objections, and rulings on them;

  (5) proposed findings and exceptions;

  (6) each decision, opinion, or report by the officer presiding at the hearing; and

  (7) all staff memoranda or data submitted to or considered by the hearing officer or members of the agency who are involved in making the decision.

CREDIT(S)

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review
            →→ **§ 2001.175. Procedures for Review Under Substantial Evidence Rule or Undefined Scope of Review**

(a) The procedures of this section apply if the manner of review authorized by law for the decision in a contested case that is the subject of complaint is other than by trial de novo.

(b) After service of the petition on a state agency and within the time permitted for filing an answer or within additional time allowed by the court, the agency shall send to the reviewing court the original or a certified copy of the entire record of the proceeding under review. The record shall be filed with the clerk of the court. The record may be shortened by stipulation of all parties to the review proceedings. The court may assess additional costs against a party who unreasonably refuses to stipulate to limit the record, unless the party is subject to a rule adopted under Section 2001.177 requiring payment of all costs of record preparation. The court may require or permit later corrections or additions to the record.

(c) A party may apply to the court to present additional evidence. If the court is satisfied that the additional evidence is material and that there were good reasons for the failure to present it in the proceeding before the state agency, the court may order that the additional evidence be taken before the agency on conditions determined by the court. The agency may change its findings and decision by reason of the additional evidence and shall file the additional evidence and any changes, new findings, or decisions with the reviewing court.

(d) The party seeking judicial review shall offer, and the reviewing court shall admit, the state agency record into evidence as an exhibit.

(e) A court shall conduct the review sitting without a jury and is confined to the agency record, except that the court may receive evidence of procedural irregularities alleged to have occurred before the agency that are not reflected in the record.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

CREDIT(S)

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter B. Rights in State Water (Refs & Annos)
                        → → **§ 11.022. Acquisition of Right to Use State Water**

The right to the use of state water may be acquired by appropriation in the manner and for the purposes provided in this chapter. When the right to use state water is lawfully acquired, it may be taken or diverted from its natural channel.

CREDIT(S)

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
        Subtitle B. Water Rights
            Chapter 11. Water Rights (Refs & Annos)
                Subchapter B. Rights in State Water (Refs & Annos)
                → → **§ 11.025. Scope of Appropriative Right**

A right to use state water under a permit or a certified filing is limited not only to the amount specifically appropriated but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated.

CREDIT(S)

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter B. Rights in State Water (Refs & Annos)
→→ **§ 11.026. Perfection of an Appropriation**

No right to appropriate water is perfected unless the water has been beneficially used for a purpose stated in the original declaration of intention to appropriate water or stated in a permit issued by the commission or one of its predecessors.

CREDIT(S)

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter B. Rights in State Water (Refs & Annos)
                        → → **§ 11.027. Rights Between Appropriators**

As between appropriators, the first in time is the first in right.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective: June 19, 2009**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter B. Rights in State Water (Refs & Annos)
                      →→ **§ 11.042. Delivering Water Down Banks and Beds**

(a) Under rules prescribed by the commission, a person, association of persons, corporation, water control and improvement district, water improvement district, or irrigation district supplying stored or conserved water under contract as provided in this chapter may use the bank and bed of any flowing natural stream in the state to convey the water from the place of storage to the place of use or to the diversion point of the appropriator.

(a-1) With prior authorization granted under rules prescribed by the commission, a person, association of persons, corporation, water control and improvement district, water improvement district, or irrigation district supplying water imported from a source located wholly outside the boundaries of this state, except water imported from a source located in the United Mexican States, may use the bed and banks of any flowing natural stream in the state to convey water for use in this state. The authorization must:

    (1) allow for the diversion of only the amount of water put into a watercourse or stream, less carriage losses; and

    (2) include special conditions adequate to prevent a significant impact to the quality of water in this state.

(b) A person who wishes to discharge and then subsequently divert and reuse the person's existing return flows derived from privately owned groundwater must obtain prior authorization from the commission for the diversion and the reuse of these return flows. The authorization may allow for the diversion and reuse by the discharger of existing return flows, less carriage losses, and shall be subject to special conditions if necessary to protect an existing water right that was granted based on the use or availability of these return flows. Special conditions may also be provided to help maintain instream uses and freshwater inflows to bays and estuaries. A person wishing to divert and reuse future increases of return flows derived from privately owned groundwater must obtain authorization to reuse increases in return flows before the increase.

(c) Except as otherwise provided in Subsection (a) of this section, a person who wishes to convey and subsequently

divert water in a watercourse or stream must obtain the prior approval of the commission through a bed and banks authorization. The authorization shall allow to be diverted only the amount of water put into a watercourse or stream, less carriage losses and subject to any special conditions that may address the impact of the discharge, conveyance, and diversion on existing permits, certified filings, or certificates of adjudication, instream uses, and freshwater inflows to bays and estuaries. Water discharged into a watercourse or stream under this chapter shall not cause a degradation of water quality to the extent that the stream segment's classification would be lowered. Authorizations under this section and water quality authorizations may be approved in a consolidated permit proceeding.

(d) Nothing in this section shall be construed to affect an existing project for which water rights and reuse authorizations have been granted by the commission before September 1, 1997.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.006, eff. Sept. 1, 1985; Acts 1997, 75th Leg., ch. 1010, § 2.06, eff. Sept. 1, 1997; Acts 2009, 81st Leg., ch. 1016, § 2, eff. June 19, 2009.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
   Water Code (Refs & Annos)
      Title 2. Water Administration (Refs & Annos)
         Subtitle B. Water Rights
            Chapter 11. Water Rights (Refs & Annos)
               Subchapter B. Rights in State Water (Refs & Annos)
         → → **§ 11.046. Return Surplus Water**

(a) A person who takes or diverts water from a watercourse or stream for the purposes authorized by this code shall conduct surplus water back to the watercourse or stream from which it was taken if the water can be returned by gravity flow and it is reasonably practicable to do so.

(b) In granting an application for a water right, the commission may include conditions in the water right providing for the return of surplus water, in a specific amount or percentage of water diverted, and the return point on a watercourse or stream as necessary to protect senior downstream permits, certified filings, or certificates of adjudication or to provide flows for instream uses or bays and estuaries.

(c) Except as specifically provided otherwise in the water right, water appropriated under a permit, certified filing, or certificate of adjudication may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit, certified filing, or certificate of adjudication for the purposes and locations of use provided in the permit, certified filing, or certificate of adjudication. Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.

(d) Water appropriated under a permit, certified filing, or certificate of adjudication which is recirculated within a reservoir for cooling purposes shall not be considered to be surplus for purposes of this chapter.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1997, 75th Leg., ch. 1010, § 2.07, eff. Sept. 1, 1997.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter D. Permits to Use State Water (Refs & Annos)
            → → **§ 11.121. Permit Required**

Except as provided in Sections 11.142, 11.1421, and 11.1422 of this code, no person may appropriate any state water or begin construction of any work designed for the storage, taking, or diversion of water without first obtaining a permit from the commission to make the appropriation.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1987, 70th Leg., ch. 544, § 1, eff. Aug. 31, 1987; Acts 1995, 74th Leg., ch. 183, § 1, eff. May 23, 1995.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



▷

**Effective: September 1, 2007**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
     Subtitle B. Water Rights
      Chapter 11. Water Rights (Refs & Annos)
       Subchapter D. Permits to Use State Water (Refs & Annos)
      →→ **§ 11.134. Action on Application**

(a) After the hearing, the commission shall make a written decision granting or denying the application. The application may be granted or denied in whole or in part.

(b) The commission shall grant the application only if:

(1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fee;

(2) unappropriated water is available in the source of supply;

(3) the proposed appropriation:

  (A) is intended for a beneficial use;

  (B) does not impair existing water rights or vested riparian rights;

  (C) is not detrimental to the public welfare;

  (D) considers any applicable environmental flow standards established under Section 11.1471 and, if applicable, the assessments performed under Sections 11.147(d) and (e) and Sections 11.150, 11.151, and 11.152; and

  (E) addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and

(4) the applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Section 11.002(8)(B).

(c) Beginning January 5, 2002, the commission may not issue a water right for municipal purposes in a region that does not have an approved regional water plan in accordance with Section 16.053(i) unless the commission determines that conditions warrant waiver of this requirement.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 133, § 1.09; Acts 1997, 75th Leg., ch. 1010, § 4.01, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 1223, § 1, eff. June 18, 1999; Acts 2001, 77th Leg., ch. 966, § 2.08, eff. Sept. 1, 2001; Acts 2007, 80th Leg., ch. 1351, § 1.12, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 1430, § 1.12, eff. Sept. 1, 2007.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter D. Permits to Use State Water (Refs & Annos)
            → → **§ 11.1351. Permit Restrictions**

In granting an application, the commission may direct that stream flow restrictions and other conditions and restrictions be placed in the permit being issued to protect the priority of senior water rights.

CREDIT(S)

Added by Acts 1987, 70th Leg., ch. 404, § 1, eff. Sept. 1, 1987.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter D. Permits to Use State Water (Refs & Annos)
                        → → **§ 11.1381. Term Permits**

(a) Until a water right is perfected to the full extent provided by Section 11.026 of this code, the commission may issue permits for a term of years for use of state water to which a senior water right has not been perfected.

(b) The commission shall refuse to grant an application for a permit under this section if the commission finds that there is a substantial likelihood that the issuance of the permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources of the area.

(c) The commission shall refuse to grant an application for a term permit if the holder of the senior appropriative water right can demonstrate that the issuance of the term permit would prohibit the senior appropriative water right holder from beneficially using the senior rights during the term of the term permit. Such demonstration will be made using reasonable projections based on accepted methods.

(d) A permit issued under this section is subordinate to any senior appropriative water rights.

CREDIT(S)

Added by Acts 1987, 70th Leg., ch. 405, § 1, eff. Sept. 1, 1987.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective: September 1, 2001**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter D. Permits to Use State Water (Refs & Annos)
                        →→ **§ 11.146. Forfeitures and Cancellation of Permit for Inaction**

(a) If a permittee fails to begin construction within the time specified in Section 11.145 of this code, he forfeits all rights to the permit, subject to notice and hearing as prescribed by this section.

(b) After beginning construction if the appropriator fails to work diligently and continuously to the completion of the work, the appropriation is subject to cancellation in whole or part, subject to notice and hearing as prescribed by this section.

(c) If the commission believes that an appropriation or permit should be declared forfeited under this section or any other sections of this code, it should give the appropriator or permittee 30 days notice and provide him with an opportunity to be heard.

(d) After the hearing, the commission by entering an order of record may cancel the appropriation in whole or part. The commission shall immediately transmit a certified copy of the cancellation order by certified mail to the county clerk of the county in which the permit is recorded. The county clerk shall record the cancellation order.

(e) Except as provided by Section 11.1381 of this code, if a permit has been issued for the use of water, the water is not subject to a new appropriation until the permit has been cancelled in whole or part as provided by this section.

(f) Except as provided by Subchapter E of this chapter, [FN1] none of the provisions of this code may be construed as intended to impair, cause, or authorize or may impair, cause, or authorize the forfeiture of any rights acquired by any declaration of appropriation or by any permit if the appropriator has begun or begins the work and development contemplated by his declaration of appropriation or permit within the time provided by the law under which the declaration of appropriation was made or the permit was granted and has prosecuted or continues to prosecute it with all reasonable diligence toward completion.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(g) This section does not apply to a permit for construction of a reservoir designed for the storage of more than 50,000 acre-feet of water.

CREDIT(S)

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977; Acts 1987, 70th Leg., ch. 405, § 2, eff. Sept. 1, 1987; Acts 2001, 77th Leg., ch. 966, § 2.10, eff. Sept. 1, 2001.

[FN1] V.T.C.A., Water Code § 11.171 et seq.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT


c

**Effective: September 1, 2007**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter D. Permits to Use State Water (Refs & Annos)
            →→ **§ 11.147. Effects of Permit on Bays and Estuaries and Instream Uses**

(a) In this section, "beneficial inflows" means a salinity, nutrient, and sediment loading regime adequate to maintain an ecologically sound environment in the receiving bay and estuary system that is necessary for the maintenance of productivity of economically important and ecologically characteristic sport or commercial fish and shellfish species and estuarine life upon which such fish and shellfish are dependent.

(b) In its consideration of an application for a permit to store, take, or divert water, the commission shall assess the effects, if any, of the issuance of the permit on the bays and estuaries of Texas. For permits issued within an area that is 200 river miles of the coast, to commence from the mouth of the river thence inland, the commission shall include in the permit any conditions considered necessary to maintain beneficial inflows to any affected bay and estuary system, to the extent practicable when considering all public interests and the studies mandated by Section 16.058 as evaluated under Section 11.1491.

(c) For the purposes of making a determination under Subsection (b) of this section, the commission shall consider among other factors:

(1) the need for periodic freshwater inflows to supply nutrients and modify salinity to preserve the sound environment of the bay or estuary, using any available information, including studies and plans specified in Section 11.1491 of this code and other studies considered by the commission to be reliable; together with existing circumstances, natural or otherwise, that might prevent the conditions imposed from producing benefits;

(2) the ecology and productivity of the affected bay and estuary system;

(3) the expected effects on the public welfare of not including in the permit some or all of the conditions considered necessary to maintain the beneficial inflows to the affected bay or estuary system;

(4) the quantity of water requested and the proposed use of water by the applicant, as well as the needs of those who would be served by the applicant;

(5) the expected effects on the public welfare of the failure to issue all or part of the permit being considered; and

(6) for purposes of this section, the declarations as to preferences for competing uses of water as found in Sections 11.024 and 11.033, Water Code, as well as the public policy statement in Section 1.003, Water Code.

(d) In its consideration of an application to store, take, or divert water, the commission shall include in the permit, to the extent practicable when considering all public interests, those conditions considered by the commission necessary to maintain existing instream uses and water quality of the stream or river to which the application applies. In determining what conditions to include in the permit under this subsection, the commission shall consider among other factors:

(1) the studies mandated by Section 16.059; and

(2) any water quality assessment performed under Section 11.150.

(e) The commission shall include in the permit, to the extent practicable when considering all public interests, those conditions considered by the commission necessary to maintain fish and wildlife habitats. In determining what conditions to include in the permit under this subsection, the commission shall consider any assessment performed under Section 11.152.

(e-1) Any permit for a new appropriation of water or an amendment to an existing water right that increases the amount of water authorized to be stored, taken, or diverted must include a provision allowing the commission to adjust the conditions included in the permit or amended water right to provide for protection of instream flows or freshwater inflows. With respect to an amended water right, the provision may not allow the commission to adjust a condition of the amendment other than a condition that applies only to the increase in the amount of water to be stored, taken, or diverted authorized by the amendment. This subsection does not affect an appropriation of or an authorization to store, take, or divert water under a permit or amendment to a water right issued before September 1, 2007. The commission shall adjust the conditions if the commission determines, through an expedited public comment process, that such an adjustment is appropriate to achieve compliance with applicable environmental flow standards adopted under Section 11.1471. The adjustment:

(1) in combination with any previous adjustments made under this subsection may not increase the amount of the pass-through or release requirement for the protection of instream flows or freshwater inflows by more than 12.5 percent of the annualized total of that requirement contained in the permit as issued or of that requirement contained in the amended water right and applicable only to the increase in the amount of water authorized to be stored, taken, or diverted under the amended water right;

(2) must be based on appropriate consideration of the priority dates and diversion locations of any other water rights

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

granted in the same river basin that are subject to adjustment under this subsection; and

(3) must be based on appropriate consideration of any voluntary contributions to the Texas Water Trust, and of any voluntary amendments to existing water rights to change the use of a specified quantity of water to or add a use of a specified quantity of water for instream flows dedicated to environmental needs or bay and estuary inflows as authorized by Section 11.0237(a), that actually contribute toward meeting the applicable environmental flow standards.

(e-2) Any water right holder who makes a contribution or amends a water right as described by Subsection (e-1)(3) is entitled to appropriate credit for the benefits of the contribution or amendment against the adjustment of the holder's water right under Subsection (e-1).

(e-3) Notwithstanding Subsections (b)-(e), for the purpose of determining the environmental flow conditions necessary to maintain freshwater inflows to an affected bay and estuary system, existing instream uses and water quality of a stream or river, or fish and aquatic wildlife habitats, the commission shall apply any applicable environmental flow standard, including any environmental flow set-aside, adopted under Section 11.1471 instead of considering the factors specified by those subsections.

(f) On receipt of an application for a permit to store, take, or divert water, the commission shall send a copy of the permit application and any subsequent amendments to the Parks and Wildlife Department. At its option, the Parks and Wildlife Department may be a party in hearings on applications for permits to store, take, or divert water. In making a final decision on any application for a permit, the commission, in addition to other information, evidence, and testimony presented, shall consider all information, evidence, and testimony presented by the Parks and Wildlife Department and the board.

(g) The failure of the Parks and Wildlife Department to appear as a party does not relieve the commission of the requirements of this section.

CREDIT(S)

Amended by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977; Acts 1985, 69th Leg., ch. 133, § 4.01; Acts 1987, 70th Leg., ch. 419, § 3, eff. Sept. 1, 1987; Acts 1987, 70th Leg., ch. 977, § 5, eff. June 19, 1987; Acts 2001, 77th Leg., ch. 966, § 2.11, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 1242, § 3, eff. June 20, 2003; Acts 2007, 80th Leg., ch. 1351, § 1.13, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 1430, § 1.13, eff. Sept. 1, 2007.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



c

**Effective: September 1, 2007**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                ⌐▣ Chapter 11. Water Rights (Refs & Annos)
                    ⌐▣ Subchapter D. Permits to Use State Water (Refs & Annos)
                        →→ **§ 11.1471. Environmental Flow Standards and Set-Asides**

(a) The commission by rule shall:

(1) adopt appropriate environmental flow standards for each river basin and bay system in this state that are adequate to support a sound ecological environment, to the maximum extent reasonable considering other public interests and other relevant factors;

(2) establish an amount of unappropriated water, if available, to be set aside to satisfy the environmental flow standards to the maximum extent reasonable when considering human water needs; and

(3) establish procedures for implementing an adjustment of the conditions included in a permit or an amended water right as provided by Sections 11.147(e-1) and (e-2).

(b) In adopting environmental flow standards for a river basin and bay system under Subsection (a)(1), the commission shall consider:

(1) the definition of the geographical extent of the river basin and bay system adopted by the advisory group under Section 11.02362(a) and the definition and designation of the river basin by the board under Section 16.051(c);

(2) the schedule established by the advisory group under Section 11.02362(d) or (e) for the adoption of environmental flow standards for the river basin and bay system, if applicable;

(3) the environmental flow analyses and the recommended environmental flow regime developed by the applicable basin and bay expert science team under Section 11.02362(m);

(4) the recommendations developed by the applicable basin and bay area stakeholders committee under Section

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

11.02362(o) regarding environmental flow standards and strategies to meet the flow standards;

(5) any comments submitted by the advisory group to the commission under Section 11.02362(q);

(6) the specific characteristics of the river basin and bay system;

(7) economic factors;

(8) the human and other competing water needs in the river basin and bay system;

(9) all reasonably available scientific information, including any scientific information provided by the science advisory committee; and

(10) any other appropriate information.

(c) Environmental flow standards adopted under Subsection (a)(1) must consist of a schedule of flow quantities, reflecting seasonal and yearly fluctuations that may vary geographically by specific location in a river basin and bay system.

(d) As provided by Section 11.023, the commission may not issue a permit for a new appropriation or an amendment to an existing water right that increases the amount of water authorized to be stored, taken, or diverted if the issuance of the permit or amendment would impair an environmental flow set-aside established under Subsection (a)(2). A permit for a new appropriation or an amendment to an existing water right that increases the amount of water authorized to be stored, taken, or diverted that is issued after the adoption of an applicable environmental flow set-aside must contain appropriate conditions to ensure protection of the environmental flow set-aside.

(e) An environmental flow set-aside established under Subsection (a)(2) for a river basin and bay system other than the middle and lower Rio Grande must be assigned a priority date corresponding to the date the commission receives environmental flow regime recommendations from the applicable basin and bay expert science team and be included in the appropriate water availability models in connection with an application for a permit for a new appropriation or for an amendment to an existing water right that increases the amount of water authorized to be stored, taken, or diverted.

(f) An environmental flow standard or environmental flow set-aside adopted under Subsection (a) may be altered by the commission in a rulemaking process undertaken in accordance with a schedule established by the commission. In establishing a schedule, the commission shall consider the applicable work plan approved by the advisory group under Section 11.02362(p). The commission's schedule may not provide for the rulemaking process to occur more frequently than once every 10 years unless the work plan provides for a periodic review under Section 11.02362(p) to occur more frequently than once every 10 years. In that event, the commission may provide for the rulemaking process to be undertaken in conjunction with the periodic review if the commission determines that schedule to be appropriate. A rulemaking process undertaken under this subsection must provide for the participation of stakeholders having in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

terests in the particular river basin and bay system for which the process is undertaken.

CREDIT(S)

Added by Acts 2007, 80th Leg., ch. 1351, § 1.14, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 1430, § 1.14, eff. Sept. 1, 2007.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

c

**Effective: September 1, 2007**

Vernon's Texas Statutes and Codes Annotated Currentness
   Water Code (Refs & Annos)
     Title 2. Water Administration (Refs & Annos)
       Subtitle B. Water Rights
         Chapter 11. Water Rights (Refs & Annos)
           Subchapter D. Permits to Use State Water (Refs & Annos)
             → → **§ 11.1491. Evaluation of Bays and Estuaries Data**

(a) The Parks and Wildlife Department and the commission shall have joint responsibility to review the studies prepared under Section 16.058, to determine inflow conditions necessary for the bays and estuaries, and to provide information necessary for water resources management. Each agency shall designate an employee to share equally in the oversight of the program. Other responsibilities shall be divided between the Parks and Wildlife Department and the commission to maximize present in-house capabilities of personnel and to minimize costs to the state. Each agency shall have reasonable access to all information produced by the other agency. Publication of reports completed under this section shall be submitted for comment to the commission, the Parks and Wildlife Department, the advisory group, the science advisory committee, and any applicable basin and bay area stakeholders committee and basin and bay expert science team.

(b) Repealed by Acts 2007, 80th Leg., ch. 1351, § 1.25; Acts 2007, 80th Leg., ch. 1430, § 1.25.

(c) The board may authorize the use of money from the research and planning fund established by Chapter 15 of this code to accomplish the purposes of this section. These funds shall be used by the commission in cooperation with the Parks and Wildlife Department for interagency contracts with cooperating agencies and universities, and contracts with private sector establishments, as necessary, to accomplish the purposes of this section.

CREDIT(S)

Added by Acts 1985, 69th Leg., ch. 133, § 4.02. Renumbered from V.T.C.A., Water Code § 11.149 and amended by Acts 1987, 70th Leg., ch. 419, § 1, eff. Sept. 1, 1987. Amended by Acts 2007, 80th Leg., ch. 1351, §§ 1.17, 1.25, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 1430, §§ 1.17, 1.25, eff. Sept. 1, 2007.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT


C

**Effective: [See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        ▼ Chapter 11. Water Rights (Refs & Annos)
          ▼ Subchapter D. Permits to Use State Water (Refs & Annos)
          →→ **§ 11.150. Effects of Permits on Water Quality**

In consideration of an application for a permit under this subchapter, the commission shall assess the effects, if any, of the issuance of the permit on water quality in this state.

CREDIT(S)

Added by Acts 1985, 69th Leg., ch. 795, § 3.001, eff. Sept. 1, 1985.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        ⌐▣ Chapter 11. Water Rights (Refs & Annos)
          ⌐▣ Subchapter D. Permits to Use State Water (Refs & Annos)
            → → **§ 11.151. Effects of Permits on Groundwater**

In considering an application for a permit to store, take, or divert surface water, the commission shall consider the effects, if any, on groundwater or groundwater recharge.

CREDIT(S)

Added by Acts 1997, 75th Leg., ch. 1010, § 4.02, eff. Sept. 1, 1997.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


C

**Effective: September 1, 2009**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                ⌐ Chapter 11. Water Rights (Refs & Annos)
                    ⌐ Subchapter D. Permits to Use State Water (Refs & Annos)
                        →→ **§ 11.152. Assessment of Effects of Permits on Fish and Wildlife Habitats**

In its consideration of an application for a permit to store, take, or divert water in excess of 5,000 acre feet per year, the commission shall assess the effects, if any, on the issuance of the permit on fish and wildlife habitats and may require the applicant to take reasonable actions to mitigate adverse impacts on such habitat. In determining whether to require an applicant to mitigate adverse impacts on a habitat, the commission may consider any net benefit to the habitat produced by the project. The commission shall offset against any mitigation required by the U.S. Fish and Wildlife Service pursuant to 33 C.F.R. Parts 320-330 any mitigation authorized by this section.

CREDIT(S)

Added by Acts 1985, 69th Leg., ch. 795, § 3.001, eff. Sept. 1, 1985. Renumbered from V.T.C.A., Water Code § 11.149 by Acts 1987, 70th Leg., ch. 167, § 5.01(a)(56), eff. Sept. 1, 1987. Amended by Acts 2009, 81st Leg., ch. 87, § 24.002, eff. Sept. 1, 2009.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
            →→ **§ 11.171. Definitions**

As used in this subchapter:

(1) "Other interested person" means any person other than a record holder who is interested in the permit or certified filing or any person whose direct interest would be served by the cancellation of the permit or certified filing in whole or part.

(2) "Certified filing" means a declaration of appropriation or affidavit that was filed with the State Board of Water Engineers under the provisions of Section 14, Chapter 171, General Laws, Acts of the 33rd Legislature, 1913, as amended.

(3) "Certificate of adjudication" means a certificate issued by the commission under Section 11.323 of this code.

(4) "Permit" means an authorization by the commission granting a person the right to use water.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1991, 72nd Leg., ch. 309, § 1, eff. Sept. 1, 1991.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
            →→ **§ 11.172. General Principle**

A permit, certified filing, or certificate of adjudication is subject to cancellation in whole or part for 10 years nonuse as provided by this subchapter.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT


C

**Effective: September 1, 2013**

Vernon's Texas Statutes and Codes Annotated Currentness
   Water Code (Refs & Annos)
     Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
            → → **§ 11.173. Cancellation in Whole or in Part**

(a) Except as provided by Subsection (b) of this section, if all or part of the water authorized to be appropriated under a permit, certified filing, or certificate of adjudication has not been put to beneficial use at any time during the 10-year period immediately preceding the cancellation proceedings authorized by this subchapter, then the permit, certified filing, or certificate of adjudication is subject to cancellation in whole or in part, as provided by this subchapter, to the extent of the 10 years nonuse.

(b) A permit, certified filing, or certificate of adjudication or a portion of a permit, certified filing, or certificate of adjudication is exempt from cancellation under Subsection (a):

   (1) to the extent of the owner's participation in the Conservation Reserve Program authorized by the Food Security Act, Pub.L. No. 99-198, Secs. 1231-1236, 99 Stat. 1354, 1509-1514 (1985) [FN1] or a similar governmental program;

   (2) if a significant portion of the water authorized to be used pursuant to a permit, certified filing, or certificate of adjudication has been used in accordance with a specific recommendation for meeting a water need included in the regional water plan approved pursuant to Section 16.053;

   (3) if the permit, certified filing, or certificate of adjudication:

     (A) was obtained to meet demonstrated long-term public water supply or electric generation needs as evidenced by a water management plan developed by the holder; and

     (B) is consistent with projections of future water needs contained in the state water plan;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4) if the permit, certified filing, or certificate of adjudication was obtained as the result of the construction of a reservoir funded, in whole or in part, by the holder of the permit, certified filing, or certificate of adjudication as part of the holder's long-term water planning; or

(5) to the extent the nonuse resulted from:

(A) the implementation of water conservation measures under a water conservation plan submitted by the holder of the permit, certified filing, or certificate of adjudication as evidenced by implementation reports submitted by the holder;

(B) a suspension, adjustment, or other restriction on the use of the water authorized to be appropriated under the permit, certified filing, or certificate of adjudication imposed under an order issued by the executive director; or

(C) an inability to appropriate the water authorized to be appropriated under the permit, certified filing, or certificate of adjudication due to drought conditions.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1986, 69th Leg., 3rd C.S., ch. 33, § 1, eff. Oct. 15, 1986; Acts 1991, 72nd Leg., ch. 309, § 2, eff. Sept. 1, 1991; Acts 1997, 75th Leg., ch. 1010, § 4.06, eff. Sept. 1, 1997; Acts 2001, 77th Leg., ch. 966, § 2.12, eff. Sept. 1, 2001; Acts 2005, 79th Leg., ch. 1044, § 1, eff. June 18, 2005; Acts 2013, 83rd Leg., ch. 1020 (H.B. 2615), § 2, eff. Sept. 1, 2013.

[FN1] 16 U.S.C.A. §§ 3831 to 3836.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
   Water Code (Refs & Annos)
      Title 2. Water Administration (Refs & Annos)
         Subtitle B. Water Rights
            Chapter 11. Water Rights (Refs & Annos)
               Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
                  → → **§ 11.174. Commission May Initiate Proceedings**

When the commission finds that its records do not show that some portion of the water has been used during the past 10 years, the executive director may initiate proceedings, terminated by public hearing, to cancel the permit, certified filing, or certificate of adjudication in whole or in part.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.016, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 309, § 3, eff. Sept. 1, 1991.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
                        → → **§ 11.175. Notice**

(a) At least 45 days before the date of the hearing, the commission shall send notice of the hearing to the holder of the permit, certified filing, or certificate of adjudication being considered for cancellation in whole or in part. Notice shall be sent by certified mail, return receipt requested, to the last address shown by the records of the commission. The commission shall also send notice by regular mail to all other holders of permits, certified filings, certificates of adjudication, and claims of unadjudicated water rights filed pursuant to Section 11.303 of this code in the same watershed.

(b) The commission shall also have the notice of the hearing published once a week for two consecutive weeks, at least 30 days before the date of the hearing, in a newspaper published in each county in which diversion of water from the source of supply was authorized or proposed to be made and in each county in which the water was authorized or proposed to be used, as shown by the records of the commission. If in any such county no newspaper is published, then the notice may be published in a newspaper having general circulation in the county.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1991, 72nd Leg., ch. 309, § 4, eff. Sept. 1, 1991.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
            →→ **§ 11.176. Hearing**

(a) Except as provided by Subsection (b) of this section, the commission shall hold a hearing and shall give the holder of the permit, certified filing, or certificate of adjudication and other interested persons an opportunity to be heard and to present evidence on any matter pertinent to the questions at issue.

(b) A hearing on the cancellation of a permit, certified filing, or certificate of adjudication as provided by this chapter is unnecessary if the right to such hearing is expressly waived by the affected holder of a permit, certified filing, or certificate of adjudication.

(c) A permit, certified filing, or certificate of adjudication for a term does not vest in the holder of a permit, certified filing, or certificate of adjudication any right to the diversion, impoundment, or use of water for longer than the term of the permit, certified filing, or certificate of adjudication and shall expire and be cancelled in accordance with its terms without further need for notice or hearing.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1991, 72nd Leg., ch. 309, § 5, eff. Sept. 1, 1991; Acts 1997, 75th Leg., ch. 1010, § 2.12, eff. Sept. 1, 1997.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



C

**Effective: September 1, 2001**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                ◥◣ Chapter 11. Water Rights (Refs & Annos)
                    ◥◣ Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse
                    (Refs & Annos)
                        →→ § 11.177. Commission Finding; Action

(a) At the conclusion of the hearing, the commission shall cancel the permit, certified filing, or certificate of adjudication in whole or in part to the extent that it finds that:

(1) the water or any portion of the water appropriated under the permit, certified filing, or certificate of adjudication has not been put to an authorized beneficial use during the 10-year period; and

(2) the holder has not used reasonable diligence in applying the water or the unused portion of the water to an authorized beneficial use or is otherwise unjustified in the nonuse.

(b) In determining what constitutes reasonable diligence or a justified nonuse as used in Subsection (a)(2), the commission shall give consideration to:

(1) whether sufficient water is available in the source of supply to meet all or part of the appropriation during the 10-year period of nonuse;

(2) whether the nonuse is justified by the holder's participation in the federal Conservation Reserve Program or a similar governmental program as provided by Section 11.173(b)(1);

(3) whether the existing or proposed authorized purpose and place of use are consistent with an approved regional water plan as provided by Section 16.053;

(4) whether the permit, certified filing, or certificate of adjudication has been deposited into the Texas Water Bank as provided by Sections 15.7031 and 15.704 or whether it can be shown that the water right or water available under the right is currently being made available for purchase through private marketing efforts; or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(5) whether the permit, certified filing, or certificate of adjudication has been reserved to provide for instream flows or bay and estuary inflows.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1991, 72nd Leg., ch. 309, § 6, eff. Sept. 1, 1991; Acts 1997, 75th Leg., ch. 1010, § 2.12, eff. Sept. 1, 1997; Acts 2001, 77th Leg., ch. 966, § 2.13, eff. Sept. 1, 2001.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT


C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                Chapter 11. Water Rights (Refs & Annos)
                    Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
                        → → **§ 11.183. Reservoir**

If the holder of a permit, certified filing, or certificate of adjudication has facilities for the storage of water in a reservoir, the commission may allow him to retain the impoundment to the extent of the conservation storage capacity of the reservoir for domestic, livestock, or recreation purposes.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



**c**

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
   Water Code (Refs & Annos)
     Title 2. Water Administration (Refs & Annos)
       Subtitle B. Water Rights
         Chapter 11. Water Rights (Refs & Annos)
           Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
             → → **§ 11.184. Municipal Certified Filing**

Regardless of other provisions of this subchapter, no portion of a certified filing held by a city, town, village, or municipal water district, authorizing the use of water for municipal purposes, shall be cancelled if water has been put to use under the certified filing for municipal purposes at any time during the 10-year period immediately preceding the institution of cancellation proceedings.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle B. Water Rights
                ⌐▣ Chapter 11. Water Rights (Refs & Annos)
                    ⌐▣ Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse
                    (Refs & Annos)
                        ➡➡ **§ 11.185. Effect of Inaction**

Failure to initiate cancellation proceedings under this subchapter does not validate or improve the status of any permit, certified filing, or certificate of adjudication in whole or in part.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT


C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 11. Water Rights (Refs & Annos)
          Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse (Refs & Annos)
            → → **§ 11.186. Subsequent Proceedings on Same Water Right**

Once cancellation proceedings have been initiated against a particular permit, certified filing, or certificate of adjudication and a hearing has been held, further cancellation proceedings shall not be initiated against the same permit, certified filing, or certificate of adjudication within the five-year period immediately following the date of the hearing.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

▷

**Effective: June 20, 2003**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle C. Water Development
        ⌐▣ Chapter 16. Provisions Generally Applicable to Water Development (Refs & Annos)
          ⌐▣ Subchapter B. Duties of the Executive Administrator
            →→ § 16.012. Studies, Investigations, Surveys

(a) The executive administrator shall make studies, investigations, and surveys of the occurrence, quantity, quality, and availability of the surface water and groundwater of this state and shall, in cooperation with other entities of the state, guide the development of a statewide water resource data collection and dissemination network. For these purposes the executive administrator shall collect, receive, analyze, process, and facilitate access to basic data and summary information concerning water resources of the state and provide guidance regarding data formats and descriptions required to access and understand Texas water resource data.

(b) The executive administrator shall:

  (1) determine suitable locations for future water facilities, including reservoir sites;

  (2) determine suitable, cost-effective water supply alternatives on a regional basis, including voluntary means of encouraging aggressive water conservation;

  (3) locate land best suited for irrigation;

  (4) make estimates of the cost of proposed irrigation works and the improvement of reservoir sites;

  (5) examine and survey reservoir sites;

  (6) monitor the effects of fresh water inflows upon the bays and estuaries of Texas;

  (7) monitor instream flows;

  (8) lead a statewide effort, in coordination with federal, state, and local governments, institutions of higher educa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion, and other interested parties, to develop a network for collecting and disseminating water resource-related information that is sufficient to support assessment of ambient water conditions statewide;

(9) make recommendations for optimizing the efficiency and effectiveness of water resource data collection and dissemination as necessary to ensure that basic water resource data are maintained and available for Texas; and

(10) make basic data and summary information developed under this subsection accessible to state agencies and other interested persons.

(c) In performing the duties required under Subdivisions (1), (4), (5), (6), and (7) of Subsection (b), the executive administrator shall consider advice from the Parks and Wildlife Department. In addition, the Department of Agriculture may provide advice to the executive administrator, where appropriate, regarding any of the duties to be performed under Subsection (b).

(d) All entities of the state, including institutions of higher education, that collect or use water data or information shall cooperate with the board in the development of a coordinated, efficient, and effective statewide water resource data collection and dissemination network.

(e) The executive administrator shall keep full and proper records of his work, observations, data, and calculations, all of which are the property of the state.

(f) In performing his duties under this section, the executive administrator shall assist the commission in carrying out the purposes and policies stated in Section 12.014 of this code.

(g) No later than December 31, 1999, the commission shall obtain or develop an updated water availability model for six river basins as determined by the commission. The commission shall obtain or develop an updated water availability model for all remaining river basins no later than December 31, 2001.

(h) Not later than December 31, 2003, the commission shall obtain or develop an updated water supply model for the Rio Grande. Recognizing that the Rio Grande is an international river touching on three states of the United States and five states of the United Mexican States and draining an area larger than the State of Texas, the model shall encompass to the extent practicable the significant water demands within the watershed of the river as well as the unique geology and hydrology of the region. The commission may collect data from all jurisdictions that allocate the waters of the river, including jurisdictions outside this state.

(i) Within 90 days of completing a water availability model for a river basin, the commission shall provide to all holders of existing permits, certified filings, and certificates of adjudication in that river basin the projected amount of water that would be available during a drought of record.

(j) Within 90 days of completing a water availability model for a river basin, the commission shall provide to each regional water planning group created under Section 16.053 of this code in that river basin the projected amount of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

water that would be available if cancellation procedures were instigated under the provisions of Subchapter E, Chapter 11 [FN1], of this code.

(k) Within 90 days of completing a water availability model for a river basin, the commission, in coordination with the Parks and Wildlife Department and with input from the Department of Agriculture, where appropriate, shall determine the potential impact of reusing municipal and industrial effluent on existing water rights, instream uses, and freshwater inflows to bays and estuaries. Within 30 days of making this determination, the commission shall provide the projections to the board and each regional water planning group created under Section 16.053 of this code in that river basin.

(l) The executive administrator shall obtain or develop groundwater availability models for major and minor aquifers in coordination with groundwater conservation districts and regional water planning groups created under Section 16.053 that overlie the aquifers. Modeling of major aquifers shall be completed not later than October 1, 2004. On completing a groundwater availability model for an aquifer, the executive administrator shall provide the model to each groundwater conservation district and each regional water planning group created under Section 16.053 overlying that aquifer.

(m) The executive administrator may conduct surveys of entities using groundwater and surface water for municipal, industrial, power generation, or mining purposes at intervals determined appropriate by the executive administrator to gather data to be used for long-term water supply planning. Recipients of the survey shall complete and return the survey to the executive administrator. A person who fails to timely complete and return the survey is not eligible for funding from the board for board programs and is ineligible to obtain permits, permit amendments, or permit renewals from the commission under Chapter 11. A person who fails to complete and return the survey commits an offense that is punishable as a Class C misdemeanor. This subsection does not apply to survey information regarding windmills used for domestic and livestock use.

(n) Information collected through field investigations on a landowner's property by the executive administrator after September 1, 2003, solely for use in the development of groundwater availability models under Subsection (l) of this section that reveals site-specific information about such landowner is not subject to Chapter 552, Government Code, and may not be disclosed to any person outside the board if the landowner on whose land the information is collected has requested in writing that such information be deemed confidential. If a landowner requests that his or her information not be disclosed, the executive administrator may release information regarding groundwater information only if the information is summarized in a manner that prevents the identification of an individual or specific parcel of land and the landowner. This subsection does not apply to a parcel of land that is publicly owned.

CREDIT(S)

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.045, eff. Sept. 1, 1985; Acts 1997, 75th Leg., ch. 1010, § 7.01, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 456, § 3, eff. June 18, 1999; Acts 1999, 76th Leg., ch. 518, § 1, eff. June 18, 1999; Acts 1999, 76th Leg., ch. 979, § 3, eff. June 18, 1999; Acts 1999, 76th Leg., ch. 1222, § 1, eff. June 18, 1999; Acts 2001, 77th Leg., ch. 966, § 2.15, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 1057, §§ 3, 4, eff. June 20, 2003.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN1] V.T.C.A., Water Code § 11.171 et seq.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

E

## REVISION OF IRRIGATION LAWS.

H. B. No. 237.]              CHAPTER 88.

An Act to provide a more adequate system of laws relating to irrigation and declaring the unappropriated waters of the State the property of the State; authorizing their appropriation, storage and diversion for beneficial uses; perpetuating the Board of Water Engineers and prescribing its powers, duties and compensation; defining water rights and prescribing the method of acquiring, perfecting and preserving same; requiring applications to be made to the Board of Water Engineers for permits to construct storage, diversion and distribution works, and prescribing the method thereof; limiting the right to the waters of the State to beneficial uses, and declaring forfeiture for abandonment of use; prescribing standards for the measurement of water; providing a method for the determination of water rights by the Board of Water Engineers; authorizing appeals from the decisions of the State Board of Water Engineers, and regulating the manner thereof; prescribing the method of serving notices on claimants and appropriators of water and declaring the effects of failure to observe the same; authorizing the issuance of certificates of water rights and the recording thereof; fixing certain fees; creating the office of Water Commissioner and prescribing the duties and compensation thereof; authorizing the appointment of special assistants and prescribing their duties and compensation; dividing the State into water divisions and providing for water districts; prescribing the method for determining and recording titles to irrigation works, and establishing the period of limitation to quiet titles thereto; regulating partnership ditches; conferring the right of eminent domain in aid of construction of irrigation works; prohibiting the seeding of Johnson grass or Russian thistle on irrigation canals; prescribing penalties for violation of the provisions of this Act; requiring the making of annual report to the Board of Water Engineers; requiring the control of flowing artesian wells; authorizing the chartering of corporations to construct and operate irrigation and other works; authorizing contracts for the supply and delivery of water, and creating liens to secure payment thereof; authorizing the acquisition of lands by irrigation companies, and requiring the elienation thereof; repealing all laws in conflict herewith and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. The unowned and unappropriated waters of the ordinary flow and underflow and tides of every flowing river or natural stream, of all lakes, bays or arms of the Gulf of Mexico, collections of still water, and of the storm, flood or rain waters of every river or natural stream, canyon, ravine, depression or water shed, within the State of Texas, are hereby declared to be the property of the State, and the right to the use thereof may be acquired by appropriation in the manner and for the uses and purposes hereinafter provided.

SEC. 2. The storm, flood or rain waters described in the preceding Section may be held or stored by dams, in lakes or reservoirs, or diverted by means of canals, ditches, intakes, pumping plants, or other works, constructed by any person, corporation, association of persons or irrigation district created under the statutes, for the purpose of irrigation, mining, milling, manufacturing, the development of power, the construction and operation of waterworks for cities and towns, or for stock raising.

SEC. 3. The ordinary flow and underflow of the flowing water

and tides of every natural river, or stream, within the State of Texas may be taken or diverted from its natural channel by any of the persons named in the preceding section for any of the purposes stated therein; provided, that such ordinary flow and underflow shall not be diverted to the prejudice of the vested rights of any riparian owner without his consent except after condemnation thereof in the manner hereinafter provided. The waters of any arm or inlet of the Gulf of Mexico, or of any salt water bay, may be changed from salt to sweet or fresh water, and held or stored by dams, dikes or other structures and taken or diverted by any of the persons named in this Section for any of the purposes stated herein.

SEC. 4. The appropriation of water must be for irrigation, mining, milling, manufacturing, the development of power, the construction and operation of waterworks for cities and towns, or for stock raising. Provided, that so far as practicable and within the limits of the public welfare, the water engineering board hereinafter created shall subordinate the appropriation of water for power to the appropriation of water for irrigation.

SEC. 5. As between appropriators, the first in time is the first in right.

SEC. 6. For the purpose of this Act, an appropriator is any person, association of persons, corporation or irrigation district, who has heretofore made beneficial use of any water, in a lawful manner, under the provisions of any Act of the Legislature of the State of Texas, prior to the passage of Chapter 171 of the General Laws of the Thirty-third Legislature of Texas, and who has filed with the State board of water engineers a record of his appropriation, as required by said Act of the Thirty-third Legislature, or who has heretofore or may hereafter make beneficial use of any water within the limitations of a permit lawfully issued by the board of water engineers, and no appropriation of any water shall be considered as having been perfected unless such water has been beneficially used for one or more of the purposes named in this Act, and for the purpose or purposes stated in the original declaration of intention to appropriate such water, or stated in the permit issued by the board of water engineers.

SEC. 7. Neither the foregoing Section nor any other provision of this Act shall be construed as intended to impair or to work or authorize the forfeiture of, or shall impair or work or authorize the forfeiture of, any rights heretofore or hereafter acquired by any declaration of appropriation or by permit when the appropriator has begun, or begins, the work and development contemplated by his declaration of appropriation, within the time provided in the law under which the same was or is made and has prosecuted, and continues to prosecute, the same with all reasonable diligence toward completion; but if any appropriator under this Act, or other law of this State, has failed or fails to begin the work and development contemplated by his declaration of appropriation within the time provided in the law under which the same was or is made, or has failed or fails, to prosecute the same with all reasonable diligence toward completion, his right to so much water as has not been ap-

plied, or is not applied, to beneficial use, as defined in Section nine of this Act shall be considered as, and shall be, forfeited, and such water shall be subject to new appropriation under this Act; provided that no such rights shall be declared forfeited until the person or persons who are the owners of the land and whose rights are claimed to have been forfeited, shall first be given due notice and hearing as required in Section 33 of this Act, and provided further, that it a permit for the use of such water has been issued, or is issued, under this Act, or under the Act approved April the 9th, 1913, such water shall not be subject to new appropriation until the permit is cancelled by the board in whole, or in part, in accordance with the provisions of Section 33 of this Act.

SEC. 8. The State shall be and is hereby divided into three water divisions, as follows:

All that portion of the State of Texas lying North of the thirtieth parallel, north latitude, and west of the one hundredth meridian west longitude, shall constitute water division No. 1.

All that portion of the State of Texas lying east of the ninety-seventh meridian west longitude, and south of the thirtieth parallel north latitude, together with all that portion lying north of the thirtieth parallel north latitude and east of the one hundredth meridian west longitude, shall constitute water division No. 2.

All that portion of the State of Texas not embraced in water division No. 1 or water division No. 2, as hereinbefore defined, shall constitute water division No. 3.

SEC. 9. For the purposes of this Act, beneficial use shall be held to mean the use of such a quantity of water, when reasonable intelligence and reasonable diligence are exercised in its application for a lawful purpose, as is economically necessary for that purpose.

SEC. 10. The board of water engineers, created and consituted by the Act of the Thirty-third Legislature, Chapter 171, General Laws, approved April 9, 1913, is hereby continued, and the members constituting such board shall continue in office for the respective terms for which they were appointed, and until their successors are appointed and qualified, unless sooner removed in the manner provided by law. Said board shall be composed of three members, one of whom shall be appointed from each of the respective water divisions described in Section 8. The members of such board shall be appointed by the Governor, by and with the advice and consent of the Senate, and shall each hold office for a term of six years, and until his successor is appointed and qualified. No person shall be appointed a member of the board who has not such technical knowledge and such practical experience and skill as shall fit him for the duties of the office. Each member of such board shall enter into bond, to be approved by the Governor, in the penal sum of ten thousand dollars, with not less than two personal sureties, or with one surety or guaranty company authorized to do business in this State, conditioned for the faithful discharge of the duties of his office, and for the delivery to his successor or other officer appointed by the Governor to receive same, all moneys, books and other property belonging to the State then in his hands, or under his control, or with which he may be legally

chargeable as a member of said board. The Governor shall have power to remove, at any time, for cause, any member of the State board of water engineers, after such member shall have been given a full, free and public hearing by the Governor. The Governor shall fill all vacancies by appointment, with the advice and consent of the Senate.

SEC. 11. Each member of such board shall receive a salary of thirty-six hundred dollars per annum, payable in monthly installments, upon the presentation of salary vouchers, approved by the board.

SEC. 12. The members appointed shall meet at Austin and organize and elect one of their number chairman of said board. A majority of said board shall constitute a quorum to transact business. Said board shall appoint a secretary who shall be thoroughly conversant with irrigation law, at a salary of not more than two thousand dollars per annum, and who shall execute a bond in the sum of twenty-five hundred dollars, to be approved by the board, payable to the board of water engineers, and the board may appoint such experts and employees as may be necessary to perform any duty that may be required of them by this Act, and fix their compensation. The Secretary shall keep full and accurate minutes of all transactions and proceedings of said board and perform such duties as may be required by the board. The board shall have power to make all needful rules for its government and proceedings; and shall have a seal, the form of which it shall prescribe. The board shall be furnished with an office at Austin, with necessary furniture, stationery, supplies, etc., at the expense of the State, to be paid for on the order of the board.

SEC. 13. The members, secretary, experts and employees of the board shall be entitled to receive from the State their necessary traveling expenses while traveling on the business of the board, upon an itemized statement, sworn to by the party who incurred the expense and approved by the board.

SEC. 14. The board may hold sessions at any place in this State, when deemed necessary to facilitate the discharge of its duties.

SEC. 15. Every person, association of persons, corporation, water improvement or irrigation district, who shall, after this Act shall take effect, desire to acquire the right to appropriate, for the purposes stated in this Act, unappropriated water of the State, shall, before commencing the construction, enlargement or extension of any dam, lake, reservoir or other storage work. or of any ditch, canal, headgate, intake, pumping plant or other distributing work, or performing any work in connection with the storage, taking or diversion of water, make an application in writing to the board for a permit to make such appropriation storage, or diversion.

Such application shall be in writing and sworn to; shall set forth the name and post office address of the applicant; the source of water supply; the nature and purposes of the proposed use; the location and description of the proposed dam, lake, reservoir, headgate, intake, pumping plant, ditch, canal or other work; the time within which it is proposed to begin construction, and the time required for the application of the water to the proposed use; and if such proposed use

is for irrigation, a description of the lands proposed to be irrigated, and, as near as may be, the total acreage thereof.

Such application shall be accompanied by a map or plat drawn on tracing linen, on a scale not less than one inch equals two thousand feet, showing substantially the location and extend of the proposed works; the location of the headgate, intake, pumping plant or point of diversion by course and distance from permanent natural objects or land marks; the location of the main ditch of canal and of the laterals or branches thereof; the course of the river, stream or other source of water supply; the position and area of all lakes, reservoirs or basins intended to be used or created, and the water line thereof, the intersection with all other ditches, canals, laterals, lakes or reservoirs the proposed work will touch or intersect, or with which connection will be made; and shall represent in ink of different color from that used to represent the proposed works, the location of all ditches, canals, laterals, reservoirs, lakes, dams, or other work of like character then existing on the ground, with a designation of the name of the owner thereof. Such map or plat shall contain the name of the proposed work or enterprise; the name or names of the applicants, and a certificate of the surveyor, giving the date of his survey, his name and post office address and also the date of the application which it accompanies.

Nothing in this Act shall be held or construed to require the filing of an application or procuring of any permit for the alteration, enlargement, extension or addition to any canal, ditch or other work that does not contemplate, or will not result in an increased appropriation, or the use of a larger volume of water, but before making any such alteration, enlargement, extension or addition, the person, association of persons, corporation or irrigation district desiring to make same, shall file with the board of water engineers a detailed statement and plan, for the information of the board of the work proposed to be done.

SEC. 16. Any person or association of persons, corporation, water improvement or irrigation district who desires to investigate the feasibility of any project having for its object the creation of a reservoir for the impounding of flood waters in quantities greater than five thousand acre-feet, and, which if constructed will probably result in the use of five thousand acre-feet per annum, or more, and who has an organized engineering force adequate to expiditiously proceed with such investigation, shall, upon the presentation of such facts, duly verified, to the board of water engineers, describing the locality of such proposed reservoir, have priority date from the time of the filing of such presentation, should a permit be granted thereafter, for the purposes described in such presentation; provided, however, that nothing in this Section or in this Act shall affect or restrict the right of any person or persons, owning lands in this State to construct on his own property any dam or reservoir which would impound or contain less than five hundred acre-feet of water.

SEC. 17. Upon the filing of such presentation, a fee of two hundred and fifty dollars shall be paid to the board for the use of the State, as provided for other fees collected under this Act; no part

of which shall be returned, except as hereinafter provided. The fee shall be held by the board for a period of twelve months from the date of its receipt, unless disposed of as hereinafter provided.

SEC. 18. Any person or association of persons, corporation, water improvement, or irrigation district who has complied with the provisions of Sections 16 and 17, and who shall, within twelve months from the date of such presentation, file an application for a permit to store and use any of the flood waters of this State, in volumes of five thousand acre-feet, or more, for the objects and purposes, and at the locality set out in the presentation described in Sections 16 and 17, shall, when paying the fees described in Section 41, be credited with the two hundred and fifty dollars paid in accordance with the provisions of Section 17.

SEC. 19. If within twelve months after the filing of the presentation of facts described in Section 16, such relator shall elect not to apply for a permit, and shall file the results of his or its investigation in intelligible form, with the board, the board may, at its option, return all or any part of said two hundred and fifty dollars, if in its judgment such information will be of equivalent value to the State.

SEC. 20. If the proposed taking or diversion of water for irrigation is of greater volume than nine cubic feet per second of time, the board may require the following in addition:

A continuous longitudinal profile; cross sections of the proposed channel; and detail plans and specifications of any structural work of whatever character entering into the proposed project, on such scales and with such definition as the board may deem necessary or expedient.

The board may also require the filing of a copy of the engineer's field notes of any survey of such lake or reservoir, and all plans and specifications, where the project calls for a dam over six feet in height, either for the purpose of diversion or storage; and no work on such project shall proceed until approval of such plans is obtained.

The board may, in case the applicant is an incorporated company, require the filing of a certified copy of the applicant's articles of incorporation, together with a statement of the names and addresses of its directors and officers; and the amount of its authorized and of its paid-up capital stock.

If the applicant be other than an incorporated company, the board may require the filing of a sworn statement, showing the names and addresses of the person or persons interested in same and the extent of such interest and of the financial condition of each such person.

Every such application shall be accompanied by the fees hereinafter provided, and shall not be filed or considered until such fees are paid.

SEC. 21. Drainage.—Whenever, in the opinion of the board the successful efficient operation of any existing or proposed irrigation system will, or may, be adversely affected by lack of adequate drainage facilities incident to the work proposed to be done by the applicant or applicants for a permit to appropriate public waters, the said applicant or applicants shall submit drainage plans adequate, in the

opinion of the board, to guard against any present or future injury which the proposed works may entail.

SEC. 22. Upon the filing of such application, accompanied by the data and fees hereinbefore provided, it shall be the duty of the board to make a preliminary examination thereof; and if it appear that there is no unappropriated water in the source of supply, or that, for other reasons, the proposed appropriation should not be allowed, the board may thereupon reject such application; in which case, it the applicant shall elect not to proceed further, the board may return to such applicant any part of the fees accompanying such application.

The board shall determine whether the application, maps, plats, contours, plans, profiles and statements accompanying same, are in compliance with the provisions of this Act, and with the regulations of the board, and may require the amendment thereof.

SEC. 23. All applications filed with the board shall be recorded in a well bound book kept for that purpose in the office of said board, and shall be indexed alphabetically in the name of the applicant, of the stream or source from which such appropriation is sought to be made, and the county in which appropriation is sought to be made.

SEC. 24. It shall be the duty of the board to reject all applications and refuse to issue the permit asked for, if there is no unappropriated water in the source of supply; of if the proposed use conflicts with existing water rights, or is detrimental to the public welfare. It shall be the duty of the board to approve all applications and issue the permit asked for if such application is made in proper form in compliance with the provisions of this Act and the regulations of said board; and is accompanied by the fees required in this Act; and if the proposed appropriation contemplates the application of water to any of the uses and purposes provided for in this Act; and does not impair existing water rights, or vested riparian rights, and is not detrimental to the public welfare.

SEC. 25. Before the board shall approve any such application and issue any such permit, notice of such application shall be given substantially in the following manner:

Such notice shall be in writing; shall state the name of the applicant and his residence; the date of the filing of the application in the office of the board; the purpose and extent of the proposed appropriation of water; the source of supply; the place at which the water is to be stored; or to be taken or diverted from the source of supply; together with such additional information as the board may deem necessary. If the proposed use is for irrigation, such notice shall contain a general description of the location and the area of the land to be irrigated. Such notice shall also state the time and place when and where such application will be heard by the board.

SEC. 26. Such notice shall be published once in each week for four consecutive weeks prior to the date stated in such notice for the hearing of such application in some newspaper having a general circulation in that section of the State in which the source of water is located. In addition to such publication, a copy of such notice shall be transmitted by the secretary of the board, by registered mail ad-

dressed to each claimant or appropriator of water from such source of water supply, the record of whose claim or appropriation has been filed in the office of the board. Such notice shall be mailed not less than twenty days before the date set for the hearing.

SEC. 27. At the time and place stated in the notice, the board shall sit to hear such application. Any person, association of persons, corporation, or irrigation district may appear, in person or by attorney, and enter appearance in writing in said matter, and present objection to the issuance of permit. The board may receive evidence, orally or by affidavit, in support of and in opposition to the issuance of such permit; and may also hear arguments. It shall have power to adjourn such hearing from time to time and from place to place, and after full hearing to render decision in writing approving or rejecting such application. Such application may be approved or rejected in whole or in part. Provided, however, that nothing herein contained shall prevent the board from rejecting any application in whole, without the issuance of the notice herein required.

SEC. 28. The cost of publication of the notice herein required and the postage for mailing thereof shall in each case be paid by the applicant.

SEC. 29. In all litigation to which the board may be, a party, the Attorney General shall represent the board.

SEC. 30. When any court of record in this State shall render any judgment. order or decree, affecting in any manner the title to any water right, claim, appropriation or irrigation works, or any matter over which the board of water engineers is given supervision, under the provisions of this Act, it shall be the duty of the clerk of such court to forthwith transmit to the office of the board a certified copy of such judgment, order or decree.

SEC. 31. The board or any one employed by the board, for that purpose, shall have, at all times, authority to inspect any impounding, diversion or distribution works during construction, to determine whether or not they are being constructed in a safe and approved manner, and in accordance with the order of the board theretofore issued.

SEC. 32. Every permit issued by the board, under the provisions of this Act, shall be in writing, attested by the seal of said board, and shall contain substantially the following: The name of the applicant to whom issued; the date of the issuance thereof; the date of the filing of the original application therefor in the office of the board; the use or purpose for which the appropriation of water is to be made; the amount or volume of water authorized to be appropriated; a general description of the source of supply from which the appropriation is proposed to be made; and if such appropriation is for irrigation, a description and statement of the approximate area of the lands to be irrigated; together with such other data and information as the board may prescribe. Upon the issuance of such permit, same shall be transmitted by the secretary of the board by registered mail to the county clerk of the county in which the appropriation is to be made; and upon receipt of a recording fee of one dollar, to be paid by the applicant, such clerk shall file and record

the same in a well bound book provided and kept for that purpose only, and to index the same alphabetically under the name of the applicant and of the stream or source of water supply, and thereupon to deliver such permit upon demand, to the applicant. Such permit, when thus filed in the office of the county clerk, shall be constructive notice of the filing of the application with the board; of the issuance of the permit; and of all the rights arising thereunder.

SEC. 33. Within ninety days after the date of issuance of the permit provided for in this Act, the applicant seeking to appropriate water thereunder shall begin actual construction of the proposed ditch, canal, dam, lake, reservoir or other work, and shall prosecute the work thereon diligently and continuously to completion; provided, that the board may, by an order entered of record, extend the time for beginning the actual construction of such work for a period not to exceed twelve months from the date of issuance of such permit; and further provided, that if any applicant shall fail to comply with the requirements of this section, he, they or it shall thereby forfeit all rights under such permit. If any applicant to whom a permit is issued or one owning prior appropriation shall after beginning the actual construction of work, as provided in this section, fail to thereafter prosecute the same diligently and continuously to completion, the board may, after thirty days notice to the applicant or owner of such appropriation, and giving him an opportunity to be heard, by an order entered of record, revoke and cancel such permit or appropriation in whole or in part; provided any party affected by such order shall have the right of appeal to the district court as in this Act provided. A certified copy of such order shall be forthwith transmitted by the secretary of the board, by registered mail, to the clerk of the county in which such permit is recorded, and which order shall be recorded by said county clerk.

SEC. 34. Any person, association of persons, corporation, water improvement or irrigation district, or any agent, officer, employe or representative of any person, association of persons, corporation or irrigation district, who shall wilfully take, divert or appropriate any of the water of this State, or the use of such water, for any purpose, without first complying with all the provisions of this Act, shall be deemed guilty of a misdemeanor; and on conviction thereof, shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail for a term not exceeding six months or by both such fine and imprisonment; and each day that such taking, diversion or appropriation of water shall continue shall constitute a separate offense; and the possession of such water, except when the right to its use is acquired in accordance with the provisions of law, shall be prima facie proof of the guilt of the person, association of persons, corporation, irrigation district, or the agent, officer, employes or representatives of any person, association of persons, corporation or irrigation district.

SEC. 35. In addition to the punishment prescribed in the last preceding section, any person, association of persons, corporation, water improvement or irrigation district, or any agent, officer, employe or representative of any such persons, association of persons, corpora-

tion, water improvement or irrigation district, who shall wilfully take, divert or appropriate water of the State, or the use of such water, without first complying with the provisions of this Act, shall be liable to a penalty of one hundred dollars per day for each and every day that such taking, diversion, appropriation, or use may be made, and the State may recover such penalties by suit brought for that purpose in any court of competent jurisdiction.

SEC. 36. When any permit is issued under the provisions of this Act, the priority of the appropriation of water, or the claimant's right to the use of such water, shall date from the date of the filing of the original application in the office of the board.

SEC. 37. It shall be the duty of the board to make or cause to be made measurements and calculations of the flow of streams from which water may be appropriated, as provided in this Act, commencing such work in those streams most used for irrigation or other beneficial uses; to collect data and make surveys; to determine the most suitable location for constructing works to utilize the waters of the State; to ascertain the location and area of the lands best suited for irrigation; to examine and survey reservoir sites; and wherever practicable, to make estimates of the cost of proposed irrigation works, and the improvements of reservoir sites. It shall be the duty of the board to make itself conversant with the water courses of the State and of the needs of the State concerning irrigation matters, and the storage and conservation of the waters of the State for other purposes. The board shall make biennial reports in writing to the Governor, in which shall be included the data and information collected by said board, and in which shall be included such suggestions as to the amendment of existing laws and the enactment of new laws as the information and experience of the board may suggest. The board shall keep in its office full and proper records of its work, observations and calculations, all of which shall be the property of the State.

SEC. 38. It shall be the duty of the board to ascertain the duty of water, and to determine the proper quantities required for irrigation and other lawful uses in the several sections of the State in order to secure the highest beneficial use of such water, such work to be first conducted in those sections where in the judgment of the board, the greatest necessity exists.

SEC. 39. Full authority is lodged with the board, on its own initiative, to condemn existing works, the existence or operation of which may, in the judgment of the board, become a public menace or dangerous to life and property; provided, that in all cases of proposed condemnation, the party or parties at interest shall be notified of such contemplated action, and may appear at a time stated and be heard. Provided, further, that in such cases the party or parties whose works may be condemned, shall have the right of appeal from the decision of the board, as provided herein, in all other cases of appeal.

SEC. 40. The board may adopt, promulgate and enforce such rules, regulations and modes of procedure as it may deem proper for the

discharge of the duties incumbent upon it under the provisions of this Act.

SEC. 41. The board shall charge and collect, for the benefit of the State, the following fees:

For filing each and every application for any purpose, a fee of seven and one-half dollars, and in addition thereto:

For filing each and every application for storage of water, except surface waters, a fee of five dollars, provided, that if the application shall contemplate and propose the storage of water in excess of five acre-feet, an additional fee of twenty-five cents shall be charged for each additional acre-foot in excess of five, up to and including one hundred acre-feet; for each additional one hundred acre-feet, or fraction thereof, in excess of one hundred, an additional fee of ten dollars, up to and including one thousand acre-feet; and for each additional thousand acre-feet, above one thousand, an additional fee of twenty-five dollars; provided, that no fee, based on storage, shall be charged for any proposed or contemplated storage of less than five acre-feet.

For filing each application contemplating and proposing the taking or division of water for the purpose of irrigation, ten cents for each and every acre proposed to be irrigated.

For filing each application proposing and contemplating the use of water for the purpose of developing hydraulic power, a fee of two cents for each foot of head for each cubic foot of water per second it is proposed to use.

For filing each application contemplating and proposing the taking, diversion, or use of flowing water for any other purpose than storage, irrigation of land, or the development of hydraulic power, as hereinbefore provided, five cents for each acre-foot of water consumed per annum.

Provided, that in estimating the aforesaid additional fees on a proposed appropriation contemplating the use of water for two or more of the aforesaid purposes, the fees charged shall be cumulative, and a charge made for each use, based on the quantity proposed for each separate use.

For the filing of each and every exhibit, map, affidavit, or other paper authorized to be filed in the office of the board of water engineers, a filing fee of twenty-five cents.

For recording each and every paper authorized or required to be recorded in the records of the office of the board, a fee of one dollar, and in addition thereto, a fee of fifteen cents per folio of one hundred words, in excess of two hundred.

For making and certifying each and every copy of an instrument or paper authorized to be certified under the seal of the board a fee of one dollar, and in addition thereto, a fee of fifteen cents per folio of one hundred words, including the certificate.

For making and certifying copies of any map or blue print thereof, a fee of one dollar, and in addition thereto a fee of seventy five cents for each hour or fraction thereof necessarily employed by the draughtsman in making such copy.

For filing each application for an extension of time within which to begin actual construction or to complete work, a fee equal to one-half of the original application fees in such case; provided, that if it be simultaneously sought to extend both the time for the beginning and completion of any work theretofore authorized, but one fee shall be charged; and in addition thereto, the usual fees for filing and recording such applications. The fees and charges collected in accordance with the provisions of this Act shall be immediately. deposited in the State treasury to the credit of the general revenue and full and detailed verified monthly and annual reports of all such receipts, as well as of the expenditures of the said board shall be filed with the comptroller of public accounts.

SEC. 42. A cubic foot of water per second of time shall be the standard unit for the measurement of flowing water, for the purpose of distributing water for beneficial uses. The standard unit for volume of static water shall be the acre-foot.

SEC. 43. A cubic foot per second of time is the quantity of water that will pass through an area of one square foot in one second, when flowing at an average velocity of one foot per second. An acre foot is the quantity of water required to cover one acre foot deep.

SEC. 44. A water right is the right to use the water of the State when such use has been acquired by the application of water under the statutes of this State and for the purposes stated in this Act. Such use shall be the basis, the measure and the limit to the right to use water of the State at all times, not exceeding in any case the limit of volume to which the user is entitled and the volume which is necessarily required and can be beneficially used for irrigation or other authorized uses.

SEC. 45. Rights to the use of water acquired under the provisions of this Act shall be limited and restricted to so much thereof as may be necessarily required when beneficially used for the purposes stated in this Act, irrespective of the capacity of the ditch or other works, and all the water not so applied shall not be considered as appropriated.

SEC. 46. Any appropriation or use of water heretofore made under any statute of this State or hereafter made under the provisions of this Act which shall be wilfully abandoned during any three successive years, shall be forfeited and the water formerly so used or appropriated shall be again subject to appropriation for the purposes stated in this Act.

SEC. 47. Any person, association of persons, corporation, water improvement or irrigation district, who may have heretofore constructed or who may hereafter construct any dam or dams across any river, or other stream, for the purpose of storing water for any of the purposes set forth in Section 2 of this Act shall have the right to appropriate the ordinary flow or underflow, or the storm, flood or rain waters of such stream, in amounts and quantities equal to the holding capacity of such dam or dams, by making application as provided for in Section 15 of this Act, and such application shall have priority over all other applications; and, provided, that any such

person, association of persons, corporations or irrigation district thus impounding water in any river, channel, lake or reservoir and appropriating the same shall have the right to collect from any riparian owner who shall divert such impounded water from said reservoir by pumping or otherwise a reasonable sum for the water so diverted, such sum to be determined by the board of water engineers, based upon the benefits accruing to such riparian owner by reason of the construction of such dam, lake or reservoir and the impounding of such waters therein, provided, the owner of such dam, lake or reservoir, and the owner of riparian rights using such water cannot agree upon the price to be paid therefor.

Sec. 48. All such corporations, whether chartered under the provisions of Chapter 2, Title 73, Revised Civil Statutes of Texas, 1911, or under the general corporation laws of the State of Texas, shall have full power and authority to make contracts for the sale of permanent water rights, to any person, corporation, association of persons, or irrigation district and to have the same secured by a lien on the lands or otherwise, and to lease, rent or otherwise dispose of the water controlled by such corporation, for such price as may be agreed upon, and in addition to the lien on the crops hereinafter provided for, such lease or rental contract may be secured by lien on land or otherwise; provided, that such water may be sold, leased, rented or otherwise disposed of to any such person, corporation, association of persons or irrigation district, or to the water tenants thereof, who have heretofore appropriated and complied with the provisions of Chapter 2, Title 73, Revised Civil Statutes of Texas, 1911, regardless of whether or not the water so furnished, to lands adjacent or contiguous to the canals of such corporation, association of persons or irrigation district so furnishing water; provided further that any person, corporation, association of persons or irrigation district, shall be under no obligation during the period that water is so taken and utilized, to operate it or their pumping plant, headgate or intake, and failure to so operate its pumping plant, headgate or intake during such period, shall not be deemed an abandonment or waiver of his, their or its rights in such pumping plant, headgate, intake and source of supply.

Provided that nothing herein contained shall affect or alter the existing relative rights of priority of the various appropriators whose supply is derived from the same source.

Sec. 49. Any person, association of persons, corporation, water improvement or irrigation district having in possession and control storm, flood or rain waters conserved or stored, under the provisions of this Act, may enter into contract to supply same to any person, association of persons, corporation, water improvement or irrigation district having the right to acquire such use; provided that the price and terms of such contract shall be just and reasonable and without discrimination and subject to the same revision and control as hereinafter provided for other water rates and charges; provided, that if any person shall use such stored or conserved water without first entering into contract with the party having stored or conserved

the same, such user shall pay for the use thereof such charge or rental as the board shall find to be just and reasonable, and subject to revision by the court, as herein provided for other water rates and charges.

SEC. 50.   For the purpose of conveying and delivering storm, flood or rain water from the place of storage to the place of use, as provided in the preceding section, it shall be lawful for any person, association of persons, corporation, water improvement or irrigation district to use the banks and beds of any flowing natural stream within this State, under and in accordance with such rules and regulations as may be prescribed by the board of water engineers, and such board shall prescribe rules and regulations for such purpose.   No person, association of persons, corporations, water improvement or irrigation district who has not acquired the right to the use of such conserved or stored waters, as provided in the last preceding Section, shall take, use or divert same.

SEC. 51.   Any person, association of persons, corporation, water improvement or irrigation district, or the agent, officer employe or representative of any such person, association of persons, corporation, water improvement or irrigation district who shall wilfully interfere with the passage of, or take, divert or appropriate such conserved or stored water during the passage and delivery thereof, as provided in the last two preceding sections, shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in any sum not exceeding one hundred dollars, or by imprisonment in the county jail for a term not exceeding six months, or by both such fine and imprisonment, and each and every day that such taking diversion or appropriation may be made, shall constitute a separate offense

SEC. 52.   It shall be the duty of the district court, or the judge thereof, of any judicial district in or through which the conserved or stored waters described in the last three preceding Sections may pass, at the suit of any party having an interest therein, upon it being made to appear that any person, association of person, corporation, water improvement or irrigation district, or any agent. officer, employee, or representative thereof, is interfering with, or threatening or about to interfere with the passage, or is taking, diverting, appropriating, or threatening, or about to take, divert, or appropriate, any conserved or stored waters, in violation of the provisions of the last three preceding Sections; to issue such writ or writs of injuncting, mandamus, or other process as may be proper or necessary to prevent such wrongful acts.

SEC. 53.   Corporations may be formed and chartered, under the provisions of this Act, and of the general corporation laws of the State of Texas, for the purpose of constructing, maintaining and operating canals, ditches, flumes, feeders, laterals, dams, reservoirs, lakes and wells, and of conserving, storing, conducting and transferring water to all persons entitled to the use of the same for irrigation, mining, milling, manufacturing, the development of power to cities and towns for waterworks, and for stock-raising.

SEC. 54.   All such corporations shall have full power and authority

to make contracts for the sale of permanent water rights, and to have the same secured by liens on the land, or otherwise, and to lease, rent or otherwise dispose of the water controlled by such corporation, for such time as may be agreed upon, and in addition to the lien on the crops hereinafter provided for, the lease or rental contract may be secured by a lien on the land, or otherwise.

Provided, any contract for the sale of water rights shall be voidable unless the seller thereof has complied with the provisions of the statute relating to certified filings, or shall have obtained a permit from the board of water engineers for the purposes and uses proposed to be made by the buyer of such water rights it is proposed to deliver.

Any person, association of persons, or corporation who sells or offers for sale any permanent water right, without having complied with the provisions of the statute relating to certified filings, or without having obtained a permit from the board of water engineers for the uses and purposes purporting to be conveyed by such permanent water right, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than one hundred dollars nor more than one thousand dollars, or be confined in the county jail for any period of time not to exceed one year, or by both such fine and imprisonment.

Sec. 55. All persons who own or hold a possessory right or title to land adjoining or contiguous to any dam, reservoir, canal, ditch, flume or lateral, constructed and maintained under the provisions of this Act, and who shall have secured a right to the use of water in said canal, ditch, flume, lateral, reservoir, dam or lake, shall be entitled to be supplied from such canal, ditch, flume, lateral, dam, reservoir or lake with water for irrigation of such land, and for mining, milling, manufacturing, development of power, and stock-raising, in accordance with the terms of his or their contract.

Sec. 56. If the person, association of persons, or corporation owning or controlling such water, and the person who owns or holds a possessory right or title to land adjoining or contiguous to any canal, ditch, flume or lateral, lake or reservoir, constructed or maintained under the provisions of this Act, fail to agree upon a price for a permanent water right, or for the use or rental of the necessary water to irrigate the land of such person, or for mining, milling, manufacturing, the development of power, or stock raising; such person, association of persons, or corporation shall, nevertheless, if he, they or it, have or control any water not contracted to others, furnish the necessary water to such person to irrigate his lands or for mining, milling, manufacturing, the development of power or stock raising, at such prices as shall be reasonable and just, and without discrimination.

Sec. 57. In case of shortage of water from drouth, accident or other cause, all water to be distributed shall be divided among all customers pro rata, according to the amount he or they may be entitled to, to the end that all shall suffer alike, and preference be given to none; provided, that nothing in this Section contained shall be

held to preclude any such person, association of persons, or corporation owning or controlling such water from supplying the same to any person having a prior vested right thereto under the laws of this State.

SEC. 58. The permanent water right shall be an easement to the land and pass with the title thereto; the owner thereof shall be entitled to the use of the water upon the terms provided in his or their contract with such person, association of persons or corporation, or, in case no contract is entered into, then at just and reasonable prices, and without discrimination. Any instrument of writing conveying a permanent water right shall be admitted to record in the same manner as other instruments relating to the conveyance of land.

SEC. 59. If any person entitled to receive or use water from any canal, ditch, flume, lateral, dam, reservoir or lake, or from any conserved or stored supply, shall present to the board his petition in writing, showing that the person, association of persons, corporation, water improvement or irrigation district owning or controlling such water has a supply of water not contracted to others and available for his use, and fails or refuses to supply such water to him, or that the price or rental demanded therefor is not reasonable and just, or is discriminatory; or that the complainant is entitled to receive or use such water, and is willing and able to pay a just and reasonable price therefor; and shall accompany such petition with a deposit of twenty-five dollars; it shall be the duty of the board to make a preliminary investigation of such complaint and determine whether there is probable ground therefor. If said board shall determine that no probable ground exists for such complaint, same shall be dismissed, and the deposit may, at the discretion of the board, be returned to the complainant or paid into the State treasury.

SEC. 60. If the board shall determine that probable ground exists for such complaint, it shall enter an order setting said matter for hearing at a time and place to be named therein. The board may, in its discretion, require the complainant to make an additional deposit, or to enter into bond in an amount fixed by the board, conditioned for the payment of all costs of such proceeding, and which bond shall be approved by the board. Thereupon it shall be the duty of the secretary of the board to transmit a certified copy of the petition of complainant and of the order setting same for hearing, by registered mail, addressed to the party or parties against whom such complaint is made, and which notice shall be deposited in the mails at least twenty days before the date set for such hearing.

SEC. 61. At the time and place stated in such order, the board shall sit to hear such complaint. It may hear evidence orally or by affidavit in support of or against such complaint, and may hear arguments, and shall have power to adjourn such hearing from time to time and from place to place, and upon completion thereof shall render decision in writing.

SEC. 62. Appeal from such decision of the board may be taken within the time and in the manner as herein provided for other ap-

peals from the decision of such board. The decision may be suspended by the filing of a supersedeas bond, in the same manner as now provided in other civil cases; provided, that the board shall fix the amount of the bond necessary to stay the execution of any such order.

SEC. 63. In any examination, investigation or proceeding authorized before the board of water engineers, such board shall have power to issue subpoenas for the attendance of witnesses, under such rules as the board may prescribe. Each witness who shall appear before the board by order of the board, at a place outside of the county of his residence, shall receive for his attendance, one dollar per day and three cents per mile traveled by nearest practicable route, in going to' and returning from the place of meeting of said board, which shall be ordered paid by the comptroller of public accounts upon the presentation of proper vouchers, sworn to by such witness and approved by the chairman of the board; provided, that no witness shall be entitled to any witness fees or mileage who is directly interested in such proceeding.

SEC. 64. In any examination or hearing held before the board of water engineers, the board shall have authority to adjourn such hearing from time to time and from place to place. Each member of such board and the secretary thereof shall be authorized to administer oaths.

SEC. 65. Upon application of any person, the board shall furnish certified copies of any order' or decision of record of such board, or of any paper, map or other document filed in the office of such board, and such certified copies, under the hand of the secretary and seal of the board, shall be admissible in evidence in any court, in the same manner and with like effect that the original would be entitled to.

SEC. 66. Every person, association of persons, corporation or irrigation district, conserving or supplying water for any of the purposes authorized by this Act, shall make and publish reasonable rules and regulations relating to the method and manner of supply, use and distribution of water, and prescribing the time and manner of making application for the use of water and of payment therefor.

SEC. 67. Every conveyance of a ditch, canal or reservoir, or other irrigation work, or any interest therein, shall hereafter be executed and acknowledged in the same manner as the conveyance of real estate, and recorded in the deed records of the county or counties in which such ditch, canal or reservoir is situated, and any such conveyance which shall not be made in conformity with the provisions of this Act, shall be null and void, as against subsequent purchasers thereof in good faith and for valuable consideration.

SEC. 68. Any person who shall wilfully open, close, change or interfere with any headgate or water box without lawful authority or who shall wilfully use water or conduct water in and through his ditch or upon his land, to which water he is not entitled, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum of not less than ten dollars, and not more than one thousand dollars, or by imprisonment in the county jail for a

term not exceeding six months; provided, that the possession or use of water to which the person using or possessing same shall not be lawfully entitled shall be prima facie proof of the guilt of the person so using or in possession of same.

SEC. 69. Any person or persons who shall knowingly and wilfully cut, dig, break down, destroy, or injure, or open any gate, bank, embankment or side of any ditch, canal, reservoir, flume, tunnel or feeder or pump or machinery, building, structure, or other work, which is the property of another, or in which another owns an interest, or which is in the lawful possession or use of another or others, and which is used for the purpose of irrigation or milling or mining, or manufacturing, or for the development of power, or for domestic purposes, or for stockraising, with intent maliciously to injure any person, association, corporation, water improvement or irrigation district, or for the gain of any person, association, water improvement or corporation, so cutting, digging, breaking, injuring or opening any such work hereinbefore in this Section named, or with the intent of taking or stealing or causing to run out or waste out of any such ditch, canal, or reservoir, feeder or flume, any water for his own profit, benefit or advantage, or to the injury of any person, association or corporation lawfully entitled to the use of such water. or to the use or management of such ditch, canal, tunnel, reservoir, feeder, flume, machine, structure or other irrigation work, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than ten dollars nor more than one thousand dollars, and may be punished by imprisonment in the county jail for any term not exceeding two years, or by both such fine and imprisonment.

SEC. 70. Any person or persons who shall deposit in any canal. lateral, reservoir or lake, used for any of the purposes enumerated in this Act, the carcass of any dead animal. tin cans, discarded buckets or pails, garbage, ashes, baling or barbed wire, earth, offal or refuse of any character, or any other article or articles which might pollute the water or obstruct the flow in any such canal or other similar structure, shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding six months, or by both such fine and imprisonment.

SEC. 71. In all cases where irrigation ditches are owned or used by two or more persons, or by mutual or co-operative companies or corporations, and one or more of such persons, or shareholders shall fail or neglect to do or to pay for his proportionate share of the work necessary for the proper maintenance and operation of such ditch, the owners or shareholders, desiring the performance of such work as is reasonably necessary to maintain and operate the ditch, may, after having given ten days' written notice to such joint owner, or owners, or shareholders who have failed to pay for or refused to perform their proportionate share of work necessary for the operation and maintenance of said ditch, proceed themselves to do such work, or cause

the same to be done, and may recover therefor from such person so failing to perform or pay for his share of such work, in any court having jurisdiction over the amount, the reasonable expense or value of such work or labor so performed.

SEC. 72. All surplus water taken or diverted from any running stream and not used by the appropriator or disposed of to consumers for the purposes stated in this Act, shall be conducted back to the stream from which taken or diverted, wherever such water may be returned by gravity flow, whenever reasonably practicable.

SEC. 73. Every person, association of persons, corporation, water improvement or irrigation district shall have power to cause an examination and survey for its proposed work to be made as may be necessary to the selection of the most advantageous reservoir sites and rights of way for any of the purposes authorized by this Act, and for such purposes shall have the right to enter upon the lands or waters of any person.

Any member or employee of the board shall have authority to enter upon the lands and any or all waterways, either natural or artificial, for the purpose of making any investigation that would, in the judgment of the board, assist in the discharge of its duties.

SEC. 74. Every person, association of persons, corporation, water improvement or irrigation district formed for any of the purposes authorized by this Act, are hereby granted the right of way, not to exceed one hundred feet in width, and the necessary area for any dam and reservoir site over all public free school, University and asylum lands of this State, with the use of the rock, gravel and timber on such reservoir site and right of way for construction purposes, after paying such compensation as the board of engineers may determine, and may acquire such reservoir site and rights of way over private lands by contract.

SEC. 75. Any person, association of persons, corporation, irrigation or water improvement district, or any city or town, may also obtain the right of way over private lands and also the lands for pumping plants, intakes, headgates and storage reservoirs, by condemnation, by causing the damages for any private property appropriated by any such person, association of persons, corporation, water improvement or irrigation district. or city or town, to be assessed and paid for as provided in cases of railroads; provided, however, that when the power granted by this section is sought to be exercised by any person or association of persons, he or they shall first make application to the Board of Water Engineers for such condemnation and said Board shall make due investigation and if it deems advisable shall give notice to the party owning the land sought to be condemned, and after hearing, may institute such condemnation proceedings in the name of the State of Texas for the use and benefit of said person or persons and all others similarly situated, the costs of said suit and condemnation to be paid by the person or persons at whose instance the same in instituted in proportion to the benefits received by each as fixed by said Board and to be paid before use is made of such condemned rights or property; and thereafter all persons seeking to take the benefits

of such condemnation proceedings shall make application therefor to the Board of Water Engineers and if such application is granted shall pay such fees and charges as may be fixed by said Board.

SEC. 76. All persons, associations of persons, corporations, and water improvement or irrigation districts shall have the right to run along or across all roads and highways necessary in the construction of their work, and shall at all such crossings construct and maintain necessary bridges, culverts, or siphons, and shall not impair the uses of such road or highway; provided, that if any public road or highway or public bridge shall be upon the ground necessary for the dam site, reservoir, or lake, it shall be the duty of the commissioners' court to change said road and to remove such bridge that the same may not interfere with the construction of the proposed dam, reservoir, or lake; provided, further, that the expense of making such change shall be paid by the person, association of persons, corporation, water improvement or irrigation district desiring to construct such dam, lake or reservoir.

SEC. 77. Such person, association of persons, corporation or irrigation district shall have power to construct its ditch or canal across, along or upon any stream of water.

SEC. 78. When, in the examination of any irrigation or reclamation project, under the provisions of the Act of Congress, known as the Reclamation Act, approved June 17, 1902, it shall be found advisable or necessary to irrigate or reclaim lands within the limits of this State, the Secretary of the Department of the Interior is authorized to make all necessary examinations and surveys for, and to locate and construct irrigation or reclamation works within this State, and to perform any and all acts necessary to carry into effect the provisions, limitations, charges, terms and conditions of said Reclamation Act.

SEC. 79. The provisions of this Act shall in all things apply to the construction, maintenance and operation of any irrigation works in this State, constructed under what is known as the Federal Reclamation Act, approved June 17, 1902, and the amendments thereto, in so far as the provisions of this Act are not inconsistent with said Act of Congress, or the amendments thereto, or the regulations prescribed by the Secretary of the Department of the Interior in conformity to such Reclamation Act and the amendments thereto.

SEC. 80. It shall be unlawful for any person, association of persons, corporation, water improvement or irrigation district to take or divert any of the water of the ordinary flow, underflow, or storm flow of any stream, water course, or watershed, in this State into any other natural stream, water course or watershed, to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted.

SEC. 81. Before any person, association of persons, corporation, water improvement or irrigation district shall take any water from any natural stream, water course, or watershed in this State into any other watershed, such person, association of persons, corporation, water improvement or irrigation district shall make application to the Board of Water Engineers for a permit so to take or divert such waters, and no such permit shall be issued by the board until after full hear-

ing before said board as to the rights to be affected thereby, and such hearing shall be held and notice thereof given at such time and such place, in such mode and maner as the board may prescribe; and from any decision of the board an appeal may be taken to the district court of the county in which such diversion is proposed to be made, in the mode and manner prescribed in this Act for other appeals from the decision of the board.

SEC. 82. If any person, association of persons, corporation, water improvement or irrigation district, or the agent, attorney, employee, or representative of any such person, association of persons, corporation or irrigation district, shall take or divert any waters from one natural stream, water course, or watershed into any other watershed, contrary to the provisions of the last two preceding Section of this Act, he, it or they shall be deemed guilty of a misdemeanor and upon conviction. thereof shall be punished by a fine in a sum not less than one hundred dollars nor more than five hundred dollars or by imprisonment in the county jail, for any term not exceeding six months, and each day that such taking or diversion shall continue shall constitute a separate offense.

SEC. 83. Whenever any appropriator of water from any stream or other source of water supply located in whole or in part within this State, shall have obtained from the Board of Water Engineers a permit for the use of water, and shall have made use of the water under the terms of such permit; or whenever any such appropriator of water shall have filed an appropriation, in accordance with the laws of this State in force at the time of such filing, and shall have filed with the Board of Water Engineers a certified record of such appropriation, as required by Chapter 171 of the Acts of the regular session of the Thirty-third Legislature, and shall have made use of the water, under the terms of such filing or permit for a period of three years after this Act shall take effect, he shall be deemed to have acquired a title to such appropriation by limitation, as against any and all other claimants of water from the same stream, or other source of water supply, and as against any and all riparian owners upon said stream or other source of water supply.

SEC. 84. Unless the person, association of persons, corporation, water improvement or irrigation district owning or controlling any ditch, canal, reservoir, dam or lake, shall keep the same securely fenced, no cause of action shall accrue in their favor against owners of live stock for any trespass thereon.

SEC. 85. Any corporation organized under the provisions of the General Laws of this State, or the provisions of this Act, for any of the purposes stated in this Act, shall have the power to acquire lands by voluntary donation or purchase in payment of stock or bonds or water rights; and to hold, improve, subdivide and dispose of all such land and other property; and to borrow money for the construction, maintenance and operation of its canals, ditches, flumes, feeders, reservoirs, dams, lakes, wells and other property and franchises, to the extent of the value thereof, to secure the payment of any debts contracted for same; provided, no corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and

all fictitious increases in stock or indebtedness shall be void; provided further, all lands acquired by such corporation, except such as are used for the construction, maintenance or operation of such canals. ditches, laterals, feeders, reservoirs, dams, lakes, wells and other necessary works, shall be alienated within fifteen years from the date of acquiring said land or be subject to judicial forfeiture.

SEC. 86. Any corporation organized under the provisions of the General Laws of this State, or the provisions of this Act, for any of the purposes stated in this Act, may elect directors or trustees to hold office for a period of three years, and may provide for the election of one-third in number thereof each year.

SEC. 87. Every person, association of persons, corporation, water improvement or irrigation district, who has heretofore constructed, or may hereafter construct any ditch, canal, dam, lake or reservoir, for the purposes of irrigation, and who shall lease, rent, furnish, or supply water to any person, association of persons, water improvement or corporation, for the purpose of irrigation, shall, irrespective of contract, have a preference lien superior to every other lien upon the crop or crops raised upon the land thus irrigated.

SEC. 88. For the enforcement of the lien provided for in the preceding Section, every such person, association of persons, corporation. water improvement or irrigation district shall be entitled to all the rights and remedies prescribed by Chapter 1, Title 80, of the Revised Civil Statutes of this State for the enforcement of the lien as between landlord and tenant.

SEC. 89. It shall be unlawful for any person, association of persons, corporation, water improvement or irrigation district owning, leasing or operating any ditch or canal or reservoir, or cultivating any lands abutting upon any reservoir, ditch, flume, canal, wasteway or lateral to permit Johnson Grass or Russian Thistle to go to seed upon such reservoir, ditch, flume, canal, waste-way or lateral within ten feet of the high water line of any such reservoir, ditch, flume, canal, waste-way, or lateral, where the same crosses or lies upon land in the ownership or control of any such person, association of persons, corporation, water improvement or irrigation district, and anyone violating the provisions of this Section shall be deemed guilty of a misdemeanor, and upon conviction therefor shall be fined in any sum not less than twenty-five dollars nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, that this Section shall not apply to Tom Green, Sterling, Irion, Schleicher, McCullough, Brewster, Menard, Maverick, Kinney, Val Verde and San Saba counties.

SEC. 90. An artesian well is defined, for the purposes of this Act, to be an artificial well in which, if properly cased, the waters will rise by natural pressure above the first impervious stratum below the surface of the ground.

SECTION 91. Any artesian well which is not tightly cased, capped and furnished with such mechanical appliances as will readily and effectively arrest and prevent the flow from such well, either over the surface of the ground about the well, or wasting from the well through

the strata through which it passes, is hereby declared a public nuisance and subject to be abated as such, upon the order of the board.

SECTION 92. Waste is defined, for the purposes of this Act, in relation to artesian wells, to be the causing, suffering or permitting the waters of an artesian well to run into any river, creek, or or other natural water course or drain, superficial or underground channel, bayou, or into any sewer, street, road, highway, or upon the land of any other person than that of the owner of such well, or upon the public lands, or to run or percolate through the strata above that in which the water is found; unless it be used for the purposes and in the manner in which it may be lawfully used on the premises of the owner of such well; provided, that nothing in this Section shall be construed to prevent the use of such water, if suitable, for proper irrigation of trees standing along or upon any street, road or highway, or for ornamental ponds or fountains, or the propagation of fish, or for the purposes authorized by this Act.

SECTION 93. Whenever any person desires to drill a well upon his own land for domestic purposes or use for stock raising purposes or use, that comes within the definition of artesian well, as defined in this Act, he shall have the right to do so without subjecting himself to the provisions of this Act; provided, that said well shall be properly and securely cased, and whenever water is reached containing mineral or other substances injurious to vegetation or agriculture it shall be the duty of owner of said well to securely cap same or to control its flow so as not to injure the land of any other person, or to fill it up so as to prevent the water of said well to rise above the first impervious stratum below the surface of the ground.

SECTION 94. Any person boring or causing to be bored any artesian well shall keep a complete and accurate record of the depth and thickness and character of the different strata pentrated, and when such well is completed, shall transmit, by registered mail, to the Board of Water Engineers, a copy of such record. Any person violating the provisions of this Section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in a sum not less than ten dollars nor more than one hundred dollars.

SECTION 95. Any person, association of persons or the agent of any corporations owning or acquiring any possessory right to lands contiguous to any canal or irrigation system and who acquires the right to the use of water from such canal or irrigation system, by contract as in this Act provided, who wilfully and knowingly permits the excessive or wasteful use of water by any of the agents, servants or employees of said parties, or who wilfully and knowingly permits water to be wasted and not applied to a beneficial purpose, shall be deemed guilty of a misdeameanor, and shall be punished as provided in Section 101, and such use or waste of water shall be declared a public nuisance and abated as such by the Board of Water Engineers; said Board of Water Engineers being empowered to direct the canal company or irrigation system to close the water gates of said persons and to keep them closed until such time as such unlawful use of water shall be corrected and the determination of this question shall be con-

trolled entirely by the Board of Water Engineers, or its agents, servants and employees.

SECTION 96. Any person, association of persons, corporation, water improvement or irrigation district who owns or operates any works which make use of water for any of the purposes named in this Act, and who permits unreasonable loss of water in the operation of such works, through the faulty design or negligent operation of such works, shall be deemed guilty of waste, and such works, or any part thereof may be declared a public nuisance and abated as such by the Board of Water Engineers.

SECTION 97. Any person, or the agent of any person, or the agent of any association or corporation, who shall operate or attempt to operate any works, or shall use any water under contract with any canal or irrigation system, that has been previously declared to be a public nuisance, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum, not more than $1,000.00 or be confined in the county jail for a period of not to exceed one year, or both such fine and imprisonment.

SEC. 98. In any and all civil suits instituted by or under the direction of the board of water engineers, suit may be prosecuted and instituted in any court of competent jurisdiction in the county or in any of the counties where the land lies.

SEC. 99. Action may be brought before any district court of this State, having jurisdiction over the irrigation district in question by any person, association of persons, corporation, water improvement or irrigation district, who may be injured by waste, as herein defined, for the determination of questions arising under Sections 96 and 97 of this Act.

SEC. 100. Any person, association of persons, corporation, irrigation or water improvement district who owns and operates any system of works used for the irrigation of land, or for any of the purposes named in the law, shall keep such detailed record of daily operations as may be necessary to determine the quantity of water taken or diverted each calendar year. If the use is for irrigation, there shall also be kept a record of the number of acres irrigated, as near as may be, without making actual surveys for the purpose and the character of crop or crops grown, and the yield per acre.

On or before the first day of March of each year, every person, association of persons, corporation, water improvement or irrigation district who, during any part of the preceding calendar year, owned or operated any of the works described in this Section, shall furnish, under oath, to the Board of Water Engineers, upon blanks to be furnished by the board, the information required to be kept for such preceding year, or part thereof, together with such other available information as the board may require, covering the uses made of water for any of the purposes named in the law.

SEC. 101. Whoever wilfully causes or knowingly permits waste, as defined in this Act, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not exceeding five hundred dollars, or shall be imprisoned in the county jail not more than ninety days, or by both such fine and imprisonment.

SEC. 102. Any person, association of persons, corporation, or water improvement or irrigation district, owning or operating any artesian well, as defined for the purposes of this Act, at the time of its taking effect, shall, within one year thereafter, transmit to the Board of Water Engineers a sworn statement showing the result of such test, together with a declaration of the use or uses to which the newly developed supply will be devoted, and the contemplated extent of such use.

SEC. 103. On or before the first day of March of each year, every person, association of persons, corporation, water improvement or irrigation district who, during any part of the preceding calendar year, owned or operated any artesian well for any purpose other than that of domestic use, shall furnish, under oath, to the Board of Water Engineers, upon blanks to be furnished by the board, a detailed statement showing the quantity of water which has been derived from such well, and the character of use to which same has been applied, together with the change in level of the water table of said well, and if used in irrigation, the acreage and yield of each crop, together with such additional data as the board may require.

SEC. 104. Nothing in the preceding Sections, relating to artesian wells, shall be construed to apply to any oil well, and the status of such oil wells shall be unaffected by this Act; provided that abandoned oil wells shall be safeguarded as required in Section 91 of this Act.

SEC. 105. Upon a petition to the Board of Water Engineers, signed by one or more water users, upon any stream or other source of water supply, requesting the determination of the relative rights of the various claimants to the waters of such streams or other source of supply, it shall be the duty of the Board of Water Engineers, if upon investigation they find the facts and conditions are such as to justify, to make a determination of such rights, fixing a time for beginning the taking of testimony, and the making of such examinations as will enable them to determine the rights of the various claimants. In case suit is brought in any court for the determination of rights to the use of water, the case may, in the discretion of the court, be transferred to the Board of Water Engineers for determination, as in this Act provided.

SEC. 106. The Board shall prepare a notice setting forth the date when the investigation will begin of the flow of the stream and of the ditches and pumps taking water therefrom, and a place and time certain when one or more members of the Board of Water Engineers will begin the taking of testimony as to the rights of the parties claiming water therefrom. Said notice shall be published in two issues of one or more newspapers having general circulation in the portion of the State in which said water supply is situated, the last publication of said notice to be not less than thirty days prior to the beginning of taking testimony and for the measurement of the stream. The member or members of the board taking such testimony shall have the power to adjourn the taking of testimony from time to time and from place to place, to suit the convenience of those interested. Provided that the hearing for the taking of testimony shall

be held in each county through which such stream may flow, or in which a portion of such water supply is situated. Such hearing may be held by any one or more members of the Board of Water Engineers, and when taken before any one or more members, shall have the same force and effect as if the whole board were sitting at such hearing.

SEC. 107. It shall be the duty of the Board of Water Engineers to cause a notice to be sent by registered mail to each person, firm or corporation shown by the Records of the Board to the Board to be a user or claimant to the use of water upon such stream or other source of water supply, which said notice shall set forth the date when a member or members of the board will sit within the county of such claimant's residence, or the county in which may be situated the land to which such water right may be appurtenant, and also setting forth the date when the examination of the stream or other source of water supply, and the ditches and pumps diverting water therefrom, will begin; and also the date when testimony will be taken as to the rights to the water of said stream, or other source of water supply. Said notice shall be mailed at least thirty days prior to the date set therein for making examination of such stream, or other source of water supply, and the taking of testimony.

SEC. 108. Accompanying each such notice there shall, in addition, be enclosed with said notice a blank form on which said claimant or owner shall present in writing all the particulars necessary for the determination of his right to the waters of the stream or other source of water supply to which he lays claim, the said statement to include the following: The name and post office address of the claimant; the nature of the right or use on which the claim is based; the time of initiation of such right, or the commencement of such use, and, if distributing works are required, the date of beginning of construction; the date when completed; the date of beginning and completion of enlargements; the dimensions of the ditch as originally constructed and as enlarged; the date when water was first used for irrigation or other beneficial purposes, and if used for irrigation, the amount of land reclaimed the first year, and the amount in subsequent use with the dates of reclamation and the amount and general location of the land such ditch or pump is intended to irrigate; the character of the soil, and the kind of crops cultivated, and such other facts as will show a compliance with the law in acquiring the right claimed.

SEC. 109. Each claimant or owner shall be required to certify to his statement under oath, and any member of the Board of Water Engineers, or the secretary of the board, is hereby authorized to administer such oaths, which shall be done without charge, as also shall be the furnishing of blank forms for said statement, above provided for.

SEC. 110. Upon the date named in the notice above provided for, for the taking of testimony, a member or members of the Board of Water Engineers shall begin the taking of such testimony, and shall continue the same until completed. Provided, that the meetings may be adjourned from time to time and place to place, to suit the convenience of the parties. In case any member of the Board of Water

Engineers is directly or indirectly interested in the water of any stream, or other source of water supply, upon which an investigation and hearing shall be undertaken, or is prevented by illness, or otherwise from taking part in such hearing, the taking of testimony, so far as relates to said stream, or other source of water supply, shall be carried on by another member or members of the board, and such member so interested shall be deemed to be disqualified, and shall not participate in the taking of testimony or the determination of such cause.

SEC. 111. Upon the completion of the taking of testimony, it shall be the duty of the board, or the member or members thereof taking such testimony, to give notice, by registered mail, to the various claimants, that at a time and place named in the notice, not less than ten days thereafter, all of said evidence shall be open to inspection of the various claimants or owners, and others, and said member or members of the board conducting such hearing, shall keep such evidence open to inspection at said places for such a length of times as, in the opinion of the board, shall be necessary to permit anyone interested to examine the same.

SEC. 112. Whenever in the judgment of the Board of Water Engineers it is deemed necessary or expedient to employ stenographers, hydrographers and other experts, in order to properly prform its duties as required by Section 111 to 123, inclusive, the board shall have the authority to make such employment, at just and reasonable rates of compensation for such services and for their necessary traveling expenses, to be paid out of a fund created for that purpose, and the Legislature shall create such fund by appropriating a sufficient sum therefor out of money not otherwise appropriated for the use of the Board of Water Engineers.

SEC. 113. Any money expended in accordance with the provisions of the preceding section shall be charged as costs in the proceedings creating the necessity for its expenditure, and upon collection thereof by the proper authority shall be thereupon deposited with the State Treasurer, who shall place the same to the credit of the fund required by the preceding section.

SEC. 114. Should any person, corporation, water improvement or irrigation district, or association of persons owning irrigation works deriving water from, or claiming any interest in the stream or other source of water supply involving the determination, desire to contest any of the rights of the persons who have submitted evidence, as aforesaid, such persons, corporations or associations shall, within thirty days after the expiration of the period as fixed in the notice for public inspection, notify the Board of Water Engineers, or the member or members conducting such hearing, in writing, stating with reasonable certainty the grounds for his proposed contest, which statement shall be verified by the affidavit of the contestant or his agent of attorney, and the said board, or the member or members thereof conducting such hearing, shall notify the said contestant and the person, corporation, water improvement, and irrigation district or association whose rights are contested, to appear before such board,

or the member or members thereof conducting such hearing, at such convenient time and place as shall be designated in such notice.

SEC. 115. The time fixed for the hearing in the foregoing section provided for shall be not less than thirty nor more than sixty days from the date the notice is issued to the person, corporation, water improvement, or irrigation district, or association of persons whose rights are contested, which notices may be served and returns thereof may be made in the same manner as citations are served in civil actions in the district court. The Board of Water Engineers, or the member or members so conducting such hearing, shall have the right and power to issue subpoenas and compel the attendance of witnesses to testify upon such hearing, which shall be served in the same manner as subpoenas issued out of the district courts, and shall have the power to compel such witnesses so subpoenaed to testify, and to give evidence in said matter, and shall have the power to order the taking of depositions, and to issue, through their secretary, commissions to take depositions, in such manner as the Board of Water Engineers, by written rule, may provide, and said witnesses shall receive the same fees as in civil cases, the costs to be taxed as the Board of Water Engineers may direct.

SEC. 116. Upon the expiration of the period for which the evidence is kept open for inspection, the evidence in the original hearing before the Board of Water Engineers, or any member or members thereof, together with the evidence taken in all contests, if any, shall be transmitted to the office of the Board of Water Engineers, either by some member of the Board, or the secretary of the Board, in person, or by registered mail, and such evidence shall thereupon be filed as a public document in the office of the Board of Water Engineers.

SEC. 117. It shall be the duty of the Board of Water Engineers, either through one of its own members, or a qualified agent or employee, to proceed, at the time specified in the notice to the parties on such stream or other source of water supply, to make an examination of such stream or other source of water supply, and the works diverting water therefrom, said examination to include the measurements of the discharge of such stream, and of the carrying capacity of the various ditches and canals, an examination of the irrigated lands, and an approximate measurement of the lands irrigated or susceptible of irrigation from the various ditches and canals, and to take such other steps and gather such other data and information as may be essential to the proper understanding of the relative rights of the parties interested, which said observation and measurement shall be reduced to writing and made a matter of record in the office of the board, and it shall be the duty of the board to make or cause to be made map or plat, on a scale of not less than one inch to a mile, showing with substantial accuracy the course of said stream, the location of each ditch and canal diverting water therefrom, and the legal subdivisions of lands which have been irrigated or which are susceptible of irrigation from the ditches and canals already constructed.

.SEC. 118. As soon as practicable after the compilation of said

data and the filing of said evidence in the office of the Board of Water Engineers, the board shall make and cause to be entered of record in its office, findings of fact and an order of determination, determining and establishing the several rights to the waters of said stream. And where the evidence taken at such a hearing as herein provided shall disclose existing water rights not represented at such a hearing, said rights shall be included in such findings of fact of said board and shall be likewise determined and established. A certified copy of such order of determination and findings shall be filed in every county in which such stream or any portion of a tributary is situated, or by which it flows, with the county clerk of said county.

SEC. 119. Upon the final determination of the rights to the waters of any stream or other source of water supply, it shall be the duty of the secretary of the Board of Water Engineers to issue to each person, association or corporation represented in such determination, upon payment of the fee required by law, a certificate to be signed by the chairman of the Board of Water Engineers, and attested under seal by the secretary of said board, setting forth the name and post office address of the owner of the right, the date of the priority, extent and purpose of such right, and if such water be for irrigation purposes, a description of the legal subdivisions of the land to which the water is appurtenant. Such certificate shall be transmitted by the secretary in person or by registered mail, to the county clerk of the county in which such right is located, and it shall be the duty of the county clerk, upon receipt of the statutory recording fee, to record the same in a book prepared and kept for that purpose, and the clerk shall, upon receipt of the filing fee and the recording of said certificate, immediately transmit the certificate to the owner.

SEC. 120. Any party or any number of parties, acting jointly, who may feel themselves aggrieved by the determination of the Board of Water Engineers, may take an appeal from the decision of the board to the district court. All persons joining in the appeal shall be joined as appellants, and all others, parties to the proceedings, shall be joined as appellees.

SEC. 121. The party or parties appealing shall, within sixty days of the determination by the Board of Water Engineers, which is appealed from, and the entry thereof in the records of the board, file in the district court to which the appeal is taken, a notice in writing stating that such party or parties appeal to such district court from the determination and order of the Board of Water Engineers, and upon the filing of such notice, the appeal shall be deemed to have been perfected. Provided, however, that the party or parties appealing shall, within sixty days mentioned, enter into a bond, to be approved by the district clerk, to be made payable to all the parties in said suit or proceeding, other than the parties appealing, which bond shall be in such an amount as the district clerk shall fix, conditioned that the parties taking such appeal will prosecute their appeal to effect, and pay all costs which may be adjudged against them, or either or any of them. In the event that more than one appeal shall be perfected, the district court shall have the right to

order such appeals consolidated in such manner and upon such terms as the district court shall direct.

Sec. 122. The clerk of the district court, immediately upon the filing of said notice of appeal, and the approval of the bond mentioned in the preceding section, shall transmit to the secretary of the Board of Water Engineers a notice over the seal of the court, to the effect that said appeal has been perfected, which notice shall be entered of record by the secretary in the records of the board. The appellant or appellants shall cause a certified copy of said notice to be served on each of the appellees, the same to be served in the same manner provided for other process issuing out of the district court.

Sec. 123. The appellant or appellants shall, within ninety days after the appeal is perfected, as provided for, file in the office of the clerk of the district court of the proper county, a certified transcript of the order of determination made by the Board of Water Engineers, which order is appealed from, together with a certified copy of all of the records of the Board of Water Engineers relating to such determination, and the originals or certified copies of all documentary evidence offered before the board, or prepared by the board, including the measurements of streams, tributaries and ditches, together with a petition setting out the cause of complaint of the party or parties appealing.

Sec. 124. When any appeal to the district court shall have been perfected, as provided in the aforesaid sections, a trial de novo shall be held in the district court, and the practice in the taking of testimony and the pleadings therein shall follow as nearly as may be the procedure provided by law in appeals in probate cases from the county to the district court, except as herein otherwise provided.

Sec. 125. All surveys, maps, plats and plans, together with stream measurements and scientific and other data collected or prepared by the board, or under its authority, and evidence taken before such board or member thereof, shall be admissible in evidence, under certificate of the secretary of the board, in all hearings before the board, and in any of the courts of this state.

Sec. 126. After final hearing, the court shall enter a decree affirming or modifying the order of the Board of Water Engineers, and may assess such costs and apportion the same, as it deems just. Appeals may be taken from the judgment of the district court to the court of civil appeals and supreme court, in the same manner as in other cases.

Sec. 127. Pending final determination of the cause on appeal, the order of the Board of Water Engineers shall be in full force and effect, and the operation thereof shall not be suspended by the appeal.

Sec. 128. The determination of the Board of Water Engineers, as confirmed or modified on appeal, as provided in this Act, shall be conclusive as to all prior rights, and upon the rights of all existing claimants, upon the stream or other body of water embraced in such determination.

Sec. 129. Whenever the Board of Water Engineers shall, as provided by law, and after publication of notice, as hereinbefore pro-

vided, proceed to determine the right of the various claimants to the use of water upon any stream or other source of water supply, it shall be the duty of all claimants interested in such streams or other source of water supply, to appear and submit its or their respective claims or appropriations, at the time and in the manner required by law, and by said published notice, and any claimant who shall fail to appear in such proceedings and submit proof of his claim or appropriation, and who are required by this Act to appear, shall, after three years from the date of the entering of the order of said hearing be barred and estopped from subsequently asserting any rights theretofore acquired upon the stream or other source of water supply, embraced in such jurisdiction and shall be held to have forfeited all rights to appropriate or use the said waters theretofore claimed by him; provided that nothing herein contained shall be held to in any way destroy, infringe or impair the right of any riparian owner to the use of the water from such stream for domestic purposes and use or for the use of stock, and it shall not be necessary for the claimant of this right to appear or assert his right to such use, but the same shall be respected.

SEC. 130. Each county in this State, now existing or hereafter organized, shall constitute a water district, provided, that no water commissioner shall be appointed for any such district until the Commissioners' Court of such county shall, by resolution duly entered in the minutes of such court, call upon the Board of Water Engineers to appoint a Water Commissioner. At the same time that said County Commissioners shall call upon the Board of Water Engineers for the appointment of a Water Commissioner for their district, such Commissioners' Court shall, by resolution, fix the salary or compensation to be paid such commissioner, and the salary and necessary traveling expenses of such Water Commissioner shall be paid by said county, in the mode and manner that may be provided by the Commissioners' Court. As soon as the Commissioners' Court shall have acted upon any such resolution, a certified copy of the order of said court shall be forthwith transmitted to the secretary of the Board of Water Engineers by the clerk of the county court.

SEC. 131. There shall be appointed by the Board of Water Engineers, by a majority vote of such board, one water commissioner for each water district, after the commissioners' court shall have acted, as in the last preceding section set forth, which commissioner shall hold his office for the term of two years, unless sooner removed by the Board of Water Engineers; provided, that any such water commissioner may, at any time, be removed by the Board of Water Engineers, by a majority vote thereof, and in case of such removal. the board shall specify in its order the reason for such removal. All vacancies in the office of water commissioner, created by removal, resignation or otherwise, shall be filled by the Board of Water Engineers. Before entering upon the discharge of the duties of his office, the water commissioner shall take the oath of office prescribed by the constitution, and shall enter into bond with at least two personal sureties or with one surety or guaranty company authorized to do business in this state, payable to the Board of Water Engineers, to be approved by such board, in the penal sum of Five

10—Laws.

Thousand ($5,000.00) Dollars, conditioned for the faithful performance of his duties.

SEC. 132. It shall be the duty of such water commissioner to divide the water of the streams, canals, ditches, or other sources of water supply of his district, among the several users and appropriators thereof, according to the prior right of each, respectively, as determined by the order of the Board of Water Engineers. He shall shut and fasten or cause to be shut and fastened, the headgates of all ditches, or of intakes of all pumps, and shall regulate or cause to be regulated the controlling works of reservoirs in times of scarcity, in accordance with the orders of the Board of Water Engineers, as may be necessary by reason of priority of right existing upon such stream or other sources of water supply in his district. Such water commissioner shall have authority to regulate the distribution of water among the various users under any partnership or other canal, ditch or reservoir, in accordance with the respective rights of the appropriators, as determined by the Board of Water Engineers. Whenever, in the pursuance of his duties, the water commissioner regulates the headgate of a ditch or the controlling works of a reservoir, or the intake of any pumping plant, it shall be his duty to attach to said headgate, pump or controlling works, a written notice, dated and signed by him, setting forth the fact that said headgate, pump or controlling works has been properly regulated and is wholly under his control, and such notice shall be legal notice to all parties interested in the division and distribution of the waters of such stream, canal, ditch, pump or reservoir.

SEC. 133. Said water commissioner shall, as near as may be, divide, regulate and control the use of the water of all streams and other sources of water supply within his district under the orders of the Board of Water Engineers, by such closing or partial closing of the headgates as will prevent the waste of water, or its use in excess of the volume to which the appropriator is legally entitled, and any person who may be injured by the action of any water commissioner or his failure to act pursuant to this Act, shall have the right to appeal to the Board of Water Engineers, and from the decision of the said Board of Water Engineers an appeal may be taken to the district court. Provided, however, that the decision of the water commissioner, or other authority appealed from, shall remain in full force and effect, pending such appeal, and until reversed or altered by the authority to which such appeal shall be taken.

SEC. 134. The Board of Water Engineers shall have the power to authorize the water commissioner to employ an assistant or assistants to aid him in the discharge of the duties of his office, but such assistant shall have no authority except such as may be delegated to him by the water commissioner, and the water commissioner shall be in all things responsible for the actions of his assistant or assistants. Such assistants shall receive such compensation as may be allowed by the County Commissioners' Court, and the time and method of paying the same shall be settled by the Commissioners' Court in an order or resolution authorizing their appointment. Such assistant or assistants may be discharged by the water commissioner at any time, for any reason satisfactory to himself.

SEC. 135. The provisions of this Act shall apply to all streams or other sources of water supply lying upon or forming a part of the boundaries of this State.

SEC. 136. Nothing in this Act contained shall be construed as a recognition of any riparian right in the owner of any lands the title to which shall have passed out of the State of Texas subsequent to the first day of July, A. D. 1895.

SEC. 137. Nothing in this Act contained shall be held or construed to alter, affect, impair, increase, destroy, validate or invalidate any existing or vested right of property existing at the date when this Act shall go into effect.

SEC. 138. If any Section or provision of this Act shall be held unconstitutional, it shall not be held to invalidate any other provision of this Act.

SEC. 139. Chapter 171 of the General Laws of the regular session of the Thirty-third Legislature, and all other laws and parts of laws in conflict with the provisions of this Act, are hereby repealed.

SEC. 140. The crowed condition of the calendar, and the near approach of the end of the session, together with the fact that the irrigation laws of this State are in an unsatisfactory condition, and are retarding development, creates an imperative public necessity that the constitutional rule, requiring bills to be read upon three several days, be suspended, and that this Act take effect from and after its passage, and it is so enacted.

Approved March 19, 1917.
Takes effect 90 days after adjournment.

———

## JURISDICTION OF COUNTY AND DISTRICT COURTS OF FALLS COUNTY.

H. B. No. 239.]                    CHAPTER 89.

An Act to diminish the civil jurisdiction of the county court of Falls county, Texas, conferring said civil jurisdiction upon the district court of said county and conforming the jurisdiction of said district court to said change; repealing all laws and parts of laws in conflict or inconsistent herewith, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. The county court of Falls county shall hereafter have jurisdiction of eminent domain proceedings and of all criminal causes or prosecutions such as county courts generally now have or which may be hereafter conferred upon them by the Constitution and General Laws of the State of Texas, including the appellate jurisdiction possessed by county courts generally in criminal causes or prosecutions originating in the justice courts and other inferior courts of the county. Said county court of Falls county shall also have the general jurisdiction of a probate court; it shall probate wills, appoint guardians of minors, idiots, lunatics, persons non compos mentis and common

F

## CHAPTER 405

### H.B. No. 1788

#### AN ACT

relating to the issuance of term permits for water rights.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Chapter 11, Water Code, is amended by adding Section 11.1381 to read as follows:

*Sec. 11.1381. TERM PERMITS. (a) Until a water right is perfected to the full extent provided by Section 11.026 of this code, the commission may issue permits for a term of years for use of state water to which a senior water right has not been perfected.*

*(b) The commission shall refuse to grant an application for a permit under this section if the commission finds that there is a substantial likelihood that the issuance of the permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources of the area.*

*(c) The commission shall refuse to grant an application for a term permit if the holder of the senior appropriative water right can demonstrate that the issuance of the term permit would prohibit the senior appropriative water right holder from beneficially using the senior rights during the term of the term permit. Such demonstration will be made using reasonable projections based on accepted methods.*

*(d) A permit issued under this section is subordinate to any senior appropriative water rights.*

SECTION 2. Subsection (e), Section 11.146, Water Code, is amended to read as follows:

*(e) Except as provided by Section 11.1381 of this code, if [If] a permit has been issued for the use of water, the water is not subject to a new appropriation until the permit has been cancelled in whole or part as provided by this section.*

SECTION 3. Section 11.124, Water Code, is amended by adding Subsection (e) to read as follows:

*(e) If the application is for a term permit, the application form used must also state that on expiration of a term permit the applicant does not have an automatic right to renew the permit.*

SECTION 4. This Act takes effect September 1, 1987.

SECTION 5. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended.

Passed by the House on April 30, 1987, by a non-record vote. Passed by the Senate on May 21, 1987, by a viva-voce vote.

Approved June 17, 1987.

Effective Sept. 1, 1987.

---

## CHAPTER 406

### H.B. No. 1875

#### AN ACT

relating to the regulation of on-site sewage disposal systems; providing penalties.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Title 71, Revised Statutes, is amended by adding Article 4477-7e to read as follows:

*Art. 4477-7e. ON-SITE SEWAGE DISPOSAL SYSTEMS*

G

*Sec. 46. PAPERWORK REDUCTION. The commission may not require a person who has held a license for five or more years to complete an application for the renewal of the license that is more than two pages in length.*

SECTION 12. (a) Except as provided by Subsection (b) of this section, this Act applies to the operation of a bingo game, the award of prizes, the disbursement of funds for a charitable purpose, or other action taken on or after October 1, 1997. The law in effect before October 1, 1997, is continued in effect for the purposes of the calculation and distribution of funds and the operation of a bingo game by a licensed authorized organization before October 1, 1997.

(b) Not later than July 1, 1997, the Texas Lottery Commission shall adopt rules under Section 19a, Bingo Enabling Act (Article 179d, Vernon's Texas Civil Statutes), as amended by this Act, relating to the operation of bingo by bingo license holders and the distribution of proceeds for charitable purposes.

SECTION 13. The Texas Legislative Council shall prepare a nonsubstantive revision of the Bingo Enabling Act (Article 179d, Vernon's Texas Civil Statutes) for consideration by the 76th Legislature at its regular session in 1999.

SECTION 14. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force according to its terms, and it is so enacted.

Passed by the House on May 10, 1997: Yeas 140, Nays 0, 2 present, not voting; the House refused to concur in Senate amendments to H.B. No. 2086 on May 23, 1997, and requested the appointment of a conference committee to consider the differences between the two houses; the House adopted the conference committee report on H.B. No. 2086 on May 31, 1997: Yeas 131, Nays 4, 2 present, not voting; passed by the Senate, with amendments, on May 21, 1997: Yeas 30, Nays 0; at the request of the House, the Senate appointed a conference committee to consider the differences between the two houses; the Senate adopted the conference committee report on H.B. No. 2086 on May 31, 1997: Yeas 30, Nays 0.

Approved June 19, 1997.

Effective June 19, 1997.

---

# CHAPTER 1010

## S.B. No. 1

### AN ACT

relating to the development and management of the water resources of the state; providing penalties.

*Be it enacted by the Legislature of the State of Texas:*

### ARTICLE 1. WATER PLANNING: DROUGHT, CONSERVATION, DEVELOPMENT, AND MANAGEMENT

SECTION 1.01. Section 16.051, Water Code, is amended to read as follows:

Sec. 16.051. STATE WATER PLAN: *DROUGHT, CONSERVATION, DEVELOPMENT, AND MANAGEMENT; EFFECT OF PLAN.* (a) *No later than September 1, 2001, and every five years thereafter, the board* [The executive administrator] shall *adopt* [prepare, develop, and formulate] a comprehensive state water plan *that incorporates the regional water plans approved under Section 16.053 of this code. The state water plan shall provide for the orderly development, management, and conservation of water resources and preparation for and response to drought conditions, in order that sufficient water will be available at a reasonable cost to ensure public health, safety, and welfare; further economic development; and protect the agricultural and natural resources of the entire state.*

(b) *The state water plan, as formally adopted by the board, shall be a guide to state water policy. The commission shall take the plan into consideration in matters coming before it.*

(c) The *board by rule* [plan] shall define and designate river basins and watersheds.

(d) *The board, in coordination with the commission and the Parks and Wildlife Department, shall adopt by rule guidance principles for the state water plan which reflect the public interest of the entire state. When adopting guidance principles, due consideration shall be given to the construction and improvement of surface water resources and the application of principles that result in voluntary redistribution of water resources.*

(e) *On adoption the board shall deliver the state water plan to the governor, the lieutenant governor, and the speaker of the house of representatives and present the plan for review to the appropriate legislative committees. The plan shall include legislative recommendations that the board believes are needed and desirable to facilitate more voluntary water transfers. The plan shall identify river and stream segments of unique ecological value and sites of unique value for the construction of reservoirs that the board recommends for protection under this section.*

(f) *The legislature may designate a:*

(1) *river or stream segment of unique ecological value; or*

(2) *site of unique value for the construction of a reservoir.*

(g) *A state agency or political subdivision of the state may not obtain a fee title or an easement that would:*

(1) *destroy the unique ecological value of a river or stream segment designated by the legislature under Subsection (f) of this section; or*

(2) *significantly prevent the construction of a reservoir on a site designated by the legislature under Subsection (f) of this section.*

(h) *The board, the commission, or the Parks and Wildlife Department or a political subdivision affected by an action taken in violation of Subsection (g) of this section may bring a cause of action to remedy or prevent the violation. A cause of action brought under this subsection must be filed in a district court in Travis County or in the county in which the action is proposed or occurring.* [(c) The executive administrator shall be governed in his preparation of the plan by a regard for the public interest of the entire state. The executive administrator shall direct his efforts toward the orderly development and management of water resources in order that sufficient water will be available at a reasonable cost to further the economic development of the entire state.

[(d) The executive administrator shall also give consideration in the plan to the effect of upstream development on the bays, estuaries, and arms of the Gulf of Mexico and to the effect of the plan on navigation.]

SECTION 1.02. Sections 16.053 through 16.057, Water Code, are amended to read as follows:

Sec. 16.053. *REGIONAL WATER PLANS.* (a) *The regional water planning group in each regional water planning area shall prepare a regional water plan, using an existing state water plan identified in Section 16.051 of this code and local water plans prepared under Section 16.054 of this code as a guide, if present, that provides for the orderly development, management, and conservation of water resources and preparation for and response to drought conditions in order that sufficient water will be available at a reasonable cost to ensure public health, safety, and welfare; further economic development; and protect the agricultural and natural resources of that particular region.*

(b) *No later than September 1, 1998, the board shall designate the areas for which regional water plans shall be developed, taking into consideration such factors as river basin and aquifer delineations, water utility development patterns, socioeconomic characteristics, existing regional water planning areas, political subdivision boundaries, public comment, and other factors the board deems relevant. The board shall review and update the designations as necessary but at least every five years.*

(c) *No later than 60 days after the designation of the regions under Subsection (b) of this section, the board shall designate representatives within each regional water planning area*

to serve as the initial coordinating body for planning. The initial coordinating body shall then designate additional representatives to serve on the regional water planning group, ensuring adequate representation from the interests comprising that region, including but not limited to the public, counties, municipalities, industries, agricultural interests, environmental interests, small businesses, electric generating utilities, river authorities, water districts, and water utilities.

(d) The board shall provide guidelines for the consideration of existing regional planning efforts by regional water planning groups. The board shall provide guidelines for the format in which information shall be presented in the regional water plans. Nothing in the initial planning effort shall prevent development of a management plan or project where local or regional needs require action prior to completion of the initial regional water plan under this section.

(e) Each regional water planning group shall submit to the board a regional water plan that:

(1) is consistent with the guidance principles for the state water plan adopted by the board under Section 16.051(d) of this code;

(2) provides information based on data provided or approved by the board in a format consistent with the guidelines provided by the board under Subsection (d) of this section;

(3) has specific provisions for water management strategies to be used:

(A) during a drought of record;

(B) when flows are at 75 percent of normal; and

(C) when flows are at 50 percent of normal;

(4) includes but is not limited to consideration of the following:

(A) any existing water or drought planning efforts addressing all or a portion of the region;

(B) certified groundwater conservation district management plans and other plans submitted under Section 16.054 of this code;

(C) all potentially feasible water management strategies, including but not limited to improved conservation, reuse, and management of existing water supplies, acquisition of available existing water supplies, and development of new water supplies;

(D) protection of existing water rights in the region;

(E) opportunities for and the benefits of developing regional water supply facilities or providing regional management of water supply facilities;

(F) appropriate provision for environmental water needs and for the effect of upstream development on the bays, estuaries, and arms of the Gulf of Mexico and the effect of plans on navigation;

(G) provisions in Section 11.085(k)(1) of this code if interbasin transfers are contemplated;

(H) voluntary transfer of water within the region using, but not limited to, regional water banks, sales, leases, options, subordination agreements, and financing agreements; and

(I) emergency transfer of water under Section 11.139 of this code, including information on the part of each permit, certified filing, or certificate of adjudication for nonmunicipal use in the region that may be transferred without causing unreasonable damage to the property of the nonmunicipal water rights holder; and

(5) identifies river and stream segments of unique ecological value and sites of unique value for the construction of reservoirs that the regional water planning group recommends for protection under Section 16.051 of this code.

(f) No later than September 1, 1998, the board shall adopt rules:

(1) to provide for the procedures for adoption of regional water plans by regional water planning groups and for approval of regional water plans by the board; and

*(2) to govern procedures to be followed in carrying out the responsibilities of this section.*

*(g) The board shall provide technical and financial assistance to the regional water planning groups in the development of their plans. The board shall simplify, as much as possible, planning requirements in regions with abundant water resources. The board, if requested, may facilitate resolution of conflicts within regions.*

*(h)(1) Prior to the preparation of the regional water plan, the regional water planning group shall, after notice, hold at least one public meeting at some central location within the regional planning area to gather suggestions and recommendations from the public as to issues that should be addressed in the plan or provisions that should be considered for inclusion in the plan.*

*(2) The regional water planning group shall provide an ongoing opportunity for public input during the preparation of the regional water plan.*

*(3) After the regional water plan is initially prepared, the regional water planning group shall, after notice, hold at least one public hearing at some central location within the regional water planning area. The group shall make copies of the plan available for public inspection at least one month before the hearing by providing a copy of the plan in the county courthouse and at least one public library of each county having land in the region. Notice for the hearing shall include a listing of these and any other location where the plan is available for review.*

*(4) After the regional water plan is initially prepared, the regional water planning group shall submit a copy of the plan to the board. The board shall submit comments on the regional water plan as to whether the plan meets the requirements of Subsection (e) of this section.*

*(5) If no interregional conflicts exist, the regional water planning group shall consider all public and board comments; prepare, revise, and adopt the final plan; and submit the adopted plan to the board for approval and inclusion in the state water plan.*

*(6) If an interregional conflict exists, the board shall facilitate coordination between the involved regions to resolve the conflict. If conflict remains, the board shall resolve the conflict. On resolution of the conflict, the involved regional water planning groups shall prepare revisions to their respective plans and hold, after notice, at least one public hearing at some central location within their respective regional water planning areas. The regional water planning groups shall consider all public and board comments; prepare, revise, and adopt their respective plans; and submit their plans to the board for approval and inclusion in the state water plan.*

*(7) The board may approve a regional water plan only after it has determined that all interregional conflicts involving that regional water planning area have been resolved.*

*(8) Notice required by Subdivision (1), (3), or (6) of this subsection must be:*

*(A) published once in a newspaper of general circulation in each county located in whole or in part in the regional water planning area before the 30th day preceding the date of the public meeting or hearing; and*

*(B) mailed to:*

*(i) each mayor of a municipality with a population of 1,000 or more that is located in whole or in part in the regional water planning area;*

*(ii) each county judge of a county located in whole or in part in the regional water planning area;*

*(iii) each special or general law district or river authority with responsibility to manage or supply water in the regional water planning area;*

*(iv) each retail public utility that:*

*(a) serves any part of the regional water planning area; or*

*(b) receives water from the regional water planning area; and*

*(v) each holder of record of a permit, certified filing, or certificate of adjudication for the use of surface water the diversion of which occurs in the regional water planning area.*

(9) Notice published or mailed under Subdivision (8) of this subsection must contain:

(A) the date, time, and location of the public meeting or hearing;

(B) a summary of the proposed action to be taken;

(C) the name, telephone number, and address of the person to whom questions or requests for additional information may be submitted; and

(D) information on how the public may submit comments.

(i) The regional water planning groups shall submit their adopted regional water plans to the board by September 1, 2000, for approval and inclusion in the state water plan. In conjunction with the submission of regional water plans, each planning group should make legislative recommendations, if any, to facilitate more voluntary water transfers in the region. Subsequent regional water plans shall be submitted at least every five years thereafter. Public participation for revised regional plans shall follow the procedures under Subsection (h) of this section.

(j) The board may provide financial assistance to political subdivisions under Subchapters E and F of this chapter and Subchapters C, D, E, F, and J, Chapter 15, and Subchapters D, I, K, and L, Chapter 17, of this code for water supply projects only if:

(1) the board determines that the needs to be addressed by the project will be addressed in a manner that is consistent with the state water plan; and

(2) beginning September 1, 2001, the board:

(A) has approved a regional water plan as provided by Subsection (i) of this section, and any required updates of the plan, for the region of the state that includes the area benefiting from the proposed project; and

(B) determines that the needs to be addressed by the project will be addressed in a manner that is consistent with that regional water plan.

(k) The board may waive the requirements of Subsection (j) of this section if the board determines that conditions warrant the waiver. [HEARING ON PRELIMINARY PLAN. (a) After the executive administrator completes his preliminary planning of the water resources development within a river basin, he shall hold a public hearing, after notice, at some central location within the river basin. If the proposed plan involves the transfer of water from one basin to another, the hearing shall be held at some location convenient to the areas affected.

[(b) The executive administrator shall present the proposed plan of development and hear evidence for and against the plan.

[(c) After the hearing, the executive administrator shall consider the effect the plan will have on the present and future development, economy, general welfare, and water requirements of the river basin or the areas affected.]

Sec. 16.054. LOCAL WATER PLANNING. (a) It is the policy of the state that water resource management, water conservation, and drought planning should occur on an ongoing basis. The board, commission, and Parks and Wildlife Department shall make available where appropriate technical and financial assistance for such planning.

(b) Local plans may be submitted to the appropriate regional water planning group for the area as follows:

(1) holders of existing permits, certified filings, or certificates of adjudication for the appropriation of surface water in the amount of 1,000 acre-feet a year or more may submit plans required by Section 11.1271 of this code;

(2) retail and wholesale public water suppliers and irrigation districts may submit plans required by Section 11.1272 of this code;

(3) groundwater districts may submit management plans certified under Section 36.1072 of this code; and

(4) special districts may submit conservation or management plans required by general or special law.

(c) The regional water planning group shall consider any plan submitted under this section when preparing the regional water plan under Section 16.053 of this code.

*(d) When preparing individual water plans that address drought or the development, management, or conservation of water resources from the holders of existing permits, certified filings, or certificates of adjudication, the water suppliers, groundwater districts, special districts, irrigation districts, and other water users should ensure that the plan is not in conflict with the applicable approved regional water plan for their region.* [~~HEARING ON COMPLETED STATE WATER PLAN. When the executive administrator has prepared and examined the completed preliminary plan, the board shall hold a public hearing on the plan to determine whether or not it gives adequate consideration to the protection of existing water rights in this state and whether or not it takes into account modes and procedures for the equitable adjustment of water rights affected by the plan. After the hearing, the board may formally adopt the state water plan. A majority vote is necessary for adoption.~~]

Sec. 16.055. *DROUGHT RESPONSE PLAN. (a) The division of emergency management of the office of the governor shall be responsible for coordinating the drought response component of the state water plan.*

*(b) The drought response and monitoring committee is created and shall meet as necessary to carry out the provisions of this section. The committee is composed of one representative from each of the following entities, appointed by the administrative head of that entity:*

*(1) the division of emergency management of the office of the governor;*

*(2) the board;*

*(3) the commission;*

*(4) the Parks and Wildlife Department;*

*(5) the Department of Agriculture;*

*(6) the Texas Agricultural Extension Service; and*

*(7) the State Soil and Water Conservation Board.*

*(c) The governor may designate any other person or a representative of any other entity to serve on the committee.*

*(d) The representative of the division of emergency management shall serve as chair of the committee.*

*(e) The committee shall be responsible for:*

*(1) the assessment and public reporting of drought monitoring and water supply conditions;*

*(2) advising the governor on significant drought conditions;*

*(3) recommending specific provisions for a defined state response to drought-related disasters for inclusion in the state emergency management plan and the state water plan;*

*(4) advising the regional water planning groups on drought-related issues in the regional water plans; and*

*(5) ensuring effective coordination among state, local, and federal agencies in drought-response planning.*

*(f) In performing its duties under this section, the drought response and monitoring committee shall consider the following factors when determining whether a drought exists for the purposes of this section:*

*(1) meteorological conditions and forecasts;*

*(2) hydrological conditions and forecasts;*

*(3) water use and demand forecasts;*

*(4) water supply conditions and forecasts;*

*(5) the potential impacts of the water shortage on: the public health, safety, and welfare; economic development; and agricultural and natural resources; and*

*(6) other factors deemed appropriate by the committee.* [~~EFFECT OF PLAN. (a) The state water plan, as formally adopted by the board, shall be a flexible guide to state policy for the development of water resources in this state.~~

[(b) The commission shall take the plan into consideration in matters coming before it but is not bound by the plan.]

[(c) Nothing in the state water plan or any amendment or modification of the plan affects any vested right existing before August 30, 1965.]

Sec. 16.056. ]AMENDMENT OF PLAN. (a) The board shall review the plan biennially to consider any amendment or modification that may be needed because of changed conditions.

[(b) The board shall amend or modify the plan as experience and changed conditions require after holding a public hearing on any amendment or modification in the manner and for the purposes provided by Section 16.054 of this code.]

[(c) Any amendment or modification adopted by the board becomes a part of the plan.]

[Sec. 16.057.] FEDERAL ASSISTANCE IN FINANCING *REGIONAL WATER PLANS* [PLAN]. The executive administrator may take all necessary action to qualify for federal assistance in financing the development and improvement of the *regional water plans* [plan].

SECTION 1.03. Subchapter D, Chapter 11, Water Code, is amended by amending Sections 11.122 and 11.1271 and adding Section 11.1272 to read as follows:

Sec. 11.122. AMENDMENTS TO WATER RIGHTS REQUIRED. (a) All holders of permits, certified filings, and certificates of adjudication issued under Section 11.323 of this code shall obtain from the commission authority to change the place of use, purpose of use, point of diversion, rate of diversion, acreage to be irrigated, or otherwise alter a water right.

(b) *Subject to meeting all other applicable requirements of this chapter for the approval of an application, an amendment, except an amendment to a water right that increases the amount of water authorized to be diverted or the authorized rate of diversion, shall be authorized if the requested change will not cause adverse impact on other water right holders or the environment on the stream of greater magnitude than under circumstances in which the permit, certified filing, or certificate of adjudication that is sought to be amended was fully exercised according to its terms and conditions as they existed before the requested amendment.*

(c) The commission shall adopt rules to effectuate the provisions of this section.

Sec. 11.1271. ADDITIONAL REQUIREMENTS: WATER CONSERVATION PLANS. (a) The commission *shall* [may] require *from an applicant for a new or amended water right* the formulation and submission of a water conservation plan and the adoption of reasonable water conservation measures, as defined by Subdivision (8)(B), Section 11.002, of this code.

(b) *The commission shall require the holder of an existing permit, certified filing, or certificate of adjudication for the appropriation of surface water in the amount of 1,000 acre-feet a year or more for municipal, industrial, and other uses, and 10,000 acre-feet a year or more for irrigation uses, to develop, submit, and implement a water conservation plan, consistent with the appropriate approved regional water plan, that adopts reasonable water conservation measures as defined by Subdivision (8)(B), Section 11.002, of this code. The requirement for a water conservation plan under this section shall not result in the need for an amendment to an existing permit, certified filing, or certificate of adjudication.*

(c) *The commission shall adopt rules establishing criteria and deadlines for submission of water conservation plans.*

Sec. 11.1272. *ADDITIONAL REQUIREMENT: DROUGHT CONTINGENCY PLANS FOR CERTAIN APPLICANTS AND WATER RIGHT HOLDERS. (a) The commission shall by rule require wholesale and retail public water suppliers and irrigation districts to develop drought contingency plans consistent with the appropriate approved regional water plan to be implemented during periods of water shortages and drought.*

(b) *The wholesale and retail public water suppliers and irrigation districts shall provide an opportunity for public input during preparation of their drought contingency plans and before submission of the plans to the commission.*

SECTION 1.04. Section 15.401, Water Code, is amended to read as follows:

Sec. 15.401. PROGRAM CREATION. The research and planning program is created to provide money for research into and planning of the proper conservation, *management,* and development of the state's water resources, *for regional planning by political subdivisions,*

for facility engineering in economically distressed areas, and for flood control planning by political subdivisions. *The program may also provide money for research and planning by Texas political subdivisions related to the proper conservation, management, and development of water resources of areas outside Texas if such research or planning will result in water being available for use in or for the benefit of Texas or will maintain and enhance the quality of water in Texas.*

SECTION 1.05. Subsection (a), Section 15.404, Water Code, is amended to read as follows:

(a) The board may enter into a contract with any person for research into any matter relating to the conservation and development of the state's water resources *or for research by Texas political subdivisions related to the proper conservation and development of water resources of areas outside Texas if such research will result in water being available for use in or for the benefit of Texas or will help maintain and enhance the quality of water in Texas.*

SECTION 1.06. Subsection (f), Section 15.406, Water Code, is amended to read as follows:

(f) The board shall adopt rules establishing criteria of eligibility for regional facility planning money that considers:

(1) the relative need of the political subdivision for the money;

(2) the legal authority of the political subdivision to plan, develop, and operate regional facilities; [and]

(3) the effect of regional facility planning by the political subdivision on overall regional facility planning, development, and operation in the state and within the area in which the political subdivision is located; *and*

(4) *the degree to which the regional facility planning by the political subdivision is consistent with an approved regional water plan for the area in which the political subdivision is located.*

SECTION 1.07. Subchapter F, Chapter 15, Water Code, is amended by adding Section 15.4061 to read as follows:

*Sec. 15.4061.   FUNDING FOR REGIONAL WATER PLANS. (a) The board may enter into contracts with political subdivisions designated as representatives of a regional water planning group under Section 16.053(c) of this code to pay from the research and planning fund all or part of the cost of developing or revising regional water plans as defined in Section 16.053 of this code.*

*(b) A political subdivision may submit, either individually or jointly with other political subdivisions, a written application to the board for the purpose of funding regional water planning from the research and planning fund.*

*(c) The application shall be in the manner and form required by board rules and include:*

*(1) the name of the political subdivision or political subdivisions;*

*(2) a citation to the laws under which the political subdivision was created and is operating, including specific citation of all laws providing authority to develop and implement a regional water plan;*

*(3) the amount requested from the board for regional water planning;  and*

*(4) any other relevant information required by the board in its rules or specifically requested by the board.*

*(d) After notice and hearing, the board may award the applicant all or part of the requested funds that the board considers necessary for the political subdivision to carry out regional water planning.*

*(e) If the board grants an application under this section and awards funds for regional water planning, the board shall enter into a contract with the political subdivision or political subdivisions that includes:*

*(1) a detailed statement of the purpose for which the money is to be used;*

*(2) the total amount of money to be paid by the board from the research and planning fund under the contract;  and*

*(3) any other terms and conditions required by the board's rules or agreed to by the contracting parties.*

*(f) The board shall adopt rules establishing criteria for eligibility for regional water planning money that include:*

*(1) the relative need of the political subdivision for the money;*

*(2) the legal authority of the political subdivision to develop and implement a regional water plan; and*

*(3) the degree to which regional water planning by the political subdivision or political subdivisions will address the water supply needs in the regional water planning area.*

*(g) The board may not provide funds under this section for activities for which existing information or data is sufficient for the planning effort, including:*

*(1) detailed evaluation of cost of water supply alternatives where recent information is available to evaluate the cost associated with the alternative;*

*(2) evaluation of groundwater resources for which current information is available from the board or other entity sufficient for evaluation of the resource;*

*(3) determination of water savings resulting from standard conservation practices for which current information is available from the board;*

*(4) revision of board demand and population projections;*

*(5) revision of environmental planning criteria for new surface water supply projects as defined in the state water plan guidelines established in Section 16.051(d) of this section; and*

*(6) collection of data describing groundwater or surface water resources where information for evaluation of the resource is currently available.*

*(h) The board shall require that regional water plans developed or revised under contracts entered into under this section be made available to the commission and the Parks and Wildlife Department.*

SECTION 1.08.  (a) Except as provided by Subsection (b) of this section, the state water plan in effect on the effective date of this Act remains in effect until a new state water plan is adopted under Subsection (a), Section 16.051, Water Code, as amended by Section 1.01 of this Act.

(b) The state water plan shall include ongoing water development projects that have been issued a permit by the Texas Natural Resource Conservation Commission or a predecessor agency for a regional water supply planning study.

### ARTICLE 2.  WATER MANAGEMENT, MARKETING, AND TRANSFERS

SECTION 2.01.  Section 791.026, Government Code, is amended to read as follows:

Sec. 791.026.  CONTRACTS FOR WATER SUPPLY AND WASTEWATER TREAT-MENT FACILITIES.  (a) A municipality, district, or river authority of this state may contract with another municipality, district, or river authority of this state to obtain or provide part or all of:

(1) water supply or wastewater treatment facilities; or

(2) a lease or operation of water supply facilities or wastewater treatment facilities.

(b) The contract may provide that the municipality, district, or river authority obtaining one of the services may not obtain those services from a source other than a contracting party, except as provided by the contract.

(c) If a contract includes a term described by Subsection (b), payments made under the contract are the paying party's operating expenses for its water supply system, wastewater treatment facilities, or both.

(d) The contract may:

(1) contain terms and extend for any period on which the parties agree; [and]

(2) *require the purchaser to develop alternative or replacement supplies prior to the expiration date of the contract and may provide for enforcement of such terms by court order;* and

(3) provide that it will continue in effect until bonds specified by the contract and any refunding bonds issued to pay those bonds are paid.

(e) *Where a contract sets forth explicit expiration provisions, no continuation of the service obligation will be implied.*

(f) Tax revenue may not be pledged to the payment of amounts agreed to be paid under the contract.

(g) [(f)] The powers granted by this section prevail over a limitation contained in another law.

SECTION 2.02. Section 11.002, Water Code, is amended by amending Subdivision (4) and adding Subdivisions (9) and (10) to read as follows:

(4) "Beneficial use" means use of the amount of water which is economically necessary for a purpose authorized by this chapter, when reasonable intelligence and reasonable diligence are used in applying the water to that purpose *and shall include conserved water.*

(9) *"Conserved water" means that amount of water saved by a holder of an existing permit, certified filing, or certificate of adjudication through practices, techniques, and technologies that would otherwise be irretrievably lost to all consumptive beneficial uses arising from storage, transportation, distribution, or application.*

(10) *"Surplus water" means water in excess of the initial or continued beneficial use of the appropriator.*

SECTION 2.03. Subsection (e), Section 11.023, Water Code, is amended to read as follows:

(e) The amount of water appropriated for each purpose mentioned in this section shall be specifically appropriated for that purpose, subject to the preferences prescribed in Section 11.024 of this code. *The commission may authorize appropriation of a single amount or volume of water for more than one purpose of use. In the event that a single amount or volume of water is appropriated for more than one purpose of use, the total amount of water actually diverted for all of the authorized purposes may not exceed the total amount of water appropriated.*

SECTION 2.04. Subchapter B, Chapter 11, Water Code, is amended by adding Section 11.0275 to read as follows:

*Sec. 11.0275. FAIR MARKET VALUE. Whenever the law requires the payment of fair market value for a water right, fair market value shall be determined by the amount of money that a willing buyer would pay a willing seller, neither of which is under any compulsion to buy or sell, for the water in an arms-length transaction and shall not be limited to the amount of money that the owner of the water right has paid or is paying for the water.*

SECTION 2.05. Section 11.036, Water Code, is amended to read as follows:

Sec. 11.036. CONSERVED OR STORED WATER: SUPPLY CONTRACT. (a) A person, association of persons, corporation, or water improvement or irrigation district having in possession and control any storm water, floodwater, or rainwater that is conserved or stored as authorized by this chapter may contract to supply the water to any person, association of persons, corporation, or water improvement or irrigation district having the right to acquire use of the water.

(b) The price and terms of the contract shall be just and reasonable and without discrimination, and the contract is subject to the same revision and control as provided in this code for other water rates and charges. *If the contract sets forth explicit expiration provisions, no continuation of the service obligation will be implied.*

(c) *The terms of a contract may expressly provide that the person using the stored or conserved water is required to develop alternative or replacement supplies prior to the expiration of the contract and may further provide for enforcement of such terms by court order.*

*(d)* If any person uses the stored or conserved water without first entering into a contract with the party that conserved or stored it, the user shall pay for the use at a rate determined by the commission to be just and reasonable, subject to court review as in other cases.

SECTION 2.06.   Section 11.042, Water Code, is amended to read as follows:

Sec. 11.042.  DELIVERING WATER DOWN BANKS AND BEDS.  *(a)* Under rules prescribed by the commission, a person, association of persons, corporation, [or] water *control and* improvement *district, water improvement district*, or irrigation district supplying stored or conserved water under contract as provided in this chapter may use the bank and bed of any flowing natural stream in the state to convey the water from the place of storage to the place of use or to the diversion *point* [plant] of the appropriator. [The commission shall prescribe rules for this purpose.]

*(b)* A person who wishes to discharge and then subsequently divert and reuse the person's existing return flows derived from privately owned groundwater must obtain prior authorization from the commission for the diversion and the reuse of these return flows.   The authorization may allow for the diversion and reuse by the discharger of existing return flows, less carriage losses, and shall be subject to special conditions if necessary to protect an existing water right that was granted based on the use or availability of these return flows. Special conditions may also be provided to help maintain instream uses and freshwater inflows to bays and estuaries.   A person wishing to divert and reuse future increases of return flows derived from privately owned groundwater must obtain authorization to reuse increases in return flows before the increase.*

*(c)* Except as otherwise provided in Subsection (a) of this section, a person who wishes to convey and subsequently divert water in a watercourse or stream must obtain the prior approval of the commission through a bed and banks authorization.   The authorization shall allow to be diverted only the amount of water put into a watercourse or stream, less carriage losses and subject to any special conditions that may address the impact of the discharge, conveyance, and diversion on existing permits, certified filings, or certificates of adjudication, instream uses, and freshwater inflows to bays and estuaries.   Water discharged into a watercourse or stream under this chapter shall not cause a degradation of water quality to the extent that the stream segment's classification would be lowered.   Authorizations under this section and water quality authorizations may be approved in a consolidated permit proceeding.*

*(d)* Nothing in this section shall be construed to affect an existing project for which water rights and reuse authorizations have been granted by the commission before September 1, 1997.*

SECTION 2.07.   Section 11.046, Water Code, is amended to read as follows:

Sec. 11.046.  RETURN *SURPLUS* [UNUSED] WATER.  *(a)* A person who takes or diverts water from a *watercourse or* [running] stream for the purposes authorized by this code shall conduct surplus water back to the *watercourse or* stream from which it was taken if the water can be returned by gravity flow and it is reasonably practicable to do so.

*(b)* In granting an application for a water right, the commission may include conditions in the water right providing for the return of surplus water, in a specific amount or percentage of water diverted, and the return point on a watercourse or stream as necessary to protect senior downstream permits, certified filings, or certificates of adjudication or to provide flows for instream uses or bays and estuaries.*

*(c)* Except as specifically provided otherwise in the water right, water appropriated under a permit, certified filing, or certificate of adjudication may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit, certified filing, or certificate of adjudication for the purposes and locations of use provided in the permit, certified filing, or certificate of adjudication.   Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.*

*(d) Water appropriated under a permit, certified filing, or certificate of adjudication which is recirculated within a reservoir for cooling purposes shall not be considered to be surplus for purposes of this chapter.*

SECTION 2.08.    Section 11.085, Water Code, is amended to read as follows:

Sec. 11.085.   *INTERBASIN* [INTERWATERSHED] TRANSFERS. (a) No person may take or divert any *state* [of the] water *from a river basin* [of the ordinary flow, underflow, or storm flow of any stream, watercourse, or watershed] in this state *and transfer such water to* [into] any other *river basin* [natural stream, watercourse, or watershed to the prejudice of any person or property situated within the watershed from which the water is proposed to be taken or diverted.

[(b) No person may transfer water from one watershed to another] *without first applying for and receiving a* water right or an amendment to a permit, certified filing, or certificate of adjudication [permit] *from the commission authorizing the transfer* [to do so. Before issuing such a permit, the commission shall hold a hearing to determine the rights that might be affected by the transfer. The commission shall give notice and hold the hearing in the manner prescribed by its procedural rules].

*(b) The application must include:*

*(1) the contract price of the water to be transferred;*

*(2) a statement of each general category of proposed use of the water to be transferred and a detailed description of the proposed uses and users under each category;*

*(3) the cost of diverting, conveying, distributing, and supplying the water to, and treating the water for, the proposed users; and*

*(4) the projected effect on user rates and fees for each class of ratepayers.*

*(c) The applicant shall provide the information described by Subsection (b) of this section to any person on request and without cost.*

*(d) Prior to taking action on an application for an interbasin transfer, the commission shall conduct at least one public meeting to receive comments in both the basin of origin of the water proposed for transfer and the basin receiving water from the proposed transfer. Notice shall be provided pursuant to Subsection (g) of this section. Any person may present relevant information and data at the meeting on the criteria which the commission is to consider related to the interbasin transfer.*

*(e) In addition to the public meetings required by Subsection (d) of this section, if the application is contested in a manner requiring an evidentiary hearing under the rules of the commission, the commission shall give notice and hold an evidentiary hearing, in accordance with commission rules and applicable state law.*

*(f) Notice of an application for an interbasin transfer shall be mailed to the following:*

*(1) all holders of permits, certified filings, or certificates of adjudication located in whole or in part in the basin of origin;*

*(2) each county judge of a county located in whole or in part in the basin of origin;*

*(3) each mayor of a city with a population of 1,000 or more located in whole or in part in the basin of origin; and*

*(4) all groundwater conservation districts located in whole or in part in the basin of origin; and*

*(5) each state legislator in both basins.*

*(g) The applicant shall cause the notice of application for an interbasin transfer to be published once a week for two consecutive weeks in one or more newspapers having general circulation in each county located in whole or in part in the basin of origin or the receiving basin. The published notice may not be smaller than 96.8 square centimeters or 15 square inches with the shortest dimension at least 7.6 centimeters or three inches. The notice of application and public meetings shall be combined in the mailed and published notices.*

*(h) The notice of application must state how a person may obtain the information described by Subsection (b) of this section.*

(i) *The applicant shall pay the cost of notice required to be provided under this section. The commission by rule may establish procedures for payment of those costs.*

(j) *In addition to other requirements of this code relating to the review of and action on an application for a new water right or amended permit, certified filing, or certificate of adjudication, the commission shall:*

(1) *request review and comment on an application for an interbasin transfer from each county judge of a county located in whole or in part in the basin of origin. A county judge should make comment only after seeking advice from the county commissioners court; and*

(2) *give consideration to the comments of each county judge of a county located in whole or in part in the basin of origin prior to taking action on an application for an interbasin transfer.*

(k) *In addition to other requirements of this code relating to the review of and action on an application for a new water right or amended permit, certified filing, or certificate of adjudication, the commission shall weigh the effects of the proposed transfer by considering:*

(1) *the need for the water in the basin of origin and in the proposed receiving basin based on the period for which the water supply is requested, but not to exceed 50 years;*

(2) *factors identified in the applicable approved regional water plans which address the following:*

(A) *the availability of feasible and practicable alternative supplies in the receiving basin to the water proposed for transfer;*

(B) *the amount and purposes of use in the receiving basin for which water is needed;*

(C) *proposed methods and efforts by the receiving basin to avoid waste and implement water conservation and drought contingency measures;*

(D) *proposed methods and efforts by the receiving basin to put the water proposed for transfer to beneficial use;*

(E) *the projected economic impact that is reasonably expected to occur in each basin as a result of the transfer; and*

(F) *the projected impacts of the proposed transfer that are reasonably expected to occur on existing water rights, instream uses, water quality, aquatic and riparian habitat, and bays and estuaries that must be assessed under Sections 11.147, 11.150, and 11.152 of this code in each basin. If the water sought to be transferred is currently authorized to be used under an existing permit, certified filing, or certificate of adjudication, such impacts shall only be considered in relation to that portion of the permit, certified filing, or certificate of adjudication proposed for transfer and shall be based on historical uses of the permit, certified filing, or certificate of adjudication for which amendment is sought;*

(3) *proposed mitigation or compensation, if any, to the basin of origin by the applicant;*

(4) *the continued need to use the water for the purposes authorized under the existing permit, certified filing, or certificate of adjudication, if an amendment to an existing water right is sought; and*

(5) *the information required to be submitted by the applicant.*

(l) *The commission may grant, in whole or in part, an application for an interbasin transfer only to the extent that:*

(1) *the detriments to the basin of origin during the proposed transfer period are less than the benefits to the receiving basin during the proposed transfer period; and*

(2) *the applicant for the interbasin transfer has prepared a drought contingency plan and has developed and implemented a water conservation plan that will result in the highest practicable levels of water conservation and efficiency achievable within the jurisdiction of the applicant.*

(m) *The commission may grant new or amended water rights under this section with or without specific terms or periods of use and with specific conditions under which a transfer of water may occur.*

*(n) If the transfer of water is based on a contractual sale of water, the new water right or amended permit, certified filing, or certificate of adjudication authorizing the transfer shall contain a condition for a term or period not greater than the contract term.*

*(o) The parties to a contract for an interbasin transfer may include provisions for compensation and mitigation. If the party from the basin of origin is a government entity, each county judge of a county located in whole or in part in the basin of origin may provide input on the appropriate compensation and mitigation for the interbasin transfer.*

*(p) For the purposes of this section, a basin is designated as provided in accordance with Section 16.051 of this code. A basin may not be redesignated in order to allow a transfer or diversion of water otherwise in violation of this section.*

(q) [(e)] A person who takes or diverts water in violation of this section is guilty of a misdemeanor and upon conviction is punishable by a fine of not [less than $100 nor] more than *$1,000* [$500] or by confinement in the county jail for not more than six months.

(r) [(d)] A person commits a separate offense each day he continues to take or divert water in violation of this section.

*(s) Any proposed transfer of all or a portion of a water right under this section is junior in priority to water rights granted before the time application for transfer is accepted for filing.*

*(t) Any proposed transfer of all or a portion of a water right under this section from a river basin in which two or more river authorities or water districts created under Section 59, Article XVI, Texas Constitution, have written agreements or permits that provide for the coordinated operation of their respective reservoirs to maximize the amount of water for beneficial use within their respective water services areas shall be junior in priority to water rights granted before the time application for transfer is accepted for filing.*

*(u) An appropriator of water for municipal purposes in the basin of origin may, at the appropriator's option, be a party in any hearings under this section.*

*(v) The provisions of this section, except Subsection (a), do not apply to:*

*(1) a proposed transfer which in combination with any existing transfers totals less than 3,000 acre-feet of water per annum from the same permit, certified filing, or certificate of adjudication;*

*(2) a request for an emergency transfer of water;*

*(3) a proposed transfer from a basin to its adjoining coastal basin; or*

*(4) a proposed transfer from a basin to a county or municipality or the municipality's retail service area that is partially within the basin for use in that part of the county or municipality and the municipality's retail service area not within the basin.*

SECTION 2.09. Subsection (a), Section 11.124, Water Code, is amended to read as follows:

(a) An application to appropriate unappropriated state water must:

(1) be in writing and sworn to;

(2) contain the name and post-office address of the applicant;

(3) identify the source of water supply;

(4) state the nature and purposes of the proposed use *or uses* and the amount of water to be used for each purpose;

(5) state the location and describe the proposed facilities;

(6) state the time within which the proposed construction is to begin; [and]

(7) state the time required for the application of water to the proposed use *or uses; and*

*(8) contain the name and address of the holder of any lien on:*

*(A) any water right permit, certified filing, or certificate of adjudication to be granted under the permit for which application is made; or*

*(B) any land to which that water right permit, certified filing, or certificate of adjudication would be appurtenant.*

SECTION 2.10. Subsection (b), Section 11.135, Water Code, is amended to read as follows:

(b) The permit shall be in writing and attested by the seal of the commission, and it shall contain substantially the following information:

(1) the name of the person to whom the permit is issued;

(2) the date the permit is issued;

(3) the date the original application was filed;

(4) the use or purpose for which the appropriation is to be made;

(5) the amount or volume of water authorized to be appropriated for each purpose; *if use of the appropriated water is authorized for multiple purposes, the permit shall contain a special condition limiting the total amount of water that may actually be diverted for all of the purposes to the amount of water appropriated;*

(6) a general description of the source of supply from which the appropriation is proposed to be made;

(7) the time within which construction or work must begin and the time within which it must be completed; and

(8) any other information the commission prescribes.

SECTION 2.11. Subsection (a), Section 11.142, Water Code, is amended to read as follows:

(a) Without obtaining a permit, a person may construct on his own property a dam or reservoir *with normal storage of* [to impound or contain] not more than 200 acre-feet of water for domestic and livestock purposes.

SECTION 2.12. Sections 11.176 and 11.177, Water Code, are amended to read as follows:

Sec. 11.176. HEARING. *(a) Except as provided by Subsection (b) of this section, the* [The] commission shall hold a hearing and shall give the holder of the permit, certified filing, or certificate of adjudication and other interested persons an opportunity to be heard and to present evidence on any matter pertinent to the questions at issue.

*(b) A hearing on the cancellation of a permit, certified filing, or certificate of adjudication as provided by this chapter is unnecessary if the right to such hearing is expressly waived by the affected holder of a permit, certified filing, or certificate of adjudication.*

*(c) A permit, certified filing, or certificate of adjudication for a term does not vest in the holder of a permit, certified filing, or certificate of adjudication any right to the diversion, impoundment, or use of water for longer than the term of the permit, certified filing, or certificate of adjudication and shall expire and be cancelled in accordance with its terms without further need for notice or hearing.*

Sec. 11.177. COMMISSION FINDING; ACTION. (a) At the conclusion of the hearing, the commission shall cancel the permit, certified filing, or certificate of adjudication in whole or in part to the extent that it finds that:

(1) the water or any portion of the water appropriated under the permit, certified filing, or certificate of adjudication has not been put to an authorized beneficial use during the 10-year period; *and*

(2) the holder has not used reasonable diligence in applying the water or the unused portion of the water to an authorized beneficial use *or is otherwise unjustified in the nonuse*[; and

[(3) the holder has not been justified in the nonuse or does not then have a bona fide intention of putting the water or the unused portion of the water to an authorized beneficial use within a reasonable time after the hearing].

(b) In determining what constitutes *reasonable diligence or* a justified nonuse [and a reasonable time] as used in Subsection *(a)(2)* [(a)(3)] of this section, the commission shall give consideration to:

(1) *whether sufficient water is available in the source of supply to meet all or part of the appropriation during the 10-year period of nonuse;*

(2) *whether the nonuse is justified by the holder's participation in the federal Conservation Reserve Program or a similar governmental program as provided by Section 11.173(b)(1) of this code;*

(3) *whether the permit, certified filing, or certificate of adjudication was obtained to meet demonstrated long-term public water supply or electric generation needs as evidenced by a water management plan developed by the holder and consistent with projections of future water needs contained in the state water plan;*

(4) *whether the permit, certified filing, or certificate of adjudication was obtained as the result of the construction of a reservoir funded, in whole or in part, by the holder of the permit, certified filing, or certificate of adjudication as part of the holder's long-term water planning;*

(5) *whether the existing or proposed authorized purpose and place of use are consistent with an approved regional water plan as provided by Section 16.053 of this code;*

(6) *whether the permit, certified filing, or certificate of adjudication has been deposited into the Texas Water Bank as provided by Sections 15.7031 and 15.704 of this code or whether it can be shown that the water right or water available under the right is currently being made available for purchase through private marketing efforts; or*

(7) *whether the permit, certified filing, or certificate of adjudication has been reserved to provide for instream flows or bay and estuary inflows* [the expenditures made or obligations incurred by the holder in connection with the permit, certified filing, or certificate of adjudication;

[(2) the purpose to which the water is to be applied;

[(3) the priority of the purpose;

[(4) the amount of time usually necessary to put water to a beneficial use for the same purpose when diligently developed; and

[(5) whether at all times during the 10-year period there was rainfall adequate to enable the use of all or part of the water authorized to be appropriated under the permit, certified filing, or certificate of adjudication].

SECTION 2.13.   Section 15.701, Water Code, is amended to read as follows:

Sec. 15.701.   DEFINITIONS.   In this subchapter:

(1) "Deposit" means the placement of a water right or the right to use water in the water bank for transfer.

(2) "Depositor" means a person who deposits or has on deposit a water right in the water bank.

(3) "Person" includes but is not limited to any individual, corporation, organization, government, or governmental subdivision or agency, including the board, business trust, estate, trust, partnership, association, and any other legal entity.

(4) "Transfer" means the conveyance of a water right or the right to use water under a water right in any of the following manners:

(A) the conveyance of legal title to a water right;  or

(B) a contract or option contract to allow use of a water right.

(5) *"Trust" means the Texas Water Trust.*

(6) "Water bank" or "bank" means the Texas Water Bank.

(7) [(6)] "Water right" means a right acquired or authorized under the laws of this state to impound, divert, or use state water, underground water, or water from any source to the extent authorized by law.

SECTION 2.14.   Section 15.702, Water Code, is amended to read as follows:

Sec. 15.702.   CREATION OF BANK.   The Texas Water Development Board shall establish the Texas Water Bank.   The board shall administer the water bank to facilitate *water transactions* [the transfer of water from all sources as necessary] to provide sources of adequate water supplies for use within the State of Texas.

SECTION 2.15.  Subsection (a), Section 15.703, Water Code, is amended to read as follows:

(a) The board may take all actions necessary to operate the water bank and to facilitate the transfer of water rights from the water bank for future beneficial use including but not limited to:

(1) negotiating a sale price and terms acceptable to the depositor and purchaser;

(2) maintaining a registry of water bank deposits and those water users in need of additional supplies;

(3) informing water users in need of additional supply of water rights available in the bank;

(4) encouraging water right holders to implement water conservation practices and deposit the right to use the conserved water into the bank;

(5) establishing requirements for deposit of a water right into the water bank including minimum terms for deposit;

(6) purchasing, holding, and selling water rights in its own name;

(7) establishing regional water banks; [and]

(8) *acting as a clearinghouse for water marketing information including water availability, pricing of water transactions, environmental considerations, and potential buyers and sellers of water rights;*

(9) *preparing and publishing a manual on structuring water transactions;*

(10) *accepting and holding donations of water rights to meet instream, water quality, fish and wildlife habitat, or bay and estuary inflow needs;  and*

(11) other actions to facilitate *water transactions* [transfers].

SECTION 2.16.  Subchapter K, Chapter 15, Water Code, is amended by adding Section 15.7081 to read as follows:

*Sec. 15.7081.  TEXAS WATER TRUST.  (a) The Texas Water Trust is established within the water bank to hold water rights dedicated to environmental needs, including instream flows, water quality, fish and wildlife habitat, or bay and estuary inflows.*

*(b) The board, in consultation with the Parks and Wildlife Department and the commission, shall adopt rules governing the process for holding and transferring water rights.*

*(c) The dedication of any water rights placed in trust must be reviewed and approved by the commission, in consultation with the board and the Parks and Wildlife Department.*

*(d) Water rights may be held in the trust for a term specified by contractual agreement or in perpetuity.*

SECTION 2.17.  Section 15.704, Water Code, is amended by amending Subsection (a) and adding Subsection (c) to read as follows:

(a) A [Up to 50 percent of a] water right may be deposited in the water bank for an initial term of up to 10 years, *unless otherwise held in the Texas Water Trust as established under Section 15.7081 of this code,* during which time the water right is exempt from cancellation by the commission under the terms of Subchapter E of Chapter 11 of this code.  A water right is exempt from cancellation under this subsection only once even if it has been transferred or redeposited.

*(c) A contract or option contract to allow use of a water right under this subchapter:*

*(1) may include a requirement that the purchaser show diligence in pursuing feasible and practicable alternative water supplies;  and*

*(2) does not vest any right in the purchaser beyond the stated terms and conditions of the contract or option contract.*

SECTION 2.18.  (a) All permits approved by the Texas Natural Resource Conservation Commission before the effective date of this Act that allow the multiple use of the appropriation of a specific amount of water and which are no longer subject to appeal are validated in all respects as if they originally had been legally authorized or accomplished.

(b) This article does not apply to an application for an interbasin transfer or reuse project using privately owned groundwater received and pending before March 2, 1997. Any subsequent renewals of such applications shall be subject to the provisions of this Act.

(c) Nothing in this Act shall affect the validity of any interbasin transfer permitted or authorized before the effective date of this Act.

### ARTICLE 3. EMERGENCY AUTHORIZATIONS; ENFORCEMENT

SECTION 3.01. Subsection (a), Section 11.082, Water Code, is amended to read as follows:

(a) A person who wilfully takes, diverts, or appropriates state water without complying with the applicable requirements of this chapter is also liable to a civil penalty of not more than *$5,000* [$1,000] for each day he continues the taking, diversion, or appropriation.

SECTION 3.02. Subchapter C, Chapter 11, Water Code, is amended by adding Sections 11.0841, 11.0842, and 11.0843 to read as follows:

*Sec. 11.0841. CIVIL REMEDY. (a) Nothing in this chapter affects the right of any private corporation, individual, or political subdivision that has a justiciable interest in pursuing any available common-law remedy to enforce a right or to prevent or seek redress or compensation for the violation of a right or otherwise redress an injury.*

*(b) A district court may award the costs of litigation, including reasonable attorney fees and expert costs, to any political subdivision of the state, private corporation, or individual that is a water right holder and that prevails in a suit for injunctive relief to redress an unauthorized diversion, impoundment, or use of surface water in violation of this chapter or a rule adopted pursuant to this chapter.*

*Sec. 11.0842. ADMINISTRATIVE PENALTY. (a) If a person violates this chapter, a rule or order adopted under this chapter or Section 16.236 of this code, or a permit, certified filing, or certificate of adjudication issued under this chapter, the commission may assess an administrative penalty against that person as provided by this section.*

*(b) The penalty may be in an amount not to exceed $5,000 for each day the person is in violation of this chapter, the rule or order adopted under this chapter, or the permit, certified filing, or certificate of adjudication issued under this chapter. The penalty may be in an amount not to exceed $1,000 for each day the person is in violation of the rule or order adopted under Section 16.236 of this code. Each day a violation continues may be considered a separate violation for purposes of penalty assessment.*

*(c) In determining the amount of the penalty, the commission shall consider:*

*(1) the nature, circumstances, extent, duration, and gravity of the prohibited acts, with special emphasis on the impairment of an existing permit, certified filing, or certificate of adjudication or the hazard or potential hazard created to the health, safety, or welfare of the public;*

*(2) the impact of the violation on the instream uses, water quality, fish and wildlife habitat, or beneficial freshwater inflows to bays and estuaries;*

*(3) with respect to the alleged violator:*

*(A) the history and extent of previous violations;*

*(B) the degree of culpability, including whether the violation was attributable to mechanical or electrical failures and whether the violation could have been reasonably anticipated and avoided;*

*(C) demonstrated good faith, including actions taken by the alleged violator to rectify the cause of the violation and to compensate affected persons;*

*(D) any economic benefit gained through the violation; and*

*(E) the amount necessary to deter future violations; and*

*(4) any other matters that justice may require.*

*(d) If, after examination of a possible violation and the facts surrounding that possible violation, the executive director concludes that a violation has occurred, the executive director shall issue a preliminary report stating the facts on which that conclusion was*

based, recommending that an administrative penalty under this section be imposed on the person charged, and recommending the amount of the penalty. The executive director shall base the recommended amount of the proposed penalty on the factors provided by Subsection (c) of this section and shall analyze each factor for the benefit of the commission.

(e) No later than the 10th day after the date on which the report is issued, the executive director shall give written notice of the report to the person charged with the violation. The notice shall include a brief summary of the charges, a statement of the amount of the penalty recommended, and a statement of the right of the person charged to a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(f) No later than the 20th day after the date on which notice is received, the person charged may either give to the commission written consent to the executive director's report, including the recommended penalty, or make a written request for a hearing.

(g) If the person charged with the violation consents to the penalty recommended by the executive director or fails to timely respond to the notice, the commission by order shall either assess the penalty or order a hearing to be held on the findings and recommendations in the executive director's report. If the commission assesses the penalty recommended by the report, the commission shall give written notice of its decision to the person charged.

(h) If the person charged requests or the commission orders a hearing, the commission shall call a hearing and give notice of the hearing. As a result of the hearing, the commission by order either may find that a violation has occurred and may assess a penalty, may find that a violation has occurred but that no penalty should be assessed, or may find that no violation has occurred. All proceedings under this subsection are subject to Chapter 2001, Government Code. In making any penalty decision, the commission shall analyze each of the factors provided by Subsection (c) of this section.

(i) The commission shall give notice of its decision to the person charged, and if the commission finds that a violation has occurred and assesses an administrative penalty, the commission shall give written notice to the person charged of its findings, of the amount of the penalty, and of the person's right to judicial review of the commission's order. If the commission is required to give notice of a penalty under this subsection or Subsection (g) of this section, the commission shall file notice of its decision in the Texas Register not later than the 10th day after the date on which the decision is adopted.

(j) Within the 30-day period immediately following the day on which the commission's order is final, as provided by Subchapter F, Chapter 2001, Government Code, the person charged with the penalty shall:

(1) pay the penalty in full;

(2) pay the amount of the penalty and file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty; or

(3) without paying the amount of the penalty, file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(k) Within the 30-day period, a person who acts under Subsection (j)(3) of this section may:

(1) stay enforcement of the penalty by:

(A) paying the amount of the penalty to the court for placement in an escrow account; or

(B) giving to the court a supersedeas bond that is approved by the court for the amount of the penalty and that is effective until all judicial review of the commission's order is final; or

(2) request the court to stay enforcement of the penalty by:

(A) filing with the court a sworn affidavit of the person stating that the person is financially unable to pay the amount of the penalty and is financially unable to give the supersedeas bond; and

*(B) giving a copy of the affidavit to the commission by certified mail.*

*(l) If the commission receives a copy of an affidavit under Subsection (k)(2) of this section, it may file with the court within five days after the date the copy is received a contest to the affidavit. The court shall hold a hearing on the facts alleged in the affidavit as soon as practicable and shall stay the enforcement of the penalty on finding that the alleged facts are true. The person who files an affidavit has the burden of proving that the person is financially unable to pay the amount of the penalty and to give a supersedeas bond.*

*(m) If the person does not pay the amount of the penalty and the enforcement of the penalty is not stayed, the commission may refer the matter to the attorney general for collection of the amount of the penalty.*

*(n) Judicial review of the order or decision of the commission assessing the penalty shall be under the substantial evidence rule and shall be instituted by filing a petition with a district court in Travis County, as provided by Subchapter G, Chapter 2001, Government Code.*

*(o) A penalty collected under this section shall be deposited in the state treasury to the credit of the general revenue fund.*

*(p) Notwithstanding any other provision to the contrary, the commission may compromise, modify, or remit, with or without condition, any penalty imposed under this section.*

*(q) Payment of an administrative penalty under this section shall be full and complete satisfaction of the violation for which the administrative penalty is assessed and shall proclude any other civil or criminal penalty for the same violation.*

*Sec. 11.0843. FIELD CITATION. (a) Upon witnessing a violation of this chapter or a rule or order or a water right issued under this chapter, a watermaster or the watermaster's deputy, as defined by commission rule, may issue the alleged violator a field citation alleging that a violation has occurred and providing the alleged violator the option of either:*

*(1) without admitting to or denying the alleged violation, paying an administrative penalty in accordance with the predetermined penalty amount established under Subsection (b) of this section and taking remedial action as provided in the citation; or*

*(2) requesting a hearing on the alleged violation in accordance with Section 11.0842 of this code.*

*(b) By rule the commission shall establish penalty amounts corresponding to types of violations of this chapter or rules or orders adopted or water rights issued under this chapter.*

*(c) A penalty collected under this section shall be deposited in the state treasury to the credit of the general revenue fund.*

SECTION 3.03. Section 11.139, Water Code, is amended to read as follows:

Sec. 11.139. EMERGENCY *AUTHORIZATIONS* [PERMITS]. (a) *Except as provided by Section 11.148 of this code, the* [The] commission may grant an emergency permit, *order, or amendment to an existing permit, certified filing, or certificate of adjudication after notice to the governor* [for the diversion and use of water] for *an initial* [a] period of not more than *120* [30] days if *the commission* [it] finds that emergency conditions exist which *present an imminent threat to* [threaten] the public health *and*[,] safety[, and welfare] and which override the necessity to comply with established statutory procedures *and there are no feasible practicable alternatives to the emergency authorization. Such emergency action may be renewed once for not longer than 60 days.*

*(b) A person desiring to obtain an emergency authorization under this section shall submit to the commission a sworn application containing the following information:*

*(1) a description of the condition of emergency justifying the granting of the emergency authorization;*

*(2) a statement setting forth facts which support the findings required under this section;*

*(3) an estimate of the dates on which the proposed authorization should begin and end;*

*(4) a description of the action sought and the activity proposed to be allowed, mandated, or prohibited; and*

(5) *any other statements or information required by the commission.*

(c) *If the commission finds the applicant's statement made under Subsection (b) of this section to be correct, the commission may grant emergency authorizations under this section without notice and hearing or with such notice and hearing as the commission considers practicable under the circumstances.*

(d) *If the commission grants an emergency authorization under this section without a hearing, the authorization shall fix a time and place for a hearing to be held before the commission. The hearing shall be held as soon after the emergency authorization is granted as is practicable but not later than 20 days after the emergency authorization is granted.*

(e) *At the hearing, the commission shall affirm, modify, or set aside the emergency authorization. Any hearing on an emergency authorization shall be conducted in accordance with Chapter 2001, Government Code, and rules of the commission.*

(f) *If an imminent threat to the public health and safety exists which requires emergency action before the commission can take action as provided by Subsections (a) through (c) of this section and there are no feasible alternatives, the executive director may grant an emergency authorization after notice to the governor. If the executive director issues an emergency authorization under this subsection, the commission shall hold a hearing as provided for in Subsections (d) and (e) of this section. The requirements of Subsection (b) of this section shall be satisfied by the applicant before action is taken by the executive director on the request for emergency authorization.*

(g) *The requirements of Section 11.132 of this code relating to the time for notice, newspaper notice, and method of giving a person notice do not apply to a hearing held on an application for an emergency authorization under this section, but such general notice of the hearing shall be given as the commission, under Subsections (c) and (e) of this section, considers practicable under the circumstances.*

(h) *The commission may grant an emergency authorization under this section for the temporary transfer and use of all or part of a permit, certified filing, or certificate of adjudication for other than domestic or municipal use to a retail or wholesale water supplier for public health and safety purposes. In addition to the requirements contained in Subsection (b) of this section, the commission may direct that the applicant will timely pay the amounts for which the applicant may be potentially liable under Subsection (j) of this section and to the extent authorized by law will fully indemnify and hold harmless the state, the executive director, and the commission from any and all liability for the authorization sought. The commission may order bond or other surety in a form acceptable to the commission as a condition for such emergency authorization. The commission may not grant an emergency authorization under this section which would cause a violation of a federal regulation.*

(i) *In transferring the amount of water requested by the applicant, the executive director or the commission shall allocate the requested amount among two or more permits, certified filings, or certificates of adjudication for other than domestic or municipal use.*

(j) *The person granted an emergency authorization under Subsection (h) of this section is liable to the owner and the owner's agent or lessee from whom the use is transferred for the fair market value of the water transferred as well as for any damages caused by the transfer of use. If, within 60 days of the termination of the authorization, the parties do not agree on the amount due, or if full payment is not made, either party may file a complaint with the commission to determine the amount due. The commission may use dispute resolution procedures for a complaint filed under this subsection. After exhausting all administrative remedies under this subsection, an owner from whom the use is transferred may file suit to recover or determine the amount due in a district court in the county where the owner resides or has its headquarters. The prevailing party in a suit filed under this subsection is entitled to recover court costs and reasonable attorney's fees.*

(k) [~~An emergency permit may be granted for a period of not more than 30 days, and no extension or additional emergency permit may be granted at the expiration of the original permit.~~

[(e) An emergency permit may be granted under this section without the necessity to comply with statutory and other procedures required for granting other permits issued by the commission.

[(d)] The commission may prescribe rules and adopt fees which are necessary to carry out the provisions of this section.

(l) [(e)] An emergency *authorization* [permit] does not vest in the *grantee* [permittee] any right to the diversion, *impoundment, or* [and] use of water and shall expire and be cancelled in accordance with its terms.

SECTION 3.04. Subsection (c), Section 12.052, Water Code, is amended to read as follows:

(c) If the owner of a dam that is required to be constructed, reconstructed, repaired, or removed in order to comply with the rules and orders promulgated under Subsection (a) of this section wilfully fails or refuses to comply within the 30-day period following the date of the commission's *final, nonappealable* order to do so or if a person wilfully fails to comply with any rule or other order issued by the commission under this section within the 30-day period following the effective date of the order, he is liable to a penalty of not more than *$5,000* [$1,000] a day for each day he continues to violate this section. The state may recover the penalty by suit brought for that purpose in the district court of Travis County.

SECTION 3.05. Section 16.236, Water Code, is amended to read as follows:

Sec. 16.236. CONSTRUCTION OF LEVEE WITHOUT APPROVAL OF PLANS; *LEVEE SAFETY.* (a) No person may construct, attempt to construct, cause to be constructed, maintain, or cause to be maintained any levee or other such improvement on, along, or near any stream of this state that is subject to floods, freshets, or overflows so as to control, regulate, or otherwise change the floodwater of the stream without first obtaining approval of the plans by the commission.

(b) *The commission shall make and enforce rules and orders and shall perform all other acts necessary to provide for the safe construction, maintenance, repair, and removal of levees located in this state.*

(c) *If the owner of a levee that is required to be constructed, reconstructed, repaired, or removed to comply with the rules and orders promulgated under this section wilfully fails or refuses to comply within the 30-day period following the date of an order of the commission requiring such action or compliance or if a person wilfully fails to comply with any rule or order issued by the commission under this section within the 30-day period following the effective date of the order, the person is liable for a penalty of not more than $1,000 a day for each day the person continues to violate this section. The state may recover the penalty by suit brought for that purpose in a district court of Travis County.*

(d) *If the commission determines that the existing condition of a levee is creating or will cause extensive or severe property damage or economic loss to others or is posing an immediate and serious threat to human life or health and that other procedures available to the commission to remedy or prevent such property damage or economic loss will result in unreasonable delay, the commission may issue an emergency order, either mandatory or prohibitory in nature, directing the owner of the levee to repair, modify, maintain, dewater, or remove the levee which the commission determines is unsafe. The emergency order may be issued without notice to the levee owner or with notice the commission considers practicable under the circumstances.*

(e) *If the commission issues an emergency order under authority of this section without notice to the levee owner, the commission shall fix a time and place for a hearing, to be held as soon as practicable but not later than 20 days after the emergency order is authorized, to affirm, modify, or set aside the emergency order. If the nature of the commission's action requires further proceedings, those proceedings shall be conducted, as appropriate, under Chapter 2001, Government Code.*

(f) *Nothing in this section or in rules or orders adopted by the commission shall be construed to relieve an owner or operator of a levee of the legal duties, obligations, or liabilities incident to ownership or operation.*

(g) Any person who violates any provision of *Subsection (a) of* this section is guilty of a *Class C* misdemeanor and upon conviction is punishable by a fine of not more than *$1,000* [$100]. A separate offense is committed each day a structure constructed in violation of this section is maintained.

(h) *Subsection (a) of this* [(e) At the request of the executive director, the attorney general shall file suit in a district court of Travis County to enjoin any violation or threatened violation of this section. In the suit, the attorney general may seek to have the illegal levee or other improvement removed and the preexisting conditions restored and may also collect civil penalties of up to $100 a day for each day a violation occurs.

[(d) This] section does not apply to:

(1) *any dam, reservoir, or canal system associated with a water right issued or recognized by the commission* [dams permitted by the commission or recognized as valid by final decree in any proceeding begun under Subchapter G, Chapter 11, of this code];

(2) dams authorized by Section 11.142 of this code;

(3) a levee or other improvement within the corporate limits of a city or town provided: (a) plans for the construction or maintenance or both must be approved by the city or town as a condition precedent to starting the project and (b) the city or town requires that such plans be in substantial compliance with rules and standards adopted by the commission; [or]

(4) a levee or other improvement within the boundaries of any political subdivision which has qualified for the National Flood Insurance Program as authorized by the National Flood Insurance Act of 1968 (Title 42, U.S.C., Sections 4001–4127) provided: (a) plans for the construction or maintenance or both must be approved by the political subdivision which is participating in the national flood insurance program as a condition precedent to starting the project and (b) the political subdivision requires that such plans be in substantial compliance with rules and standards adopted by the commission;

(5) projects implementing soil and water conservation practices set forth in a conservation plan with a landowner or operator and approved by the governing board of a soil and water conservation district organized under the State Soil Conservation Law, as amended (Article 165a–4, Vernon's Texas Civil Statutes), provided that the governing board finds the practices do not significantly affect stream flooding conditions on, along, or near a state stream; *or*

(6) *any levee or other improvement constructed outside of the 100-year floodway. For the purposes of this section, "100-year floodway" is defined as the channel of a stream and the adjacent land areas that must be reserved in order to discharge the 100-year flood without cumulatively increasing the water surface elevation more than one foot above the 100-year flood elevation prior to encroachment.*

(i) [(e)] On projects located within the corporate limits of a city or town or within the boundaries of any political subdivision which are exempt from the provisions of *Subsection (a) of* this section by Subdivision (3) or (4) of Subsection *(h) of this section* [(d) above], any person whose property is located outside of the corporate limits of such city or town or of the boundaries of such a political subdivision and whose property is affected or potentially affected by the effect of the project on the floodwaters of the stream may appeal the decision of such political subdivision. The appeal shall be in writing and shall specify the grounds therefor and a copy shall be sent by certified mail to the project applicant and to the city or town or such political subdivision. The timely filing of such an appeal with the executive director suspends the decision of the city or town or political subdivision until a final decision is rendered by the commission. The executive director shall review the complaint and investigate the facts surrounding the nature of the complaint. If the executive director finds that the complaint is frivolous or nonmeritorious or made solely for purposes of harassment or delay, then he shall dismiss the appeal. Otherwise, the executive director shall refer the appeal to the commission which shall after due notice hold a hearing to determine whether the project should be approved using the standards established by the commission and shall hear such appeal de novo under the procedural rules established by the commission for other reclamation projects.

SECTION 3.06.   Subchapter G, Chapter 16, Water Code, is amended by adding Section 16.237 to read as follows:

*Sec. 16.237. ADMINISTRATIVE PENALTY; CIVIL REMEDY.   (a) If a person violates a commission rule or order adopted under Section 16.236 of this code, the commission may assess an administrative penalty against that person as provided by Section 11.0842 of this code.*

*(b) Nothing in this chapter affects the right of any private corporation, individual, or political subdivision that has a justiciable interest in pursuing any available common-law remedy to enforce a right or to prevent or seek redress or compensation for the violation of a right or otherwise redress an injury.*

### ARTICLE 4.   SURFACE WATER AND GROUNDWATER SUPPLIES

SECTION 4.01.   Section 11.134, Water Code, is amended by amending Subsection (b) and adding Subsection (c) to read as follows:

(b) The commission shall grant the application only if:

(1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fee;

(2) unappropriated water is available in the source of supply;

(3) the proposed appropriation:

(A) *is intended for a* [contemplates the application of water to any] beneficial use;

(B) does not impair existing water rights or vested riparian rights; [and]

(C) is not detrimental to the public welfare; [and]

*(D) considers the effects of any hydrological connection between surface water and groundwater; and*

*(E) addresses a water supply need in a manner that is consistent with the state water plan and an approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and*

(4) the applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Subdivision (8)(B), Section 11.002, of this code.

*(c) Beginning September 1, 2001, the commission may not issue a water right for municipal purposes in a region that does not have an approved regional water plan in accordance with Section 16.053(i) of this code unless the commission determines that conditions warrant waiver of this requirement.*

SECTION 4.02.   Subchapter D, Chapter 11, Water Code, is amended by adding Sections 11.1501 and 11.151 to read as follows:

*Sec. 11.1501.   CONSIDERATION AND REVISION OF PLANS.   In considering an application for a permit to store, take, or divert surface water, or for an amendment to a permit, certified filing, or certificate of adjudication, the commission shall consider the state water plan and any approved regional water plan for the area or areas in which the water is proposed to be stored, diverted, or used.*

*Sec. 11.151.   EFFECTS OF PERMITS ON GROUNDWATER.   In considering an application for a permit to store, take, or divert surface water, the commission shall consider the effects, if any, on groundwater or groundwater recharge.*

SECTION 4.03.   Section 11.153, Water Code, is amended by amending the section heading and Subsections (a) and (d) to read as follows:

Sec. 11.153.   [PILOT] PROJECTS FOR STORAGE OF APPROPRIATED WATER IN AQUIFERS.  (a) The commission shall investigate the feasibility of storing appropriated water in various types of aquifers around the state by encouraging the issuance of temporary or term permits for [pilot] demonstration projects for the storage of appropriated water for subsequent retrieval and beneficial use [in the following aquifers in the specified counties:

[(1) the Anacacho, Austin Chalk, and Glen Rose Limestone aquifers in Bexar County and Medina County;

[(2) the Carrizo-Wilcox aquifer in Bexar, Webb, Smith, Wood, Rains, and Van Zandt counties;

[(3) the Hickory and Ellenberger aquifers in Gillespie County; and

[(4) the Gulf Coast aquifer in Cameron and Hidalgo counties].

(d) *The commission shall only issue a* [A] final order granting a permit or amendment to a permit authorizing the storage of appropriated water in aquifers for subsequent beneficial use *where completed pilot projects or historically demonstrated projects have been shown to be feasible under the criteria provided in Sections 11.154(c) and (d)*[, other than for the pilot projects authorized by this section, may not be issued before June 1, 1999].

SECTION 4.04.   Subsections (a), (b), (c), and (e), Section 11.154, Water Code, are amended to read as follows:

(a) An application filed with the commission to undertake a [pilot] project under Section 11.153 must include:

(1) the information required for an application for a permit or permit amendment to appropriate state water;

(2) all information required for an application for a permit for a Class V injection well without requiring a separate hearing or notice; and

(3) a map or plat showing the injection facility and the aquifer in which the water will be stored.

(b) If the application is for a permit or permit amendment to store appropriated water in *a groundwater* [an underground water] reservoir or a subdivision of *a groundwater* [an underground water] reservoir, as defined by Chapter *36* [52], that is under the jurisdiction of *a groundwater* [an underground water] conservation district:

(1) the applicant shall:

(A) provide a copy of the application to each *groundwater* [underground water] conservation district that has jurisdiction over the reservoir or subdivision;

(B) cooperate with *each district* [the districts] that *has* [have] jurisdiction over the reservoir or subdivision to ensure compliance with the rules of each district;

(C) cooperate with each district that has jurisdiction over the reservoir or subdivision to develop rules regarding the injection, storage, and withdrawal of appropriated water stored in the aquifer; and

(D) comply with the rules governing the injection, storage, *and* [or] withdrawal of appropriated water stored in the reservoir or subdivision that are adopted by *each* [a] district that has jurisdiction over the reservoir or subdivision; and

(2) the commission shall require that any agreement the applicant reaches with a district that has jurisdiction over the reservoir or subdivision regarding the terms for the injection, storage, and withdrawal of appropriated water be included as a condition of the permit or permit amendment.

(c) On [completion of a pilot project and] receipt of an [appropriate] application for a permit or an amendment to an existing permit *from an applicant with a completed pilot or historically demonstrated project*, the commission shall evaluate the success of the [pilot] project for purposes of issuing a final order granting a permit or permit amendment authorizing the storage of appropriated water incident to a beneficial use. The commission shall consider whether:

(1) the introduction of water into the aquifer will alter the physical, chemical, or biological quality of native groundwater to a degree that the introduction would:

(A) render groundwater produced from the aquifer harmful or detrimental to people, animals, vegetation, or property; or

(B) require treatment of the groundwater to a greater extent than the native groundwater requires before being applied to that beneficial use;

3634

(2) the water stored in the receiving aquifer can be successfully harvested from the aquifer for beneficial use; and

(3) [the permit holder has provided evidence that] reasonable diligence will be used to protect the water stored in the receiving aquifer from unauthorized withdrawals to the extent necessary to maximize the permit holder's ability to retrieve and beneficially use the stored water without experiencing unreasonable loss of appropriated water.

(e) A permit to store appropriated water in *a groundwater* [an underground water] reservoir or subdivision, as defined by Chapter *36* [52], shall provide as a condition to the permit that the permit holder shall:

(1) register the permit holder's injection and recovery wells with *a groundwater* [an underground water] conservation district that has jurisdiction over the reservoir or subdivision, if any; and

(2) each calendar month, provide the district, if any, with a written report showing for the previous calendar month:

(A) the amount of water injected for storage; and

(B) the amount of water recaptured for use.

SECTION 4.05. Subsection (b), Section 11.155, Water Code, is amended to read as follows:

(b) The board shall make other studies, investigations, and surveys of the aquifers in the state as it considers necessary to determine the occurrence, quantity, quality, and availability of other aquifers in which water may be stored and subsequently retrieved for beneficial use. The board shall undertake the studies, investigations, and surveys in the following order of priority:

(1) the aquifers *described* [identified] in Section 11.153(a);

(2) areas designated by the commission as "*priority groundwater management* [critical] areas" under Section *35.008* [52.053]; and

(3) other areas of the state in a priority to be determined by the board's ranking of where the greatest need exists.

SECTION 4.06. Subsection (b), Section 11.173, Water Code, is amended to read as follows:

(b) A permit, certified filing, or certificate of adjudication or a portion of a permit, certified filing, or certificate of adjudication is exempt from cancellation under Subsection (a) of this section:

(1) to the extent of the owner's participation in the Conservation Reserve Program authorized by the Food Security Act, Pub.L. No. 99-198, Secs. 1231-1236, 99 Stat. 1354, 1509-1514 (1985) or a similar governmental program; or

(2) if any portion of the water authorized to be used pursuant to a permit, certified filing, or certificate of adjudication has been used in accordance with a *regional* water [management] plan approved *pursuant to Section 16.053 of this code* [by the commission].

SECTION 4.07. Subdivision (6), Section 15.001, Water Code, is amended to read as follows:

(6) "Project" means:

(A) any undertaking or work, *including planning activities and work to obtain regulatory authority at the local, state, and federal level,* to conserve, convey, and develop [surface or subsurface] water resources in the state, to provide for the maintenance and enhancement of the quality of the water of the state, to provide nonstructural and structural flood control, drainage, subsidence control, recharge, chloride control, *brush control, precipitation enhancement,* and desalinization, *to provide for the acquisition of water rights and the repair of unsafe dams,* and to carry out other purposes defined by board rules; [or]

(B) any undertaking or work outside the state to provide for the maintenance and enhancement of the quality of water by eliminating saline inflow through well pumping and deep well injection of brine; *or*

(C) *any undertaking or work by Texas political subdivisions or institutions of higher education to conserve, convey, and develop water resources in areas outside Texas or to provide for the maintenance and enhancement of the quality of the water in areas adjoining Texas, if such undertaking or work will result in water being available for use in or for the benefit of Texas or will maintain and enhance the quality of water in Texas.*

SECTION 4.08.  Subsection (b), Section 15.002, Water Code, is amended to read as follows:

(b) The legislature finds that the conventional means of financing projects are inadequate to meet current and anticipated needs of the state.  Therefore, it is the further intent of the legislature to provide a means of coordinating the development of projects [throughout the state] through the board and to provide political subdivisions the maximum opportunity to finance projects through programs provided by this chapter.  *Projects may be in the state or outside the state, provided that out-of-state projects must be funded through a Texas political subdivision or an institution of higher education and must result in water being available for use in or for the benefit of Texas or maintain and enhance the quality of water in Texas.*

SECTION 4.09.  Section 17.895, Water Code, is amended by amending Subsection (a) and adding Subsection (c) to read as follows:

(a) The board or lender districts may make conservation loans for capital equipment or materials, labor, preparation costs, and installation costs:

(1) to improve water use efficiency of water delivery and application on existing irrigation systems;

(2) for preparing irrigated land to be converted to dryland conditions;  [or]

(3) for preparing dryland for more efficient use of natural precipitation;

(4) *for preparing and maintaining land to be used for brush control activities, including but not limited to activities conducted pursuant to Chapter 203, Agriculture Code;  or*

(5) *for implementing precipitation enhancement activities in areas of the state where such activities would be, in the board's judgment, most effective.*

(c) *The board may make conservation loans to borrower districts for the cost of purchasing and installing devices, on public or private property, designed to indicate the amount of water withdrawn for irrigation purposes.*

SECTION 4.10.  Subdivision (12), Section 35.002, Water Code, is amended to read as follows:

(12) "*Priority groundwater management* [Critical] area" means an area designated and delineated by the commission as an area that is experiencing or is expected to experience critical groundwater problems.

SECTION 4.11.  Section 35.007, Water Code, is amended to read as follows:

Sec. 35.007.  IDENTIFYING, DESIGNATING, AND DELINEATING *PRIORITY GROUNDWATER MANAGEMENT* [CRITICAL] AREAS.  (a) The executive director and the executive administrator shall meet at least once a year to identify, *based on information gathered by the commission and the Texas Water Development Board,* those areas of the state that are experiencing or that are expected to experience, [based on information available to the commission and the Texas Water Development Board,] within the immediately following *25-year* [20-year] period, critical groundwater problems, including shortages of surface *water* or groundwater, land subsidence resulting from groundwater withdrawal, and contamination of groundwater supplies.

(b) If the executive director concludes that an area of the state should be considered for designation as a *priority groundwater management* [critical] area, the executive director shall prepare a report to the commission.

(c) *Before the executive director requests a study from the executive administrator under Subsection (d), the executive director shall provide notice to the persons listed in Section 35.009(c) of areas being considered for identification as experiencing or expected to experience critical groundwater problems and shall consider any information or studies submitted under this subsection.  Not later than the 45th day after the date of the notice, a person*

3636

required to receive notice under this subsection may submit to the executive director information or studies that address the potential effects on an area of being identified as experiencing or expected to experience critical groundwater problems.

(d) The executive director shall begin preparation of a *priority groundwater management* [critical] area report by requesting a study from the executive administrator. The study must:

(1) include an appraisal of the hydrogeology of the area and matters within the Texas Water Development Board's planning expertise relevant to the area;

(2) *assess the area's immediate, short-term, and long-term water supply and needs;* and

(3) [. The study must] be completed and delivered to the executive director on or before the *180th* [90th] day following the date of the request. If the study is not delivered within this *180-day* [90-day] period, the executive director may proceed with the preparation of the report.

(e) *The executive director shall request a study from the executive director of the Parks and Wildlife Department for the purpose of preparing the report required by this section. The study must:*

(1) *evaluate the potential effects of the designation of a priority groundwater management area on an area's natural resources;* and

(2) *be completed and delivered to the executive director on or before the 180th day following the date of the request. If the study is not delivered within this 180-day period, the executive director may proceed with the preparation of the report.*

(f) [(d)] The report shall include:

(1) the recommended delineation of the boundaries of any proposed *priority groundwater management* [critical] area in the form of *an order* [a rule] to be considered for adoption by the commission;

(2) the reasons and supporting information for or against designating the area as a *priority groundwater management* [critical] area;

(3) a recommendation regarding whether a district should be created in the *priority groundwater management* [critical] area or whether the *priority groundwater management* [critical] area should be added to an existing district;

(4) *a recommendation as to actions that should be considered to conserve natural resources;*

(5) *an evaluation of information or studies submitted to the executive director under Subsection (c);* and

(6) any other information that the executive director considers helpful to the commission.

(g) [(e)] The executive director must complete the report and file it with the commission on or before the *240th* [210th] day following the date on which the executive administrator was requested to produce a study. The executive director shall make the report available for public inspection by providing a copy of the report to at least one *public* library *and the county clerk's office* in each county in which the proposed *priority groundwater management* [critical] area is located *and to all districts adjacent to the area of the proposed priority groundwater management area.*

(h) [(f)] To carry out this section, the executive director may make necessary studies, hold hearings, solicit and collect information, and use information already prepared by the executive director or the executive administrator for other purposes.

SECTION 4.12. Section 35.008, Water Code, is amended to read as follows:

Sec. 35.008. PROCEDURES FOR DESIGNATION OF *PRIORITY GROUNDWATER MANAGEMENT AREA; CONSIDERATION OF CREATION OF DISTRICT OR ADDITION OF LAND IN PRIORITY GROUNDWATER MANAGEMENT AREA TO EXISTING DISTRICT* [CRITICAL AREAS]. (a) The commission shall designate *priority groundwater management* [critical] areas using the procedures *provided by this chapter in lieu of* those provided by [applicable to rulemaking under the Administrative Procedure Act,] Subchapter B, Chapter 2001, Government Code[, but if procedures required by this chapter are in conflict with that Act, this chapter controls].

(b) *The commission shall call an evidentiary hearing to consider:*

*(1) the designation of a priority groundwater management area;*

*(2) whether a district should be created over all or part of a priority groundwater management area; or*

*(3) whether all or part of the land in the priority groundwater management area should be added to an existing district.*

(c) *Evidentiary hearings shall be held at a location in one of the counties in which the priority groundwater management area is located, or proposed to be located, or in the nearest convenient location if adequate facilities are not available in those counties.*

(d) *At the hearing, the commission shall hear testimony and receive evidence from affected persons. The commission shall consider the executive director's report and supporting information and the testimony and evidence received at the hearing. If the commission considers further information necessary, the commission may request such information from any source.* ·

(e) The designation of a *priority groundwater management* [critical] area may not be appealed nor may it be challenged under the Administrative Procedure Act, Section 2001.038, Government Code.

SECTION 4.13.   Section 35.009, Water Code, is amended to read as follows:

Sec. 35.009.   NOTICE AND HEARING.   (a) *The* [In addition to the notice required for rulemaking under the Administrative Procedure Act, Section 2001.023, Government Code, the] commission shall have notice *of the hearing* published in at least one newspaper with general circulation in the county or counties in which the *area* proposed *for designation as a priority groundwater management* [critical] area *or the area within a priority groundwater management area being considered for district creation or for addition to an existing district* is [to be] located.   Notice must be published not later than the 30th day before the date set for the commission to consider the designation of the *priority groundwater management* [critical] area, *the creation of a district in a priority groundwater management area, or the addition of land in a priority groundwater management area to an existing district.*

(b) The notice must include:

(1) *if applicable,* a statement of the general purpose and effect of designating the proposed *priority groundwater management* area [critical areas];

*(2)* *if applicable, a statement of the general purpose and effect of creating a district in the priority groundwater management area;*

*(3) if applicable, a statement of the general purpose and effect of adding all or part of the land in the priority groundwater management area to an existing district;*

*(4)* a map generally outlining the boundaries of the *area being considered for priority groundwater management* [proposed critical] area *designation or the priority groundwater management area being considered for district creation or for addition to an existing district,* or notice of the location at which a copy of the map may be examined or obtained;

*(5) a statement that the executive director's report concerning the priority groundwater management area or proposed area is available at the commission's main office in Austin, Texas, and at regional offices of the commission for regions which include territory within the priority groundwater management area or proposed priority groundwater management area and that the report is available for inspection during regular business hours;*

*(6)* [(3)] a description or the name of the locations *in the affected area* at which the commission has provided copies of the executive director's report to be made available for public inspection;

*(7) the name and address of each public library, each county clerk's office, and each district to which the commission has provided copies of the executive director's report;* and

*(8)* [(4)] the date, time, and place *of the hearing* [at which the commission will consider the designation of the critical areas].

(c) *The commission shall also give written notice of the date, time, place, and purpose of the hearing to the governing body of each county, regional water planning group, adjacent groundwater district, municipality, river authority, water district, or other entity which*

3638

*supplies public drinking water, including each holder of a certificate of convenience and necessity issued by the commission, and of each irrigation district, located either in whole or in part in the priority groundwater management area or proposed priority groundwater management area. The notice must be given before the 30th day preceding the date set for the hearing.*

SECTION 4.14. Subsections (b), (c), (d), and (e), Section 35.012, Water Code, are amended to read as follows:

(b) If the commission finds that the land and other property in the *priority groundwater management* [critical] area would benefit from the creation of one or more districts, that there is a public need for one or more districts, and that the creation of one or more districts would further the public welfare, the commission shall issue an order stating that the creation of one or more districts is needed.

(c) *Following* [During the period between] the [date of] issuance of a commission order under Subsection (b) [and one year after the close of the next regular session of the legislature following the issuance of the order], the landowners in the *priority groundwater management* [critical] area may:

    (1) create one or more districts under Subchapter B, Chapter 36;

    (2) have the area annexed to a district that adjoins the area; or

    (3) create one or more districts through the legislative process.

(d) The commission shall identify the areas subject to the order of the commission issued under Subsection (b) that have not[, in the period provided by Subsection (c),] been incorporated into a district[,] and shall delineate proposed boundaries of a district to include those areas. If the commission proposes the creation of one or more districts, the *Texas Agricultural Extension Service* [commission] shall begin *an educational program within such areas with the assistance and cooperation of the Texas Water Development Board, the commission, other state agencies, and existing districts to inform the residents of the status of the area's water resources and management options including possible formation of a district, before beginning* the procedures for creation of a district provided in Subchapter B, Chapter 36.

(e) If the commission fails to find that the district would be a benefit to the land and other property within the *priority groundwater management* [critical] area, that there is a public need for the district, or that creation of the district will further the public welfare, the commission shall issue an order stating that a district should not be created within the boundaries of the *priority groundwater management* [critical] area.

SECTION 4.15. Section 35.013, Water Code, is amended to read as follows:

Sec. 35.013. ADDING *PRIORITY GROUNDWATER MANAGEMENT* [CRITICAL] AREA TO EXISTING DISTRICT. (a) If land in a *priority groundwater management* [critical] area is located adjacent to one or more existing districts, the commission, instead of issuing an order under Section 35.012, may issue an order recommending that the *priority groundwater management* [critical] area be added to the existing district designated by the commission. In its order, the commission must find that the land and other property in the *priority groundwater management* [critical] area and the land in the existing district will benefit from the addition of the area, that there is a public need to add the *priority groundwater management* [critical] area to the existing district, and that the addition of the land to the existing district would further the public welfare.

(b) If the executive director recommends that the *priority groundwater management* [critical] area be added to an existing district or if the commission considers it possible to add the *priority groundwater management* [critical] area to an adjacent existing district, the commission shall give notice to the board of the existing district recommended by the executive director or considered by the commission to possibly serve the area and to any other existing districts adjacent to the *priority groundwater management* [critical] area.

(c) The commission shall submit a copy of the order to the board of the district to which it is recommending the *priority groundwater management* [critical] area be added. The board shall vote on the addition of the *priority groundwater management* [critical] area to the district and shall advise the commission of the outcome.

(d) If the board votes to accept the addition of the *priority groundwater management* [critical] area to the district, the board:

(1) may request the Texas Agricultural Extension Service, the commission, the Texas Water Development Board, and other state agencies to administer an educational program to inform the residents of the area's water resources and management options including possible annexation into a district;

(2) shall call an election within the *priority groundwater management* [critical] area as delineated by the commission to determine if the *priority groundwater management* [critical] area will be added to the district; and

(3) [, In the order calling the election, the board] shall designate election precincts and polling places for the elections *in the order calling an election under this subsection.*

(e) The board shall give notice of the election and the proposition to be voted on. The board shall publish notice of the election at least one time in one or more newspapers with general circulation within the boundaries of the *priority groundwater management* [critical] area. The notice must be published before the 30th day preceding the date set for the election.

(f) The ballots for the election shall be printed to provide for voting for or against the proposition: "The inclusion of _____ (briefly describe *priority groundwater management* [critical] area) in the _____ District." If the district has *outstanding debts or taxes* [issued bonds], the proposition shall include the following language: "and assumption by the described area of a proportional share of the *debts or taxes* [outstanding indebtedness] of the district."

(g) Immediately after the election, the presiding judge of each polling place shall deliver the returns of the election to the board, and the board shall canvass the returns for the election within the *priority groundwater management* [critical] area and declare the results. If a majority of the voters in the *priority groundwater management* [critical] area voting on the proposition vote in favor of the proposition, the board shall declare that the *priority groundwater management* [critical] area is added to the district. If a majority of the voters in the *priority groundwater management* [critical] area voting on the proposition vote against adding the *priority groundwater management* [critical] area to the district, the board shall declare that the *priority groundwater management* [critical] area is not added to the district. The board shall file a copy of the election results with the commission.

(h) If the voters approve adding the *priority groundwater management* [critical] area to the district, the board of the district to which the *priority groundwater management* [critical] area is added shall provide reasonable representation on that board compatible with the district's existing scheme of representation.

(i) If the proposition is defeated, another election to add the *priority groundwater management* [critical] area to an existing district may not be called before the first anniversary of the date on which the election on the proposition was held.

SECTION 4.16. Subsections (b) and (c), Section 35.014, Water Code, are amended to read as follows:

(b) The costs of an election to add a *priority groundwater management* [critical] area to an existing district at which the voters approve adding the *priority groundwater management* [critical] area to the district shall be paid by the existing district.

(c) The costs of an election to create a district or add a *priority groundwater management* [critical] area to an existing district at which the proposition fails shall be paid by the commission.

SECTION 4.17. Section 35.015, Water Code, is amended to read as follows:

Sec. 35.015. STATE ASSISTANCE. [(a) A political subdivision located in or that has within its boundaries an area or part of an area delineated as a critical area, and in which the qualified voters fail to approve the creation of a district or to join an existing district, shall not be eligible to receive any financial assistance from the state under Chapter 15, 16, or 17 for use within that portion of the critical area not covered by a district.

[(b)] A political subdivision located in an area delineated as a *priority groundwater management* [critical] area, and in which qualified voters approve the creation of a district or

annexation into an existing district, shall be given consideration to receive financial assistance from the state under Chapter 17 for funds to be used in addressing issues identified in the *priority groundwater management* [critical] area report in the manner provided by Sections 17.124 and 17.125[, except that the board is not required to make the finding set out in Section 17.125(a)(2)].

SECTION 4.18.   Section 35.017, Water Code, is amended to read as follows:

Sec. 35.017.   STATE-OWNED LAND.   If state-owned land or a portion of state-owned land is located in a *priority groundwater management* [critical] area, the state agency that has management and control over that land under the constitution or by statute may elect by written agreement with the commission and the district to include the state-owned land in the district.   The agreement shall be entered into as provided by the Texas Intergovernmental Cooperation Act, Chapter 741, Government Code, and may include provisions for the payment by the state agency of reasonable fees to the district.   If the state does not elect to enter into the agreement to include the state-owned land in the district, the state agency must establish a groundwater management plan that will conserve, protect, and prevent the waste of groundwater on that state-owned land.

SECTION 4.19.   Chapter 35, Water Code, is amended by adding Sections 35.018 and 35.019 to read as follows:

*Sec. 35.018.   REPORTS.   (a) No later than January 31 of each odd-numbered year, the commission in conjunction with the Texas Water Development Board shall prepare and deliver to the governor, the lieutenant governor, and the speaker of the house of representatives a comprehensive report concerning activities during the preceding two years relating to the designation of priority groundwater management areas by the commission and the creation and operation of districts.*

*(b)   The report must include:*

*(1) the names and locations of all priority groundwater management areas and districts created or attempted to be created on or after November 5, 1985, the effective date of Chapter 133 (H.B. No. 2), Acts of the 69th Legislature, Regular Session, 1985;*

*(2) the authority under which each priority groundwater management area and district was proposed for creation;*

*(3) a detailed analysis of each election held to confirm the creation of a district, including analysis of election results, possible reasons for the success or failure to confirm the creation of a district, and the possibility for future voter approval of districts in areas in which attempts to create districts failed;*

*(4) a detailed analysis of the activities of each district created, including those districts which are implementing management plans certified under Section 36.1072;*

*(5) a report on audits performed on districts under Section 36.302 and remedial actions taken under Section 36.303;*

*(6) recommendations for changes in this chapter and Chapter 36 that will facilitate the creation of priority groundwater management areas and the creation and operation of districts;*

*(7) a report on educational efforts in newly designated priority groundwater management areas; and*

*(8) any other information and recommendations that the commission considers relevant.*

*(c)(1) If voters fail to create a groundwater district in a priority groundwater management area or if voters fail to add the priority groundwater management area to an existing groundwater district, the report shall include recommendations for the future management of the priority groundwater management area. The recommendations may include but are not limited to the following:*

*(A) creation of a groundwater district by the legislature;*

*(B) annexation of a priority groundwater management area into an existing district by the legislature; or*

(C) *management of the priority groundwater management area by the nearest regional office of the commission. The commission may be authorized to:*

(i) *adopt spacing and annual per acre pumping restrictions;*

(ii) *issue well permits in accordance with Sections 36.113 and 36.1131;*

(iii) *prevent waste and protect the quality of groundwater in accordance with Sections 36.001(8)(A)–(G);*

(iv) *levy administrative penalties for violations; and*

(v) *collect fees in accordance with Sections 36.206(a) and (b).*

(2) *If the commission is required by the legislature to manage the priority groundwater management area, a new election may not be called for three years from the date of the last election.*

Sec. 35.019. *WATER AVAILABILITY. (a) The commissioners court of a county in a priority groundwater management area may adopt water availability requirements in an area where platting is required if the court determines that the requirements are necessary to prevent current or projected water use in the county from exceeding the safe sustainable yield of the county's water supply.*

(b) *The commissioners court of a county in a priority groundwater management area may:*

(1) *require a person seeking approval of a plat required by Subchapter A, Chapter 232, Local Government Code, to show:*

(A) *compliance with the water availability requirements adopted by the court under this section; and*

(B) *that an adequate supply of water of sufficient quantity and quality is available to supply the number of lots proposed for the platted area;*

(2) *adopt standards or formulas to determine whether an adequate water supply exists for the platted area; and*

(3) *adopt procedures for submitting the information necessary to determine whether an adequate water supply exists for the platted area.*

(c) *The water availability requirements established by a commissioners court under this section may require that:*

(1) *a person seeking approval of a plat or attempting to sell a lot in a subdivision:*

(A) *notify a purchaser of a lot in the subdivision if an approved water supply for the subdivision does not exist; or*

(B) *if the person attempts to build a water supply system to serve one or more lots within the subdivision:*

(i) *comply with federal, state, and local law; and*

(ii) *establish an entity to construct and operate the system; or*

(2) *a planned or operating water supply system serving one or more lots within a subdivision be built and operated in compliance with federal, state, and local laws and rules related to public drinking water.*

SECTION 4.20.  Section 36.001, Water Code, is amended by amending Subdivision (14) and adding Subdivisions (16) and (17) to read as follows:

(14) *"Priority groundwater management* [Critical] *area"* means an area designated and delineated by the commission under Chapter 35 as an area experiencing or expected to experience critical groundwater problems.

(16) *"Loan fund"* means the groundwater district loan assistance fund created under Section 36.371.

(17) *"Applicant"* means a newly confirmed district applying for a loan from the loan fund.

SECTION 4.21.  Subchapter A, Chapter 36, Water Code, is amended by adding Section 36.0015 to read as follows:

*Sec. 36.0015.  PURPOSE.  In order to provide for the conservation, preservation, protection, recharging, and prevention of waste of groundwater, and of groundwater reservoirs or their subdivisions, and to control subsidence caused by withdrawal of water from those groundwater reservoirs or their subdivisions, consistent with the objectives of Section 59, Article XVI, Texas Constitution, groundwater conservation districts may be created as provided by this chapter.  Groundwater conservation districts created as provided by this chapter are the state's preferred method of groundwater management.*

SECTION 4.22.  Subsection (c), Section 36.012, Water Code, is amended to read as follows:

(c) The boundaries of a district must be coterminous with or inside the boundaries of a management area or a *priority groundwater management* [critical] area.

SECTION 4.23.  Subsection (d), Section 36.013, Water Code, is amended to read as follows:

(d) If a part of the proposed district is not included within either a management area or a *priority groundwater management* [critical] area, the petition to create a district may also contain a request to create a management area.  A request to create a management area must comply with the requirements for a petition in Section 35.005, and may be acted on by the commission separately from the petition to create the district.

SECTION 4.24.  Subchapter B, Chapter 36, Water Code, is amended by adding Section 36.0151 to read as follows:

*Sec. 36.0151.  CREATION OF DISTRICT FOR PRIORITY GROUNDWATER MANAGEMENT AREA.  (a)  If the commission proposes that a district be created under Section 35.012(d), it shall in its order creating the district provide that temporary directors be appointed under Section 36.016 and that an election be called by the temporary directors to confirm the creation of the district and to elect permanent directors.*

*(b) The commission shall notify the county commissioners court of each county with territory in the district of the district's creation as soon as practicable after issuing the order creating the district.*

SECTION 4.25.  Section 36.016, Water Code, is amended to read as follows:

Sec. 36.016.  APPOINTMENT OF TEMPORARY DIRECTORS.  (a) If the commission grants a petition to create a district *under Section 36.015 or after the commission dissolves a district's board under Section 36.303,* it shall appoint five temporary directors.

*(b) If the commission creates a district under Section 36.0151, the county commissioners court or courts of the county or counties that contain the area of the district shall, within 90 days after receiving notification by the commission under Section 36.0151(b), appoint five temporary directors, or more if the district contains the territory of more than five counties, for the district's board using the method provided by Section 36.0161.  A county commissioners court shall not make any appointments after the expiration of the 90-day period.  If fewer than five temporary directors have been appointed at the expiration of the period, the commission shall appoint additional directors so that the board has at least five members.*

(c) *Temporary directors appointed under this section* [who] shall serve until the initial directors are elected and have qualified for office or until the voters fail to approve the creation of the district.

(d) [(b)] If an appointee of the commission *or of a county commissioners court* fails to qualify or if a vacancy occurs in the office of temporary director, the commission *or the county commissioners court, as appropriate,* shall appoint an individual to fill the vacancy.

(e) [(c)] As soon as all temporary directors have qualified, the directors shall meet, take the oath of office, and elect a chairman and vice chairman from among their membership.  The chairman shall preside at all meetings of the board and, in the chairman's absence, the vice chairman shall preside.

SECTION 4.26.  Subchapter B, Chapter 36, Water Code, is amended by adding Section 36.0161 to read as follows:

3643

*Sec. 36.0161.   METHOD FOR APPOINTING TEMPORARY DIRECTORS FOR DISTRICT IN PRIORITY GROUNDWATER MANAGEMENT AREA.   (a) If a district in a priority groundwater management area is:*

*(1) contained within one county, the county commissioners court of that county shall appoint five temporary directors for the district;*

*(2) contained within two counties, the county commissioners court of each county shall appoint at least one temporary director, with the appointments of the three remaining directors to be apportioned as provided by Subsection (b);*

*(3) contained within three counties, the county commissioners court of each county shall appoint at least one temporary director, with the appointments of the two remaining directors to be apportioned as provided by Subsection (b);*

*(4) contained within four counties, the county commissioners court of each county shall appoint at least one temporary director, with the appointment of the remaining director to be apportioned as provided by Subsection (b);  or*

*(5) contained within five or more counties, the county commissioners court of each county shall appoint one temporary director.*

*(b)(1) In this subsection, "estimated groundwater use" means the estimate of groundwater use in acre-feet developed by the commission under Subsection (c) for the area of a county that is within the district.*

*(2) The apportionment of appointments under Subsection (a) shall be made by the commission so as to reflect, as closely as possible, the proportion each county's estimated groundwater use bears to the sum of the estimated groundwater use for the district as determined under Subsection (c).   The commission shall by rule determine the method it will use to implement this subdivision.*

*(c) If a district for which temporary directors are to be appointed is contained within two, three, or four counties, the commission shall develop an estimate of annual groundwater use in acre-feet for each county area within the district.*

SECTION 4.27.   Section 36.052, Water Code, is amended to read as follows:

Sec. 36.052.   OTHER LAWS NOT APPLICABLE.   (a) Other laws governing the administration or operations of districts created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, shall not apply to any district governed by this chapter.   This chapter prevails over any other law in conflict or inconsistent with this chapter, except any special law governing a specific district shall prevail over this chapter.

*(b) Notwithstanding Subsection (a), the following provisions prevail over a conflicting or inconsistent provision of a special law that governs a specific district:*

*(1) Sections 36.107–36.108;*

*(2) Sections 36.159–36.161;  and*

*(3) Subchapter I.*

SECTION 4.28.   Subchapter D, Chapter 36, Water Code, is amended by amending Section 36.107 and adding Sections 36.1071, 36.1072, and 36.1073 to read as follows:

Sec. 36.107.   RESEARCH [AND PLANNING].   [(a)] A district may carry out any research projects deemed necessary by the board.

*Sec. 36.1071.   MANAGEMENT PLAN.   (a)*   [(b)] Following notice and hearing, the district shall, *in coordination with surface water management entities on a regional basis,* develop a comprehensive management plan *which addresses the following management goals, as applicable:*

*(1) providing the most efficient use of groundwater;*

*(2) controlling and preventing waste of groundwater;*

*(3) controlling and preventing subsidence;*

*(4) addressing conjunctive surface water management issues;  and*

*(5) addressing natural resource issues.*

3644

*(b) A district management plan, or any amendments to a district management plan, adopted after the Texas Water Development Board approval of a regional water plan for the region in which the district is located shall be consistent with the regional water plan.*

*(c) The commission and the Texas Water Development Board shall provide technical assistance to a district in the development of the management plan required under Subsection (a) which may include, if requested by the district, a preliminary review and comment on the plan prior to final approval by the board. If such review and comment by the commission is requested, the commission shall provide comment not later than 30 days from the date the request is received.*

*(d) The commission shall provide technical assistance to a district during its initial operational phase.*

*(e) In the management plan described under Subsection (a), the district shall:*

*(1) identify the performance standards and management objectives under which the district will operate to achieve the management goals identified under Subsection (a);*

*(2) specify, in as much detail as possible, the actions, procedures, performance, and avoidance that are or may be necessary to effect the plan, including specifications and proposed rules;*

*(3) include estimates of the following:*

*(A) the existing total usable amount of groundwater in the district;*

*(B) the amount of groundwater being used within the district on an annual basis;*

*(C) the annual amount of recharge, if any, to the groundwater resources within the district and how natural or artificial recharge may be increased; and*

*(D) the projected water supply and demand for water within the district; and*

*(4) address water supply needs in a manner that is not in conflict with the appropriate approved regional water plan if a regional water plan has been approved under Section 16.053* [for the most efficient use of the groundwater, for controlling and preventing waste of groundwater, and for controlling and preventing subsidence. The plan may be reviewed annually but must be reviewed by the board at least once every five years].

*(f)* [(e) The district shall specify in the management plan, in as much detail as possible, the acts, procedures, performance, and avoidance that are or may be necessary to effect the plan, including specifications and proposed rules.] The district shall adopt rules necessary to implement the management plan.

*(g) The board shall adopt amendments to the management plan as necessary. Amendments to the management plan shall be adopted after notice and hearing and shall otherwise comply with the requirements of this section.*

*Sec. 36.1072. TEXAS WATER DEVELOPMENT BOARD REVIEW AND CERTIFICATION OF MANAGEMENT PLAN. (a) A* [The] *district shall, not later than two years after the creation of the district or, if the district required confirmation, after the election confirming the district's creation, submit* [file a copy of] *the management plan required under Section 36.1071 to* [and the rules with] *the executive administrator for review and certification* [commission].

*(b) Within 60 days of receipt of a management plan adopted under Section 36.1071, the executive administrator shall certify a management plan if the plan is administratively complete. A management plan is administratively complete when it contains the information required to be submitted under Section 36.1071. The executive administrator may determine that conditions justify waiver of the requirements under Section 36.1071(e)(4).*

*(c) Once a determination that a management plan is administratively complete has been made:*

*(1) the executive administrator may not revoke the determination that a management plan is administratively complete;*

*(2) the executive administrator may request additional information from the district if the information is necessary to clarify, modify, or supplement previously submitted material; and*

3645

*(3) a request for additional information does not render the management plan incomplete.*

*(d) A management plan takes effect on certification by the executive administrator or, if appealed, on certification by the Texas Water Development Board.*

*(e) The board may review the plan annually and must review and readopt the plan with or without revisions at least once every five years.*

*(f) If the executive administrator does not certify the management plan, the executive administrator shall provide to the district, in writing, the reasons for the action. Not later than the 180th day after the date a district receives notice that its management plan has not been certified, the district may submit a revised management plan for review and certification. The executive administrator's decision may be appealed to the Texas Water Development Board. The decision of the Texas Water Development Board on whether to certify the management plan may not be appealed. The commission shall not take enforcement action against a district under Subchapter I until the later of the expiration of the 180-day period or the date the Texas Water Development Board has taken final action withholding certification of a revised management plan.*

*Sec. 36.1073. AMENDMENT TO MANAGEMENT PLAN. Any amendment to the management plan shall be submitted to the executive administrator within 60 days following adoption of the amendment by the district's board. The executive administrator shall review and certify any amendment which substantially affects the management plan in accordance with the procedures established under Section 36.1072.*

SECTION 4.29. Subsection (a), Section 36.108, Water Code, is amended to read as follows:

(a) If two or more districts are located within the boundaries of the same management area, each district shall prepare a comprehensive management plan as required by Section 36.1071 [36.107] covering that district's respective territory. On completion of the plan, each district shall forward a copy of the new revised management plan to the other districts in the management area.

SECTION 4.30. Section 36.113, Water Code, is amended to read as follows:

Sec. 36.113. PERMITS FOR WELLS. *(a)* A district shall require permits for the drilling, equipping, or completing of wells[,] or for substantially altering the size of wells or well pumps.

*(b) A district shall require that an application for a permit be in writing and sworn to.*

*(c) A district may require that the following be included in the permit application:*

*(1) the name and mailing address of the applicant and the owner of the land on which the well will be located;*

*(2) if the applicant is other than the owner of the property, documentation establishing the applicable authority to construct and operate a well for the proposed use;*

*(3) a statement of the nature and purpose of the proposed use and the amount of water to be used for each purpose;*

*(4) a water conservation plan or a declaration that the applicant will comply with the district's management plan;*

*(5) the location of each well and the estimated rate at which water will be withdrawn;*

*(6) a water well closure plan or a declaration that the applicant will comply with well plugging guidelines and report closure to the commission; and*

*(7) a drought contingency plan.*

*(d) Before granting or denying a permit, the district shall consider whether:*

*(1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fees;*

*(2) the proposed use of water unreasonably affects existing groundwater and surface water resources;*

*(3) the proposed use of water is dedicated to any beneficial use;*

*(4) the proposed use of water is consistent with the district's certified water management plan;*

*(5) the applicant has agreed to avoid waste and achieve water conservation; and*

*(6) the applicant has agreed that reasonable diligence will be used to protect groundwater quality and that the applicant will follow well plugging guidelines at the time of well closure.*

(e) Permits may be issued subject to the rules promulgated by the district and subject to terms and provisions with reference to the drilling, equipping, completion, or alteration of wells or pumps that may be necessary to [conserve the groundwater,] prevent waste *and achieve water conservation,* minimize as far as practicable the drawdown of the water table or the reduction of artesian pressure, lessen interference between wells, or control and prevent subsidence.

*(f) A district may require that changes in the withdrawal and use of groundwater under a permit not be made without the prior approval of a permit amendment issued by the district.*

SECTION 4.31. Subchapter D, Chapter 36, Water Code, is amended by adding Section 36.1131 to read as follows:

*Sec. 36.1131. ELEMENTS OF PERMIT. (a) A permit issued by the district to the applicant under Section 36.113 shall state the terms and provisions prescribed by the district.*

*(b) The permit may include:*

*(1) the name and address of the person to whom the permit is issued;*

*(2) the location of the well;*

*(3) the date the permit is to expire if no well is drilled;*

*(4) a statement of the purpose for which the well is to be used;*

*(5) a requirement that the water withdrawn under the permit be put to beneficial use at all times;*

*(6) the location of the use of the water from the well;*

*(7) a water well closure plan or a declaration that the applicant will comply with well plugging guidelines and report closure to the commission;*

*(8) the conditions and restrictions, if any, placed on the rate and amount of withdrawal;*

*(9) any conservation-oriented methods of drilling and operating prescribed by the district;*

*(10) a drought contingency plan prescribed by the district; and*

*(11) other terms and conditions as provided by Section 36.113.*

SECTION 4.32. Section 36.117, Water Code, is amended to read as follows:

Sec. 36.117. *EXEMPTIONS; EXCEPTION; LIMITATIONS. (a) A district may exempt wells from the requirements to obtain a drilling permit, an operating permit, or any other permit required by this chapter or the district's rules.* A district may not require a permit for:

(1) drilling or producing from a well either drilled, completed, or equipped so that it is incapable of producing more than 25,000 gallons of groundwater a day;

(2) the drilling or alteration of the size of a well or to restrict the production of a well if the water produced or to be produced from the well is used or to be used to supply the domestic needs of 10 or fewer households and a person who is a member of each household is either the owner of the well, a person related to the owner or a member of the owner's household within the second degree by consanguinity, or an employee of the owner;

(3) the drilling or alteration of the size of a well or to restrict the production from the well if the water produced or to be produced from the well is used or to be used to provide water for feeding livestock and poultry connected with farming, ranching, or dairy enterprises;

(4) water wells to supply water for hydrocarbon production activities, regardless of whether those wells are producing, that are associated with any well permitted by the Railroad Commission of Texas drilled before September 1, 1985; or

(5) jet wells used for domestic needs.

(b) The board shall adopt rules determining the applicability of Subsection (a)(3) to facilities used primarily for feeding livestock.

(c) The district shall not deny the owner of a tract of land, or his lessee, who has no well equipped to produce more than 25,000 gallons a day on the tract, either a permit to drill a well on his land or the privilege to produce groundwater from his land, subject to the rules of the district.

(d) A district may not restrict the production of any well equipped to produce 25,000 gallons or less a day.

(e) Nothing in this chapter applies to wells drilled for oil, gas, sulphur, uranium, or brine, or for core tests, or for injection of gas, saltwater, or other fluid, or for any other purpose, under permits issued by the Railroad Commission of Texas. A district may not require a *drilling* permit *for* [to drill] a well to supply water for drilling any [of these] wells permitted by the Railroad Commission of Texas. Any well that ceases to be used for these purposes and is then used as an ordinary water well is subject to the rules of the district. *Water wells drilled after September 1, 1997, to supply water for hydrocarbon production activities must meet the spacing requirements of the district unless no space is available within 300 feet of the production well or the central injection station.*

(f) Water wells exempted under this section shall be equipped and maintained so as to conform to the district's rules requiring installation of casing, pipe, and fittings to prevent the escape of groundwater from a groundwater reservoir to any reservoir not containing groundwater and to prevent the pollution or harmful alteration of the character of the water in any groundwater reservoir.

(g) A district shall require water wells exempted under this section to be registered with the district *before drilling.* All exempt water wells shall be equipped and maintained so as to conform to the district's rules requiring installation of casing, pipe, and fittings to prevent the escape of groundwater from a groundwater reservoir to any reservoir not containing groundwater and to prevent the pollution or harmful alteration of the character of the water in any groundwater reservoir.

*(h) A well to supply water for a subdivision of land for which a plat approval is required by law is not exempted under this section.*

SECTION 4.33. Subchapter D, Chapter 36, Water Code, is amended by adding Section 36.122 to read as follows:

*Sec. 36.122. TRANSFER OF GROUNDWATER OUT OF DISTRICT. (a) A district may promulgate rules requiring a person to obtain a permit from the district for the transfer of groundwater out of the district to:*

*(1) increase, on or after March 2, 1997, the amount of groundwater to be transferred under a continuing arrangement in effect before that date; or*

*(2) transfer groundwater out of the district on or after March 2, 1997, under a new arrangement.*

*(b) The district may impose a reasonable fee for processing an application for a permit under this section.*

*(c) Before issuing a permit under this section, the district must give notice of the application and hold a public hearing.*

*(d) In determining whether to issue a permit under this section, the district shall consider:*

*(1) the availability of water in the district and in the proposed receiving area during the period for which the water supply is requested;*

*(2) the availability of feasible and practicable alternative supplies to the applicant;*

*(3) the amount and purposes of use in the proposed receiving area for which water is needed;*

*(4) the projected effect of the proposed transfer on aquifer conditions, depletion, subsidence, or effects on existing permit holders or other groundwater users within the district; and*

(5) the approved regional water plan and certified district management plan.

(e) The district may limit a permit issued under this section if conditions in Subsection (d) warrant the limitation.

(f) In addition to conditions provided by Section 36.1131, the permit shall specify:

(1) the amount of water that may be transferred out of the district; and

(2) the period for which the water may be transferred.

(g) A district may not prohibit the export of groundwater if the purchase was in effect on or before June 1, 1997.

(h) This section applies only to a transfer of water that is initiated or increased after the effective date of this section.

(i) A district shall adopt rules as necessary to implement this section.

SECTION 4.34. Subchapter E, Chapter 36, Water Code, is amended by adding Sections 36.159, 36.160, and 36.161 to read as follows:

Sec. 36.159. GROUNDWATER DISTRICT MANAGEMENT PLAN FUNDS. The Texas Water Development Board may allocate funds from the water assistance fund to a district to conduct initial data collections under this chapter, to develop and implement a long-term management plan under Section 36.1071, and to participate in regional water plans.

Sec. 36.160. FUNDS. The Texas Water Development Board, the commission, the Parks and Wildlife Department, the Texas Agricultural Extension Service, and institutions of higher education may allocate funds to carry out the objectives of this chapter and Chapter 35, which include but are not limited to:

(1) conducting initial and subsequent studies and surveys under Sections 36.106, 36.107, and 36.109;

(2) providing appropriate education in affected areas identified in Section 35.007 relating to the problems and issues concerning water management that may arise;

(3) processing priority groundwater management area evaluations under this chapter and Chapter 35;

(4) providing technical and administrative assistance to newly created districts under this chapter and Chapter 35;

(5) covering the costs of newspaper notices required under Sections 35.009 and 36.014 and failed elections in accordance with Sections 35.014(c), 36.017(h), and 36.019; and

(6) providing for assistance from the Parks and Wildlife Department to the Texas Water Development Board or a district for the purpose of assessing fish and wildlife resource habitat needs as they may apply to overall management plan goals and objectives of the district.

Sec. 36.161. ELIGIBILITY FOR FUNDING. (a) The Texas Water Development Board may provide funds under Sections 36.159 and 36.160, Chapters 15, 16, and 17, and Subchapter L of this chapter to a district if the Texas Water Development Board determines that such funding will allow the district to comply or continue to comply with provisions of this chapter.

(b) The Texas Water Development Board may, after notice and hearing, discontinue funding described in Subsection (a) if the Texas Water Development Board finds that the district is not using the funds to comply with the provisions of this chapter.

(c) The Texas Water Development Board, when considering a discontinuance under Subsection (b), shall give written notice of the hearing to the district at least 20 days before the date set for the hearing. The hearing shall be conducted in accordance with Chapter 2001, Government Code, or the rules of the respective agency. General notice of the hearing shall be given in accordance with the rules of the agency.

(d) The Texas Water Development Board may delegate to the State Office of Administrative Hearings the responsibility to conduct a hearing under this section.

SECTION 4.35. Subchapter G, Chapter 36, Water Code, is amended by adding Sections 36.206 and 36.207 to read as follows:

*Sec. 36.206. DISTRICT FEES. (a) A temporary board may set user fees to pay for the creation and initial operation of a district, until such time as the district creation has been confirmed and a permanent board has been elected by a majority vote of the qualified voters voting in the district in an election called for those purposes.*

*(b) The rate of fees set for crop or livestock production or other agricultural uses shall be no more than 20 percent of the rate applied to municipal uses.*

*Sec. 36.207. USE OF PERMIT FEES AUTHORIZED BY SPECIAL LAW. A district may use funds obtained from permit fees collected pursuant to the special law governing the district for any purpose consistent with the district's certified water management plan including, without limitation, making grants, loans, or contractual payments to achieve, facilitate, or expedite reductions in groundwater pumping or the development or distribution of alternative water supplies.*

SECTION 4.36.    Subchapter I, Chapter 36, Water Code, is amended to read as follows:

SUBCHAPTER I.   *PERFORMANCE REVIEW AND* DISSOLUTION [OF DISTRICT]

*Sec. 36.301. FAILURE TO SUBMIT A MANAGEMENT PLAN. If a board fails to submit a management plan or to receive certification of its management plan under Section 36.1072 or fails to submit or receive certification of an amendment to the management plan under Section 36.1073, the commission shall take appropriate action under Section 36.303.*

*Sec. 36.302. LEGISLATIVE AUDIT REVIEW; DETERMINATION OF WHETHER DISTRICT IS OPERATIONAL. (a) A district is subject to review by the state auditor under the direction of the legislative audit committee pursuant to Chapter 321, Government Code.*

*(b) The commission, the Texas Water Development Board, and the Parks and Wildlife Department shall provide technical assistance to the state auditor's office for the review.*

*(c) The state auditor shall make a determination of whether a district is actively engaged in achieving the objectives of the district's management plan based on an audit of the district's performance under the plan.*

*(d) The state auditor shall conduct such audits following the first anniversary of the initial certification of the plan by the Texas Water Development Board under Section 36.1072 and following the end of every five-year period thereafter.*

*(e) The state auditor shall report findings of the review to the legislative audit committee and to the commission.*

*(f) If it is determined under Subsection (c) that the district is not operational, the commission shall take appropriate action under Section 36.303.*

*Sec. 36.303. ACTION BY COMMISSION. (a) If Section 36.301 or 36.302(f) applies, the commission, after notice and hearing in accordance with Chapter 2001, Government Code, shall take action the commission considers appropriate, including:*

*(1) issuing an order requiring the district to take certain actions or to refrain from taking certain actions;*

*(2) dissolving the board in accordance with Sections 36.305 and 36.307;*

*(3) removing the district's taxing authority; or*

*(4) dissolving the district in accordance with Sections 36.304, 36.305, and 36.308.*

*(b) In addition to actions identified under Subsection (a), the commission may recommend to the legislature, based upon the report required by Section 35.018, actions the commission deems necessary to accomplish comprehensive management in the district.*

Sec. *36.304* [36.301].    DISSOLUTION *OF DISTRICT.* (a) *The* [After notice and hearing, the] commission may dissolve a district that:

(1) *is not operational, as determined under Section 36.302* [has been inactive for a period of three consecutive years]; and

(2) has no outstanding bonded indebtedness.

3650

(b) A district composed of territory entirely within one county may be dissolved even if *the district* [it] has outstanding indebtedness that matures after the year in which the district is dissolved, whereupon the commissioners court shall levy and collect taxes on all taxable property in the district in an amount sufficient to pay the principal of and interest on the indebtedness when due. The taxes shall be levied and collected in the same manner as county taxes.

[(c) A district is considered active if:

[(1) the district has a board as required by Subchapter D;

[(2) the board holds regularly scheduled meetings and has on file minutes of its meetings;

[(3) the district has developed and filed with the commission a management plan for the district;

[(4) the district has copies of drillers' logs on file;

[(5) the district has on file well permits issued by the district; and

[(6) the district has on file annual district audits.]

Sec. *36.305* [36.302]. NOTICE OF HEARING *FOR DISSOLUTION OF BOARD OR DISTRICT*. (a) The commission shall give notice of the [dissolution] hearing *for dissolution of a district or of a board* which briefly describes the reasons for the proceeding.

(b) The notice shall be published once each week for two consecutive weeks before the day of hearing in *a* [some] newspaper having general circulation in the county or counties in which the district is located. The first publication shall be 30 days before the day of the hearing.

(c) The commission shall give notice of the hearing by first class mail addressed to the directors of the district according to the last record on file with the executive director.

Sec. *36.306* [36.303]. INVESTIGATION. The executive director shall investigate the facts and circumstances of *any violations of any rule or order of the commission or any provisions of this chapter and shall prepare and file a written report with the commission and district and include any actions the executive director believes the commission should take under Section 36.303*.

Sec. *36.307. ORDER OF DISSOLUTION OF BOARD. If the commission enters an order to dissolve the board, the commission shall notify the county commissioners court of each county which contains territory in the district and the commission shall provide that temporary directors be appointed under Section 36.016 to serve until an election for a new board can be held under Section 36.017, provided, however, that district confirmation shall not be required for continued existence of the district and shall not be an issue in the election* [the district to be dissolved and the result of the investigation shall be included in a written report].

[Sec. 36.304. ORDER OF DISSOLUTION. The commission may enter an order dissolving the district at the conclusion of the hearing if it finds that the district has performed none of the functions for which it was created for a period of three consecutive years before the day of the proceeding and that the district has no outstanding bonded indebtedness.]

Sec. *36.308* [36.305]. CERTIFIED COPY OF ORDER. The commission shall file a certified copy of the order of dissolution of the district in the deed records of the county or counties in which the district is located. If the district was created by a special Act of the legislature, the commission shall file a certified copy of the order of dissolution with the secretary of state.

Sec. *36.309* [36.306]. APPEALS. [(a)] Appeals from *any* [a] commission order [dissolving a district] shall be filed and heard in the district court of any of the counties in which the land is located.

[(b) The trial on appeal shall be de novo and the substantial evidence rule shall not apply.]

Sec. *36.310* [36.307]. ASSETS ESCHEAT [TO STATE]. Upon the dissolution of a district by the commission, all assets of the district shall *be sold at public auction and the proceeds given to the county if it is a single-county district. If it is a multicounty district, the proceeds shall be divided with the counties in proportion to the surface land area in each county served by the district* [escheat to the State of Texas. The assets shall be administered

~~by the state treasurer and shall be disposed of in the manner provided by Chapter 72, Property Code~~].

SECTION 4.37.  Subsection (b), Section 36.325, Water Code, is amended to read as follows:

(b) The petition must be signed by:

(1) a majority of the landowners in the territory;

(2) at least 50 landowners if the number of landowners is more than 50; or

(3) the commissioners court of the county in which the area is located if the area is identified as a *priority groundwater management* [critical] area or includes the entire county.  The petition must describe the land by legal description or by metes and bounds or by lot and block number if there is a recorded plat of the area to be included in the district.

SECTION 4.38.  Section 36.331, Water Code, is amended to read as follows:

Sec. 36.331.  ANNEXATION OF NONCONTIGUOUS TERRITORY.  Land not contiguous to the existing boundaries of a district may not be added to or annexed to a district unless the land is located either within the same management area, *priority groundwater management* [critical] area, or a groundwater subdivision designated by the commission or its predecessors.

SECTION 4.39.  Chapter 36, Water Code, is amended by adding Subchapter L to read as follows:

### SUBCHAPTER L.  GROUNDWATER DISTRICT LOAN ASSISTANCE FUND

*Sec. 36.371.  GROUNDWATER DISTRICT LOAN ASSISTANCE FUND.  (a) The groundwater district loan assistance fund is created, to be funded by direct appropriation and by the Texas Water Development Board from the water assistance fund.*

*(b) Repayments of loans shall be deposited in the water assistance fund.*

*Sec. 36.372.  FINANCIAL ASSISTANCE.  (a) The loan fund may be used by the Texas Water Development Board to provide loans to newly confirmed districts and legislatively created districts that do not require a confirmation election to pay for their creation and initial operations.*

*(b) The Texas Water Development Board shall establish rules for the use and administration of the loan fund.*

*Sec. 36.373.  APPLICATION FOR ASSISTANCE.  (a) In an application to the Texas Water Development Board for financial assistance from the loan fund, the applicant shall include:*

*(1) the name of the district and its board members;*

*(2) a citation of the law under which the district operates and was created;*

*(3) a description of the initial operations;*

*(4) the total start-up cost of the initial operations;*

*(5) the amount of state financial assistance requested;*

*(6) the plan for repaying the total cost of the loan;  and*

*(7) any other information the Texas Water Development Board may require to perform its duties and protect the public interest.*

*(b) The Texas Water Development Board may not accept an application for a loan from the loan fund unless it is submitted in affidavit form by the applicant's board.  The Texas Water Development Board shall prescribe the affidavit form in its rules.*

*(c) The rules implementing this section shall not restrict or prohibit the Texas Water Development Board from requiring additional factual material from an applicant.*

*Sec. 36.374.  APPROVAL OF APPLICATION.  The Texas Water Development Board, by resolution, may approve an application if it finds that:*

*(1) granting financial assistance to the applicant will serve the public interest;  and*

*(2) the revenue pledged by the applicant from district taxes and fees and other sources will be sufficient to meet all the obligations assumed by the applicant.*

SECTION 4.40. Subsection (g), Section 151.318, Tax Code, is amended to read as follows:

(g) Each person engaged in manufacturing, processing, fabricating, or repairing tangible personal property for ultimate sale is entitled to a refund or a reduction in the amount of tax imposed by this chapter as provided by Subsection (h) for the purchase of machinery, equipment, and replacement parts or accessories with a useful life in excess of six months if the equipment is:

(1) used or consumed in or during the actual manufacturing, processing, fabrication, or repair of tangible personal property for ultimate sale, and the use or consumption of the property is necessary or essential to the manufacturing, processing, fabrication, or repair operation, or to a pollution control process; or

(2) specifically installed to:

(A) reduce water use and wastewater flow volumes from the manufacturing, processing, fabrication, or repair operation;

(B) reuse and recycle wastewater streams generated within the manufacturing, processing, fabrication, or repair operation; or

(C) treat wastewater from another industrial or municipal source for the purpose of replacing existing freshwater sources in the manufacturing, processing, fabrication, or repair operation.

SECTION 4.41. Subchapter D, Chapter 5, Water Code, is amended by adding Section 5.1035 to read as follows:

*Sec. 5.1035. RULES REGARDING DRINKING-WATER STANDARDS. Before adopting rules regarding statewide drinking-water standards, the commission shall hold public meetings, if requested, at its regional offices to allow municipalities, water supply corporations, and other interested persons to submit data or comments concerning the proposed drinking-water standards.*

SECTION 4.42. Section 5.235, Water Code, is amended by adding Subsection (o) to read as follows:

*(o) A fee imposed under Subsection (j) of this section for the use of saline tidal water for industrial processes shall be $1 per acre-foot of water diverted for the industrial process, not to exceed a total fee of $5,000.*

SECTION 4.43. Subsection (a), Section 26.121, Water Code (effective until delegation of NPDES permit authority), is amended to read as follows:

(a) Except as authorized by a rule, permit, or order issued by the commission, no person may:

(1) discharge sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state;

(2) discharge other waste into or adjacent to any water in the state which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state, unless the discharge complies with the person's:

(A) certified water quality management plan approved by the State Soil and Water Conservation Board as provided by Section 201.026, Agriculture Code; or

(B) water pollution and abatement plan approved by the commission; or

(3) commit any other act or engage in any other activity which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state, unless the activity is under the jurisdiction of the Parks and Wildlife Department, the General Land Office, or the Railroad Commission of Texas, in which case this subdivision does not apply.

SECTION 4.44. Subsection (a), Section 26.121, Water Code (effective upon delegation of NPDES permit authority), is amended to read as follows:

(a) Except as authorized by the commission, no person may:

(1) discharge sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state;

(2) discharge other waste into or adjacent to any water in the state which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state, unless the discharge complies with a person's:

*(A)* certified water quality management plan approved by the State Soil and Water Conservation Board as provided by Section 201.026, Agriculture Code; *or*

*(B) water pollution and abatement plan approved by the commission;* or

(3) commit any other act or engage in any other activity which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state, unless the activity is under the jurisdiction of the Parks and Wildlife Department, the General Land Office, or the Railroad Commission of Texas, in which case this subdivision does not apply.

SECTION 4.45. Subchapter D, Chapter 51, Water Code, is amended by adding Section 51.196 to read as follows:

*Sec. 51.196. DEVELOPMENT OF UNDERGROUND WATER BY CERTAIN DISTRICTS. A conservation and reclamation district created by special law under the authority of Section 59, Article XVI, Texas Constitution, and designated as a municipal water district to which the administrative and taxing provisions applicable to districts governed by this chapter apply, may develop or otherwise acquire underground sources of water, notwithstanding a provision in that district's special law otherwise prohibiting the development of acquisition of underground water.*

SECTION 4.46. Subchapter L, Chapter 51, Water Code, is amended by adding Section 51.534 to read as follows:

*Sec. 51.534. ADDITION OF LAND SUBJECT TO WATER QUALITY PLAN TO DEFINED AREA. The procedures of Section 49.301 may be used to add land to a defined area created under this subchapter. The land must be included in the district and subject to a water quality plan approved by the commission but is not required to be contiguous to the defined area. Notwithstanding any law to the contrary, the procedures of Section 49.301 shall apply to districts operating under Chapter 49.*

SECTION 4.47. Subsections (a) and (c), Section 401.002, Local Government Code, are amended to read as follows:

(a) A home-rule municipality may prohibit the pollution *or degradation* of and may police a stream, drain, *recharge feature, recharge area,* or tributary that may constitute *or recharge* the source of water supply of any municipality.

(c) The authority granted by this section may be exercised inside [or outside] the municipality's boundaries *or inside the municipality's extraterritorial jurisdiction or outside the municipality's extraterritorial jurisdiction only if required to meet other state or federal requirements. The authority granted by this section for the protection of recharge, recharge areas, or recharge features of groundwater aquifers may be exercised outside the municipality's boundaries and within the extraterritorial jurisdiction provided the municipality exercising such authority has a population greater than 750,000 and the groundwater constitutes more than 75 percent of the municipality's source of water supply.*

SECTION 4.48. (a) Sections 35.010, 35.011, and 35.016, Water Code, are repealed.

(b) Section 5.02, Chapter 133, Acts of the 60th Legislature, Regular Session, 1985, is repealed.

SECTION 4.49. (a) In this section, "district" means a groundwater conservation district created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, that has the authority to regulate the spacing of water wells, the production from water wells, or both.

(b) Notwithstanding the time limitation under Subsection (a), Section 36.1072, Water Code, as added by this Act, and notwithstanding any provision to the contrary in prior law, a district which was created or, if the district required a confirmation election, a district whose creation was confirmed before the effective date of this Act shall submit a management plan for

certification under Section 36.1072, Water Code, as added by this Act, to the Texas Water Development Board not later than September 1, 1998.

(c) Notwithstanding any provision to the contrary in prior law and in addition to existing powers and duties, a district that was created by special law, or whose creation was confirmed by an election required by the special law, before the effective date of this Act:

(1) in deciding whether or not to issue a permit and in setting the terms of the permit, shall consider matters set forth under Subsections (d) and (e), Section 36.113, Water Code, as amended by this Act, including, without limitation, whether the proposed use of water is consistent with the district's certified water management plan; and

(2) may use funds obtained from permit fees collected pursuant to the special law for any purpose consistent with the district's certified water management plan including, without limitation, making grants, loans, or contractual payments to achieve, facilitate, or expedite reductions in groundwater pumping or the development or distribution of alternative water supplies.

SECTION 4.50. An area designated as a critical area under Chapter 35, Water Code, as it existed before the effective date of this Act, or under other prior law, shall be known and referred to as a priority groundwater management area on or after the effective date of this Act.

SECTION 4.51. Not later than September 1, 1998, the Texas Natural Resource Conservation Commission must, under Chapter 35, Water Code, as amended by this Act, make all designations of priority groundwater management areas for which critical area reports were required to have been completed before the effective date of this Act under Section 35.007, Water Code, as that section existed immediately before the effective date of this Act.

### ARTICLE 5. FINANCIAL ASSISTANCE FOR WATER NEEDS AND CONSERVATION

SECTION 5.01. Section 15.431, Water Code, is amended by amending Subsection (d) and adding Subsection (g) to read as follows:

(d) Money appropriated by the legislature to be maintained as principal in the fund, $10 million of the money transferred to that fund by H.B. No. 2, Acts of the 69th Legislature, Regular Session, 1985, and half of the money earned as interest on the money held as principal in the agricultural trust fund shall be maintained as principal. Money maintained as principal in the agricultural trust fund may [not] be *used by the board to make conservation loans to borrower districts and loans to lender districts for the purposes listed in Section 17.895 of this code. Loans and conservation loans made under this subchapter are subject to the provisions of Sections 17.896 through 17.903 of this code. Repayments of principal and interest on loans and conservation loans made under this subchapter shall be deposited in the agricultural trust fund* [spent for any purpose].

*(g) In this section, "borrower district," "conservation loan," "individual borrower," "lender district," and "loan" have the meanings assigned those terms by Section 17.871 of this code.*

SECTION 5.02. Section 16.189, Water Code, is amended to read as follows:

Sec. 16.189. LEASE PAYMENTS. In leasing a state facility for a term of years, the board shall require [annual] payments *that will recover over the lease period* not less than the total of:

(1) *all* [the annual] principal and interest requirements applicable to the debt incurred by the state in acquiring the facility; and

(2) the state's [annual] cost for operation, maintenance, and rehabilitation of the facility.

SECTION 5.03. Chapter 17, Water Code, is amended by adding Subchapter L to read as follows:

*SUBCHAPTER L. WATER FINANCIAL ASSISTANCE BOND PROGRAM*

*Sec. 17.951. DEFINITIONS. In this subchapter:*

*(1) "Fund" means the Texas Water Development Fund II.*

*(2) "Resolution" means any resolution or order approved by the board authorizing the issuance of water financial assistance bonds.*

*Sec. 17.952. ISSUANCE OF WATER FINANCIAL ASSISTANCE BONDS. The board by resolution may provide for the issuance of water financial assistance bonds, which shall be general obligation bonds of the state, in an aggregate principal amount not to exceed the principal amount authorized to be issued by Section 49-d-8, Article III, Texas Constitution.*

*Sec. 17.953. CONDITIONS FOR ISSUANCE OF WATER FINANCIA'. ASSISTANCE BONDS. (a) Water financial assistance bonds may be issued as various series and issues.*

*(b) Water financial assistance bonds may mature, serially or otherwise, not later than 50 years after the date on which they are issued.*

*(c) Water financial assistance bonds may be issued as bonds, notes, or other obligations as permitted by law and may be in the form and denominations and be issued in the manner and under the terms, conditions, and details as provided by resolution.*

*(d) Water financial assistance bonds may be sold at public or private sale at a price or prices and on terms determined by the board.*

*(e) Water financial assistance bonds shall be signed and executed as provided by resolution.*

*(f) Water financial assistance bonds may bear no interest or bear interest at a rate or rates determined in accordance with law.*

*(g) Rates of interest on water financial assistance bonds may be fixed, variable, floating, adjustable, or otherwise, as determined by the board or determined pursuant to any contractual arrangements approved by the board. The resolution may provide for the payment of interest at any time or the periodic determination of interest rates or interest rate periods.*

*Sec. 17.954. BOND ENHANCEMENT AGREEMENTS; PAYMENT OF EXPENSES. (a) The board at any time and from time to time may enter into one or more bond enhancement agreements that the board determines to be necessary or appropriate to place the obligation of the board, as represented by the water financial assistance bonds, in whole or in part, on the interest rate, currency, cash flow, or other basis desired by the board. A bond enhancement agreement is an agreement for professional services and shall contain the terms and conditions and be for the period that the board approves.*

*(b) The fees and expenses of the board in connection with the issuance of water financial assistance bonds and the providing of financial assistance to political subdivisions may be paid from money in the fund, provided that any payments due from the board under a bond enhancement agreement, other than fees and expenses, that relate to the payment of debt service on water financial assistance bonds constitute payments of principal of and interest on the water financial assistance bonds.*

*(c) Bond enhancement agreements may include, on terms and conditions approved by the board, interest rate swap agreements; currency swap agreements; forward payment conversion agreements; agreements providing for payments based on levels of or changes in interest rates or currency exchange rates; agreements to exchange cash flows or a series of payments; agreements, including options, puts, or calls, to hedge payment, currency, rate, spread, or other exposure; or other agreements that further enhance the marketability, security, or creditworthiness of water financial assistance bonds.*

*Sec. 17.955. PERSONS DESIGNATED TO ACT AS AGENTS OF BOARD. (a) In the resolution the board may delegate authority to one or more officers, employees, or agents designated by the board to act on behalf of the board during the time any series of water financial assistance bonds are outstanding to:*

*(1) fix dates, prices, interest rates, amortization schedules, redemption features, and interest payment periods;*

*(2) perform duties and obligations of the board under a bond enhancement agreement; and*

*(3) perform other procedures specified in the resolution.*

*(b) The person designated by the board may adjust the interest on water financial assistance bonds and perform all duties described in a bond enhancement agreement as necessary to permit the water financial assistance bonds to be sold or resold at par in conjunction with secondary market transactions.*

*Sec. 17.956.　TEXAS WATER DEVELOPMENT FUND II.　The fund is a special fund in the state treasury, and all water financial assistance bond proceeds shall be deposited in the state treasury to the credit of the fund.　The fund shall contain a "state participation account," an "economically distressed areas program account," and a "financial assistance account," and proceeds from the sale of water financial assistance bonds issued for the purpose of providing financial assistance to political subdivisions shall be credited to such accounts as provided by resolution by the board.　By resolution, the board may create additional accounts within the fund as the board determines are necessary or convenient for the administration of the fund.*

*Sec. 17.957.　STATE PARTICIPATION ACCOUNT.　(a) The Texas Water Development Fund II state participation account, referred to as the "state participation account," is an account established within the fund in the state treasury.　Transfers shall be made from this account as provided by this subchapter.*

*(b) The state participation account is composed of:*

*(1) money and assets attributable to water financial assistance bonds designated by the board as issued for projects described in Section 16.131;*

*(2) money from the sale, transfer, or lease of a project described in Subdivision (1) that was acquired, constructed, reconstructed, developed, or enlarged with money from the state participation account;*

*(3) payments received under a bond enhancement agreement with respect to water financial assistance bonds designated by the board as issued for projects described in Section 16.131;*

*(4) investment income earned on money on deposit in the state participation account; and*

*(5) any other funds, regardless of their source, that the board directs be deposited to the credit of the state participation account.*

*(c) Money on deposit in the state participation account may be used by the board for projects described in Section 16.131 in the manner that the board determines necessary for the administration of the fund.*

*Sec. 17.958.　ECONOMICALLY DISTRESSED AREAS PROGRAM ACCOUNT.　(a) The Texas Water Development Fund II economically distressed areas program account, referred to as the "economically distressed areas program account," is an account established within the fund in the state treasury.　Transfers shall be made from this account as provided by this subchapter.*

*(b) The economically distressed areas program account is composed of:*

*(1) money and assets attributable to water financial assistance bonds designated by the board as issued for projects described in Subchapter K;*

*(2) money provided by the federal government, the state, political subdivisions, and private entities for the purpose of paying debt service on water financial assistance bonds issued for purposes provided by Subchapter K;*

*(3) payments received under a bond enhancement agreement with respect to water financial assistance bonds designated by the board as issued for purposes provided by Subchapter K;*

*(4) investment income earned on money on deposit in the economically distressed areas program account; and*

*(5) any other funds, regardless of their source, that the board directs be deposited to the credit of the economically distressed areas program account.*

*(c) Money on deposit in the economically distressed areas program account may be used by the board for purposes provided by Subchapter K in the manner that the board determines necessary for the administration of the fund.*

*Sec. 17.959. FINANCIAL ASSISTANCE ACCOUNT. (a) The Texas Water Development Fund II water financial assistance account, referred to as the "financial assistance account," is an account established within the fund in the state treasury. Transfers shall be made from this account as provided by this subchapter.*

*(b) The financial assistance account is composed of:*

*(1) money and assets attributable to water financial assistance bonds designated by the board as issued for purposes described in Section 49-d-8, Article III, Texas Constitution, other than for purposes described in Sections 17.957 and 17.958;*

*(2) payments received under a bond enhancement agreement with respect to water financial assistance bonds designated by the board as issued for purposes described in Section 49-d-8, Article III, Texas Constitution, other than for purposes described in Sections 17.957 and 17.958;*

*(3) investment income earned on money on deposit in the financial assistance account; and*

*(4) any other funds, regardless of their source, that the board directs be deposited to the credit of the financial assistance account.*

*(c) Money on deposit in the financial assistance account may be used by the board for any one or more of the purposes described in Section 49-d-8, Article III, Texas Constitution, other than for purposes described in Sections 17.957 and 17.958, in the manner that the board determines necessary for the administration of the fund.*

*Sec. 17.960. BOND RESOLUTIONS. (a) In the resolution, the board may make additional covenants with respect to water financial assistance bonds and may provide for:*

*(1) the flow of funds;*

*(2) the establishment of accounts and subaccounts within the fund that the board determines are necessary for the administration of the fund;*

*(3) at the discretion of the board, the payment of fees and expenses of the board in connection with providing financial assistance to political subdivisions as the board determines are necessary for the administration of the fund;*

*(4) the maintenance, investment, and management of money within the fund and any accounts established by resolution by the board; and*

*(5) any other provisions and covenants that the board determines are necessary for the administration of the fund.*

*(b) The board may invest and reinvest money in the fund and any account therein in any obligations or securities as provided by the resolution or by rule adopted by the board.*

*(c) The board may adopt and have executed other proceedings, agreements, or trust agreements or instruments necessary in the issuance of water financial assistance bonds, including, without limitation, bond enhancement agreements.*

*Sec. 17.961. TRANSFERS TO REVOLVING FUNDS. (a) In order to implement and administer a revolving loan program established under Title VI of the Federal Water Pollution Control Act (33 U.S.C. Section 1381 et seq.), the board may direct the comptroller to transfer amounts from the financial assistance account to the state water pollution control revolving fund created by Section 15.601 to provide financial assistance pursuant to this subchapter.*

*(b) In order to implement and administer a revolving loan program established by any other federal legislation, including, without limitation, Title XIV of the federal Public Health Service Act, or any federal agency program under which an additional state revolving fund, as defined in Section 15.602, has been established, the board may direct the comptroller to transfer amounts from the financial assistance account to such additional state revolving fund to provide financial assistance pursuant to this subchapter.*

*(c) The board shall use the state water pollution control revolving fund in accordance with Section 15.604(a)(4) and Section 603(d)(4), Federal Water Pollution Control Act (33 U.S.C. Section 1383), as a source of revenue to be deposited in accordance with this subchapter for the payment of principal and interest on water financial assistance bonds issued by the board, the proceeds of which are deposited into the state water pollution control revolving*

fund, and to make payments under a bond enhancement agreement with respect to principal or interest on the water financial assistance bonds.

(d) In the event amounts are transferred to any additional state revolving fund, as defined in Section 15.602, pursuant to Subsection (b), the board shall, to the extent permitted by the federal legislation or federal agency program under which such additional state revolving fund was established, use the additional state revolving fund as a source of revenue to be deposited in accordance with this subchapter for the payment of principal and interest on water financial assistance bonds issued by the board, the proceeds of which are deposited into the additional state revolving fund, and to make payments under a bond enhancement agreement with respect to principal or interest on the water financial assistance bonds.

Sec. 17.962. STATE APPROVALS. (a) Water financial assistance bonds may not be issued under this subchapter unless such issuance has been reviewed and approved by the bond review board.

(b) The proceedings relating to the water financial assistance bonds issued under this subchapter are subject to review and approval by the attorney general in the same manner and with the same effect as provided by Chapter 656, Acts of the 68th Legislature, Regular Session, 1983 (Article 717q, Vernon's Texas Civil Statutes).

(c) After approval by the attorney general of the proceedings relating to water financial assistance bonds issued under this subchapter, registration of the proceedings by the comptroller, and delivery of the water financial assistance bonds to the purchasers, the water financial assistance bonds are incontestable and constitute general obligations of the state.

Sec. 17.963. PAYMENT OF BOARD OBLIGATIONS. (a) The board shall cooperate with the comptroller to develop procedures for the payment of principal and interest on water financial assistance bonds and any obligation under a bond enhancement agreement, as the same become due and owing.

(b) If there is not enough money in any account of the fund available to pay the principal and interest on water financial assistance bonds issued for such account, including money to make payments by the board under a bond enhancement agreement with respect to principal or interest on such water financial assistance bonds, the board shall notify the comptroller of such occurrence, and the comptroller shall transfer out of the first money coming into the state treasury not otherwise appropriated by the constitution the amount required to pay the obligations of the board that are due and owing. The comptroller shall make the transfers required by Section 49-d-8, Article III, Texas Constitution, and this subchapter in the manner specified in the resolution.

Sec. 17.964. ELIGIBLE SECURITY. Water financial assistance bonds are eligible to secure deposits of public funds of the state and political subdivisions of the state. Water financial assistance bonds are lawful and sufficient security for deposits to the extent of their face value.

Sec. 17.965. LEGAL INVESTMENTS. Water financial assistance bonds are legal and authorized investments for:

(1) banks;

(2) savings banks;

(3) trust companies;

(4) savings and loan associations;

(5) insurance companies;

(6) fiduciaries;

(7) trustees;

(8) guardians; and

(9) sinking funds and other public funds of the state and its agencies and of political subdivisions of the state.

Sec. 17.966. MUTILATED, LOST, OR DESTROYED BONDS. The board may provide for the replacement of mutilated, lost, or destroyed water financial assistance bonds.

*Sec. 17.967. REFUNDING BONDS. (a) The board by resolution may provide for the issuance of water financial assistance bonds to refund outstanding bonds and water financial assistance bonds issued under this chapter and federal contractual obligations incurred under Section 49-d, Article III, Texas Constitution.*

*(b) The board may sell the refunding water financial assistance bonds and use the proceeds to retire any of the outstanding obligations described in Subsection (a), exchange the refunding water financial assistance bonds for the outstanding bonds or water financial assistance bonds, or refund any of the outstanding obligations described in Subsection (a) in the manner provided by any other applicable statute, including Chapter 503, Acts of the 54th Legislature, 1955 (Article 717k, Vernon's Texas Civil Statutes), and Chapter 784, Acts of the 61st Legislature, Regular Session, 1969 (Article 717k-3, Vernon's Texas Civil Statutes).*

*Sec. 17.968. SALE OF POLITICAL SUBDIVISION BONDS BY THE BOARD; USE OF PROCEEDS. (a) The board may sell or dispose of political subdivision bonds purchased with money in the fund to any person, including the Texas Water Resources Finance Authority, and the board, in such manner as it shall determine, may apply the proceeds of the sale of political subdivision bonds held by the board to:*

*(1) pay debt service on water financial assistance bonds issued under this subchapter; or*

*(2) provide financial assistance to political subdivisions for any one or more of the purposes authorized by Section 49-d-8, Article III, Texas Constitution.*

*(b) The board shall sell the political subdivision bonds at the price and under the terms that it determines to be reasonable.*

*Sec. 17.969. TAX EXEMPT BONDS. Since the board is performing an essential governmental function in the exercise of the powers conferred on it by this chapter, water financial assistance bonds issued under this subchapter and the interest and income from the water financial assistance bonds, including any profit made on the sale of water financial assistance bonds, and all fees, charges, gifts, grants, revenues, receipts, and other money received or pledged to pay or secure the payment of water financial assistance bonds are free from taxation and assessments of every kind by this state and any city, county, district, authority, or other political subdivision of this state.*

*Sec. 17.970. ENFORCEMENT BY MANDAMUS. Payment of water financial assistance bonds and obligations incurred under bond enhancement agreements and performance of official duties prescribed by Section 49-d-8, Article III, Texas Constitution, and this subchapter may be enforced in a court of competent jurisdiction by mandamus or other appropriate proceedings.*

*Sec. 17.971. SUBCHAPTER CUMULATIVE OF OTHER LAWS. (a) This subchapter is cumulative of other laws on the subject, and the board may use provisions of other applicable laws in the issuance of water financial assistance bonds and the execution of bond enhancement agreements, but this subchapter is wholly sufficient authority for the issuance of water financial assistance bonds, the execution of bond enhancement agreements, and the performance of all other acts and procedures authorized by this subchapter.*

*(b) In addition to other authority granted by this subchapter, the board may exercise the authority granted to the governing body of an issuer with regard to the issuance of obligations under Chapter 656, Acts of the 68th Legislature, Regular Session, 1983 (Article 717q, Vernon's Texas Civil Statutes).*

*(c) In exercising the powers granted to the board under this subchapter, the board may exercise any powers granted to it under this chapter and Chapter 16 including the powers described in Subchapters D, E, F, G, and K, notwithstanding any provision in this chapter or Chapter 16 that may be inconsistent with or in conflict with the provisions of this subchapter as a result of the establishment of the fund as a fund separate and distinct from the existing Texas Water Development Fund, it being the intent of the legislature that the financial assistance made available to political subdivisions under this subchapter, in pursuance of the authority granted by Section 49-d-8, Article III, Texas Constitution, be provided by the board in the manner the board deems necessary to achieve the purposes of Section 49-d-8, Article III, Texas Constitution, and notwithstanding any other existing provisions in this chapter or Chapter 16, the provisions of this chapter and Chapter 16 shall*

*be inclusive of the provisions of this subchapter and Section 49-d-8, Article III, Texas Constitution.*

SECTION 5.04. Subdivision (7), Section 17.001, Water Code, is amended to read as follows:

(7) "Water supply project" means:

(A) any engineering undertaking or work to conserve and develop [surface or subsurface] water resources of the state, including the control, storage, and preservation of its storm water and floodwater and the water of its rivers and streams for all useful and lawful purposes by the acquisition, improvement, extension, or construction of dams, reservoirs, *brush control, precipitation enhancement, desalinization,* and other water storage *and conservation* projects, which may include flood storage, including underground storage projects, filtration and water treatment plants, including any system necessary to transport water from storage to points of distribution or from storage to filtration and treatment plants, including facilities for transporting water therefrom to wholesale purchasers or to retail purchasers as authorized by Section 17.072(c) of this code, by the acquisition, by purchase of rights in [underground] water, by the drilling of wells, or for any one or more of these purposes or methods; [or]

(B) any engineering undertaking or work outside the state to provide for the maintenance and enhancement of the quality of water by eliminating saline inflow through well pumping and deep well injection of brine *if such undertaking or work results in water being available for use in or for the benefit of Texas;*

(C) *any undertaking or work by Texas political subdivisions to conserve, convey, or develop water resources in areas outside Texas if such undertaking or work results in water being available for use in or for the benefit of Texas; or*

(D) *a channel storage reservoir located on an international boundary between Texas and Mexico that develops the water resources of Texas and the research, planning, and actions necessary to obtain regulatory authority at the local, state, and federal level.*

SECTION 5.05. Section 17.001, Water Code, is amended by amending Subdivision (17) and adding Subdivision (25) to read as follows:

(17) "Financial assistance" means any loan of funds from the water supply account, the water quality enhancement account, or the flood control account to a political subdivision for construction of a water supply project, *including projects referenced in the state water plan,* treatment works, or flood control measures through the purchase of bonds or other obligations of the political subdivision, *and any loan of funds the source of which is the proceeds from water financial assistance bonds.*

*(25) "Water financial assistance bonds" means the Texas Water Development Bonds authorized to be issued by Section 49-d-8, Article III, Texas Constitution, and dedicated to use for the purposes described in that section.*

SECTION 5.06. Section 17.011, Water Code, is amended by adding Subsection (c) to read as follows:

*(c) Notwithstanding any other provision of this section, the board by resolution may issue water financial assistance bonds for any one or more of the purposes described in Section 49-d-8, Article III, Texas Constitution, in an aggregate principal amount not to exceed the amount of bonds authorized by Section 49-d-8, Article III, Texas Constitution, in accordance with the provisions of Subchapter L.*

SECTION 5.07. Section 17.0111, Water Code, is amended to read as follows:

Sec. 17.0111. DEDICATION OF CERTAIN BONDS. *No more than $250 million in principal* [Fifty percent of the] amount of bonds authorized by Article III, Section 49-d-7, of the Texas Constitution, *and issued under either that section or Article III, Section 49-d-8, of the Texas Constitution, may be* [is] dedicated to the purposes provided by Subchapter K [of this chapter].

SECTION 5.08. Section 17.182, Water Code, is amended to read as follows:

Sec. 17.182. PROCEEDS FROM SALE. Unless used to pay debt service on bonds issued under this chapter, the proceeds from the sale of political subdivision bonds held by the

board *either* shall be credited to the account from which financial assistance was made to the political subdivision, except that accrued interest shall be credited to the interest and sinking fund, *or shall be deposited to the credit of the Texas Water Development Fund II, established within the state treasury pursuant to Section 49-d-8, Article III, Texas Constitution. However, no such proceeds shall be deposited to the credit of the Texas Water Development Fund II unless the executive administrator certifies to the board that the transfer of such proceeds into the Texas Water Development Fund II will not cause the board, in the fiscal year the transfer is made, to direct the comptroller to transfer out of the first money coming into the state treasury during that fiscal year funds sufficient for the payment of principal of or interest on water development bonds, other than water development bonds issued for the purposes described in Subsection (e), Section 49-d-7, Article III, Texas Constitution, coming due in that fiscal year.*

SECTION 5.09.  Section 17.278, Water Code, is amended to read as follows:

Sec. 17.278.  FINDINGS REGARDING PERMITS.  If an application includes a proposal for a wastewater treatment plant, the board may not deliver funds for the wastewater treatment plant until the applicant has obtained a permit for the construction and operation of the plant and approval of the plans and specifications for the plant from the commission.  *If an application includes a proposal for a wastewater treatment plant that is located outside the jurisdiction of this state and that is not subject to the permitting authority of the commission, the board may not deliver funds for the wastewater treatment plant until after the board reviews the plans and specifications in coordination with the commission and finds that the wastewater treatment plant is capable of producing effluent that will meet federal and Texas-approved water quality standards and if effluent produced will result in water being available for use in or for the benefit of Texas.*

SECTION 5.10.  Sections 44.007 through 44.010, Agriculture Code, are amended to read as follows:

Sec. 44.007.  LINKED DEPOSIT PROGRAM.  (a) The board shall establish a linked deposit program to encourage commercial lending for the enhanced production, processing, and marketing of certain agricultural crops and for the *financing* [purchase] of water conservation *projects or* equipment for agricultural production purposes.

(b) The board shall promulgate rules for the loan portion of the linked deposit program. The rules must include:

(1) a list of the categories of crops customarily grown in Texas;

(2) a list of crops that are alternative agricultural crops;

(3) a list of crops the production of which has declined markedly because of natural disasters; and

(4) identification of *projects and* [the] types of equipment considered as water conservation *projects or* equipment for agricultural production purposes.

(c) In order to participate in the linked deposit program, an eligible lending institution may solicit loan applications from eligible borrowers.

(d) After reviewing an application and determining that the applicant is eligible and creditworthy, the eligible lending institution shall send the application for a linked deposit loan to the board or *the administrator of the Texas Agricultural Finance Authority.*

(e) The eligible lending institution shall certify the interest rate applicable to the specific eligible borrower and attach it to the application sent to the board or *the administrator of the Texas Agricultural Finance Authority.*

(f) After reviewing each linked deposit loan application, the board shall recommend to the *comptroller* [state treasurer] the acceptance or rejection of the application.

(g) After acceptance of the application, the *comptroller* [state treasurer] shall place a linked deposit with the applicable eligible lending institution for the period the *comptroller* [treasurer] considers appropriate.  The *comptroller* [state treasurer] may not place a deposit for a period extending beyond the state fiscal biennium in which it is placed.  Subject to the limitation described by Section 44.010 of this chapter, the *comptroller* [treasurer] may place time deposits at an interest rate described by Section 44.001(5)(A) of this chapter, notwithstanding any order of the State Depository Board to the contrary.

(h) Before the placing of a linked deposit, the eligible lending institution and the state, represented by the *comptroller* [state treasurer] and the board, shall enter into a written deposit agreement containing the conditions on which the linked deposit is made.

(i) If a lending institution holding linked deposits ceases to be a state depository, the *comptroller* [state treasurer] may withdraw the linked deposits.

(j) The board may adopt rules that create a procedure for determining priorities for loans granted under this chapter. Each rule adopted must state the policy objective of the rule. The policy objectives of the rules may include preferences to:

(1) achieve adequate geographic distribution of loans;

(2) assist certain industries;

(3) encourage certain practices including water conservation; and

(4) encourage value-added processing of agricultural products.

Sec. 44.008. COMPLIANCE. (a) On accepting a linked deposit, an eligible lending institution must loan money to eligible borrowers in accordance with the deposit agreement and this chapter. The eligible lending institution shall forward a compliance report to the board.

(b) The board shall monitor compliance with this chapter and inform the *comptroller* [state treasurer] of noncompliance on the part of an eligible lending institution.

Sec. 44.009. STATE LIABILITY PROHIBITED. The state is not liable to an eligible lending institution for payment of the principal, interest, or any late charges on a loan made to an eligible borrower. A delay in payment or default on a loan by an eligible borrower does not affect the validity of the deposit agreement. Linked deposits are not an extension of the state's credit within the meaning of any state constitutional prohibition.

Sec. 44.010. LIMITATIONS IN PROGRAM. (a) At any one time, not more than *$15* [$5] million, *of which $10 million may only be used to finance water conservation projects,* may be placed in linked deposits under this chapter.

(b) The maximum amount of a loan under this chapter to process and market Texas agricultural crops is $500,000. The maximum amount of a loan under this chapter to produce alternative agricultural crops in this state is $250,000. The maximum amount of a loan under this chapter to *finance* [purchase] water conservation *projects or* equipment for agricultural production purposes is $250,000.

(c) A loan granted pursuant to this chapter must be applied to the purchase or lease of land, equipment, seed, fertilizer, direct marketing facilities, or processing facilities, or to payment for professional services.

*(d) A loan granted pursuant to this chapter, when used to finance eligible water conservation projects or equipment, may be applied to existing debt resulting from the financing of water conservation projects or equipment for agricultural purposes as defined by board rule.*

SECTION 5.11. Subchapter B, Chapter 11, Tax Code, is amended by adding Section 11.32 to read as follows:

*Sec. 11.32. CERTAIN WATER CONSERVATION INITIATIVES. The governing body of a taxing unit by official action of the governing body adopted in the manner required by law for official actions may exempt from taxation part or all of the assessed value of property on which approved water conservation initiatives have been implemented. For purposes of this section, approved water conservation initiatives shall be designated pursuant to an ordinance or other law adopted by the governing unit.*

SECTION 5.12. Section 2155.444, Government Code, is amended by adding Subsection (d) to read as follows:

*(d) The commission and all state agencies making purchase of vegetation for landscaping purposes, including plants, shall give preference to Texas vegetation native to the region if the cost to the state is not greater and the quality is not inferior.*

SECTION 5.13. Subchapter E, Chapter 13, Water Code, is amended by adding Section 13.143 to read as follows:

*Sec. 13.143.  NOTICE OF WHOLESALE WATER SUPPLY CONTRACT.  A district or authority created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, a retail public utility, a wholesale water service, or other person providing a retail public utility with a wholesale water supply shall provide the commission with a certified copy of any wholesale water supply contract with a retail public utility within 30 days after the date of the execution of the contract.  The submission must include the amount of water being supplied, term of the contract, consideration being given for the water, purpose of use, location of use, source of supply, point of delivery, limitations on the reuse of water, and any other condition or agreement relating to the contract.*

## ARTICLE 6.  SMALL COMMUNITIES ASSISTANCE

SECTION 6.01.  Section 5.311, Water Code, is amended to read as follows:

Sec. 5.311.  DELEGATION OF RESPONSIBILITY.  (a) The commission may delegate to an administrative law judge of the State Office of Administrative Hearings the responsibility to hear any matter before the commission *and to issue interlocutory orders related to interim rates under Chapter 13.*

(b) *Except as provided in Subsection (a), the* [The] administrative law judge shall report to the commission on the hearing in the manner provided by law.

SECTION 6.02.  Subdivisions (11), (21), and (24), Section 13.002, Water Code, are amended to read as follows:

(11) "Member" means a person who holds a membership in a water supply or sewer service corporation and [who either receives water or sewer utility service from the corporation or] is a record owner of a fee simple title to property in an area served by a water supply or sewer service corporation *or a person who is granted a membership and who either currently receives or will be eligible to receive water or sewer utility service from the corporation.*  In determining member control of a water supply or sewer service corporation, a person is entitled to only one vote regardless of the number of memberships the person owns.

(21) "Service" means any act [done, rendered, or] performed, anything furnished or supplied, and any *facilities or lines committed or* [facility] used[, furnished, or supplied] by a *retail public* utility in the performance of its duties under this chapter te its patrons, employees, other *retail public* utilities, and the public, as well as the interchange of facilities between two or more *retail public* utilities.

(24) "Water supply or sewer service corporation" means a nonprofit[, member-owned, member-controlled] corporation organized and operating under Chapter 76, Acts of the 43rd Legislature, 1st Called Session, 1933 (Article 1434a, Vernon's Texas Civil Statutes) that provides potable water service or sewer service for compensation *and that has adopted and is operating in accordance with by-laws or articles of incorporation which ensure that it is member-owned and member-controlled.*  The term does not include a corporation that provides retail water or sewer service to a person who is not a member, except that the corporation may provide retail water or sewer service to a person who is not a member if the person only builds on or develops property to sell to another and the service is provided on an interim basis before the property is sold.

SECTION 6.03.  Section 13.181, Water Code, is amended to read as follows:

Sec. 13.181.  POWER TO ENSURE COMPLIANCE; RATE REGULATION.  *(a) Except for the provisions of Section 13.192, this subchapter shall apply only to a utility and shall not be applied to municipalities, counties, districts, or water supply or sewer service corporations.*

*(b)* Subject to this chapter, the commission has all authority and power of the state to ensure compliance with the obligations of utilities under this chapter.  For this purpose the regulatory authority may fix and regulate rates of utilities, including rules and regulations for determining the classification of customers and services and for determining the applicability of rates.  A rule or order of the regulatory authority may not conflict with the rulings of any federal regulatory body.  [Except Section 13.192, this subchapter shall apply only to a utility and shall not be applied to municipalities, counties, districts, or water supply or sewer service corporations.] The commission may adopt rules which authorize a utility which is permitted

under Section 13.242(c) to provide service without a certificate of public convenience and necessity to request or implement a rate increase and operate according to rules, regulations, and standards of service other than those otherwise required under this chapter provided that rates are just and reasonable for customers and the utility and that service is safe, adequate, efficient, and reasonable.

SECTION 6.04. Section 13.183, Water Code, is amended by adding Subsection (c) to read as follows:

*(c) To ensure that retail customers receive a higher quality or more reliable water or sewer service, to encourage regionalization, or to maintain financially stable and technically sound utilities, the regulatory authority may develop methodologies for water or sewer rates based on factors other than rate of return and those specified in Section 13.185. Overall revenues determined pursuant to an alternate methodology developed under this section must provide revenues to the utility that satisfy the requirements of Subsection (a). In determining to use alternate ratemaking methodologies, the regulatory authority shall assure that rates, operations, and services are just and reasonable to the consumers and to the utilities.*

SECTION 6.05. Subsection (a), Section 13.184, Water Code, is amended to read as follows:

*(a) Unless the commission establishes alternate rate methodologies in accordance with Section 13.183(c), the commission [The regulatory authority] may not prescribe any rate that will yield more than a fair return on the invested capital used and useful in rendering service to the public. The governing body of a municipality exercising its original jurisdiction over rates and services may use alternate ratemaking methodologies established by ordinance or by commission rule in accordance with Section 13.183(c). Unless the municipal regulatory authority uses alternate ratemaking methodologies established by ordinance or by commission rule in accordance with Section 13.183(c), it may not prescribe any rate that will yield more than a fair return on the invested capital used and useful in rendering service to the public.*

SECTION 6.06. Subsection (a), Section 13.185, Water Code, is amended to read as follows:

*(a) Unless alternate methodologies are adopted as provided in Sections 13.183(c) and 13.184(a), the* [The] *components of invested capital and net income shall be determined according to the rules stated in this section.*

SECTION 6.07. Subchapter G, Chapter 13, Water Code, is amended by adding Section 13.241 to read as follows:

*Sec. 13.241. GRANTING CERTIFICATES. (a) In determining whether to grant a certificate of public convenience and necessity, the commission shall ensure that the applicant possesses the financial, managerial, and technical capability to provide continuous and adequate service.*

*(b) For water utility service, the commission shall ensure that the applicant:*

*(1) is capable of providing drinking water that meets the requirements of Chapter 341, Health and Safety Code, and requirements of this code; and*

*(2) has access to an adequate supply of water.*

*(c) For sewer utility service, the commission shall ensure that the applicant is capable of meeting the commission's design criteria for sewer treatment plants and the requirements of this code.*

*(d) Before the commission grants a new certificate of convenience and necessity for an area which would require construction of a physically separate water or sewer system, the applicant must demonstrate that regionalization or consolidation with another retail public utility is not economically feasible.*

SECTION 6.08. Section 13.246, Water Code, is amended to read as follows:

Sec. 13.246. NOTICE AND HEARING; ISSUANCE OR REFUSAL; FACTORS CONSIDERED. (a) If an application for a certificate of public convenience and necessity is filed, the commission shall cause notice of the application to be given to affected parties and, if

requested, shall fix a time and place for a hearing and give notice of the hearing. Any person affected by the application may intervene at the hearing.

(b) The commission may grant applications and issue certificates only if the commission finds that a certificate is necessary for the service, accommodation, convenience, or safety of the public. The commission may issue a certificate as requested, or refuse to issue it, or issue it for the construction of only a portion of the contemplated system or facility or extension, or for the partial exercise only of the right or privilege *and may impose special conditions necessary to ensure that continuous and adequate service is provided.*

(c) Certificates of convenience and necessity shall be granted on a nondiscriminatory basis after consideration by the commission of the adequacy of service currently provided to the requested area, the need for additional service in the requested area, the effect of the granting of a certificate on the recipient of the certificate and on any retail public utility of the same kind already serving the proximate area, the ability of the applicant to provide adequate service, the feasibility of obtaining service from an adjacent retail public utility, the financial stability of the applicant, including, if applicable, the adequacy of the applicant's debt-equity ratio, environmental integrity, and the probable improvement of service or lowering of cost to consumers in that area resulting from the granting of the certificate.

*(d) The commission may require an applicant utility to provide a bond or other financial assurance in a form and amount specified by the commission to ensure that continuous and adequate utility service is provided.*

*(e) Where applicable, in addition to the other factors in this section the commission shall consider the efforts of the applicant to extend service to any economically distressed areas located within the service areas certificated to the applicant. For the purposes of this subsection, "economically distressed area" has the meaning assigned by Section 15.001.*

SECTION 6.09. Section 13.253, Water Code, is amended to read as follows:

Sec. 13.253. IMPROVEMENTS IN SERVICE; INTERCONNECTING SERVICE. *(a)* After notice and hearing, the commission may:

(1) order any retail public utility that is required by law to possess a certificate of public convenience and necessity *or any retail public utility that possesses a certificate of public convenience and necessity and is located in an affected county as defined in Section 16.341* to:

*(A)* provide specified improvements in its service in a defined area if service in that area is inadequate or is substantially inferior to service in a comparable area and it is reasonable to require the retail public utility to provide the improved service; *or*

*(B) develop, implement, and follow financial, managerial, and technical practices that are acceptable to the commission to ensure that continuous and adequate service is provided to any areas currently certificated to the retail public utility if the retail public utility has not provided continuous and adequate service to any of those areas and, for a utility, to provide financial assurance of the utility's ability to operate the system in accordance with applicable laws and rules, in the form of a bond or other financial assurance in a form and amount specified by the commission;*

(2) order two or more public utilities or water supply or sewer service corporations to establish specified facilities for [the] interconnecting service; [or]

*(3) order a public utility or water supply or sewer service corporation that has not demonstrated that it can provide continuous and adequate service from its drinking water source or sewer treatment facility to obtain service sufficient to meet its obligation to provide continuous and adequate service on at least a wholesale basis from another consenting utility service provider; or*

*(4)* issue an emergency order, with or without a hearing, under Section 13.041 [of this code].

*(b) If the commission has reason to believe that improvements and repairs to a water or sewer service system are necessary to enable a retail public utility to provide continuous and adequate service in any portion of its service area and the retail public utility has provided financial assurance under Section 341.0355, Health and Safety Code, or under this chapter, the commission, after providing to the retail public utility notice and an opportunity to be*

heard by the commissioners at a commission meeting, may immediately order specified improvements and repairs to the water or sewer system, the costs of which may be paid by the bond or other financial assurance in an amount determined by the commission not to exceed the amount of the bond or financial assurance. The order requiring the improvements may be an emergency order if it is issued after the retail public utility has had an opportunity to be heard by the commissioners at a commission meeting. After notice and hearing, the commission may require a retail public utility to obligate additional money to replace the financial assurance used for the improvements.

SECTION 6.10.   Section 13.254, Water Code, is amended to read as follows:

Sec. 13.254.   REVOCATION OR AMENDMENT OF CERTIFICATE.   (a) The commission at any time after notice and hearing may revoke or amend any certificate of public convenience and necessity with the written consent of the certificate holder or if it finds that:

(1) the certificate holder has never provided, is no longer providing, or has failed to provide continuous and adequate service in the area, or part of the area, covered by the certificate;

(2) in an affected county as defined in Section 16.341, the cost of providing service by the certificate holder is so prohibitively expensive as to constitute denial of service, provided that, for commercial developments or for residential developments started after September 1, 1997, in an affected county as defined in Section 16.341, the fact that the cost of obtaining service from the currently certificated retail public utility makes the development economically unfeasible does not render such cost prohibitively expensive in the absence of other relevant factors;

(3) the certificate holder has agreed in writing to allow another retail public utility to provide service within its service area, except for an interim period, without amending its certificate; or

(4) the certificate holder has failed to file a cease and desist action pursuant to Section 13.252 within 180 days of the date that it became aware that another retail public utility was providing service within its service area, unless the certificate holder demonstrates good cause for its failure to file such action within the 180 days.

(b) Upon written request from the certificate holder, the executive director may cancel the certificate of a utility or water supply corporation authorized by rule to operate without a certificate of public convenience and necessity under Section 13.242(c).

(c) If the certificate of any retail public utility is revoked or amended, the commission may require one or more retail public utilities with their consent to provide service in the area in question. The order of the commission shall not be effective to transfer property.

(d) A retail public utility may not in any way render retail water or sewer service directly or indirectly to the public in an area that has been decertified under this section without providing compensation for any property that the commission determines is rendered useless or valueless to the decertified retail public utility as a result of the decertification.

(e) The determination of the monetary amount of compensation, if any, shall be determined at the time another retail public utility seeks to provide service in the previously decertified area and before service is actually provided.

(f) The monetary amount shall be determined by a qualified individual or firm serving as independent appraiser agreed upon by the decertified retail public utility and the retail public utility seeking to serve the area. The determination of compensation by the independent appraiser shall be binding on the commission. The costs of the independent appraiser shall be borne by the retail public utility seeking to serve the area.

(g) For the purpose of implementing this section, the value of real property shall be determined according to the standards set forth in Chapter 21, Property Code, governing actions in eminent domain and the value of personal property shall be determined according to the factors in this subsection. The factors ensuring that the compensation to a retail public utility for the taking, damaging, or loss of personal property, including the retail public utility's business, is just and adequate shall at a minimum include: the impact on the existing indebtedness of the retail public utility and its ability to repay that debt; the value of the service facilities of the retail public utility located within the area in question;

*the amount of any expenditures for planning, design, or construction of service facilities that are allocable to service to the area in question; the amount of the retail public utility's contractual obligations allocable to the area in question; any demonstrated impairment of service or increase of cost to consumers of the retail public utility remaining after the decertification; the impact on future revenues and expenses of the retail public utility; necessary and reasonable legal expenses and professional fees; factors relevant to maintaining the current financial integrity of the retail public utility; and other relevant factors.*

*(h) The commission shall determine whether payment of compensation shall be in a lump sum or paid out over a specified period of time. If there were no current customers in the area decertified and no immediate loss of revenues or if there are other valid reasons determined by the commission, installment payments as new customers are added in the decertified area may be an acceptable method of payment.*

SECTION 6.11.   Section 13.301, Water Code, is amended to read as follows:

Sec. 13.301.   REPORT OF SALE, MERGER, ETC.; INVESTIGATION; DISALLOWANCE OF TRANSACTION.   (a) A utility or a water supply or sewer service corporation, *on or before the 120th day before the effective date of a sale, acquisition, lease, or rental of a water or sewer system that is required by law to possess a certificate of public convenience and necessity or the effective date of a merger or consolidation with such a utility or water supply or sewer service corporation,* shall:

(1) *file a written application with* [notify] the commission;  and

(2) [give public notice] unless public notice is waived by the executive director for good cause shown, *give public notice of the action* [at least 120 days before the effective date of any sale, acquisition, lease, or rental of any water or sewer system required by law to possess a certificate of public convenience and necessity or of any merger or consolidation with such a utility or water supply or sewer service corporation].

*(b) The commission may require that the person purchasing or acquiring the water or sewer system demonstrate adequate financial, managerial, and technical capability for providing continuous and adequate service to the requested area and any areas currently certificated to the person.*

*(c) If the person purchasing or acquiring the water or sewer system cannot demonstrate adequate financial capability, the commission may require that the person provide a bond or other financial assurance in a form and amount specified by the commission to ensure continuous and adequate utility service is provided.*

*(d)* The commission shall, with or without a public hearing, investigate the sale, acquisition, lease, or rental to determine whether the transaction will serve the public interest.

*(e)* [(e)] Before the expiration of the 120-day notification period, the executive director shall notify all known parties to the transaction of the executive director's decision whether to request that the commission hold a public hearing to determine if the transaction will serve the public interest.  The executive director may request a hearing if:

(1) the *application filed with* [notification to] the commission or the public notice was improper;

(2) the person purchasing or acquiring the water or sewer system *has not demonstrated adequate financial, managerial, and technical capability for providing continuous and adequate service to the service area being acquired and to any areas currently certificated to the person* [is inexperienced as a utility service provider];

(3) the person or an affiliated interest of the person purchasing or acquiring the water or sewer system has a history of:

(A) noncompliance with the requirements of the commission or the Texas Department of Health;  or

(B) [of] continuing mismanagement or misuse of revenues as a utility service provider;

(4) the person purchasing or acquiring the water or sewer system cannot demonstrate the financial ability to provide the necessary capital investment to ensure the provision of continuous and adequate service to the customers of the water or sewer system;  or

(5) there are concerns that the transaction may not serve the public interest, after the application of the considerations provided by Section 13.246(c) for determining whether to grant a certificate of convenience and necessity.

(f) [(d)] Unless the executive director requests that a public hearing be held, the sale, acquisition, lease, or rental may be completed as proposed:

(1) at the end of the 120-day period; or

(2) [may be completed] at any time after the executive director notifies the utility or water supply or sewer service corporation that a hearing will not be requested.

(g) If a hearing is requested or if the utility or water supply or sewer service corporation fails to *make the application as* [provide the] required [notification] or *to provide* public notice, the sale, acquisition, lease, or rental may not be completed unless the commission determines that the proposed transaction serves the public interest.

(h) A sale, acquisition, lease, or rental of any water or sewer system required by law to possess a certificate of public convenience and necessity that is not completed in accordance with the provisions of this section is void.

(i) [(e)] This section does not apply to:

(1) the purchase of replacement property; or

(2) [to] a transaction under Section 13.255 of this code.

(j) [(f)] If a public utility facility or system is sold and the facility or system was partially or wholly constructed with customer contributions in aid of construction derived from specific surcharges approved by the regulatory authority over and above revenues required for normal operating expenses and return, the public utility may not sell or transfer any of its assets, its certificate of convenience and necessity, or *its* controlling interest in an incorporated utility, unless the utility provides to the purchaser or transferee before the date of the sale or transfer a written disclosure relating to the contributions. The disclosure must contain, at a minimum, the total dollar amount of the contributions and a statement that the contributed property or capital may not be included in invested capital or allowed depreciation expense by the regulatory authority in rate-making proceedings.

(k) [(g)] A utility or a water supply or sewer service corporation that proposes to sell, assign, lease, or rent its facilities shall notify the other party to the transaction of the requirements of this section before signing an agreement to sell, assign, lease, or rent its facilities.

SECTION 6.12. Section 13.302, Water Code, is amended to read as follows:

Sec. 13.302. PURCHASE OF VOTING STOCK IN ANOTHER PUBLIC UTILITY: REPORT. (a) A utility may not purchase voting stock in another utility doing business in this state and a person may not acquire a controlling interest in a utility doing business in this state unless the person or utility *files a written application with* [notifies] the commission [of the proposed purchase or acquisition] not later than the 61st day before the date on which the transaction is to occur.

(b) *The commission may require that a person acquiring a controlling interest in a utility demonstrate adequate financial, managerial, and technical capability for providing continuous and adequate service to the requested area and any areas currently certificated to the person.*

(c) *If the person acquiring a controlling interest cannot demonstrate adequate financial capability, the commission may require that the person provide a bond or other financial assurance in a form and amount specified by the commission to ensure continuous and adequate utility service is provided.*

(d) The executive director may request that the commission hold a public hearing on the transaction if the executive director believes that a *criterion* [criteria] prescribed by Section 13.301(e) [13.301(e) of this code] applies.

(e) [(c)] Unless the executive director requests that a public hearing be held, the purchase or acquisition may be completed as proposed:

(1) at the end of the 60-day period; or

(2) [may be completed] at any time after the executive director notifies the person or utility that a hearing will not be requested.

(f) If a hearing is requested or if the person or utility fails to *make the application to the commission as* [provide the] required [notification to the commission], the purchase or acquisition may not be completed unless the commission determines that the proposed transaction serves the public interest. A purchase or acquisition that is not completed in accordance with the provisions of this section is void.

SECTION 6.13. Section 13.412, Water Code, is amended by amending Subsections (a) and (b) and adding Subsections (f) and (g) to read as follows:

(a) At the request of the commission, the attorney general shall bring suit for the appointment of a receiver to collect the assets and carry on the business of a water or sewer utility that:

(1) has abandoned operation of its facilities;

(2) *informs the commission that the owner is abandoning the system;*

(3) [or] violates a final order of the commission; or

(4) allows any property owned or controlled by it to be used in violation of a final order of the commission.

(b) The court shall appoint a receiver if an appointment is necessary:

(1) to guarantee the collection of assessments, fees, penalties, or interest;

(2) to guarantee *continuous and adequate* [continued] service to the customers of the utility; or

(3) to prevent continued or repeated violation of the final order.

(f) *For purposes of this section and Section 13.4132, abandonment may include but is not limited to:*

(1) *failure to pay a bill or obligation owed to a retail public utility or to an electric or gas utility with the result that the utility service provider has issued a notice of discontinuance of necessary services;*

(2) *failure to provide appropriate water or wastewater treatment so that a potential health hazard results;*

(3) *failure to adequately maintain facilities, resulting in potential health hazards, extended outages, or repeated service interruptions;*

(4) *failure to provide customers adequate notice of a health hazard or potential health hazard;*

(5) *failure to secure an alternative available water supply during an outage;*

(6) *displaying a pattern of hostility toward or repeatedly failing to respond to the commission or the utility's customers; and*

(7) *failure to provide the commission with adequate information on how to contact the utility for normal business and emergency purposes.*

(g) *Notwithstanding Section 64.021, Civil Practice and Remedies Code, a receiver appointed under this section may seek commission approval to acquire the water or sewer utility's facilities and transfer the utility's certificate of convenience and necessity. The receiver must apply in accordance with Subchapter H.*

SECTION 6.14. Subsections (a) and (c), Section 13.4132, Water Code, are amended to read as follows:

(a) The commission, after providing to the utility notice and an opportunity *to be heard by the commissioners at a commission meeting* [for a hearing], may authorize a willing person to temporarily manage and operate a utility *if the utility:*

(1) [that] has discontinued or abandoned operations or the provision of services; *or*

(2) *has been* or is being referred to the attorney general for the appointment of a receiver under Section 13.412 [of this code].

(c) A person appointed under this section has the powers and duties necessary to ensure the continued operation of the utility and the provision of continuous and adequate services to customers, including the power and duty to:

(1) read meters;

(2) bill for utility services;

(3) collect revenues;

(4) disburse funds; [and]

(5) *access all system components;* and

(6) *request rate increases.*

SECTION 6.15. Section 15.602, Water Code, is amended to read as follows:

Sec. 15.602. DEFINITIONS. In this subchapter:

(1) "Additional state revolving fund" means any state revolving fund hereafter established by the board to provide financial assistance to political subdivisions for public works in accordance with a capitalization grant program hereafter established by a federal agency or otherwise authorized by federal law.

(2) "Authorized investments" means any authorized investments described in Section 404.024, Government Code.

(3) *"Community water system" means a public water system that:*

*(A) serves at least 15 service connections used by year-round residents of the area served by the system; or*

*(B) regularly serves at least 25 year-round residents.*

(4) "Construction" shall have the meaning assigned by the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

(5) *"Disadvantaged community" means an area meeting criteria established by board rule, which criteria shall be based on measures that may include single-family residential property valuation, income levels of residents of the area, or other similarly appropriate measures.*

(6) [(4)] "Federal Act" means the Federal Water Pollution Control Act, as amended (33 U.S.C. 1251 et seq.).

(7) *"Nonprofit noncommunity water system" means a public water system that is not operated for profit and that:*

*(A) is owned by a political subdivision or nonprofit entity; and*

*(B) is not a community water system.*

(8) [(5)] "Political subdivision" means a municipality, intermunicipal, interstate, or state agency, [or] any other public entity eligible for assistance under this subchapter, *or a nonprofit water supply corporation created and operating under Chapter 76, Acts of the 43rd Legislature, 1st Called Session, 1933 (Article 1434a, Vernon's Texas Civil Statutes), if such entity is eligible for financial assistance under federal law establishing the state revolving fund or an additional state revolving fund.*

(9) *"Public water system" means a system that is owned by any person and that meets the definition of public water system in the Safe Drinking Water Act.*

(10) [(6)] "Public works" means any project to acquire, construct, improve, repair, or otherwise provide any buildings, structures, facilities, equipment, or other real or personal property or improvements designed for public use, protection, or enjoyment undertaken by a political subdivision and paid for, in whole or in part, out of public funds.

(11) [(7)] "Revolving fund" means the state water pollution control revolving fund.

(12) *"Safe Drinking Water Act" means Title XIV of the federal Public Health Service Act, commonly known as the Safe Drinking Water Act, as amended (42 U.S.C. Section 300f et seq.).*

*(13) "Safe drinking water revolving fund" means the fund established by the board as an additional state revolving fund to provide financial assistance in accordance with the federal program established pursuant to the provisions of the Safe Drinking Water Act.*

*(14) [(8)] "Treatment works" has the meaning established by the federal act and the eligible components of the management programs established by Sections 319 and 320 of the federal act.*

SECTION 6.16. Subchapter J, Chapter 15, Water Code, is amended by adding Section 15.6041 to read as follows:

*Sec. 15.6041. FINANCIAL ASSISTANCE UNDER THE SAFE DRINKING WATER REVOLVING FUND. (a) The safe drinking water revolving fund shall be administered by the board under this subchapter and rules adopted by the board. The safe drinking water revolving fund shall be held and administered by the board in the same manner as provided by Section 15.603, except that the safe drinking water revolving fund shall be held and administered in accordance with the Safe Drinking Water Act and shall be used to provide financial assistance in accordance with that act and in the manner provided by rules adopted by the board:*

*(1) to political subdivisions for community water systems and for nonprofit noncommunity water systems;*

*(2) to persons other than political subdivisions for community water systems or nonprofit noncommunity water systems from the account established by Subsection (b)(1);*

*(3) to persons, including political subdivisions, for service to disadvantaged communities from the account established by Subsection (b)(2); and*

*(4) for other purposes authorized by the Safe Drinking Water Act.*

*(b) In addition to other accounts the board may establish in the safe drinking water revolving fund, the board shall establish the following separate accounts:*

*(1) the community/noncommunity water system financial assistance account, to be used solely for providing financial assistance to persons, other than political subdivisions, providing services through a community water system or a nonprofit noncommunity water system, which account shall be composed solely of funds appropriated by the legislature, funds provided as gifts or grants by the United States government, interest earnings on amounts credited to the account, and repayments of loans made from the account; and*

*(2) the disadvantaged community account, to be used solely for providing financial assistance under the terms of Subsections (c) and (d), which account shall be composed solely of funds appropriated by the legislature, funds provided as gifts or grants by the United States government, interest earnings on amounts credited to the account, and repayments of loans made from the account.*

*(c) The board may provide financial assistance from the disadvantaged community account to:*

*(1) a political subdivision:*

*(A) that is a disadvantaged community; or*

*(B) for a project serving an area that:*

*(i) is located outside the boundaries of the political subdivision; and*

*(ii) meets the definition of a disadvantaged community; or*

*(2) an owner of a community water system that is ordered by the commission to provide service to a disadvantaged community, provided that the financial assistance is for the sole purpose of providing service to a disadvantaged community.*

*(d) In providing financial assistance from the disadvantaged community account, the board shall determine the amount of a loan which the political subdivision cannot repay based on affordability criteria established by the board by rule. The board shall forgive repayment of that portion of the principal of the loan which the board determines the political subdivision cannot repay. Financial assistance from the disadvantaged community account may not exceed the allowable percentage of the amount of the capitalization grant received by the state pursuant to the Safe Drinking Water Act.*

SECTION 6.17. Subsections (c) and (g), Section 15.603, Water Code, are amended to read as follows:

(c) The revolving fund consists of money derived from federal grants, direct appropriations, investment earnings on amounts credited to the revolving fund, and, at the board's discretion, from any and all sources available [to provide the required state match for the purposes of this subchapter].

(g) The revolving fund and any accounts established in the revolving fund shall be kept and maintained by or at the direction of the board and do not constitute and are not a part of the State Treasury. However, at the direction of the board, the revolving fund or accounts in the revolving fund may be kept and held in escrow and in trust by the *comptroller* [State Treasurer] for and on behalf of the board, shall be used only as provided by this subchapter, and pending such use shall be invested in authorized investments as provided by any order, resolution, or rule of the board. Legal title to money and investments in the revolving fund is in the board unless or until paid out as provided by this subchapter, the federal act, and the rules of the board. The *comptroller* [State Treasurer], as custodian, shall administer the funds strictly and solely as provided by this subchapter and in the orders, resolutions, and rules, and the state shall take no action with respect to the revolving fund other than that specified in this subchapter, the federal act, and the rules of the board.

SECTION 6.18. Subsection (a), Section 341.031, Health and Safety Code, is amended to read as follows:

(a) Public drinking water must be free from deleterious matter and must comply with the standards established by the commission[, the United States Public Health Service,] or the United States Environmental Protection Agency. The commission may adopt and enforce rules to implement the federal Safe Drinking Water Act (42 U.S.C. Section 300f et seq.).

SECTION 6.19. Subchapter C, Chapter 341, Health and Safety Code, is amended by adding Section 341.0315 to read as follows:

*Sec. 341.0315. PUBLIC DRINKING WATER SUPPLY SYSTEM REQUIREMENTS. (a) To preserve the public health, safety, and welfare, the commission shall ensure that public drinking water supply systems:*

*(1) supply safe drinking water in adequate quantities;*

*(2) are financially stable; and*

*(3) are technically sound.*

*(b) The commission shall encourage and promote the development and use of regional and areawide drinking water supply systems.*

*(c) Each public drinking water supply system shall provide an adequate and safe drinking water supply. The supply must meet the requirements of Section 341.031 and commission rules.*

*(d) The commission shall consider compliance history in determining issuance of new permits, renewal permits, and permit amendments for a public drinking water system.*

SECTION 6.20. Subchapter C, Chapter 341, Health and Safety Code, is amended by amending Section 341.035 and adding Sections 341.0351 through 341.0356 to read as follows:

*Sec. 341.035. APPROVED PLANS REQUIRED FOR PUBLIC WATER SUPPLIES. (a) Except as provided by Subsection (d), a person may not begin construction of a public drinking water supply system unless the executive director of the commission approves:*

*(1) a business plan for the system; and*

*(2) the plans and specifications for the system.*

*(b) The prospective owner or operator of the system must submit to the executive director a business plan that demonstrates that the owner or operator of the proposed system has available the financial, managerial, and technical capability to ensure future operation of the system in accordance with applicable laws and rules. The executive director:*

*(1) shall review the business plan; and*

*(2) may order the prospective owner or operator of the system to provide adequate financial assurance of ability to operate the system in accordance with applicable laws*

3673

*and rules, in the form of a bond or as specified by the commission, unless the executive director finds that the business plan demonstrates adequate financial capability.*

*(c) The prospective owner or operator of the proposed system shall provide to the commission* [A person contemplating establishing a drinking water supply system for public use must submit] *completed plans and specifications for review and approval in accordance with commission rules.*

*(d) A person is not required to file a business plan under Subsection (a)(1) or (b) if the person:*

*(1) is a county;*

*(2) is a retail public utility as defined by Section 13.002, Water Code, unless that person is a utility as defined by that section;*

*(3) has executed an agreement with a political subdivision to transfer the ownership and operation of the water supply system to the political subdivision; or*

*(4) is a noncommunity nontransient water system and the person has demonstrated financial assurance under Chapter 361 or 382 of this code or Chapter 26, Water Code* [to the commission before construction of the system. The commission shall approve plans that conform to the state's water safety laws. The water supply system may be established only on the commission's approval].

**Sec. 341.0351.** *NOTIFICATION OF SYSTEM CHANGES.* [(b)] Any *person* [agency], including a municipality, supplying a drinking water service to the public that intends to make a material or major change in a water supply system that may affect the sanitary features of that utility must give written notice of that intention to the commission before making the change.

**Sec. 341.0352.** *ADVERTISED QUALITY OF WATER SUPPLY.* [(c)] A water supply system owner, manager, or operator or an agent of a water supply system owner, manager, or operator may not advertise or announce a water supply as being of a quality other than the quality that is disclosed by the commission's latest rating.

**Sec. 341.0353.** *DRINKING WATER SUPPLY COMPARATIVE RATING INFORMATION.* [(d)] The commission shall assemble and tabulate all necessary *information* [data] relating to public drinking water supplies at least once each year and as often during the year as conditions demand or justify. The *information* [data] forms the basis of an official comparative rating of public drinking water supply systems.

**Sec. 341.0354.** *HIGHWAY SIGNS FOR APPROVED SYSTEM RATING.* [(c)] A water supply system that attains an approved rating is entitled to erect signs of a design approved by the commission on highways approaching the municipality in which the water supply system is located. The signs shall be immediately removed on notice from the commission if the water supply system does not continue to meet the specified standards.

**Sec. 341.0355.** *FINANCIAL ASSURANCE FOR CERTAIN SYSTEMS.* *(a) The commission may require the owner or operator of a public drinking water supply system that was constructed without the approval required by Section 341.035, that has a history of noncompliance with this subchapter or commission rules, or that is subject to a commission enforcement action to:*

*(1) provide the executive director of the commission with a business plan that demonstrates that the system has available the financial, managerial, and technical resources adequate to ensure future operation of the system in accordance with applicable laws and rules; and*

*(2) provide adequate financial assurance of the ability to operate the system in accordance with applicable laws and rules in the form of a bond or as specified by the commission.*

*(b) If the commission relies on rate increases or customer surcharges as the form of financial assurance, such funds shall be deposited in an escrow account and released only with the approval of the commission.*

*Sec. 341.0356. ORDER TO STOP OPERATIONS. (a) A public water supply system shall stop operations on receipt of a written notification of the executive director of the commission or an order of the commission issued under this section.*

*(b) The executive director or the commission may order a public water supply system to stop operations if:*

*(1) the system was constructed without the approval required by Section 341.035; or*

*(2) the executive director determines that the system presents an imminent health hazard.*

*(c) A notification or order issued under this section may be delivered by facsimile, by personal service, or by mail.*

*(d) A water supply system subject to notification or an order under this section, on written request, is entitled to an opportunity to be heard by the commissioners at a commission meeting.*

*(e) The public water supply system may not resume operations until the commission, the executive director, or a court authorizes the resumption.*

SECTION 6.21. Subsections (a) and (b), Section 341.047, Health and Safety Code, are amended to read as follows:

(a) A person commits an offense if the person:

(1) violates a provision of Section 341.031;

(2) violates a provision of Section 341.032(a) or (b);

(3) violates a provision of Section 341.033(a)–(f);

(4) constructs a drinking water supply system without submitting completed plans and specifications as required by Section *341.035(c)* [341.035(a)];

(5) *begins construction of* [establishes] a drinking water supply system without the commission's approval as required by Section 341.035(a);

(6) violates a provision of Section *341.0351 or 341.0352* [341.035(b) or (c)];

(7) fails to remove a sign as required by Section *341.0354* [341.035(a)]; or

(8) violates a provision of Section 341.036.

(b) An offense under Subsection (a) is a Class C misdemeanor [punishable by a fine of not less than $100].

SECTION 6.22. Subsections (b) through (i), Section 341.048, Health and Safety Code, are amended to read as follows:

(b) A person who causes, suffers, allows, or permits a violation under this subchapter shall be assessed a civil penalty of not less than $50 nor more than *$1,000* [$500] for each violation. Each day of a continuing violation is a separate violation.

(c) [If it is shown on a trial of the defendant that the defendant has previously been assessed a civil penalty under this section within a year before the date on which the violation being tried occurred, the defendant shall be assessed a civil penalty of not less than $50 nor more than $1,000 for each subsequent violation under this subchapter. Each day of a continuing violation is a separate violation.

[(d)] If it appears that a person has violated, is violating, or threatens to violate a provision under this subchapter, the commission, a county, or a municipality may institute a civil suit in a district court for:

(1) injunctive relief to restrain the person from continuing the violation or threat of violation;

(2) the assessment and recovery of a civil penalty; or

(3) both injunctive relief and a civil penalty.

(d) [(e)] The commission is a necessary and indispensable party in a suit brought by a county or municipality under this section.

3675

*(e)* [(f)] On the commission's request, the attorney general shall institute a suit in the name of the state for injunctive relief, to recover a civil penalty, or for both injunctive relief and civil penalty.

*(f)* [(g)] The suit may be brought in:

*(1)* Travis County;

*(2)* [~in] the county in which the defendant resides; *or*

*(3)* [~or in] the county in which the violation or threat of violation occurs.

*(g)* [(h)] In a suit under this section to enjoin a violation or threat of violation of this subchapter, the court shall grant the state, county, or municipality, without bond or other undertaking, any injunction that the facts may warrant including temporary restraining orders, temporary injunctions after notice and hearing, and permanent injunctions.

*(h)* [(i)] Civil penalties recovered in a suit brought under this section by a county or municipality shall be equally divided between:

(1) the state; and

(2) the county or municipality that first brought the suit.

SECTION 6.23.  Subsection (a), Section 341.049, Health and Safety Code, is amended to read as follows:

(a) If a person causes, suffers, allows, or permits a violation of this subchapter or a rule or order adopted under this subchapter, the commission may assess a penalty against that person as provided by this section.  The penalty shall not be less than $50 nor more than *$1,000* [$500] for each violation.  Each day of a continuing violation may be considered a separate violation.

SECTION 6.24.  Section 1, Chapter 190, Acts of the 66th Legislature, Regular Session, 1979 (Article 1110f, Vernon's Texas Civil Statutes), is amended to read as follows:

Sec. 1.  PURPOSE.  The purpose of this Act is to clarify the authority of public entities that are lawfully authorized to engage in the collection, transportation, treatment, and disposal of sewage *and the conservation, storage, transportation, treatment, and distribution of water,* to join together as cotenants or coowners, or by concurrent resolution or ordinance, to create a public utility agency, to engage in the planning, financing, acquiring, constructing, owning, operating, and maintaining of facilities so that each public entity will owe all of the duties, will have and be secure in all of the rights, powers, and liabilities, and shall be entitled to all of the privileges and exemptions attributable to its undivided interest as a cotenant or coowner should the entities elect not to create a public utility agency, as provided by law with respect to an entire interest in facilities planned, financed, acquired, constructed, owned, operated, and maintained by it alone.  These alternatives are to serve as a means of achieving economies of scale by providing essential *water and* sewage systems to the public and promoting the orderly economic development of the state while providing environmentally sound protection of future *water and* wastewater needs of the state and its inhabitants.  The provisions of this Act shall be liberally construed to effectuate these purposes but shall not be construed to otherwise enlarge, change, or modify in any way the rights, powers, or authority of any public or private entity under existing law.  Nothing in this Act shall be construed to alter, change, abrogate, or otherwise affect the existing contracts in force at the time this Act takes effect.

SECTION 6.25.  Section 2, Chapter 190, Acts of the 66th Legislature, 1979 (Article 1110f, Vernon's Texas Civil Statutes), is amended by amending Subsections (2), (3), and (4) to read as follows:

(2) "Private entity" means any entity other than a public entity solely involved in financing, constructing, operating, and maintaining *water and* sewer facilities.

(3) "Facilities" means facilities necessary or incidental to the collection, transportation, treatment, or disposal of sewage *and to the conservation, storage, transportation, treatment, and distribution of water,* including plant sites, rights-of-way, and real and personal property and equipment and rights of every kind useful in connection with collection, transportation, treatment, or disposal of sewage *or with conservation, storage, transportation, treatment, and distribution of water.*

(4) "Public utility agency" or "agency" means any agency created under this Act by two or more public entities for the purpose of planning, financing, constructing, owning, operating, and maintaining facilities for the purpose of achieving economies of scale in providing *water or* sewer services.

SECTION 6.26. Subsection (a), Section 8, Chapter 190, Acts of the 66th Legislature, 1979 (Article 1110f, Vernon's Texas Civil Statutes), is amended to read as follows:

(a) To more readily accomplish the purposes of this Act, two or more public entities, by concurrent ordinances, may create an agency to be known as a public utility agency. The agency shall be without taxing power, and shall be a separate agency, a political subdivision of the state, and body politic and corporate exercising all of the powers that are conferred by Chapter 10, Title 28, Revised Civil Statutes of Texas, 1925, as amended, and this Act on a public entity. No agency is authorized to engage in any utility business other than the collection, transportation, treatment, or disposal of sewage *or the conservation, storage, transportation, treatment, and distribution of water* for the participating public entities that are joint owners with the agency of a facility located within the state. A public entity, at the time of the passage of the concurrent ordinance, must be one that has the authority to engage in the collection, transportation, treatment, or disposal of sewage *or the conservation, storage, transportation, treatment, and distribution of water*, but the entity may subsequently dispose of its facilities. Before the passage of a concurrent ordinance to create a public utility agency, the governing body of each public entity shall have notice of its intention to adopt the ordinance published in a newspaper of general circulation within the county in which the public entity is domiciled once a week for two consecutive weeks, the date of the first publication to be at least 14 days before the date set for the passage of the concurrent ordinance. The notice shall state the date, time, and place that the governing body proposes to pass the ordinance and that on the effective date of the concurrent ordinances the public entities adopting them shall have created a public utility agency. If, prior to the day set for the passage of a concurrent ordinance, 10 percent of the qualified electors of the particular public entity present a petition to the governing body requesting that a referendum election be called, the ordinance shall not become effective until a majority of the qualified electors of the entity voting in the election have approved the ordinance. The election shall be called and held in conformity with the Texas Election Code, as amended, Chapter 1, Title 22, Revised Civil Statutes of Texas, 1925, as amended, and this Act. Except as provided in this Act, a concurrent ordinance shall not be subject to a referendum election.

SECTION 6.27. Subsections (f) and (g), Section 4, Chapter 190, Acts of the 66th Legislature, 1979 (Article 1110f, Vernon's Texas Civil Statutes), are amended to read as follows:

(f) The agency may make contracts, leases, and agreements with and accept grants and loans from the United States of America, its departments and agencies, the State of Texas, its agencies, counties, municipalities, and political subdivisions, and public or private corporations and persons and may generally perform all acts necessary for the full exercise of the powers vested in the agency. Each agency may contract with those public entities creating the agency for the collection, transportation, treatment, and disposal of sewage *or the conservation, storage, transportation, treatment, and distribution of water*, and the authority to contract for these services shall also extend to private entities under terms and conditions the agency's board of directors may consider appropriate. The agency may sell, lease, convey, or otherwise dispose of any right, interest, or property that is, in its judgment, not needed for the efficient operation and maintenance of its facilities. The responsibility of the management, operation, and control of the properties belonging to the agency shall be vested in the board of directors.

(g) The agency, in contracting with any public or private entity for wastewater collection, transmission, treatment, or disposal services *or for water conservation, storage, transportation, treatment, and distribution*, must charge rates sufficient to produce revenues adequate:

    (1) to pay all expenses of operation and maintenance;

    (2) to pay all interest and principal due on bonds issued as they become due and payable;

    (3) to pay the principal of and interest on any legal debt of the agency;

    (4) to pay all sinking and reserve fund payments as they become due and payable; and

(5) to fulfill the terms of any agreements made with the holders of any bonds.

The agency may also establish a reasonable depreciation and emergency fund. Payments made pursuant to contracts with the agencies are to constitute an operating expense of the public or private entity served as a result of the contracts unless otherwise prohibited by a previously outstanding obligation of the purchasing entity.

SECTION 6.28.  Subchapter C, Chapter 13, Water Code, is amended by adding Section 13.045 to read as follows:

*Sec. 13.045.  NOTIFICATION REGARDING USE OF REVENUE.  At least annually and before any rate increase, a municipality shall notify in writing each water and sewer retail customer of any service or capital expenditure not water or sewer related funded in whole or in part by customer revenue.*

SECTION 6.29.  Subchapter D, Chapter 13, Water Code, is amended by adding Section 13.086 to read as follows:

*Sec. 13.086.  FAIR WHOLESALE RATES FOR WHOLESALE WATER SALES TO A WATER DISTRICT.  (a) A municipality that makes a wholesale sale of water to a special district created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, and that operates under Title 4 or under Chapter 36 shall determine the rates for that sale on the same basis as for other similarly situated wholesale purchasers of the municipality's water.*

*(b) This section does not apply to a sale of water under a contract executed before the effective date of this section.*

SECTION 6.30.  Section 13.411, Water Code, is amended to read as follows:

Sec. 13.411.  ACTION TO ENJOIN OR REQUIRE COMPLIANCE.  (a) If [it-appears to] the commission *has reason to believe* that any retail public utility or any other person or corporation is engaged in or is about to engage in any act in violation of this chapter or of any order or rule of the commission entered or adopted under this chapter or that any retail public utility or any other person or corporation is failing to comply with this chapter or with any rule or order, the attorney general on request of the commission, in addition to any other remedies provided in this chapter, shall bring an action in a court of competent jurisdiction in the name of and on behalf of the commission against the retail public utility or other person or corporation to enjoin the commencement or continuation of any act or to require compliance with this chapter or the rule or order.

*(b) If the executive director has reason to believe that the failure of the owner or operator of a water utility to properly operate, maintain, or provide adequate facilities presents an imminent threat to human health or safety, the executive director shall immediately:*

*(1) notify the utility's representative; and*

*(2) initiate enforcement action consistent with:*

*(A) this subchapter; and*

*(B) procedural rules adopted by the commission.*

SECTION 6.31.  Section 13.418, Water Code, is amended to read as follows:

Sec. 13.418.  DISPOSITION OF FINES AND PENALTIES; *WATER UTILITY IM-PROVEMENT ACCOUNT.  (a) Fines and penalties collected under this chapter from a retail public utility that is not a public utility in other than criminal proceedings shall be paid to the commission and deposited in the general revenue fund.*

*(b) Fines and penalties collected from a public utility* under this chapter in other than criminal proceedings shall be paid to the commission and deposited in the *water utility improvement account as provided by Section 341.0485, Health and Safety Code* [General Revenue Fund].

SECTION 6.32.  Subchapter C, Chapter 341, Health and Safety Code, is amended by adding Section 341.0485 to read as follows:

*Sec. 341.0485.  WATER UTILITY IMPROVEMENT ACCOUNT.  (a) The water utility improvement account is created outside of the state treasury.*

*(b) A civil or administrative penalty payable to the state that is collected from a utility for a violation of this subchapter shall be deposited in the account.*

*(c) The comptroller shall manage the account for the benefit of the commission and shall invest the money and deposit interest and other investment proceeds in the account. The comptroller shall release money from the account in the manner provided by the commission. Money in the account may be used only for:*

*(1) capital improvements to the water or sewer system of a utility that has paid fines or penalties under this chapter or under Chapter 13, Water Code, that have been deposited in the account; or*

*(2) capital improvements and operating and maintenance expenses for a utility placed in receivership or under a temporary manager under Section 13.4132, Water Code.*

*(d) Money used under Subsection (c)(1) for a utility's system may not exceed the amount of the civil or administrative penalties the utility has paid. Capital improvements made with money from the account may not be considered as invested capital of the utility for any purpose. If the utility is sold to another owner, a portion of the sales price equivalent to the percentage of the used and useful facilities that were constructed with money under Subsection (c)(1) shall be immediately distributed equally to the current customers of the utility.*

*(e) Money used under Subsection (c)(2) may not be considered as invested capital of the utility for any purpose.*

*(f) In this section, "utility" has the meaning assigned by Section 13.002, Water Code.*

SECTION 6.33. Subchapter L, Chapter 49, Water Code, is amended by adding Section 49.352 to read as follows:

*Sec. 49.352. MUNICIPAL SYSTEM IN UNSERVED AREA. (a) This section applies only to a home-rule municipality that:*

*(1) is located in a county with a population of more than 1.75 million that is adjacent to a county with a population of more than 1 million; and*

*(2) has within its boundaries a part of a district.*

*(b) If a district does not establish a fire department under this subchapter, a municipality that contains a part of the district inside its boundaries may by ordinance or resolution provide that a water system be constructed or extended into the area that is in both the municipality and the district for the delivery of potable water for fire flow that is sufficient to support the placement of fire hydrants and the connection of the water system to fire suppression equipment.*

*(c) For purposes of this section, a municipality may obtain single certification in the manner provided by Section 13.255, except that the municipality may file an application with the commission to grant single certification immediately after the municipality provides notice of intent to provide service as required by Section 13.255(b).*

## ARTICLE 7. WATER DATA COLLECTION AND DISSEMINATION

SECTION 7.01. Section 16.012, Water Code, is amended to read as follows:

Sec. 16.012. STUDIES, INVESTIGATIONS, SURVEYS. (a) The executive administrator shall make studies, investigations, and surveys of the occurrence, quantity, quality, and availability of the surface water and groundwater of this state *and shall, in cooperation with other entities of the state, guide the development of a statewide water resource data collection and dissemination network.* For these purposes the *executive administrator* [staff] shall collect, receive, analyze, [and] process, *and facilitate access to* basic data *and summary information* concerning [the] water resources of the state *and provide guidance regarding data formats and descriptions required to access and understand Texas water resource data.*

(b) The executive administrator shall:

(1) determine suitable locations for future water facilities, including reservoir sites;

*(2) determine suitable, cost-effective water supply alternatives on a regional basis, including voluntary means of encouraging aggressive water conservation;*

(3) locate land best suited for irrigation;

(4) [(3)] make estimates of the cost of proposed irrigation works and the improvement of reservoir sites;

(5) [(4)] examine and survey reservoir sites; [and]

(6) *monitor* [(5) investigate] the effects of fresh water inflows upon the bays and estuaries of Texas;

(7) *monitor instream flows;*

(8) *lead a statewide effort, in coordination with federal, state, and local governments, institutions of higher education, and other interested parties, to develop a network for collecting and disseminating water resource-related information that is sufficient to support assessment of ambient water conditions statewide;*

(9) *make recommendations for optimizing the efficiency and effectiveness of water resource data collection and dissemination as necessary to ensure that basic water resource data are maintained and available for Texas; and*

(10) *make basic data and summary information developed under this subsection accessible to state agencies and other interested persons.*

(c) *In performing the duties required under Subdivisions (1), (4), (5), (6), and (7) of Subsection (b), the executive administrator shall consider advice from the Parks and Wildlife Department.*

(d) *All entities of the state, including institutions of higher education, that collect or use water data or information shall cooperate with the board in the development of a coordinated, efficient, and effective statewide water resource data collection and dissemination network.*

(e) The executive administrator shall keep full and proper records of his work, observations, data, and calculations, all of which are the property of the state.

(f) [(d)] In performing his duties under this section, the executive administrator shall assist the commission in carrying out the purposes and policies stated in Section 12.014 of this code.

(g) *No later than December 31, 1999, the commission shall obtain or develop an updated water availability model for six river basins as determined by the commission. The commission shall obtain or develop an updated water availability model for all remaining river basins no later than December 31, 2001.*

(h) *Within 90 days of completing a water availability model for a river basin, the commission shall provide to all holders of existing permits, certified filings, and certificates of adjudication in that river basin the projected amount of water that would be available: during a drought of record; when flows are at 75 percent of normal; and when flows are at 50 percent of normal.*

(i) *Within 90 days of completing a water availability model for a river basin, the commission shall provide to each regional water planning group created under Section 16.053 of this code in that river basin the projected amount of water that would be available if cancellation procedures were instigated under the provisions of Subchapter E, Chapter 11, of this code.*

(j) *Within 90 days of completing a water availability model for a river basin, the commission, in coordination with the Parks and Wildlife Department, shall determine the potential impact of reusing municipal and industrial effluent on existing water rights, instream uses, and fresh water inflows to bays and estuaries. Within 30 days of making this determination, the commission shall provide the projections to the board and each regional water planning group created under Section 16.053 of this code in that river basin.*

SECTION 7.02.   Section 16.021, Water Code, is amended to read as follows:

Sec. 16.021.   TEXAS NATURAL RESOURCES INFORMATION SYSTEM.   (a) The executive administrator shall establish the Texas Natural Resources Information System *(TNRIS) to serve Texas agencies and citizens as a centralized clearinghouse and referral center for natural resource, census, and other socioeconomic data* [as a centralized information system incorporating all Texas natural resource data, socioeconomic data related to

natural resources, or indexes related to that data that is collected by state agencies or other entities].

(b) The Texas *Geographic Information Council (TGIC)* [Natural Resources Information System Task Force] is created to provide *strategic planning and coordination in the acquisition and use of geo-spatial data and related technologies in the State of Texas. The executive administrator and the executive director of the Department of Information Resources shall designate entities to be members of the TGIC. The chief administrative officer of each member entity shall select one representative to serve on the TGIC. The duties of the TGIC shall include providing* guidance to the executive administrator in carrying out his duties under this section *and guidance to the Department of Information Resources for development of rules related to statewide geo-spatial data and technology standards.* [The task force is composed of one representative from each state agency designated by the executive administrator. The executive administrator shall designate a state agency as a participant in the task force if the agency collects or uses natural resource and related socioeconomic data. Representatives of each designated agency shall be selected by the chief administrative officer of that agency.]

(c) Under the guidance of the *TGIC* [Texas Natural Resources Information System Task Force], the executive administrator shall:

(1) *further* develop [and implement] the Texas Natural Resources Information System *by promoting and providing for effective acquisition, archiving, documentation, indexing, and dissemination of natural resource and related digital and nondigital data and information;*

(2) obtain information in response to disagreements regarding names and name spellings for natural and cultural features in the state and provide this information to the Board on Geographic Names of the United States Department of the Interior;

(3) make recommendations to the Board on Geographic Names of the United States Department of the Interior for naming any natural or cultural feature subject to the limitations provided by Subsection (d) of this section;

(4) *make recommendations to the Department of Information Resources to adopt and promote standards that facilitate sharing of digital natural resource data and related socioeconomic data among federal, state, and local governments and other interested parties;*

(5) *acquire and disseminate natural resource and related socioeconomic data describing the Texas-Mexico border region; and*

(6) *coordinate, conduct, and facilitate the development, maintenance, and use of mutually compatible statewide digital base maps depicting natural resources and man-made features.*

(d) A recommendation may not be made under Subdivision (3) of Subsection (c) of this section for:

(1) a feature previously named under statutory authority or recognized by an agency of the federal government, the state, or a political subdivision of the state;

(2) a feature located on private property for which consent of the property owner cannot be obtained; or

(3) naming a natural or cultural feature for a living person.

SECTION 7.03. On September 1, 1997, the Texas Natural Resources Information System Task Force and the Texas Geographic Information Systems Planning Council are merged into the Texas Geographic Information Council. All designated member agencies of both predecessor entities shall continue to serve as member agencies of the Texas Geographic Information Council.

### ARTICLE 8. INTERIM COMMITTEE ON WATER RESOURCES DEVELOPMENT AND MANAGEMENT

SECTION 8.01. CREATION AND COMPOSITION. (a) The Interim Committee on Water Resources Development and Management is created to study the state's water supply and wastewater infrastructure needs.

(b) The committee consists of 10 members, of whom:

(1) five shall be appointed by the speaker of the house of representatives from the members of the house of representatives; and

(2) five shall be appointed by the lieutenant governor from the members of the senate.

(c) The lieutenant governor and the speaker of the house of representatives each shall appoint a presiding officer from among the members appointed to the committee.

(d) The committee shall convene at the call of the two presiding officers.

SECTION 8.02. DUTIES AND POWERS. (a) The committee is specifically charged to review:

(1) Texas' current inventory of water resources, including water supply and wastewater treatment infrastructure;

(2) projections for Texas' future water and wastewater needs to the year 2050;

(3) the role of the state and regional and local entities in participation and investment in water-related projects; and

(4) the implementation of Senate Bill No. 1, Acts of the 75th Legislature, Regular Session, 1997.

(b) In addition, the committee shall develop recommendations to:

(1) assist Texas communities having limited financial capabilities with their water supply and wastewater infrastructure needs;

(2) ensure efficient allocation of state and local resources through the use of regional water facilities and management, including water market transactions; and

(3) help local governments to meet the financial costs created by federal and state water quality regulations.

(c) The committee may travel around the state and hold hearings or public meetings as needed to fulfill its duties under this article.

(d) The Senate Committee on Natural Resources and the House Committee on Natural Resources shall provide staff to the committee.

SECTION 8.03. EXPENSES. The committee shall submit a proposed budget to the appropriate committee on administration in each house. The administrative committees shall jointly approve the committee budget in an amount appropriate for the committee to accomplish its duties under this article.

SECTION 8.04. REPORT. Not later than January 5, 1999, the committee shall report to the governor, the lieutenant governor, the speaker of the house of representatives, and members of the 76th Legislature the committee's findings and recommendations for necessary legislation.

## ARTICLE 9. REPEALER; EFFECTIVE DATE; SAVING; EMERGENCY

SECTION 9.01. Section 11.028, Water Code, is repealed.

SECTION 9.02. (a) Except as provided by Subsections (b) through (f) of this section, this Act takes effect September 1, 1997.

(b) This section and Sections 2.03, 2.09, 2.10, 2.18, and 3.03 of this Act take effect immediately.

(c) Section 4.40 of this Act takes effect on the first day of the first calendar quarter beginning on or after the date that it may take effect under Section 39, Article III, Texas Constitution.

(d) The change in law made by Section 4.40 of this Act to Section 151.318, Tax Code, does not affect taxes imposed before the effective date of Section 4.40 of this Act, and the law in effect before the effective date of that section is continued in effect for purposes of liability for and collection of those taxes.

(e) Sections 5.03 and 5.05 through 5.08 of this Act take effect on the date on which the constitutional amendment proposed by S.J.R. No. 17, 75th Legislature, Regular Session, 1997, takes effect. If that amendment is not approved by the voters, those sections have no effect.

(f) Section 5.11 of this Act takes effect on the date on which the constitutional amendment proposed by S.J.R. No. 45, 75th Legislature, Regular Session, 1997, takes effect. If that amendment is not approved by the voters, that section has no effect.

(g) The change in law made by Section 5.11 of this Act to Subchapter B, Chapter 11, Tax Code, does not affect taxes imposed before the effective date of Section 5.11 of this Act, and the law in effect before the effective date of that section is continued in effect for purposes of liability for and collection of those taxes.

SECTION 9.03. Section 11.0842, Water Code, as added by this Act, and the changes to Sections 11.082 and 12.052, Water Code, made by this Act are not applicable to any violation relating to the construction of a dam or reservoir for domestic and livestock purposes initiated before March 2, 1997, if a registration for authorization is submitted to the Texas Natural Resource Conservation Commission not later than September 1, 1999, unless modifications other than repairs are made to the dam or reservoir on or after March 2, 1997. On registration of the location, approximate size, and date of completion of the dam or reservoir, the commission shall issue a permit for the dam or reservoir relating back to the date of completion of construction. The date of completion of construction may be established by the submission of competent evidence.

SECTION 9.04. (a) The requirement of Section 341.035, Health and Safety Code, as amended by Section 6.20 of this Act, that certain persons must provide the executive director of the Texas Natural Resource Conservation Commission with a business plan, applies only to the prospective owner or operator of a public drinking water supply system for which construction begins on or after September 1, 1997.

(b) Section 341.0355, Health and Safety Code, as added by Section 6.20 of this Act, applies to the owner or operator of a public drinking water supply system regardless of the date construction of the system began.

SECTION 9.05. (a) A change in law made by this Act that applies to a criminal, civil, or administrative penalty applies only to an offense committed or a violation that occurs on or after the effective date of this Act. For the purposes of this Act, an offense is committed or a violation occurs before the effective date of this Act if any element of the offense or violation occurs before that date.

(b) An offense committed or violation that occurs before the effective date of this Act is covered by the law in effect when the offense was committed or the violation occurred, and the former law is continued in effect for this purpose.

SECTION 9.06. An Act creating a groundwater conservation district that requires a confirmation election enacted by the 71st, 72nd, 73rd, or 74th Legislature is repealed, effective on the second anniversary of the effective date of this Act, unless the district has been approved at a confirmation election before the second anniversary of the effective date of this Act.

SECTION 9.07. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force according to its terms, and it is so enacted.

Passed the Senate on April 3, 1997: Yeas 31, Nays 0; May 24, 1997, Senate refused to concur in House amendments and requested appointment of Conference Committee; May 26, 1997, House granted request of the Senate; June 1, 1997, Senate adopted Conference Committee Report: Yeas 31, Nays 0; passed the House, with amendments, on May 23, 1997, by a non-record vote; May 26, 1997, House granted request of the Senate for appointment of Conference Committee; June 1, 1997, House adopted Conference Committee Report: Yeas 140, Nays 4, one present not voting.

Approved June 19, 1997.

Effective September 1, 1997, except as provided in § 9.02(b) to (f).

H

Westlaw.

30 TAC § 297.19

Tex. Admin. Code tit. 30, § 297.19

C

Texas Administrative Code Currentness
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 297. Water Rights, Substantive
        Subchapter B. Classes of Water Rights
          → → § 297.19. Term Permit under Texas Water Code, §§ 11.1381 and 11.153-11.155

(a) The commission may issue a permit for a term of years for the use of unused appropriated water when there is insufficient unappropriated water in the source of supply to satisfy the application.

(b) An application for a term permit under this section shall be denied if:

(1) the commission finds there is a substantial likelihood that the issuance of the term permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources in the area;

(2) if the holder of an affected unused appropriation can demonstrate that the issuance of the permit would prohibit the holder from beneficially using the water right during the term of the permit. Such demonstration may be made by using water use projections contained in the state or regional water plans, economic indicators, population growth projections, electrical generation needs, or other reasonable projections based on accepted methods;

(3) the proposed permit is not intended for a beneficial use; or

(4) the proposed permit would be detrimental to the public welfare.

(c) A term permit is subordinate to any vested or senior appropriative water right. Additionally, conditions may be placed in the permit as necessary to protect instream uses and freshwater inflows to bays and estuaries.

(d) The commission may grant a permit under this section for an aquifer storage and retrieval project as defined in § 297.1 of this title (relating to Definitions).

**Source:** The provisions of this § 297.19 adopted to be effective May 29, 1986, 11 TexReg 2330; amended to be effective June 28, 1996, 21 TexReg 5442; amended to be effective February 24, 1999, 24 TexReg 1162.

30 TAC § 297.19, 30 TX ADC § 297.19

Current through 40 Tex.Reg. No. 1770, dated March 20, 2015, as effective on or before March 27, 2015

Copr. (C) 2015. All rights reserved.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Tex. Admin. Code tit. 30, § 297.42

**C**

Texas Administrative Code Currentness
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 297. Water Rights, Substantive
        ⌐⊞ Subchapter E. Issuance and Conditions of Water Rights
          →→ **§ 297.42. Water Availability**

(a) Except as provided by Texas Water Code (TWC), § 11.1381, and § 297.19 of this title (relating to Term Permit Under Texas Water Code §§ 11.1381 and 11.153, 11.155), an application for a new or increased appropriation will be denied unless there is a sufficient amount of unappropriated water available for a sufficient amount of the time to make the proposed project viable and ensure the beneficial use of water without waste.

(b) A new water right may be conditioned as appropriate to protect instream uses, water quality, aquatic and wildlife habitat, and freshwater inflows to bays and estuaries as provided by TWC, §§ 11.147, 11.150, 11.152, and 16.059.

(c) For the approval of an application for a direct diversion from a stream without sufficient on or off channel water storage facilities for irrigation, approximately 75% of the water requested must be available approximately 75% of the time when distributed on a monthly basis and based upon the available historic stream flow record. Lower availability percentages may be acceptable if the applicant can demonstrate that a long-term, reliable, alternative source or sources of water of sufficient quantity and quality are economically available to the applicant to make the proposed project viable and ensure the beneficial use of state water without waste.

(d) Projects that are not required to be based upon the continuous availability of historic, normal stream flow include, but are not limited to: the artificial recharge of the Edwards Aquifer under TWC, § 11.023(c); conjunctive ground and surface water management projects such as aquifer storage and recovery projects; diversions or impoundments at times of above-normal stream flow (e.g., "scalping" operations) for seasonal or supplemental use; a system operation in conjunction with other water rights; non-consumptive instream uses; or other similar type projects. The required availability of unappropriated water for these special type projects shall be determined on a case-by-case basis based upon whether the proposed project can be viable for the intended purposes and the water will be beneficially used without waste.

(e) For an application for an on-channel storage facility to be authorized for domestic or municipal water use, the proposed diversion right of the reservoir must be equal to its firm yield. The purpose of this limitation is to ensure a secure and dependable source of water supply for uses necessary to protect the public health, safety, and welfare (see also 30 TAC § 290.41(b) requiring public water systems to have a "safe" yield capable of supplying the maximum daily demands during extended periods of peak usage and "critical hydrologic conditions"). Such reservoir may be authorized in excess of its firm yield when the implementation of a drought management plan or alternative sources of water supply such as groundwater, other reservoir systems, or other means are available to satisfy water needs during drought periods when the reservoir's normal supply capabilities would be exceeded.

(f) Except for an application for an emergency, temporary, seasonal, or term permit, or as provided by this section, the commission may require an applicant to provide storage sufficient to yield the requested annual diversion.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

30 TAC § 297.42

Tex. Admin. Code tit. 30, § 297.42

(g) In order to make the optimum beneficial use of available water, a water right may be granted based upon the availability of return flows or discharges. However, a water right granted upon return flows or discharges that may cease in the future because of new or increased direct reuse (i.e., the lawful re-use of water before it is returned or discharged into the stream) or that may cease for other lawful reasons will be granted with the express provision that the water available for the water right is dependent upon potentially interruptible return flows or discharges.

**Source:** The provisions of this § 297.42 adopted to be effective February 24, 1999, 24 TexReg 1162; amended to be effective August 15, 2002, 27 TexReg 7152.

30 TAC § 297.42, 30 TX ADC § 297.42

Current through 40 Tex.Reg. No. 1770, dated March 20, 2015, as effective on or before March 27, 2015

Copr. (C) 2015. All rights reserved.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

I

SOAH DOCKET NO. 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
TCEQ DOCKET NO. 2008-0181-WR

| | | |
|---|---|---|
| APPLICATION BY | § | BEFORE THE STATE OFFICE |
| | § | |
| BRADLEY B. WARE | § | |
| | § | OF |
| TO AMEND WATER USE | § | |
| | § | |
| PERMIT NO. 5594 | § | ADMINISTRATIVE HEARINGS |

2008 DEC 21 PM 4:52
CHIEF CLERKS OFFICE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

## EXECUTIVE DIRECTOR'S RESPONSE TO CLOSING ARGUMENTS

TO THE HONORABLE ADMINISTRATIVE LAW JUDGE:

The question in this case is whether a sufficient amount of water is available to satisfy the application as required under Texas Water Code Section 11.134(b)(2) for a new appropriation of water or Section 11.1381(a) for a renewal of a term use permit. Applicant had the burden to prove that water is available by a preponderance of the evidence. The record clearly shows that Applicant did not prove up any factual data, analysis or other evidence useful in answering this question. As the Public Interest Counsel agrees in his brief, the Applicant did not meet his burden of proof and the application must therefore be denied.

Beyond the factual questions, however, Closing Arguments filed by the Applicant and Office of the Public Interest Counsel (OPIC) demonstrate that confusion remains regarding certain legal issues. In this response, the Executive Director will strive to further explain his legal position so that the answers to disputed questions become apparent. Hopefully, this will lead to understanding of how the Executive Director's actions in interpreting and applying the regulatory scheme not only comply with the principle of the law that "first in time is first in right," but are absolutely necessary to bear it out.

The legal principle "first in time is first in right" is implemented in state law through the doctrine of prior appropriation. Understanding the regulatory framework built up around this doctrine requires an understanding of what it means to "appropriate" and when to properly attach a "priority date" to achieve compliance with the doctrine. These terms of art have given rise to much discussion and deliberation in the hearing on this matter and in Closing Arguments, most likely because the parties recognize that their proper definition and application will be dispositive of the ultimate issue.

Tex. Water Code § 11.1381. TERM PERMITS. (a) Until a water right is perfected to the full extent provided by Section 11.026 of this code, the commission may issue permits for a term of years for use of state water to which a senior water right has not been perfected.

...

(d) A permit issued under this section *is subordinate to any senior appropriative water rights*. (emphasis added)

30 Tex. Admin. Code § 297.19. Term Permit under Texas Water Code, §§11.1381 and 11.153-11.155.

(a) The commission may issue a permit for a term of years for the use of *unused appropriated* water when there is insufficient unappropriated water in the source of supply to satisfy the application. (emphasis added)

...

(d) A term permit is subordinate to any vested or senior appropriative water right.

Sec. 11.141. DATE OF PRIORITY. When the commission issues a permit, the priority of the appropriation of water and the claimant's right to use the water date from the date of filing of the application.

Special condition 3.b. of Mr. Ware's term permit states:
> The authorization to divert and use 130 acre-feet of water shall expire and become null and void on November 7, 2007 unless prior to such date, permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity. *The priority date of this permit and all extensions hereof shall be July 1, 1997.* (emphasis added)

There is only one way to harmonize the above laws, rules, and permit condition that results in an internally consistent, logical regulatory and legal framework.[1] Even more compelling is the reality of the physical world in which there is only one way to apply these together that will not result in giving away the same water more than once, thus over-appropriating the available supply. The Executive Director has successfully used this interpretation and implementation time and again in analyzing similar applications.

## I. Term Permits and Priority Dates

There are two points necessary to understanding the Executive Director's analysis of water availability with respect to Applicant's request for a renewal of his term permit:

1. The Executive Director did not assign a new priority date to Permit 5594; rather, the Executive Director used a priority date as of the administrative complete date of the application to determine whether a sufficient amount of water was available for term use.
2. When the Commission assigned a priority date to the original term permit, its purpose was not to restrict future analyses of availability to outdated stream conditions, but rather was only to assert the permit's seniority against junior *term permits*. That is the purpose of a priority date.

---

[1] Statutes should be harmonized whenever possible. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984) (citing *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937)); *see also* Tex. Gov't Code Ann. §§ 311.021(2),.025(a)-(b),.026(a).

The express policy of the State of Texas in regulating the use of state water is to "effectuate the maximum utilization of water[.]"[2] Among the means used to achieve that goal is the issuance of term permits. During a period in which a holder of an appropriative water right is not making full use of the water subject to that right, another individual who is able to make beneficial use of that water, by virtue of his location relative to the appropriative right, may be permitted to do so.[3] A term user, however, is not entitled to a renewal of a term permit if unused appropriated water is no longer available.[4]

A priority date is assigned to a term permit in order to preserve the seniority of use authorized in the permit against claims by other term users.[5] When a term user applies for a renewal of a term permit, the Executive Director must perform a water availability analysis that can show whether unused appropriated water is available for diversion by that user during the new term requested. In order to do that, the analysis must be performed as though the permit has a new priority date as of the beginning of the new term. An analysis performed based on the original priority date of the permit itself would reveal no useful information regarding the availability of water during the requested subsequent term. That would potentially result in issuance of a renewal in error, and an over-appropriation of surface water resources.

When the Executive Director performed a water availability analysis for Applicant's request for a renewal of Permit 5594, he applied a priority date of March 20, 2006.[6, 7] Using that date was necessary to accurately determine whether unused appropriated water would be available during Applicant's requested second term. When the Commission originally issued Permit 5594, and stated that the original priority date would remain for all extensions thereof, it did not intend to require the Executive Director to only consider granting such extensions in the context of water availability at Applicant's diversion point as it existed in 1997.[8] Using a 2006 priority date to determine whether enough water is available to justify granting a term renewal

---

[2] TEX. WATER CODE § 11.123.

[3] Id. §11.1381(a).

[4] Id. §11.124(e).

[5] *See* id. § 11.141. The priority date of a permit is the date from which the claimant's right to use the water authorized under the permit originates. For a term permit, the right authorized is to use unperfected appropriated water. It follows that an application for an extension of a term permit must be granted before the priority date for that permit may be extended beyond its expiration date.

[6] Transcript of Proceedings Vol. 1, at 117-18, 170.

[7] In his Closing Argument, Applicant states that the Executive Director "applied one or two other priority dates" and the reasons therefore ranged "from the mysterious to the erroneous." (App. Closing Arg. at 14 and 15). However, the reasons for the dates used are clear in the transcript and in commission rule. Staff first runs the model as soon as practicable after receipt of the application for administrative efficiency and as a matter of courtesy so that an applicant can make alterations to the application as necessary to achieve its goals. (Testimony of Jeff Thomas, Transcript at 118). Once the application is declared administratively complete, it is accepted as filed (30 TAC 295.201). The date the application is filed is the priority date for the application. 30 TAC 297.44 (c) clearly states: the time priority of an appropriation of water dates from the filing of the related application with the commission or as determined with a final decree in accordance with Texas Water Code §11.323. The application is considered filed after the application has been declared administratively complete in accordance with §281.17 of this title (relating to Notice of Receipt of Application and Declaration of Administrative Completeness) and filed with the chief clerk. This is the second date used.

[8] As Ms. Alexander testified, to do so would be in violation of the Water Code. Transcript of Proceedings Vol. 2, at 346.

does not affect the original July 1, 1997 priority date, because it serves only to assert the seniority of Applicant's permit, and any extension thereof, against claims made by junior term users.

By definition, the permit Mr. Ware holds is to water that *has already been appropriated*. Water cannot be appropriated more than once. While Mr. Ware's application may not be for a *"new permit,"* rather it is for an extension of an existing permit, it *does* require a new analysis of water availability based on current conditions. The priority date used to evaluate water availability for each new application must be linked to the date of the request for each new term of use because that is the point in time when that water is first being requested.

The logic of the Executive Director's position becomes even more apparent when considering the practical consequences of the Applicant's position. To adopt the Applicant's interpretation would lead to an absurd result: a system of term permits that is obviously hydrologically impossible to sustain. Consider, for example, an applicant approaching the agency in 1997 and asking for a direct diversion of water. The agency cannot find enough water at that diversion point that has not already been promised to another water right holder, so the Executive Director's staff must determine whether there is some appropriated but unused water available. For this analysis, staff reviews records of actual water usage by other water right holders for the last ten years (1987-1997) and decides that at least one of them is not yet using all of the water they have been granted.[9] Based on the most recent ten years' usage reports showing underutilization, the applicant is allowed to use some portion of that currently unused water, but only for a limited time, such as 1997 to 2007. Although usage reports show that the water has not been fully used in the past ten years, the water right holder has the right and may start using all of the water appropriated to it at any time. After a period of time, the agency must look again and see if the permanent water right holder has increased its utilization over the past ten years and in the coming ten year period (2007-2017), will need to use the acre-feet it had not used in the ten years from 1987-1997. A term permit, by its very definition, requires this reevaluation of availability at the beginning of each new requested term of years. How else can it be determined whether appropriated but currently unused water is available in the stream, as required by law and rule before issuing a term permit?

If we adopt the Applicant's interpretation, the term permit holder would come in every ten years and the Executive Director's staff would perform the availability analysis using the same inputs, including the same priority date. Of course, the Executive Director's staff would get the same result every time, showing water availability for the term 1997-2007. There would be no purpose in having a term of years specified in the permit in the first place. Indeed, the applicant's time would be wasted in coming back to the Executive Director every ten years to run the same analysis over and over again. With the same input and result each time, this would render the permit exactly the same thing as a permanent appropriative water right.

Among the factors to be considered in interpreting a statute are the consequences of a particular construction.[10] As explained above, interpreting the law in the manner suggested by the Applicant would place an effective construction on the term "appropriation" that would make

---

[9] Transcript of Proceedings Vol. 1, at 82, 87.
[10] TEX. GOV'T CODE § 311.023(6).

all term permits issued by the Commission duplicative authorizations for the permanent use of water. This would retroactively constitute an enormous over-appropriation of the precious and scarce surface water resources in the State of Texas, and would fatally flaw the regulatory system of management of those resources. The Legislature clearly did not intend that consequence when enacting Section 11.1381.

The Public Interest Counsel comments in his closing argument that the Executive Director's interpretation of Section 11.1381, and how the provisions therein relate to those in Section 11.141, renders the priority date provision in Applicant's original term permit meaningless.[11] As stated above, a priority date is assigned to a term permit in order to preserve the seniority of use authorized in the permit against claims by other term users.[12] Using a new priority date in performing an availability analysis for the new application is necessary to accurately determine whether unused appropriated water would be available during Applicant's requested second term. That action did nothing to negate the priority of the permit itself against junior term permits. The Executive Director's interpretation of how applications for term renewals must be reviewed is not in conflict with Section 11.141.

## II. The Executive Director reiterates that Applicant failed to meet his burden of demonstrating that water is available for his use at his diversion point.

While Applicant dedicates the vast majority of his closing argument to questioning the Executive Director's application of the law, the relatively brief section of the argument titled "Additional Water Is Available for Appropriation in the Brazos River Basin" provides no evidence from the record that there is any water available *for Applicant's use at his diversion point*. The Executive Director agrees, as was thoroughly discussed at hearing and in his closing argument, that there is some water available for use in the Brazos River Basin. Nothing in the record demonstrates to any degree that any of that water is available for diversion and use at Applicant's location without some harm coming to other water rights in the basin. Indeed, Applicant fails to even directly assert in his closing that such is the case. Without belaboring the point, the Executive Director observes again that the 74,387 acre-feet return flows on which Applicant's argument depends can only be diverted at the furthest downstream diversion point possible in the basin without causing potential harm to other water rights holders.

Applicant mischaracterizes the return flows as purely "surplus water" as governed by Section 11.046.[13] Applicant quotes that section, observing that it reads in part:

Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore *subject to reservation* for instream uses or

---

[11] Office of Public Interest Counsel's Closing Argument, at 6.
[12] See TEX. WATER CODE §11.141. The priority date of a permit is the date from which the claimant's right to use the water authorized under the permit originates. For a term permit, the right authorized is to use unperfected appropriated water. It follows that an application for an extension of a term permit must be granted before the priority date for that permit may be extended beyond its expiration date.
[13] See Applicant's Closing Argument, at 18. (Note that Applicant cites an incorrect Section of Chapter 11 when discussing return surplus water.)

beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.[14]

Applicant would have you read that section as requiring the Commission to reserve all return flows for use by other water rights applicants in perpetuity or until the flows are exhausted.[15] This is clearly not the intent of this statute.

Section 11.046(c) merely states that return flows are subject to reservation for other downstream uses and not that return flows must be reserved. Further, the section lists multiple types of use for which surplus water may be reserved including instream uses such as environmental flows, and beneficial inflows into bays and estuaries. Even when you read the section in error, as Applicant has, the record shows that diversion of the return flows referenced at hearing anywhere but the furthest downstream point in the entire basin results in potential harm to other water rights holders unless the diverter has a means to insure that no shortages occur as a result of the diversion.[16]

The return flows were not included in the modeling used in reviewing Applicant's request for a permanent water right because they are interruptible and, therefore, cannot be relied upon as source water for an appropriation by a person who has no control over the discharges from which they originate. The Executive Director did include the return flows in the modeling used in the review of Applicant's request for a term renewal but the model showed that none of those return flows was available at Applicant's diversion point. What the model shows is that these return flows were already reserved for some purpose of use downstream from Applicant's diversion point by the time his application was received. The hydrologic function and management of the Brazos River Basin depends on the presence of those return flows.

As observed in both the Executive Director's and Applicant's closing arguments, the Executive Director recognizes that some permanent water rights were granted based, at least in part, on the presence of the return flows.[17] The record does not indicate the specific circumstances under which those appropriations were made. What is known about those appropriations is that they were made before BRA submitted its application in 2004, making those appropriations prior to BRA's request and therefore afforded the protection of seniority.

## III. Ware Farm

Applicant has stated that the Ware farm has provided a living to his family since 1874 and insists that the continued existence of Ware Farm is dependent on the granting of this

---

[14] TEX. WATER CODE. § 11.046(c) (emphasis added).

[15] Applicant's Closing Argument at 18-19.

[16] Transcript of Proceedings Vol. 2, at 360-361.

[17] Such rights are allowed under 30 TAC Sec. 297.42(g): In order to make the optimum beneficial use of available water, a water right may be granted based upon the availability of return flows or discharges. However, a water right granted upon return flows or discharges that may cease in the future because of new or increased direct reuse (i.e., the lawful reuse of water before it is returned or discharged into the stream) or that may cease for other lawful reasons will be granted with the express provision that the water available for the water right is dependent upon potentially interruptible return flows or discharges.

application.[18]  While the Executive Director recognizes and takes very seriously the fact that agriculture and irrigation are two of the most important uses of state water, and are vital to not only the livelihoods of many Texans, but to the economy of the State generally, he observes that water is not exclusively available through the water rights permitting process.  Indeed, Mr. Ware testified at hearing that he was able to secure a substantial amount of water through a purchase of a permanent appropriative right to 100 acre-feet, which he chose to use on other property, to "expand (his) operation".[19]  Further, the farm was not productive from the mid-1960s[20] until 1996, when Mr. Ware testified that he re-started the irrigation program[21]; during the interim, Mr. Ware testified he was working in town "and the farm just kind of laid there".[22]  Finally, the record shows that Mr. Ware uses the land for recreation and sees the expansion of recreation as the future of the property, not a sustained-level of farming.[23]  The Executive Director has no desire to take away anyone's family farm; that was the reason for the execution of a formal process of adjudication for historical water users.  The State had to have a plan by which to do the initial distribution of certificates, and to be fair and workable, that plan required participants to make their claims to historically-used water within a certain period of years.  As Mr. Ware testified at trial, knowing the consequences of inaction,[24] his family "just dropped the ball,"[25] and subsequently, that water has been appropriated to another user.  The Executive Director must also think of the consequences to those other users, whose own livelihoods would suffer if the Executive Director over-appropriated the available water, making the supplies they need unreliable.  They are entitled to the protections of the law, too.

## IV. The Executive Director's Role

The Applicant questions the appropriateness of the actions the Executive Director has taken in fulfilling his role in this hearing, citing Texas Water Code Section 5.228.[26]  This statute was enacted to ensure that the Executive Director does not aid an applicant in meeting his burden of proof.  It is not intended to require the Executive Director to try to fulfill his duty to protect state water with one hand tied behind his back.

The state's role as trustee of state water requires that the Executive Director always participate in water rights hearings.[27]  As trustee and permitting entity, the TCEQ is the custodian of a comprehensive repository of the hundreds of thousands of pieces of data necessary to

---

[18] Applicant's Closing Argument, at 9.

[19] Testimony of Bradley B. Ware, Transcript of Proceeding Vol. 1, at 65.

[20] Id. at 22.

[21] Id. at 28, 29-30.

[22] Id. at 41.

[23] Id. at 56 and 61.

[24] Id. at 43: "As soon as the adjudication period was over…your chances are lost forever is the way that it was led to us to believe…".

[25] Id. at 22.

[26] Tex. Water Code § 5.228(c) states, in part: The executive director may participate as a party in contested case permit hearings before the commission or the State Office of Administrative Hearings for the sole purpose of providing information to complete the administrative record.

[27] This is implemented in rule at 30 TAC § 80.108(b)(1), which requires the Executive Director to participate as a party in all water rights hearings.  Moreover, the Executive Director is entitled to request a contested case hearing on a water rights application on his own motion (30 TAC § 295.171).

accurately model water availability. The state is both charged with the responsibility of protecting state water resources and also possesses the information necessary to do so.

Conversely, it is inadequately protective of the state's water and senior water right holders to rely solely upon other affected persons to maintain the integrity of the management system.[28] Due to the complex nature of a basin's hydrology, it is not the case that granting a given application will affect another specific water right holder. Rather, all permits must be applied to all the water to see how much remains available, and when and where it remains. The practical affect is that it rarely obvious to any given water user how they might be affected by any one application. Indeed, other water right holders and users rely on the state to serve this function. Even BRA withdrew from this hearing, stating "BRA is confident that the TCEQ staff's analysis and position…is correct and will prevail in the proceeding."[29] If a sophisticated holder of large water rights can rely on the Executive Director, should not all smaller water right holders and even water users be able to rely on us as trustee to ensure that the water supply they depend upon remains reliably available? Further, many who might be affected could choose not to participate in a hearing because of the expense.[30]

There are myriad reasons other affected parties might fail to or choose not to protest a water rights application, but the state cannot fail to or choose not to ensure the integrity of the management system ensuring the reliability and sustainability of our surface water supply. A vigorous defense of the state's system of surface water management is not only within the bounds of the Executive Director's proper role, it is a duty of monumental importance that, as evidenced by this proceeding, the Executive Director takes very seriously.


## V. Conclusion

The Commission has never issued a permit for an appropriation of water to Applicant. Applicant has no claim to use water pursuant to an appropriative right. The priority date assigned to Permit 5594 is void upon the expiration of the term, and has no effect in regard to Applicant's request for a permit for a new, permanent appropriation of water. Using the correct priority date, the Executive Director has found that no water, whether for use as a new appropriation of water or for term use of previously-appropriated water, is available for diversion at Applicant's diversion point. Even more, the Applicant failed to produce any evidence or analysis of evidence proving water availability for his request. Consequently, the Executive Director respectfully requests that the Honorable Administrative Law Judge recommend denial of Application 5594A.

---

[28] As Applicant states in his Closing Argument, "The legal principles of Western water law…support the concepts of government oversight of water resources, deemed essential to promoting the beneficial use of available water in accordance with the public welfare." Applicant's Closing Argument, 4.

[29] Applicant's Exhibit 43, Brazos River Authority's Withdrawal of Protest and Party Status, January 9, 2009, at 2.

[30] For example, in its withdrawal, BRA cited a "disproportionate commitment of resources that is being required" of it in discontinuing its participation in this proceeding. Applicant's Exhibit 43, at 2.

Respectfully submitted,

Texas Commission on Environmental Quality

Mark Vickery, Executive Director

Stephanie Bergeron Perdue, Deputy Director
Office of Legal Services

Robert Martinez, Director
Environmental Law Division


_____
Shana L. Horton, Staff Attorney
Environmental Law Division
State Bar No. 24041131
P. O. Box 13087, MC 173
Austin, Texas 78711-3087
(512) 239-1088


_____
James Aldredge, Staff Attorney
Environmental Law Division
State Bar No. 24058514
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
(512) 239-2496

CHIEF CLERKS OFFICE

2009 DEC 21 PM 4: 52

TEXAS
COMMISSION
ON ENVIRONMENTAL
QUALITY

9

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2009, the foregoing Executive Director's Response to Closing Arguments was filed with the Chief Clerk of the Texas Commission on Environmental Quality and that a true and correct copy was forwarded to each of the parties listed below by the method(s) indicated.

The Honorable Paul Keeper
State Office of Administrative Hearings
300 West 15th Street, Suite 502
P.O. Box 13025
Austin, Texas 78711-3025
Via Fax 512.475.4993
Via E-mail to: carmen.montalvo@soah.state.tx.us

*For the Applicant:*
Gwendolyn Hill Webb
1270 Bank of America Center
515 Congress Avenue
P.O. Drawer 1329
Austin, Texas 78767-1329
Via E-mail to: gwen.hill.webb@sbcglobal.net

*For OPIC:*
Garrett Arthur
Office of the Public Interest Counsel
TCEQ, MC 103
Via E-mail to: garthur@tceq.state.tx.us

Shana L. Horton
Shana L. Horton

Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

December 21, 2009

The Honorable Paul Keeper
State Office of Administrative Hearings
300 West 15th Street, Suite 502
P.O. Box 13025
Austin, Texas 78711-3025

Re:     Application by Bradley B. Ware to Amend Water Use Permit No. 5594
        SOAH Docket No. 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
        TCEQ Docket No. 2008-0181-WR

Dear Judge Keeper:

Enclosed please find the Executive Director's Response to Closing Arguments.

Thank you for your attention to this matter.

Sincerely,

*Shana L. Horton*

Shana L. Horton
Attorney
Environmental Law Division

Enclosure

cc:     TCEQ Chief Clerk
        Service List

2009 DEC 21 PM 4: 52
CHIEF CLERKS OFFICE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY